1    STEPHEN M. HAYES (SBN 83583)
     RYAN Z. KELLER (SBN 249193)
2    HAYES SCOTT BONINO ELLINGSON
     GUSLANI SIMONSON & CLAUSE LLP
3    999 Skyway Road, Suite 310
     San Carlos, California 94070
4    Telephone:650.637.9100
     Facsimile: 650.637.8071
5
6
     Attorneys for Plaintiff
7    MASSACHUSETTS BAY INSURANCE COMPANY
8
                    UNITED STATES DISTRICT COURT
9
                    CENTRAL DISTRICT OF CALIFORNIA
10
                          SOUTHERN DIVISION
11

| 12  MASSACHUSETTS BAY | CASE NO.: 8:21-cv-00607-DOC-JDE |
|---|---|
| 13  INSURANCE COMPANY, | |
| 14              Plaintiff, | **PLAINTIFF MASSACHUSETTS BAY INSURANCE COMPANY'S COMPENDIUM OF EXHIBITS IN SUPPORT OF ITS MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| 15       v. | |
| 16  NEUROPATHY SOLUTIONS, INC. dba SUPERIOR HEALTH CENTERS, | |
| 17  RIGOBERTO BERNAL, an individual; MARILENA BERNAL, an individual; | |
| 18  and DOES 1-10, inclusive, | Date:    May 24, 2021 |
| 19              Defendants. | Time:    8:30 a.m. |
|     | Ctrm.:   Courtroom 9D |
| 20  | Judge:   Hon. David O. Carter |
| 21  | |
| 22  | Trial Date:  None Set |
| 23  | Complaint Filed:  April 14, 2020 |

24        Plaintiff Massachusetts Bay Insurance Company (hereinafter "MBIC") hereby

25   submits its Compendium of Exhibits in support of its motion for summary

26   judgement.

27        //

1824957   28                              -1-

| **EXHIBIT NO.** | **DESCRIPTION** |
|---|---|
| A. | A copy of the Massachusetts Bay Insurance Company Policy issued to named insured Neuropathy Solutions, Inc., policy number OD3-D903901-00, for the policy period of May 1, 2019 to May 1, 2020. |
| B. | Original Complaint filed in the action of *Bernal v. Highshaw et al.*, Riverside County Superior Court, Case No. RIC2003600 (filed Sept. 9, 2020). |
| C. | First Amended Complaint filed in the action of *Bernal v. Highshaw et al.*, Riverside County Superior Court, Case No. RIC2003600. |
| D. | September 24, 2019 (updated January 10, 2020), newspaper story referenced in the Bernal FAC, p.5, footnote 2. |
| E. | January 15, 2020, newspaper story referenced in the Bernal FAC, p.5, footnote 2. |
| F. | Second Amended Complaint filed in *Harvey Stone, et al. v. Philip Straw*, et al., Case No. BC677958, Los Angeles Superior Court. |
| G. | Amendment to Complaint filed in *Harvey Stone, et al. v. Philip Straw*, et al., Case No. BC677958, Los Angeles Superior Court, naming Neuropathy Solutions, Inc. as a Doe 1 defendant, filed on March 29, 2018. |
| H. | The court docket as of April 26, 2021 from the underlying *Bernal Action*. |
| I. | Reservation of Rights Letter dated February 25, 2021. |
| J. | April 19, 2021 meet and confer email exchange with Chris Clark, counsel for Neuropathy. |

Dated:  April 26, 2021

HAYES SCOTT BONINO ELLINGSON
GUSLANI SIMONSON & CLAUSE, LLP


By: */s/ Ryan Z. Keller*
_____
STEPHEN M. HAYES
RYAN Z. KELLER
Attorneys for Plaintiff
MASSACHUSETTS BAY INSURANCE
COMPANY

1824957

# EXHIBIT A



OD3 D903901     1001696

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614



OD3 D903901       1001696

Dear Policyholder:

As your local independent Hanover agent and on behalf of the employees of Hanover from coast to coast, thank you for placing your insurance coverage with us.

Since 1852 Hanover has provided quality insurance protection for businesses large and small.  Today, nearly a million people insure their automobiles, homes, boats, businesses and more with one of Hanover's fine companies.

Hanover has a very simple corporate goal: To provide affordable insurance to responsible safety-minded customers - customers like you. We are proud of the excellent rating Hanover has earned within our industry and of their reputation for treating customers responsibly.

Please take time to carefully review your policy, including your Declarations Page which illustrates your coverage selections and limits of protection.  If you have any questions, please contact us.

Sincerely,



OD3 D903901      1001696

**TO:**        COMMERCIAL PROPERTY/CASUALTY POLICYHOLDERS

**FROM:**    THE HANOVER INSURANCE GROUP,
MASSACHUSETTS BAY INSURANCE COMPANY,OR
CITIZENS INSURANCE COMPANY OF AMERICA
CITIZENS INSURANCE COMPANY OF ILLINOIS

**SUBJECT:**    AVAILABILITY OF LOSS CONTROL SERVICES

Virtually every business concern continually seeks out methods to reduce the cost of conducting business.

The cost of accidents due to motor vehicle operation and defective products and those that result in employee injury, liability to third parties and property damage can harm your business profitability and competitive advantage.

The Loss Control Department of The Hanover Insurance Group offers a wide range of products and services to assist you in your safety efforts.

These services include written and audio/visual materials as well as on-site management consultations.

Hanover Insurance has provided innovative property-casualty insurance solutions to commercial and individual clients since 1852.

For more information, call your agent or your nearest Hanover Branch Office.

LOSS CONTROL IS A RESPONSIBILITY OF YOUR MANAGEMENT. THIS REPORT DOES NOT ATTEMPT TO DEAL WITH EVERY POSSIBLE LEGAL OBLIGATION, CODE VIOLATION, LOSS POTENTIAL OR EXCEPTION TO GOOD PRACTICE. IT IS NOT INTENDED TO IMPLY THAT ALL HAZARDS AND SITUATIONS ARE RESOLVED. THE LIABIL-ITY OF ANY AND ALL OF THE HANOVER INSURANCE GROUPS AND THEIR AFFILIATES AND SUBSIDIARIES IS LIMITED TO THAT WHICH IS COVERED BY THE INSURANCE POLICY. NO LIABILITIES ARE ASSUMED BY REASON OF THIS REPORT WHICH IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

* The Hanover Insurance Group * Citizens Insurance Company of America
* Massachusetts Bay Insurance Company * Citizens Insurance Company of Illinois

Executive Offices: Worcester, Massachusetts

171-0741



OD3 D903901      1001696

# Thirteen steps to a more secure property.

When a guest, a resident or an employee becomes a victim of crime at one of your properties, who is liable?

Based on recent civil court decisions, it appears commercial property owners can be just as much to blame for violent crimes and robberies as the people who commit them can. And the price of that responsibility is steep: Six-figure verdicts are commonplace.

Owners and operators of apartment and condominium complexes, office buildings, motels, hotels, parking lots and garages, and shopping malls must be diligent in providing security for those who visit their properties.

Some of the reasons for these blockbuster damage awards and the ever-growing number of premises-security lawsuits and insurance claims are:

- The growing and well-publicized tendency of the courts to shift responsibility from the criminals themselves to "negligent" property owners.

- The reluctance or inability of business owners to keep up with advances in security technology. If your systems fall short of what a jury would consider state-of-the-art, you have a potential problem on your hands.

- The failure of commercial property owners to adequately screen employees assigned to high-risk positions. It's easy for juries to second-guess the character of that employee to whom you handed the keys over.

## A safe-premises checklist.

Fortunately, it need not take a lot of time or money to shore up the security of the premises and limit your liability. There are some simple steps you can take, right now.

1. Limit access to your property. How easy is it for unwanted guests to walk or drive in? Consider posting guards at entrances.

2. Consider closed circuit TV. When monitored by people, who can react quickly and decisively to emergencies, the payoffs of CCTV can be immediate and substantial. Be prepared to maintain your equipment, however. Inoperable cameras can actually increase your problems by luring your customers into a false sense of security.

3. Brighten things up. Hallways and parking lots should be well lighted. Potential trouble areas should be bright enough to eliminate shadows and provide for clear CCTV pictures.

4. Build a fence. Good perimeter fencing will keep people from wandering onto your property and mark the boundaries of your area of control.

5. Be careful with your keys. Well-written and enforced key-control plans are crucial and expected in such public-use areas as hotels and office buildings. Yet many managers are surprisingly lax when it comes to keeping track of keys.

6.  Check your doors and windows. Locks should look solid and be in good repair. Sliding doors should have track-blocking devices in supplement handle locks. Double cylinder deadbolt locks should be on tenant and guest room doors.

7.  Eliminate elevator stops at vacant floors. Program your elevators to by-pass floors that are unoccupied. These are prime locations for criminal assaults.

8.  Screen new hires. Conduct background checks on people responsible for safety and security, as well as those with access to master keys (such as housekeeping and security personnel). Depending on the potential employee's level of responsibility, employment history, motor vehicles records and police records are worth checking.

9.  Educate your staff. It's crucial that employees know security procedures - and be kept informed of changes. Security is everybody's responsibility.

10. Manage for safety. Management should monitor security controls. When violations are noted, the appropriate employees should be promptly notified, and the situation corrected.

11. Make friends with the police. Do you have a good working relationship with your local police department? Ask them about criminal activity in your neighborhood - or for an appraisal of your security systems and procedures. For information on current security technologies, try a reputable security company.

12. Document your security efforts. Keep careful records of training programs conducted, procedures you put in place and physical enhancements you make to improve security. You'll want this information handy should a problem ever arise. If you ever have to cut back on security measures, be sure to document the reason.

13. Don't overstate the safety of your facility. Avoid inflated claims about the safety of your site and its surroundings - and if warnings are appropriate, make them. Ask an attorney familiar with this area of the law what's safe to say and not to say.

## Concerned about your security.

Proud members of the The Hanover Insurance Group, the Citizens Insurance Company of America and The Hanover Insurance Company have provided innovative property-casualty insurance solutions to commercial and individual clients for a combined total of more than 200 years

Along with independent insurance agents nationwide, Citizens and Hanover can help make your business a safer place for your customers and employees. For more information, call your agent or your nearest Citizens or Hanover branch office.

111-2054 (7-04)



OD3 D903901        1001696

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.



OD3 D903901      1001696

# IMPORTANT INFORMATION ABOUT YOUR INSURANCE COMPANY

The Home Office address for the Insurance Company shown on the policy Declarations page is:

**Allmerica Financial Alliance Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002

**Allmerica Financial Benefit Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002

**Campmed Casualty & Indemnity Company, Inc.**
(A Stock Company)
12100 Sunset Hills Road, Suite 300
Reston, VA 20190-3295

**Citizens Insurance Company of America**
(A Stock Company)
808 North Highlander Way
Howell, MI 48843-1070

**Citizens Insurance Company of Illinois**
(A Stock Company)
333 West Pierce Road, Suite 300
Itasca, IL 60143-3114

**Citizens Insurance Company of the Midwest**
(A Stock Company)
9229 Delegates Row, Suite 100
Indianapolis, IN 46240-3824

**Citizens Insurance Company of Ohio**
(A Stock Company)
1300 East 9th Street, Suite 1010
Cleveland, OH 44114-1506

**The Hanover American Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002

**The Hanover Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002

**Hanover Lloyds Insurance Company**
(A Texas Lloyd s Plan Company)
440 Lincoln Street
Worcester, MA 01653-0002

**Massachusetts Bay Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002

**The Hanover New Jersey Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002

**Verlan Fire Insurance Company**
(A Stock Company)
440 Lincoln Street
Worcester, MA 01653-0002



OD3 D903901        1001696

THIS NOTICE IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT, AS AMENDED. THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY. IF THERE IS A CONFLICT BETWEEN THIS NOTICE AND THE POLICY, THE PROVISIONS OF THE POLICY SHALL APPLY.

## NOTICE - ACCEPTANCE OF TERRORISM COVERAGE AND DISCLOSURE OF PREMIUM

### Schedule

| Disclosure of Premium: | |
|---|---|
| Total Terrorism Premium | $ 25.00 |
| Fire Following Premium | $ 15.00 |
| Other than Fire Following Premium | $ 10.00 |

Coverage for "acts of terrorism," as defined in Section 102(1) of the Terrorism Risk Insurance Act ("Act") is included in your policy. You are hereby notified that under the Act, as amended in 2015, the definition of "act of terrorism" is:

Any act or acts that are certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

**Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States government through the Department of the Treasury may pay a share of terrorism losses insured under the federal program under a formula set forth in the Act. Under this formula, the United States government generally reimburses the following percentage of covered terrorism loss which exceeds the statutorily established deductible paid by the insurance company providing the coverage: 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020.

**Cap on Insurer Participation in Payment of Terrorism Losses**

The Act contains a $100 billion cap that limits the reimbursement by the United States government as well as insurers' liability for losses resulting from certified acts of terrorism. If the aggregate of insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.



OD3 D903901          1001696

THIS NOTICE IS PROVIDED IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS NOTICE DOES NOT GRANT COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF COVERAGE UNDER THE POLICY. IF THERE IS A CONFLICT BETWEEN THIS NOTICE AND THE POLICY, THE PROVISIONS OF THE POLICY SHALL APPLY.

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### Schedule

| Disclosure of Premium: | |
|---|---|
| Total Terrorism Premium | $  25.00 |
| Fire Following Premium | $  15.00 |
| Other than Fire Following Premium | $  10.00 |

**Disclosure of Terrorism Coverage Available**

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from "acts of terrorism" defined in Section 102(1) of the Act as follows:

Any act or acts that are certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

The premium charged for this coverage is provided in the Schedule above and does not include any charges for the portion of loss that may be covered by the Federal Government as described below.

Your policy may contain other exclusions which could affect your coverage, such as an exclusion for Nuclear Events or Pollution. **Please read your policy carefully**.

**Note for Commercial Property or Commercial Inland Marine Policyholders in Standard Fire States:**

In your state, a terrorism exclusion makes an exception for (and therefore provides coverage for) fire losses resulting from an act of terrorism. If you reject the offer of terrorism coverage, therefore, that rejection does not apply to fire losses resulting from an act of terrorism. Coverage for such fire losses will be provided in your policy. The additional premium just for such fire coverage is shown in the Schedule above.

**Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States government through the Department of the Treasury may pay a share of terrorism losses insured under the federal program under a formula set forth in the Act. Under this formula, the United States government generally reimburses the following percentage of covered terrorism loss which exceeds the statutorily established deductible paid by the insurance company providing the coverage: 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020.

**Cap on Insurer Participation in Payment of Terrorism Losses**

The Act contains a $100 billion cap that limits the reimbursement by the United States government as well as insurers' liability for losses resulting from certified acts of terrorism. If the aggregate of insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Rejection of Terrorism Insurance Coverage**

☐    I decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism.

_____

Applicant/Policyholder Signature

**MASSACHUSETTS BAY INSURANCE COMPANY**

**Insurance Company**

OD3-D903901-00

_____

**Print Name**

**Quote or Policy Number**

_____

**Date**



OD3 D903901        1001696

# IMPORTANT NOTICE TO POLICYHOLDERS

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverage you are provided. If there is any conflict between the policy and this notice, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

## EMPLOYMENT PRACTICES LIABILITY COVERAGE

The **Employment Practices Liability Insurance Coverage** is designed to protect small commercial businesses with 25 employees or fewer for liability damages and defense costs due to claims brought by employees who allege employment discrimination, wrongful termination, or sexual harassment.

This coverage will be written on any risk that meets the eligibility criteria under the portfolio Employment Practices Liability Coverage. Such eligibility will be determined by state, class and employee count of individual Insureds.

This coverage will attach to all eligible policies, unless waived. There is a premium charge for this coverage. The coverage provided has an Aggregate Limit of Liability of $25,000 for all losses combined, including defense costs. This coverage has a $5,000 Deductible Amount for each claim. An optional $100,000 Limit of Liability is also available for an additional premium charge.

Coverage may be waived by signing and returning the **Employment Practices Liability Coverage Waiver, 391-1205,** to Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653 or coverage can be waived by Your request.

Such waiver will continue automatically through subsequent renewals, unless rescinded by the company at your request.

Please contact your agent for additional information or if you have any questions, or if you wish to waive this coverage.



OD3 D903901      1001696

Dear Policyholder:

Pursuant to the California Code of Regulations -CCR2646.6, the State of California requires us to ask all our new policyholders to voluntarily provide the information shown on the attached "Race, National Origin, and Gender Form".

We ask that you complete and return the form to:

Hanover Insurance Group
Attention: Statistical Reporting N-234
440 Lincoln Street
Worcester, MA 01653-0002

You can be assured that no information provided within this form will be used for the purposes of underwriting or rating any applicant or policyholder.

We thank you for your cooperation in this matter.

Hanover Insurance Group

# CALIFORNIA INSURANCE SUPPLEMENT

## RACE, NATIONAL ORIGIN & GENDER FORM

### COMMUNITY SERVICE STATEMENT

_____
Company Name

\# _____ Policyholder Number (For New Business Only)

This information is requested by the State of California in order to monitor the insurer's compliance with the law. All new policyholders are requested to voluntarily provide the following information.

No such information shall be used for the purposes of underwriting or rating any policyholder.

Policyholder's Name and Address (to be provided in order to refer back to the policy)
Note: Use additional forms if needed.

_____

_____

_____

### Policy Type

☐ Fire - Personal                           ☐ Fire - Commercial
☐ Homeowners                            ☐ Commercial Multi Peril
☐ Private Passenger Auto Liability

☐ If the policyholder does not wish to provide the Department of Insurance with this information, please check here.

Check the Race or National Origin as it applies to the policyholder(s). For the purpose of completing this form, the policyholder is defined as: an individual, spouse, domestic partner, or business partner(s) named on the policy.

| Race/National Origin | Policyholder | | | Co-Policyholder | | |
|---|---|---|---|---|---|---|
| | Male | Female | Business | Male | Female | Business |
| African- American | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| American Indian or Alaskan Native | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Asian/Pacific Islander | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Latino | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| White | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Other | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |



OD3 D903901      1001696

# Customer Notice of Privacy Policy and Producer Compensation Practices Disclosures

## Privacy Policy Disclosure

### Collection of Information

We collect personal information so that we may offer quality products and services. This information may include, but is not limited to, name, address, Social Security number, and consumer reports from consumer reporting agencies in connection with your application for insurance or any renewal of insurance. For example, we may access driving records, insurance scores or health information. Our information sources will differ depending on your state and/or the product or service we are providing to you. This information may be collected directly from you and/or from affiliated companies, non-affiliated third parties, consumer reporting agencies, medical providers and third parties such as the Medical Information Bureau.

We, and the third parties we partner with, may track some of the web pages you visit through cookies, pixel tagging or other technologies. We currently do not process or comply with any web browser's "do not track" signals or similar mechanisms that request us to take steps to disable online tracking. For additional information regarding online privacy, please see our online privacy statement, located at www.hanover.com       .

### Disclosure of Information

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with our insurance company affiliates or with third parties that assist us in processing and servicing your account. We also may share your information with regulatory or law enforcement agencies, reinsurers and others, as permitted or required by law.

Our insurance companies may share information with their affiliates, but will not share information with non-affiliated third parties who would use the information to market products or services to you.

Our standards for disclosure apply to all of our current and former customers.

### Safeguards to Protect Your Personal Information

We recognize the need to prevent unauthorized access to the information we collect, including information held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect the confidentiality and integrity of all non-public, personal information, including but not limited to social security numbers, driver's license numbers and other personally identifiable information.

### Internal Access to Information

Access to personal, non-public information is limited to those people who need the information to provide our customers with products or services. These people are expected to protect this information from inappropriate access, disclosure and modification.

### Consumer Reports

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;
- credit history, driving record (including records of any operators who will be insured under the policy); and/or
- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.

### Access to Information

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances, you may be entitled to a copy at no cost.

You also may review certain information we have about you or your business in our files. To review information we maintain in our files about you or your business, please write to us, providing your complete name, address and policy number(s), and indicating specifically what you would like to see. If you request actual copies of your file, there may be a nominal charge.

We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a record indicating that the information was provided to another party, we will tell you to whom such information is normally disclosed.

There is information that we cannot share with you. This may include information collected in order to evaluate a claim under an insurance policy, when the possibility of a lawsuit exists. It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be properly explained.

## Correction of Information

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position. The information in question will be investigated. If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified. However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed. If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect. We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

## Our Commitment to Privacy

In the insurance and financial services business, lasting relationships are built upon mutual respect and trust. With that in mind, we will periodically review and revise our privacy policy and procedures to ensure that we remain compliant with all state and federal requirements. If any provision of our privacy policy is found to be non-compliant, then that provision will be modified to reflect the appropriate state or federal requirement. If any modifications are made, all remaining provisions of this privacy policy will remain in effect. For more detailed information about our customer privacy policy (including any applicable state-specific policies) and our online privacy statement, visit our Web site, located at www.hanover.com .

## Further Information

If you have questions about our customer privacy policy (including any applicable state-specific policies) or our online privacy statement, or if you would like to request information we have on file, please write to us at our Privacy Office, N435, The Hanover Insurance Group, Inc., 440 Lincoln Street, Worcester, MA 01653. Please provide your complete name, address and policy number(s). A copy of our Producer Compensation Disclosure is also available upon written request addressed to the attention of the Corporate Secretary, N435, The Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653.

### Producer Compensation Disclosure

Our products are sold through independent agents and brokers, often referred to as "Producers." We may pay Producers a fixed commission for placing and renewing business with our company. We may also pay additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us. Details of our Producer compensation practices may be found at www.hanover.com .

This notice is being provided on behalf of the following Hanover Companies: The Hanover Insurance Group, Inc. - Allmerica Financial Alliance Insurance Company - Allmerica Financial Benefit Insurance Company - Allmerica Plus Insurance Agency, Inc. - Citizens Insurance Company of America - Citizens Insurance Company of Illinois - Citizens Insurance Company of the Midwest - Citizens Insurance Company of Ohio - Citizens Management, Inc. - AIX Ins. Services of California, Inc.- Campania Insurance Agency Co. Inc. - Campmed Casualty & Indemnity Co. Inc. - Chaucer Syndicates Limited- Educators Insurance Agency, Inc.- Hanover Specialty Insurance Brokers, Inc. - The Hanover American Insurance Company - The Hanover Insurance Company - The Hanover New Jersey Insurance Company - The Hanover National Insurance Company - Hanover Lloyd's Insurance Company - Massachusetts Bay Insurance Company - Opus Investment Management, Inc. - Professionals Direct Insurance Services, Inc. -Professional Underwriters Agency, Inc. - Verlan Fire Insurance Company - Nova Casualty Company - AIX Specialty Insurance Company.

OD3 D903901        1001696



# Your Avenues
# Businessowners Insurance Policy



# BUSINESSOWNERS DECLARATION
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA 92614

**Agent**

800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA 92677

**Policy Period: Beginning and Ending at 12:01 a.m. Standard Time at the Location of the Described Premises.**

**Business Type:** CORPORATION (SINGLE).

**Mortgagee/Loss Payable:**

**Business of the Named Insured:**

OFFICE.

In consideration of the premium, insurance is provided the Named Insured with respect to those premises described in the Schedule below and with respect to those coverages and kinds of property for which a specific Limit of Insurance is shown, subject to all of the terms of this policy including forms and endorsements made a part hereof:

## LOCATION SCHEDULE

**Described Premises:**

NO. 001 001   701 W KIMBERLY AVE, IRVINE, CA 92614
NO. 001 002   2083 COMPTON AVE, IRVINE, CA 92614
NO. 001 003   411 N CENTRAL AVE, IRVINE, CA 92614
      (SEE FORM 391-1013 FOR ADDITIONAL PREMISES.)

| SECTION I - PROPERTY | LIMITS OF INSURANCE | | | | | |
|---|---|---|---|---|---|---|
| | Loc No 001 | Bldg No 001 | Loc No 001 | Bldg No 002 | Loc No 001 | Bldg No 003 |
| Deductible Amount | $ 500 | | $ 500 | | $ 500 | |
| Building Amount Valuation | NOT COVERED | | NOT COVERED | | NOT COVERED | |
| Business Personal Property Valuation | $ 245,700 RC | | $ 245,700 RC | | $ 245,700 RC | |
| Business Income | ACTUAL BUSINESS LOSS SUSTAINED NOT EXCEEDING 12 CONSECUTIVE MONTHS | | | | | |
| Business Income Waiting Period | Excluded / None / 24 hours / 48 hours / 72 hours 48 HOURS | | | | | |
| SECTION II - LIABILITY | LIMITS OF INSURANCE | | | | | |

**Liability and Medical Expenses Limits of Insurance:**

Except for Damage to Premises Rented to You, each paid claim for the following coverages reduce the Amount of Insurance we provide during the applicable annual period. Please refer to **SECTION II - LIABILITY, D. LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE, paragraph.4.** of the Businessowners Coverage Form.

| Liability and Medical Expenses Limit | $2,000,000 | Per Occurrence | $4,000,000 | Aggregate |
|---|---|---|---|---|
| Medical Expenses | $ 5,000 | Each Person | | |
| Damage to Premises Rented to You | $ 300,000 | All Perils | | |

Date Issued: 04/30/2019          ORIGINAL/INSURED          Payment Type: DIRECT BILL



# BUSINESSOWNERS DECLARATION
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

**Agent**

800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

**Additional Property Coverages and Extensions:**
See attached Schedule for Additional Coverages provided for under this Policy.

**Additional Liability Coverages:** General Liability Broadening Endorsement
**General Liability Class:** 66561
**Description:** CHIROPRACTORS OFFICE
**Liability Exposure:** 2,000 Sq.FT

**Policy Forms, Endorsements and Optional Coverages Attached:**
See Forms and Endorsements Schedule

```
TOTAL BOP COVERAGE PREMIUM:             $2,755.00
BOP TERRORISM COVG (INCLUDED IN TOTAL POLICY PREMIUM) $  25.00
    OTHER THAN FIRE FOLLOWING           $   10.00
    FIRE FOLLOWING                      $   15.00
TOTAL UMBRELLA COVERAGE PREMIUM:        NOT COVERED
UMB TERRORISM COVG (INCLUDED IN TOTAL POLICY PREMIUM) NOT COVERED
TOTAL POLICY PREMIUM IS:                $2,755.00
```

Countersigned this _____ Day of _____

_____
**Authorized Representative**

**This Declarations Page with the Policy Contract, Forms and Endorsements, if any,
Complete the Policy.**

Date Issued: 04/30/2019     ORIGINAL/INSURED     Payment Type: DIRECT BILL

391-1002 08 16                                                    Page 2 of 2



# BUSINESSOWNERS DECLARATION

### BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**
NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

**Agent**
800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

**Described Premises:**

NO. 001 004    1515 W 190TH ST, IRVINE, CA  92614

**Limits Of Insurance**

| Loc. No. | Bldg. No. | Deductible | Building Valuation | Building Amount | Personal Property Valuation | Personal Property Amount |
|---|---|---|---|---|---|---|
| 001 | 004 | $   500 | | NOT COVERED | RC | $   245,700 |

Form   391-1013 (7-99)

Date Issued:  04/30/2019                    ORIGINAL/INSURED



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

**Agent**

800-464-4606

BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

| Additional Property Coverages & Extensions | Deductible | Amount Included | Additional Amount Increase | Total Limit |
|---|---|---|---|---|
| DEBRIS REMOVAL | NONE | $25,000 | N/A | $25,000 |
| PRESERVATION OF PROPERTY | NONE | 90 DAYS | N/A | 90 DAYS |
| FIRE DEPARTMENT SERVICE CHARGE | NONE | $25,000 | N/A | $25,000 |
| POLLUTANT CLEAN-UP AND REMOVAL | NONE | $25,000 | N/A | $25,000 |
| MONEY ORDERS AND COUNTERFEIT MONEY | $500 | $5,000 | N/A | $5,000 |
| FORGERY OR ALTERATION | $500 | $25,000 | N/A | $25,000 |
| GLASS EXPENSES | $250 | INCLUDED | N/A | INCLUDED |
| REWARDS ARSON, THEFT AND VANDALISM | NONE | $10,000 | N/A | $10,000 |
| TENANT SIGNS | $500 | $5,000 | N/A | $5,000 |
| FIRE PROTECTION EQUIPMENT RECHARGE | NONE | $25,000 | N/A | $25,000 |
| INSTALLATION FLOATER | $1,000 | $5,000 | N/A | $5,000 |
| FINE ARTS | $500 | $10,000 | N/A | $10,000 |
| FENCE AND WALLS | SEE BUILDING AND CONTENTS DEDUCTIBLE | INCLUDED | N/A | INCLUDED |
| SALES REPRESENTATIVE SAMPLES | $1,000 | $5,000 | N/A | $5,000 |
| LEASEHOLD INTEREST (TENANT'S ONLY) | NONE | $10,000 | N/A | $10,000 |
| UNAUTHORIZED BUSINESS CREDIT CARD USE | NONE | $5,000 | N/A | $5,000 |
| UTILITY SERVICES | | | N/A | |
| DIRECT DAMAGE | $500 | $10,000 | N/A | $10,000 |
| BUSINESS INCOME | 24 HOURS | $5,000 | N/A | $5,000 |
| DEFERRED PAYMENTS | NONE | $5,000 | N/A | $5,000 |
| NEWLY ACQUIRED OR CONSTRUCTED PROPERTY | | 180 DAYS | N/A | 180 DAYS |
| BUILDINGS | $500 | $1,000,000 | N/A | $1,000,000 |
| PERSONAL PROPERTY | $500 | $500,000 | N/A | $500,000 |
| BUSINESS INCOME AND EXTRA EXPENSE | SEE WAITING PERIOD | $250,000 | N/A | $250,000 |
| OUTDOOR PROPERTY - TREES, SHRUBS AND PLANTS-$1,000 EACH ITEM | $500 | $10,000 | N/A | $10,000 |

Form  391-1018  (7-02)
Date Issued:  04/30/2019

ORIGINAL/INSURED



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

**Agent**

800-464-4606

BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

| Additional Property Coverages & Extensions | Deductible | Amount Included | Additional Amount Increase | Total Limit |
|---|---|---|---|---|
| PERSONAL EFFECTS | $500 | $10,000 | N/A | $10,000 |
| INVENTORY AND LOSS APPRAISAL | NONE | $10,000 | N/A | $10,000 |
| KEY REPLACEMENT AND LOCK REPAIR | NONE | $1,000 | N/A | $1,000 |
| APPURTENANT STRUCTURE | $500 | $50,000 | N/A | $50,000 |
| PERSONAL PROPERTY IN TRANSIT | $1,000 | $10,000 | N/A | $10,000 |
| EXTENDED BUSINESS INCOME | | 30 DAYS | N/A | 30 DAYS |
| EMPLOYEE THEFT INCLUDING ERISA COMPLIANCE | $1,000 | $10,000 | N/A | $10,000 |
| COMMERCIAL TOOLS AND SMALL EQUIP | $500 | $5,000 | N/A | $5,000 |
| PERSONAL PROPERTY OFF PREMISES | $1,000 | $50,000 | N/A | $50,000 |
| BUSINESS INCOME FROM DEPENDENT PROPERTIES | 72 HOURS | $5,000 | N/A | $5,000 |
| TERRORISM | SEE BUILDING AND CONTENTS DEDUCTIBLE | SAME AS PROPERTY LIMITS OF INSURANCE IF COVERED | N/A | SAME AS PROPERTY LIMITS OF INSURANCE IF COVERED |
| INTERRUPTION OF COMPUTER OPERATIONS | SEE WAITING PERIOD | $10,000 | N/A | $10,000 |
| BUSINESS PERSONAL PROPERTY TEMPORARILY IN PORTABLE STORAGE UNITS | $500 | $25,000 | N/A | $25,000 |
| CIVIL AUTHORITY | 72 HOURS | 4 WEEKS | N/A | 4 WEEKS |
| COMPUTER AND FUNDS TRANSFER FRAUD | $500 | $5,000 | N/A | $5,000 |
| LIMITED COVERAGE FOR FUNGI, WET ROT, OR DRY ROT | $500 | $50,000 | N/A | $50,000 |
| PAVED SURFACES | $500 | $25,000 | N/A | $25,000 |
| TENANT BUILDING COVERAGE - REQUIRED BY LEASE | $500 | $25,000 | N/A | $25,000 |
| TENANT BUSINESS PERSONAL PROPERTY COVERAGE - REQUIRED BY LEASE | $500 | $25,000 | N/A | $25,000 |

Form  391-1018  (7-02)
Date Issued:  04/30/2019



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period From | To | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**

NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

**Agent**

800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

| Additional Property Coverages & Extensions | Deductible | Amount Included | Additional Amount Increase | Total Limit |
|---|---|---|---|---|
| THEFT OF TELEPHONIC SERVICES | $500 | $25,000 | N/A | $25,000 |
| UNDERGROUND PIPES | $500 | INCLUDED | N/A | INCLUDED |

Form  391-1018  (7-02)
Date Issued:  04/30/2019



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

Named Insured and Address
NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

Agent
800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

| Additional Property Coverages & Extensions | Loc. No. | Bldg. No. | Deductible Amount | Amount Included | Additional Amount | Total Limit |
|---|---|---|---|---|---|---|
| ORDINANCE OR LAW | 001 | 001 | NONE | $5,000 | N/A | $5,000 |
| COMPUTER EQUIPMENT | | | $500 | $35,000 | N/A | $35,000 |
| COMPUTER EQUIPMENT EXTRA EXPENSE | | | NONE | $5,000 | N/A | $5,000 |
| ELECTRONIC VANDALISM | | | $500 | | | |
| OCCURRENCE LIMIT | | | | $10,000 | N/A | $10,000 |
| AGGREGATE LIMIT | | | | $10,000 | N/A | $10,000 |
| VALUABLE PAPERS AND RECORDS (OTHER THAN ELECTRONIC DATA) | | | $500 | | | |
| ON PREMISES | | | | $25,000 | N/A | $25,000 |
| OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| ACCOUNTS RECEIVABLE | | | $500 | | | |
| ON PREMISES | | | | $25,000 | N/A | $25,000 |
| OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| MONEY AND SECURITIES | | | $500 | | | |
| ON PREMISES | | | | $10,000 | N/A | $10,000 |
| OFF PREMISES | | | | $5,000 | N/A | $5,000 |
| EQUIPMENT BREAKDOWN | | | $500 | INCLUDED | N/A | INCLUDED |
| PROTECTIVE DEVICES CREDIT | | | | | | |
| AUTOMATIC SPRINKLER SYSTEM | | | | YES | | |
| AUTOMATIC FIRE ALARM | | | | YES | | |
| CENTRAL STATION SECURITY | | | | YES | | |
| COLLAPSE | | | $500 | INCLUDED | N/A | INCLUDED |
| UTILITY SERVICES | | | | | | |
| DIRECT DAMAGE | | | $500 | $25,000 | N/A | $25,000 |
| TIME-ELEMENT | | | 24 HOURS | $25,000 | N/A | $25,000 |

Form  391-1018A (9-04)
Date Issued:  04/30/2019

ORIGINAL/INSURED



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

Named Insured and Address
NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

Agent
800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

| Additional Property Coverages & Extensions | Loc. No. | Bldg. No. | Deductible Amount | Amount Included | Additional Amount | Total Limit |
|---|---|---|---|---|---|---|
| ORDINANCE OR LAW | 001 | 002 | NONE | $5,000 | N/A | $5,000 |
| COMPUTER EQUIPMENT | | | $500 | $35,000 | N/A | $35,000 |
| COMPUTER EQUIPMENT EXTRA EXPENSE | | | NONE | $5,000 | N/A | $5,000 |
| ELECTRONIC VANDALISM | | | $500 | | | |
|   OCCURRENCE LIMIT | | | | $10,000 | N/A | $10,000 |
|   AGGREGATE LIMIT | | | | $10,000 | N/A | $10,000 |
| VALUABLE PAPERS AND RECORDS (OTHER THAN ELECTRONIC DATA) | | | $500 | | | |
|   ON PREMISES | | | | $25,000 | N/A | $25,000 |
|   OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| ACCOUNTS RECEIVABLE | | | $500 | | | |
|   ON PREMISES | | | | $25,000 | N/A | $25,000 |
|   OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| MONEY AND SECURITIES | | | $500 | | | |
|   ON PREMISES | | | | $10,000 | N/A | $10,000 |
|   OFF PREMISES | | | | $5,000 | N/A | $5,000 |
| EQUIPMENT BREAKDOWN | | | $500 | INCLUDED | N/A | INCLUDED |
| PROTECTIVE DEVICES CREDIT | | | | | | |
|   AUTOMATIC SPRINKLER SYSTEM | | | | YES | | |
|   AUTOMATIC FIRE ALARM | | | | YES | | |
|   CENTRAL STATION SECURITY | | | | YES | | |
| COLLAPSE | | | $500 | INCLUDED | N/A | INCLUDED |
| | | | | | | |
| UTILITY SERVICES | | | | | | |
|   DIRECT DAMAGE | | | $500 | $25,000 | N/A | $25,000 |
|   TIME-ELEMENT | | | 24 HOURS | $25,000 | N/A | $25,000 |

Form  391-1018A (9-04)
Date Issued:  04/30/2019

ORIGINAL/INSURED



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

Named Insured and Address
NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

Agent
800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

| Additional Property Coverages & Extensions | Loc. No. | Bldg. No. | Deductible Amount | Amount Included | Additional Amount | Total Limit |
|---|---|---|---|---|---|---|
| ORDINANCE OR LAW | 001 | 003 | NONE | $5,000 | N/A | $5,000 |
| COMPUTER EQUIPMENT | | | $500 | $35,000 | N/A | $35,000 |
| COMPUTER EQUIPMENT EXTRA EXPENSE | | | NONE | $5,000 | N/A | $5,000 |
| ELECTRONIC VANDALISM | | | $500 | | | |
| OCCURRENCE LIMIT | | | | $10,000 | N/A | $10,000 |
| AGGREGATE LIMIT | | | | $10,000 | N/A | $10,000 |
| VALUABLE PAPERS AND RECORDS (OTHER THAN ELECTRONIC DATA) | | | $500 | | | |
| ON PREMISES | | | | $25,000 | N/A | $25,000 |
| OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| ACCOUNTS RECEIVABLE | | | $500 | | | |
| ON PREMISES | | | | $25,000 | N/A | $25,000 |
| OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| MONEY AND SECURITIES | | | $500 | | | |
| ON PREMISES | | | | $10,000 | N/A | $10,000 |
| OFF PREMISES | | | | $5,000 | N/A | $5,000 |
| EQUIPMENT BREAKDOWN | | | $500 | INCLUDED | N/A | INCLUDED |
| PROTECTIVE DEVICES CREDIT | | | | | | |
| AUTOMATIC SPRINKLER SYSTEM | | | | YES | | |
| AUTOMATIC FIRE ALARM | | | | YES | | |
| CENTRAL STATION SECURITY | | | | YES | | |
| COLLAPSE | | | $500 | INCLUDED | N/A | INCLUDED |
| UTILITY SERVICES | | | | | | |
| DIRECT DAMAGE | | | $500 | $25,000 | N/A | $25,000 |
| TIME-ELEMENT | | | 24 HOURS | $25,000 | N/A | $25,000 |

Form  391-1018A (9-04)
Date Issued: 04/30/2019

ORIGINAL/INSURED



# ADDITIONAL PROPERTY COVERAGES AND EXTENSIONS
## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

Named Insured and Address
NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA 92614

Agent
800-464-4606
BRAKKE SCHAFNITZ INSURANCE BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA 92677

| Additional Property Coverages & Extensions | Loc. No. | Bldg. No. | Deductible Amount | Amount Included | Additional Amount | Total Limit |
|---|---|---|---|---|---|---|
| ORDINANCE OR LAW | 001 | 004 | NONE | $5,000 | N/A | $5,000 |
| COMPUTER EQUIPMENT | | | $500 | $35,000 | N/A | $35,000 |
| COMPUTER EQUIPMENT EXTRA EXPENSE | | | NONE | $5,000 | N/A | $5,000 |
| ELECTRONIC VANDALISM | | | $500 | | | |
| OCCURRENCE LIMIT | | | | $10,000 | N/A | $10,000 |
| AGGREGATE LIMIT | | | | $10,000 | N/A | $10,000 |
| VALUABLE PAPERS AND RECORDS (OTHER THAN ELECTRONIC DATA) | | | $500 | | | |
| ON PREMISES | | | | $25,000 | N/A | $25,000 |
| OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| ACCOUNTS RECEIVABLE | | | $500 | | | |
| ON PREMISES | | | | $25,000 | N/A | $25,000 |
| OFF PREMISES | | | | $25,000 | N/A | $25,000 |
| MONEY AND SECURITIES | | | $500 | | | |
| ON PREMISES | | | | $10,000 | N/A | $10,000 |
| OFF PREMISES | | | | $5,000 | N/A | $5,000 |
| EQUIPMENT BREAKDOWN | | | $500 | INCLUDED | N/A | INCLUDED |
| PROTECTIVE DEVICES CREDIT | | | | | | |
| AUTOMATIC SPRINKLER SYSTEM | | | | YES | | |
| AUTOMATIC FIRE ALARM | | | | YES | | |
| CENTRAL STATION SECURITY | | | | YES | | |
| COLLAPSE | | | $500 | INCLUDED | N/A | INCLUDED |
| | | | | | | |
| UTILITY SERVICES | | | | | | |
| DIRECT DAMAGE | | | $500 | $25,000 | N/A | $25,000 |
| TIME-ELEMENT | | | 24 HOURS | $25,000 | N/A | $25,000 |

Form 391-1018A (9-04)
Date Issued: 04/30/2019



# BUSINESSOWNERS DECLARATION

## BUSINESSOWNERS DECLARATIONS

33

| Policy Number | Policy Period | | Coverage is Provided in the | Agency Code |
|---|---|---|---|---|
| | From | To | | |
| OD3-D903901-00 | 05/01/2019 | 05/01/2020 | MASSACHUSETTS BAY INSURANCE COMPANY | 100169600 |

**Named Insured and Address**
NEUROPATHY SOLUTIONS, INC.
17748 SKY PARK CIRCLE STE 240
IRVINE, CA  92614

**Agent**
800-464-4606
BRAKKE SCHAFNITZ INSURANCE
BROKERS, LLC
28202 CABOT RD STE 600
LAGUNA NIGUEL, CA  92677

## Forms and Endorsements Schedule

| Form Number | Edition Date | Description |
|---|---|---|
| 391-1241 | 08/16 | PROP MEDICAL OFFICE BROADENING |
| BP0686 | 05/17 | CA HIRED NON-OWNED AUTO LIAB |
| 401-1127 | 01/15 | TERRORISM ACCEPTANCE OF COVG |
| 391-1114 | 01/15 | CAP ON LOSSES FROM TERRORISM |
| 391-1313 | 01/15 | EXCLUSION OF PUNITIVE DAMAGES |
| 391-1006 | 08/16 | LIABILITY SPECIAL BROADENING |
| 391-1902 | 07/17 | CALIFORNIA CHANGES |
| 421-0022 | 07/02 | ASBESTOS EXCLUSION |
| BP0417 | 01/10 | EMPLYMT RELATED PRACTICES EXCL |
| 231-0475 | 06/89 | PILR NOTICE |
| 391-1003 | 08/16 | BUSINESSOWNERS COVERAGE FORM |
| 391-1102 | 08/16 | EXCL - FUNGI OR BACTERIA LIAB |
| 391-1375 | 01/10 | AMEND LIMITS PERSONAL AND ADV |
| 401-1374 | 01/15 | DISCLOSURE PURSUANT TO TRIA |
| 391-1209 | 03/06 | EPLI INSURANCE CVG ENDR |
| 391-1206 | 03/06 | IMPORTANT NOTICE |
| 391-1208 | 03/06 | EPLI SUPPLEMENTAL DEC |

ORIGINAL/INSURED

**COMMERCIAL EMPLOYMENT PRACTICES**
**LIABILITY INSURANCE COVERAGE ENDORSEMENT**
**SUPPLEMENTAL DECLARATIONS**



OD3 D903901        1001696

Policy Number: OD3 D903901 00                          Agent: 1001696
Account Number:  1519979724
Named Insured:  NEUROPATHY SOLUTIONS, INC.

---

### NOTICE

· EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS COVERAGE ENDORSEMENT IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS OR SUITS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE EPL COVERAGE PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. VARIOUS PROVISIONS IN THIS COVERAGE ENDORSEMENT RESTRICT COVERAGE. PLEASE READ THE ENTIRE COVERAGE ENDORSEMENT CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.

· THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGEMENTS OR SETTLEMENTS UNDER THIS COVERAGE ENDORSEMENT SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.

---

| | | |
|---|---|---|
| **EPL Coverage Period:** | From: 05/01/2019<br><br>To:    05/01/2020 | At 12:01 A.M. Standard Time at your mailing address shown on the Declarations page of this policy. |
| **EPL Aggregate Limit of Liability:** | $      250,000.00 | Aggregate for all "loss" combined, including "defense costs". |
| **EPL Deductible Amount:** | $       10,000.00 | For "loss" arising from claims or suits alleging the same "wrongful employment act" or "related wrongful employment acts". |
| **EPL Original Inception Date:** | 05/01/2019 | (Enter "original inception date") If no date is shown, "we" will consider the "original inception date" to be the same as the beginning of this coverage endorsement. |

This insurance does not apply to "loss" arising out of a "wrongful employment act" that: (1) commences on or takes place prior to the "original inception date" shown here, or (2) arises out of incidents or circumstance of which "you" had knowledge prior to the "original inception date" shown.

| | | |
|---|---|---|
| **EPL COVERAGE PREMIUM:** | $ | 246.00 |

391-1208 03 06



OD3 D903901        1001696

# BUSINESSOWNERS COVERAGE FORM

## Table of Contents

**SECTION I - PROPERTY**

| | Page Number |
|---|---|
| **A. Coverage** | 4 |
|   **1. Covered Property** | 4 |
|   **2. Property Not Covered** | 5 |
|   **3. Covered Causes of Loss** | 6 |
|   **4. Limitations** | 6 |
|   **5. Additional Coverages** | 7 |
|     Business Income | 10 |
|     Business Income from Dependent Properties | 17 |
|     Civil Authority | 13 |
|     Collapse | 8 |
|     Commercial Tools and Small Equipment | 27 |
|     Computer Equipment | 20 |
|     Computer and Funds Transfer Fraud | 34 |
|     Debris Removal | 7 |
|     Deferred Payments | 31 |
|     Electronic Vandalism | 31 |
|     Employee Theft including ERISA Compliance | 18 |
|     Equipment Breakdown | 22 |
|     Extra Expense | 12 |
|     Fine Arts | 28 |
|     Fire Department Service Charge | 8 |
|     Fire Protection Equipment Recharge | 18 |
|     Forgery or Alteration | 13 |
|     Glass Expenses | 18 |
|     Installation | 27 |
|     Interruption of Computer Operations | 32 |
|     Leasehold Interest (Tenants only) | 29 |
|     Limited Coverage for Fungi, Wet Rot, or Dry Rot | 33 |
|     Money and Securities | 21 |
|     Money Orders and Counterfeit Money | 13 |
|     Ordinance or Law | 14 |
|     Preservation of Property | 8 |
|     Pollutant Clean-Up and Removal | 12 |
|     Rewards - Arson, Theft and Vandalism | 20 |
|     Sales Representative Samples | 29 |
|     Tenant Building Insurance - When Your Lease Requires You to Provide Insurance | 34 |
|     Tenant Business Personal Property Insurance - When Your Lease Requires You to Provide Insurance | 34 |
|     Tenant Signs (Tenants Only) | 22 |
|     Theft of Telephonic Services | 34 |
|     Unauthorized Business Credit Card Use | 30 |
|     Utility Services | 30 |
|     Water Damage, Other Liquids, Powder or Molten Material Damage | 10 |

| | | |
|---|---|---|
| 6. Coverage Extensions | | 35 |
| Accounts Receivable | | 37 |
| Business Personal Property Temporarily in Portable Storage Units | | 39 |
| Appurtenant Structures | | 38 |
| Inventory and Loss Appraisal | | 39 |
| Key Replacement and Lock Repair | | 38 |
| Newly Acquired or Constructed Property | | 35 |
| Outdoor Property | | 36 |
| Paved Surfaces | | 39 |
| Personal Effects | | 36 |
| Personal Property Off Premises | | 36 |
| Personal Property In Transit | | 38 |
| Valuable Papers and Records (Other Than Electronic Data) | | 36 |
| Underground Pipes | | 40 |
| B. Exclusions | | 40 |
| C. Limits of Insurance | | 45 |
| D. Deductibles | | 46 |
| E. Property Loss Conditions | | 47 |
| 1. Abandonment | | 47 |
| 2. Appraisal | | 47 |
| 3. Duties in the Event of Loss or Damage | | 47 |
| 4. Legal Action Against Us | | 48 |
| 5. Loss Payment | | 48 |
| 6. Recovered Property | | 50 |
| 7. Vacancy | | 50 |
| 8. Pair, Sets or Parts | | 51 |
| F. Property General Conditions | | 51 |
| 1. Control of Property | | 51 |
| 2. Mortgageholders | | 51 |
| 3. No Benefit to Bailee | | 52 |
| 4. Policy Period, Coverage Territory | | 52 |
| 5. Protective Devices | | 52 |
| 6. Increase in Hazard | | 52 |
| G. Property Definitions | | 52 |
| | | |
| SECTION II - LIABILITY | | |
| A. Coverages | | 59 |
| 1. Business Liability | | 59 |
| 2. Medical Expenses | | 61 |
| B. Exclusions | | 62 |
| 1. Applicable to Business Liability Coverage | | 62 |
| 2. Additional Exclusions Applicable only to Personal and Advertising Injury | | 68 |
| 3. Additional Exclusions Applicable to Medical Expenses Coverage Only | | 69 |
| 4. Additional Exclusions Applicable to Both Business Liability Coverage and Medical Expenses Coverage - Nuclear Energy Liability Exclusion | | 70 |
| C. Who is an Insured | | 71 |
| D. Liability and Medical Expenses Limits of Insurance | | 72 |



OD3 D903901        1001696

E. Liability and Medical Expenses General Conditions .......................................... 73
   1. Bankruptcy .......................................................................................................... 73
   2. Duties in the Event of Occurrence, Offense, Claim or Suit ............................... 73
   3. Legal Action Against Us ..................................................................................... 73
   4. Separation of Insureds ....................................................................................... 73
F. Liability and Medical Expenses Definitions ......................................................... 74

**SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY)**
A. Cancellation ......................................................................................................... 77
B. Changes ............................................................................................................... 78
C. Concealment, Misrepresentation or Fraud .......................................................... 78
D. Examination of Your Books and Records ............................................................ 78
E. Inspections and Surveys ...................................................................................... 78
F. Insurance Under Two or More Coverages ........................................................... 78
G. Liberalization ....................................................................................................... 79
H. Other Insurance ................................................................................................... 79
I. Premiums .............................................................................................................. 80
J. Premium Audit ...................................................................................................... 80
K. Transfer of Rights of Recovery Against Others to Us ......................................... 80
L. Transfer of Your Rights and Duties Under This Policy ........................................ 81

# BUSINESSOWNERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

In **SECTION II - LIABILITY**, the word "insured" means any person or organization qualifying as such under paragraph **C. Who is an Insured**.

Other words and phrases that appear in quotation marks have special meaning. Refer to paragraph **G. Property Definitions** in **SECTION I - PROPERTY** and paragraph **F. Liability and Medical Expenses Definitions** in **SECTION II - LIABILITY**.

## SECTION I - PROPERTY

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property includes Buildings as described in paragraph **a.** below, Business Personal Property as described in paragraph **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described in **SECTION I - PROPERTY, A. Coverage, 2. Property Not Covered.**

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Your personal property in apartments, rooms or common areas furnished by you as the landlord;

**(5)** Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

**(a)** Fire protection equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(6)** If not covered by other insurance

**(a)** Additions under construction, alterations and repairs to the buildings or structures;

**(b)** Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

**(7)** Signs, whether or not they are attached to covered buildings or structures;

**(8)** Interior and Exterior Building glass if you are a building owner;

**(9)** Fences and retaining walls located on or within 1,000 feet of a covered building or structure, whether or not attached to buildings or structures, except for retaining walls that are used, in whole or in part, to contain water.

**b.** Business Personal Property located in or on the buildings or structures at the described premises or in the open (or in a vehicle) within 1,000 feet of the building or structures or within 1,000 feet of the premises described in the Declarations, whichever distance is greater, including:

**(1)** Property you own that is used in your business;

**(2)** Property of others that is in your care, custody or control, including the cost of labor, materials or services furnished or arranged by you on personal property of others, except as otherwise provided in **SECTION I -**



OD3 D903901       1001696

PROPERTY, E. Property Loss Condition, 5. Loss Payment paragraph d., subparagraph (3)(b);

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

    (a) Made a part of the building or structure you occupy but do not own; and

    (b) You acquired or made at your expense but cannot legally remove.

(4) Leased personal property for which you have a written contractual responsibility to insure, unless otherwise provided in paragraph (2) above;

(5) Exterior building glass, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control;

(6) Physical damage sustained to a building leased to you caused by or resulting from "theft" or attempted "theft", burglary or robbery of your Business Personal Property.

**2.   Property Not Covered**

Covered Property does not include:

a.   Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

b.   Contractor's equipment, which is used or operated principally away from the premises described in the Declarations, or parts and equipment, whether attached or unattached to contractor's equipment, unless such parts and equipment is held for sale by you, or sold by you but not delivered unless specifically endorsed and scheduled, or as provided for in **SECTION I - PROPERTY, B. Additional Coverages, v. Commercial Tools and Small Equipment;**

c.   "Money" or "securities" except as provided in the:

    (1) Money and Securities Additional Coverage; or

    (2) Employee Theft Additional Coverage;

d.   Contraband or property in the course of illegal transportation or trade;

e.   Land, whether or not resurfaced with stone, gravel or similar layer (including

land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof), except as provided in **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extension, l. Paved Surfaces;**

f.   Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are part of a vegetated roof), all except as provided in **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extension, c. Outdoor Property;**

g.   Watercraft (including motors, equipment and accessories);

h.   Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided in this Coverage Form;

i.   "Computer equipment", which is permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration. This paragraph does not apply to "computer equipment" while held as "stock";

j.   "Electronic Data", except as provided under the Computer Equipment and Electronic Vandalism Additional Coverages. This paragraph does not apply to your "stock" of prepackaged "software" or to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

k.   Animals, unless owned by others and boarded by you, or held for sale by you, or sold but not delivered, and only while inside of buildings;

l.   The cost of excavations, grading, backfilling, or filling;

m.   Bulkheads, pilings, piers, wharves or docks;

n.   Retaining walls that are used, in whole or in part, to contain water.

o.   "Computer Equipment", except as provided for under the:

    (1) Computer Equipment Additional Coverage;

    (2) Equipment Breakdown Additional Coverage; or

    **(3)** Electronic Vandalism Additional Coverage.

**p.** Commercial tools and small equipment except as provided in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, v. Commercial Tools and Small Equipment** or for contractor's equipment specifically endorsed and scheduled. This does not apply to your commercial tools and small equipment permanently installed or exclusively used at the described premises;

**q.** Employee tools and small equipment except as provided in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, v. Commercial Tools and Small Equipment** or when added by separate endorsement;

**r.** Bridges (unless the bridge is made a part of a covered Building), roadways, walks, patios or other paved surfaces, except as provided in **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, l. Paved Surfaces;**

**s.** Underground pipes, flues or drains except as provided in **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, m. Underground Pipes;** and

**t.** Personal Property while airborne or waterborne.

**3. Covered Causes of Loss**

Risks of direct physical loss unless the loss is:

**a.** Excluded in **SECTION I - PROPERTY, B. Exclusions;** or

**b.** Limited in **SECTION I - PROPERTY, A. Coverages, 4. Limitations**

**4. Limitations**

**a.** We will not pay for loss of or damage to:

    **(1)** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, s. Money and Securities.**

    **(2)** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

    **(3)** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      **(a)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      **(b)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

    **(4)** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

      **(a)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

      **(b)** Changes in or extremes of temperature;

      **(c)** Disease;

      **(d)** Frost or hail; or

      **(e)** Rain, snow, ice or sleet.

**b.** We will not pay for loss of or damage to the following types of property unless caused by any of the "specified causes of loss" or building glass breakage:

    **(1)** Animals, and then only if they are killed or their destruction is made necessary.

    **(2)** Fragile articles such as glassware, statuary, marble, chinaware and porcelain, if broken. This restriction does not apply to:

      **(a)** Glass that is part of the exterior or interior of a building or structure;

      **(b)** Containers of property held for sale; or

      **(c)** Photographic or scientific instrument lenses.

**c.** For loss or damage by "theft", the following types of property are covered only up to the limits shown:

    **(1)** $10,000 for furs, fur garments and garments trimmed with fur.

    **(2)** $10,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $250 or less per item.



OD3 D903901        1001696

5.  **Additional Coverages**

a.  **Debris Removal**

(1) Subject to paragraphs **(2)**, **(3)** and **(4)** below, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Remove debris of property of yours that is not insured under this Coverage Form, or property in your possession that is not Covered Property;

(b) Remove debris of property owned or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this Coverage Form;

(c) Remove any property that is Property Not Covered except as provided under the Outdoor Property Coverage Extension;

(d) Remove property of others of a type that would not be Covered Property under this Coverage Form;

(e) Remove deposits of mud or earth from the grounds of the described premises;

(f) Extract "pollutants" from land or water; or

(g) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in paragraph **(4)** below, the following provisions apply:

(a) The most that we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to paragraph **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

(4) We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss of or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss of or damage to the Covered Property that has sustained loss or damage.

Therefore, if paragraphs **(a)** and/or **(b)** above apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

(5) **Examples**

**Example #1**

| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| ($50,000 - $500) | |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense | |

Payable                          $ 10,000
($10,000 is 20% of $50,000)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of Loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of paragraph **(3)** above.

### Example #2

Limit of Insurance              $ 90,000
Amount of Deductible            $ 500
Amount of Loss                  $ 80,000
Amount of Loss Payable          $ 79,500
($80,000 - $500)

Debris Removal Expense          $ 40,000
Debris Removal Expense
Payable
    Basic Amount          $ 10,500
    Additional Amount     $ 25,000

The basic amount payable for debris removal expense under the terms of paragraph **(3)** above is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000 (capped at $10,500). The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of paragraph **(4)** above, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because (from paragraph **(3) (a)**) the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under paragraph **(4)** above. Thus the total payable for debris removal expense in this example is $35,500; $4,500 of the

debris removal expense is not covered.

**b.   Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 90 days after the property is first moved.

This Additional Coverage does not increase the applicable Limit of Insurance.

**c.   Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 for service at each premises described in the Declarations, unless a higher Limit of Insurance is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department services charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**d.   Collapse**

The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in paragraphs **(1), (2), (3), (4), (5), (6)** and **(7)** below.

**(1)** For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**(2)** We will pay for direct physical loss of or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property



OD3 D903901     1001696

insured under this policy, if such collapse is caused by one or more of the following:

(a) Building decay that is hidden from view, unless the presence of such decay is known to any insured prior to collapse;

(b) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to any insured prior to collapse;

(c) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation; or

(d) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(i) A cause of loss listed in paragraphs (a) or (b) above of this Additional Coverage;

(ii) One or more of the "specified causes of loss";

(iii) Breakage of building glass;

(iv) Weight of people or personal property; or

(v) Weight of rain that collects on a roof.

(3) This Additional Coverage - Collapse does not apply to:

(a) A building or any part of a building that is in danger of falling down or caving in;

(b) A part of a building that is standing, even if it has separated from another part of the building; or

(c) A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(4) With respect to the following property:

(a) Awnings;

(b) Gutters and downspouts;

(c) Yard Fixtures;

(d) Outdoor swimming pools;

(e) Beach or diving platforms or appurtenances;

(f) Retaining walls; and

(g) Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in paragraph (2), subparagraphs (a), (b), (c) and (d) of this Additional Coverage, we will pay for loss or damage to that property only if such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form and the property is Covered Property under this Coverage Form.

(5) If personal property abruptly falls down or caves in and such collapse is not the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

(a) The abrupt collapse of personal property was caused by a cause of loss listed in paragraph (2), subparagraphs (a), (b), (c) and (d) of this Additional Coverage;

(b) The personal property which collapses is inside a building; and

(c) The property which collapses is not of a kind listed in paragraph (4) above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in paragraph (5) does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

(6) This Additional Coverage - Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(7) This Additional Coverage - Collapse will not increase **SECTION I - PROPERTY, C. Limits of Insurance**.

(8) The term Covered Cause of Loss includes the Additional Coverage -

Collapse as described and limited in paragraphs **(1)**, **(2)**, **(3)**, **(4)**, **(5)**, **(6)** and **(7)** above.

**e. Water Damage, Other Liquids, Powder or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage; but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or

**(2)** Is directly caused by freezing.

**f. Business Income**

When Business Income Coverage is provided under this policy:

**(1) Business Income**

**(a)** We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to a described premises shown in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

**(i)** The portion of the building which you rent, lease or occupy;

**(ii)** The area within 1,000 feet of the building or within 1,000 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(iii)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

**(b)** We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within the designated, consecutive number of months found on the Declarations Page beginning immediately after the date of direct physical loss or damage. For purposes of this insurance, all recoverable loss ceases when the "period of restoration" ends.

**(c) Business Income** means the:

**(i)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(ii)** Continuing normal operating expenses incurred, including "payroll expenses". However, if your business is not generating any income because you are primarily in research or development or have not yet brought your product to market, your continuing normal operating expenses, including "payroll expenses", will not be offset by the Net Loss; and

**(iii)** "Rental Value".



OD3 D903901        1001696

For manufacturing risks, Net Income includes the net sales value of production.

**(2) Extended Business Income**

If no Business Income Coverage is provided under this Coverage Form, then there is no Extended Business Income Coverage afforded under this Coverage Form.

**(a) Extended Business Income - Other Than Rental Value**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this Coverage Form, we will pay for the actual loss of Business Income you incur during the period that:

**(i)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced (to the extent necessary to resume "operations") and "operations" are resumed; and

**(ii)** Ends on the earlier of:

**1)** The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

**2)** The number of consecutive days shown in the Additional Property Coverage Schedule for Extended Business Income after the date determined in **(a) Extended Business Income - Other Than Rental Value,** paragraph **(i)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical

loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(b) Extended Business Income - Rental Value**

If the necessary "suspension" of your "operations" produces a "rental value" loss payable under this Coverage Form, we will pay for the actual loss of "rental value" you incur during the period that:

**(i)** Begins the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(ii)** Ends the earlier of:

**1)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "rental value" that would have existed if no direct physical loss or damage had occurred; or

**2)** The number of consecutive days shown in the Additional Property Coverage Schedule for Extended Business Income after the date determined in **(b) Extended Business Income - Rental Value,** paragraph **(i)** above.

However, Extended Business Income does not apply to loss of "rental value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "rental value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(iii)** We will reduce the amount of your:

Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged

property (including merchandise or "stock") at the described premises or elsewhere.

(iv) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

This Additional Coverage is not subject to **SECTION I - PROPERTY, C. Limits of Insurance.**

**g.   Extra Expense**

When Business Income Coverage is provided under this Coverage Form:

(1) We will pay the necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

(a) The portion of the building which you rent, lease or occupy;

(b) The area within 1,000 feet of the building or within 1,000 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

(c) Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

(2) Extra Expense means expense incurred:

(a) To avoid or minimize the "suspension" of business and

to continue "operations":

(i) At the described premises; or

(ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b) To minimize the "suspension" of business if you cannot continue "operations".

(c) To:

(i) Repair or replace any property; or

(ii) Research, replace or restore the lost information on damaged "valuable papers and records"

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverage, f. Business Income.**

With regard to paragraph **(i)** above, we will pay only for those expenses necessary to expedite the repair or replacement of the property. Under this provision we will not pay for any portion of the ordinary and expected cost to actually repair or replace property.

(3) We will only pay for Extra Expense that occurs within 12 consecutive months beginning immediately after the date of direct physical loss or damage.

(4) We will reduce the amount of your Extra Expense loss payment to the extent you can return "operations" to normal and discontinue such Extra Expense.

(5) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

This Additional Coverage is not subject to **SECTION I - PROPERTY, C. Limits of Insurance.**

**h.   Pollutant Clean-Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the

The **Hanover**
Insurance Group·
OD3 D903901        1001696

described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is $25,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

i.  **Civil Authority**

When Business Income Coverage is provided under this Coverage Form:

(1) When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss or damage to property within one mile of the described premises, provided that both of the following apply:

(a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property;

(b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(2) Civil Authority Coverage for Business Income will begin 72 hours after the time of the

first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(a) Four consecutive weeks after the date of that action; or

(b) When your Civil Authority Coverage for Business Income ends;

whichever is later.

(3) The definitions of Business Income and Extra Expense contained in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, f. Business Income; and g. Extra Expense** also apply to this Additional Coverage.

j.  **Money Orders and Counterfeit Money**

(1) We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

(a) Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or

(b) "Counterfeit money" that is acquired during the regular course of business.

(2) Under this Additional Coverage, all loss:

(a) Caused by one or more persons; or

(b) Involving a single act or series of related acts;

is considered one occurrence.

(3) The most we will pay for any loss under this Additional Coverage is $5,000.

k.  **Forgery or Alteration**

(1) We will pay for loss resulting directly from forgery or alteration of any:

(a) Check, draft, promissory note, bill of exchange or similar written promises of payment in "money" that you or your agent has issued, or that was issued

by someone who impersonates you or your agent; and

**(b)** Credit, debit or charge slips or documents, including signatures or the entry of a Personal Identification Number (PIN) into a "payment processing device" required with the use of any credit, debit, or charge card issued to you or any "employee" for business purposes.

**(2)** Under this Additional Coverage, all loss:

**(a)** Caused by one or more persons; or

**(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(3)** If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promises of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

**(4)** For purposes of this Additional Coverage, check includes a substitute check as defined by the United States Congress in the Check Clearing for the 21st Century Act and will be treated the same as the original it replaced.

**(5)** The most we will pay for any loss, including legal expenses, under this Additional Coverage is $25,000, unless a higher Limit of Insurance is shown in the Schedule of Amended Limits of Insurance.

**I.** **Ordinance or Law**

**(1)** This Additional Coverage applies only to buildings insured on a replacement cost basis.

**(2)** **Application of Coverages:**

The coverages provided under this Additional Coverage applies only if paragraphs **(a)** and **(b)** below, are satisfied and are then subject to the qualifications found in **(c)** below.

**(a)** The ordinance or law:

**(i)** Regulates the demolition, construction or repair of buildings, or establishes

zoning or land use requirements at the described premise;

**(ii)** Is in force at the time of loss; and

**(iii)** Was not in force at the time the involved construction was completed.

But coverage under this Additional Coverage applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this Additional Coverage.

**(b)** The building sustains direct physical damage:

**(i)** That is covered under this Coverage Form and as a result of such damage, you are required to comply with the ordinance or law; or

**(ii)** That is covered under this Coverage Form and direct physical damage that is not covered under this Coverage Form and as a result of the building damage in its entirety, you are required to comply with the ordinance or law.

**(iii)** But if the damage is not covered under this Coverage Form and such damage is the subject of the ordinance or law, then there is no coverage under this Additional Coverage even if building has also sustained covered direct physical damage.

**(c)** In the situation described in **(2)** **Application of Coverages,** paragraph **(b)**, subparagraph **(ii)** above, we will not pay the full amount of loss otherwise payable under the terms of coverages for Coverage for Loss to the Undamaged Portion of the Building, Demolition Cost Coverage or Increased Cost of Construction Coverage. Instead, we will pay a proportion of such loss, meaning the proportion that



OD3 D903901      1001696

the covered direct physical damage bears to the total direct physical damage. Paragraph (7) of this coverage provides an example of this procedure.

However, if the covered direct physical damage alone would have resulted in a requirement to comply with the ordinance or law, then we will pay the full amount of the loss otherwise payable under the terms of Coverages for Loss to the Undamaged Portion of the Building, Demolition Cost Coverage or Increased Cost of Construction Coverage under this Additional Coverage.

(3) We will not pay under this Additional Coverage for:

(a) Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot; or

(b) The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet rot or dry rot.

(4) Coverage

(a) **Coverage for Loss to the Undamaged Portion of the Building**

With respect to the building that has sustained covered direct physical damage, we will pay under this Additional Coverage for the loss in value of the undamaged portion of the building as a consequence of a requirement to comply with an ordinance or law that requires demolition of undamaged parts of the same building. Coverage for Loss to the Undamaged Portion of the Building is included within the Limit of Insurance shown in the

Declarations as applicable to the covered building. Coverage for Loss to the Undamaged Portion of the Building does not increase the Limit of Insurance.

(b) **Demolition Cost Coverage**

With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of the undamaged parts of the same building, as a consequence of a requirement to comply with an ordinance or law that requires demolition of such undamaged property.

**SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment, paragraph d.** does not apply to Demolition Cost Coverage.

(c) **Increased Cost of Construction**

With respect to the building that has sustained covered direct physical damage, we will pay the increased cost to:

(i) Repair or reconstruct damaged portions of that building; and/or

(ii) Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

when the increased cost is a consequence of a requirement to comply with the minimum standards of the ordinance or law.

However:

(i) This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

(ii) We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

**SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment, paragraph d.** does not apply to the Increased Cost of Construction Coverage.

**(5) Loss Payment**

(a) Loss Payment provisions **(b), (c), (d)** and **(e)** below are subject to the apportionment procedure set forth in above **Application of Coverages,** paragraph **(2)(c).**

(b) When there is a loss in value of an undamaged portion of the building to which Coverage for Loss to the Undamaged Portion of the Building applies, the loss payment for that building, including damaged and undamaged portions, will be determined as follows:

(i) If the property is repaired or replaced on the same or another premise, we will not pay more than the lesser of:

1) The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

2) The Limit of Insurance shown in the Declarations as applicable to the covered building.

(ii) If the property is not repaired or replaced. We will not pay more than the lesser of:

1) The actual cash value of the building at the time of loss; or

2) The Limit of Insurance shown in the Declarations as applicable to the covered building.

(c) The most we will pay for the total of all covered losses for Demolition Cost Coverage and Increased Cost of Construction is the Limit of Insurance shown in paragraph **(d)** below. Subject to this combined Limit of Insurance, the following loss payment provisions apply:

(i) For Demolition Cost Coverage, we will not pay for more than the amount you actually spend to demolish and clear the site of the described premises.

(ii) Loss payment under Increased Cost of Construction Coverage will be determined as follows:

1) We will not pay for the increased cost of construction until the property is actually repaired or replaced at the same or another premises; and

2) Unless the repairs or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(iii) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction Coverage is the lesser of:

1) The increased cost of construction at the same premises; or

2) The Limit of Insurance described in paragraph **(d)** below.

(iv) If the ordinance or law requires relocation to another premise, the most we will pay for the increased cost of construction is the lesser of:

1) The increased cost of construction at the new premises; or

2) The Limit of Insurance described in paragraph **(d)** below.

(d) The most we will pay for the total of all covered losses for Demolition Cost and Increased Cost of Construction for each building described in the Declarations is $5,000 or the amount shown in the Additional Property Schedule.

The **Hanover**
Insurance Group

OD3 D903901      1001696

If a damaged building(s) is covered under a Blanket Limit of Insurance and the Blanket Limit of Insurance applies to more than one building or item of property, then the most we will under this Additional Coverage, for each building, is $5,000, or the amount shown in the Additional Property Coverage Schedule.

(6) Under this coverage, we will not pay for loss due to any ordinance or law that:

(a) You were required to comply with before the loss, even if the building was undamaged; and

(b) You failed to comply with.

(7) Example of Proportionate Loss Payment for Ordinance or Law Coverage losses (procedures as set forth in paragraph **(2)(c)** of this Additional Coverage).

Assume:

- Wind is a Covered Cause of Loss; "Flood" is an excluded Cause of Loss

- The building has value of $200,000

- The total direct physical damage to the building: $100,000;

- The ordinance or law in this jurisdiction is enforced when building damage equals or exceeds 50% of the building's value;

- Portion of direct physical damage that is covered (caused by wind): $30,000;

- Portion of direct physical damage that is not covered (caused by "flood"): $70,000; and

- Loss under Increased Cost of Construction: $60,000

**Step 1:** Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$30,000 divided by $100,000 = .30

**Step 2:** Apply that portion to the Ordinance or Law loss.

$60,000 x .30 = $18,000

In this example, the most we will pay under this Additional Coverage for the Increased Cost of Construction loss is $18,000, subject to the applicable Limit of Insurance and any other applicable provisions.

Note: The same procedure applies to losses under Loss to the Undamaged Portion of the Building and Demolition Cost of this Additional Coverage.

**m.  Business Income from Dependent Properties**

When Business Income Coverage is provided under this Coverage Form:

(1) We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the premises of a "dependent property" caused by or resulting from any Covered Cause of Loss.

However, this Additional Coverage does not apply when the only loss at the premises of a "dependent property" is loss or damage to "electronic data", including destruction or corruption of "electronic data". If the "dependent property" sustains loss or damage to "electronic data" and other property, coverage under this Additional Coverage will not continue once the other property is repaired, rebuilt or replaced.

(2) The most we will pay under this Additional Coverage is $5,000 per occurrence, regardless of the number of "dependent properties" affected.

(3) We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

(a) Source of materials; or

(b) Outlet for your products.

(4) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

(5) The coverage period for Business Income under this Additional Coverage:

(a) Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the "dependent property"; and

**(b)** Ends on the date when the property at the premises of the "dependent property" should be repaired, rebuilt or replaced (to the extent necessary to resume "operations") with reasonable speed and similar quality or 12 months immediately following the date of direct physical loss or damage, whichever is shorter.

**(6)** The Business Income coverage period, as stated in paragraph **(4)** above, does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

**(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this Coverage Form will not reduce the Business Income coverage period.

**(7)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income from Dependent Properties Additional Coverage.

**n. Glass Expenses**

When glass is damaged from a Covered Cause of Loss we will pay for your expenses incurred to:

**(1)** Put up temporary plates or board up openings if repair or replacement of damaged glass is delayed;

**(2)** Replace lettering, artwork, sensors or other items permanently affixed to, or a part of, the damaged glass; and

**(3)** Remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**o. Fire Protection Equipment Recharge**

**(1)** We will pay:

**(a)** The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems

(including hydrostatic testing if needed) if they are discharged on or within 1,000 feet of the described premises; and

**(b)** For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

**(2)** No coverage will apply if the fire extinguishing system is discharged during installation or testing.

**(3)** The most we will pay under this Additional Coverage is $25,000 in any one occurrence. The deductible does not apply to these expenses.

**p. Employee Theft including ERISA Compliance**

**(1)** We will pay for loss or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", clergy, or any non-compensated person whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Additional Coverage, "theft" shall also include "forgery".

**(2)** This Additional Coverage terminates as to any "employee" as soon as:

**(a)** You; or

**(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

"Discovered" the "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

**(3)** Under this Additional Coverage, all loss:

**(a)** Caused by one or more persons; or

**(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(4)** We will pay only for loss you sustain through acts committed or events occurring anytime which is "discovered" by you:

**(a)** During the policy period; or



OD3 D903901      1001696

**(b)** No later than 1 year from the date of termination or cancellation of this insurance. However this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this Additional Coverage, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(5)** You may extend this coverage to apply to loss caused by any "employee" while temporarily outside the Coverage Territory for a period of not more than 90 days.

**(6)** The most we will pay for all loss resulting directly from an occurrence is $10,000 or the Limit of Insurance shown in the Additional Property Coverage Schedule. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year.

**(7) Special Employee Theft Exclusions**

We will not pay for:

**(a)** Loss resulting from "theft" or any other dishonest act committed by:

**(i)** You; or

**(ii)** Any of your partners or "members";

Whether acting alone or in collusion with other persons.

**(b)** Loss caused by an "employee" if the "employee" has also committed "theft" or any other dishonest act prior to the effective date of this policy and you or any of your partners, "managers", officers, directors or trustees, not in collusion with the "employee", learned of that "theft" or dishonest act prior to the policy period shown in the Declarations.

**(c)** Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(i)** Whether acting alone or in collusion with other persons; or

**(ii)** While performing services for you or others;

Except when covered under this Additional Coverage.

**(d)** Loss that is an indirect result of an occurrence covered by this Additional Coverage, including, but not limited to, loss resulting from:

**(i)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

**(ii)** Payment of damages of any type for which you are legally liable;

**(iii)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this Additional Coverage.

**(e)** Fees, costs and expenses incurred by you which are related to any legal action.

**(f)** Loss or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(i)** An inventory computation; or

**(ii)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**(g)** Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**(h)** Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

**(i)** Loss resulting from:

**(i)** The unauthorized disclosure of your

confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

(ii) The unauthorized use or disclosure of confidential information of another person or entity which is held by you including, but not limited to, financial information, personal information, credit card information or similar non public information.

**(8) Welfare and Pension Plan ERISA Compliance**

(a) The "employee benefit plan" (hereafter referred to as Plan) is included as an insured under this Additional Coverage.

(b) If any Plan is insured jointly with any other entity under this Additional Coverage, you or the Plan Administrator must select a Limit of Insurance for this Additional Coverage that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(c) With respect to loss sustained or "discovered" by any such Plan, paragraph **(1)** above, of this Additional Coverage is replaced by the following:

(1) We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(d) If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

(e) If two or more Plans are insured under this Additional Coverage, any payment we make for loss:

(i) Sustained by two or more Plans; or

(ii) Of commingled "funds" or "other property" of two or more Plans;

Resulting from an occurrence, will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total Limit of Insurance of all Plans sustaining loss.

(f) The deductible does not apply to this Additional Coverage.

**q. Rewards - Arson, Theft and Vandalism**

(1) We will reimburse you for payment of any reward offered on your behalf and for information that leads to the arrest and conviction of the person or persons responsible for:

(a) Arson;

(b) "Theft" or

(c) Vandalism

to Covered Property.

(2) The arrest or conviction must involve a covered loss caused by arson, "theft" or vandalism.

(3) The most we will pay under this Additional Coverage is $10,000 unless a higher Limit of Insurance is shown in the Additional Property Coverage Schedule. The amount we pay is not increased by the number of persons involved in providing the information.

(4) The amount payable under this Additional Coverage is additional insurance.

(5) The deductible does not apply to this Additional Coverage.

**r. Computer Equipment**

(1) We will pay for direct physical loss of or damage to the following Covered Property which is your property or property in your care, custody or control while at or away from the described premises when loss or damage is caused by or resulting from a Covered Cause of Loss:

(a) "Computer equipment"; and

(b) Programming documentation and instruction manuals.

(2) We will pay for the actual loss of Business Income you sustain as described in the Business Income Additional Coverage and we will pay for any necessary Extra Expense you incur during the "period of restoration"



OD3 D903901          1001696

as described in the Extra Expense Additional Coverage.

(3) In the event of a loss of or damage to "Computer equipment" by a Covered Cause of Loss, we will pay your costs to modify or replace undamaged "hardware" or "software" when it:

   (a) Was dependent on the damaged "hardware" or "software" prior to the covered loss; and

   (b) Is not compatible with the "hardware" or "software" that is replacing the property that was involved in the covered loss.

   We will only pay for your costs to modify or replace undamaged "hardware" or "software" at a premises described in the Declarations.

   The most we will pay for your costs covered in any one occurrence is $10,000.

(4) We will not pay for any loss of or damage to the following property:

   (a) Property you rent, loan or lease to others while it is away from the described premises;

   (b) Property you hold for sale, distribute or manufacture except as provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property,** paragraph **b.**; or

   (c) "Software" that cannot be duplicated or replaced with similar property of equal quality and/or substantially similar functionality.

(5) If we provide Building coverage only, we will only pay for loss to "computer equipment" that service building operations at the described premises and are located at the described premises.

(6) The most we will pay for any loss or damage to property described in paragraphs **(1)** and **(2)** above, is $35,000 unless a higher Limit of Insurance is shown in the Additional Property Coverage Schedule for Computer Equipment. The most we will pay for Extra Expense is $5,000 unless a higher Limit of Insurance is shown in the Additional Property Coverage Schedule for Extra Expense.

(7) The following in **SECTION I - PROPERTY, B. Exclusions,** paragraph **1.** do not apply to this Additional Coverage:

   (a) **b. Earth Movement**; and

   (b) **g. Water**.

(8) **Special Computer Equipment Exclusions**

   We will not pay for loss or damage to portable electronic devices when caused by, resulting from, or arising out of "theft" or unexplained loss when the property is checked baggage with a carrier for transit. Portable electronic devices includes laptops, tablets, e-readers, smartphones or other lightweight, hand-held or wearable devices capable of storing, retrieving and processing data.

**s. Money and Securities**

(1) We will pay for loss of "money" and "securities":

   (a) Inside a building at the described premises or "financial institution" resulting directly from "theft" committed by a person present inside a building at the described premises or "financial institution";

   (b) Inside a building at the described premises or "financial institution" resulting directly from disappearance or destruction; or

   (c) Outside of a building at or away from the described premises in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

(2) For the purposes of this Additional Coverage, all loss:

   (a) Caused by one or more persons; or

   (b) Involving a single act or series of related acts;

   is considered one occurrence.

(3) You must keep records of all "money" and "securities" so we can verify the amount of any one loss or damage.

(4) The amount payable under this Additional Coverage is additional insurance.

(5) The most we will pay for loss in any one occurrence is:

    (a) $10,000 or the amount shown in the Additional Property Coverage Schedule while:

        (i) Inside a building at the described premises; or

        (ii) Within a "financial institution" in the Coverage Territory; and

    (b) $5,000 or the amount shown in the Additional Property Coverage Schedule while outside of a building at the described premises or when away from the described premises in the Coverage Territory.

(6) **Special Money and Securities Exclusions**

We will not pay for loss:

    (a) Resulting from accounting or arithmetic errors or omissions;

    (b) Resulting from giving or surrendering of property in any exchange or purchase;

    (c) Of property contained in any money-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device; or

    (d) Loss or damage to "money" and "securities" following and directly related to the use of any computer to fraudulently cause a transfer of that property.

**t. Tenant Signs (Tenants only)**

(1) This Additional Coverage is available only when the Named Insured is a tenant and a Limit of Insurance is shown in the Declarations Page for Business Personal Property.

We will pay for direct physical loss of or damage to all signs:

    (a) Owned by you; or

    (b) Owned by others but in your care, custody or control;

when loss or damage is caused by or resulting from a Covered Cause of Loss.

(2) **SECTION I - PROPERTY, A. Coverage, 3. Covered Causes of Loss** does not apply to this Additional Coverage and **SECTION I -**

**PROPERTY, B. Exclusions,** paragraph **1.** does not apply to this Additional Coverage except for the following:

    (a) **c. Government Action;**

    (b) **d. Nuclear Hazard;** and

    (c) **f. War and Military Action.**

(3) We will not pay for loss or damage caused by or resulting from:

    (a) Wear and tear;

    (b) Hidden or latent defect;

    (c) Rust;

    (d) Corrosion; or

    (e) Mechanical Breakdown, except as provided for in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, u. Equipment Breakdown.**

(4) The most we will pay for loss or damage in any one occurrence is $5,000 regardless of the number of locations or buildings involved.

**u. Equipment Breakdown**

(1) We will pay for direct physical damage to Covered Property that is the direct result of an "accident" or "electronic circuitry impairment". We will consider "electronic circuitry impairment" to be physical damage to "covered equipment".

(2) The following coverages also apply to the direct result of an "accident" or "electronic circuitry impairment". However, with respect to coverage **A.5.u.(2)(h)** Utility Services - Equipment Breakdown (Accident) and **A.5.m.** Business Income from Dependent Properties provided in this coverage form, coverage will apply only to the direct result of an "accident" and will not apply to the direct result of an "electronic circuitry impairment". These coverages do not provide additional amounts of insurance.

    (a) **Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data".

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and



OD3 D903901      1001696

necessary Extra Expense you incur is $50,000.

**(b) Expediting Expenses**

With respect to your damaged Covered Property, we will pay, up to $50,000, the reasonable extra cost to:

**(i)** Make temporary repairs; and

**(ii)** Expedite permanent repairs or permanent replacement.

**(c) Fungi, Wet Rot, or Dry Rot**

**(i)** We will pay the additional cost to repair or replace Covered Property because of contamination by "fungi", wet rot or dry rot. This includes the additional costs to clean up or dispose of such property. This does not include spoilage of personal property that is "perishable goods" to the extent that such spoilage is covered under Spoilage coverage.

**(ii)** As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "fungi", wet rot or dry rot been involved.

**(iii)** We will also pay the cost of testing performed after repair or replacement of the damaged Covered Property is completed only to the extent that there is reason to believe there is the presence of "fungi", wet rot or dry rot.

**(iv)** This coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**(v)** The most we will pay in any "one equipment breakdown" for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $15,000 even if the "fungi", wet rot or dry rot continues to be present or active or recurs in a later policy period.

**(d) Hazardous Substances**

We will pay for the additional cost to repair or replace Covered Property because of a contamination by a "hazardous substance".

This includes the additional costs to clean up or dispose of such property. This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **(g) Spoilage** below. Additional costs mean those beyond what would have been payable had no "hazardous substance" been involved. The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain, and necessary Extra Expense you incur is $50,000.

**(e) Personal Property Off Premises Equipment Breakdown**

**(i)** Any direct physical damage for personal property off premises provided under Coverage Extension **b.** Personal Property Off Premises, also applies to the direct result of an "accident" or "electronic circuitry impairment".

**(ii)** We will also pay for your reasonable and necessary cost to research, replace and restore lost "electronic data" contained within "covered equipment" when due to covered loss or damage as described in **(i)** above. This amount may not exceed the limit applicable to Data Restoration coverage.

**(iii)** The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur and Data Restoration as described in **(ii)** above is $50,000.

**(f) Public Relations**

(i) This coverage only applies if you have sustained an actual loss of Business Income.

(ii) We will pay for your reasonable costs for professional services to create and disseminate communications, when the need for such communications arises directly from the interruption of your business. This communication must be directed to one or more of the following:

  1) The media;

  2) The public; or

  3) Your customers, clients or members.

(iii) Such costs must be incurred during the "period of restoration" or up to 30 days after the "period of restoration" has ended.

(iv) The most we will pay for loss or expense under this coverage is $5,000.

**(g) Spoilage**

(i) We will pay for:

  1) Physical damage to your "perishable goods" due to spoilage.

  2) Physical damage to your "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

  3) Any necessary expenses you incur to reduce the amount of loss under this coverage. We will pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

(ii) If you are unable to replace "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the

"accident" or "electronic circuitry impairment", less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Loss Payment Condition.

(iii) The most we will pay for loss or damage under this coverage is $50,000.

**(h) Utility Services - Equipment Breakdown (Accident)**

(i) Any insurance provided for Business Income, Extra Expense, Data Restoration or Spoilage is extended to apply to your loss, damage or expense caused by a failure or disruption of service. The failure or disruption of service must be caused by an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, Internet access, telecommunications services, "cloud computing services", wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

(ii) "Cloud computing services" must be provided by a professional provider with whom you have a contract.

(iii) With respect to the Data Restoration portion of this Service Interruption coverage, coverage will also apply to "data" stored in the equipment of a provider of "cloud computing services".

(iv) Any insurance provided for Business Income or Data Restoration will not apply



OD3 D903901    1001696

under this Service Interruption coverage unless the failure or disruption of service exceeds 24 hours immediately following the "accident". If the interruption exceeds 24 hours, coverage will begin at the time of the disruption, and the applicable deductible will apply.

(v) The most we will pay in any "one equipment breakdown" for loss, damage or expense under this coverage is the applicable limit for Business Income, Extra Expense, Data Restoration or Spoilage.

**(3) Conditions**

**(a) Suspension**

When any "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" or "electronic circuitry impairment" to that "covered equipment". We can do this by mailing or delivering a written notice of suspension to:

(i) Your address as shown in the Declarations; or

(ii) The address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment". If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment". But the suspension will be effective even if we have not yet made or offered a refund.

**(b) Jurisdictional Inspections**

If any property that is "covered equipment" under this Additional Coverage requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**(c) Environmental, Safety and Efficiency Improvements**

If "covered equipment" requires replacement due to an "accident" or "electronic circuitry impairment", we will pay your additional cost to replace with equipment that is better for the environment, safer for people or more energy or water efficient than the equipment being replaced. However, we will not pay to increase the size or capacity of the equipment and we will not pay more than 150% of what the cost would have been to replace with like kind and quality. This provision does not apply to the replacement of component parts or to any property to which Actual Cash Value applies and does not increase any of the applicable limits.

**(4) Special Equipment Breakdown Exclusions**

(a) We will not pay for loss, damage or expense caused by or resulting from a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

(b) With respect to Business Income, Extra Expense and Utility Services coverages, we will also not pay for:

(i) Loss caused by your failure to use due diligence and dispatch, and all reasonable means to resume business; or

(ii) Any increase in loss resulting from an agreement between you and your customer or supplier.

(c) Except as provided under **u.2.(c)** "Fungi", Wet Rot or Dry Rot coverage we will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident" or "electronic circuitry impairment": Any "fungi," wet rot or dry rot, including any presence, growth, proliferation, spread or any activity of "fungi," wet rot or dry rot. This includes, but is not

limited to, costs arising from clean up, removal, or abatement of such "fungi," wet rot or dry rot. However, this exclusion does not apply to spoilage of personal property that is "perishable goods," to the extent that such spoilage is covered under Spoilage coverage.

(d) This Additional Coverage - Equipment Breakdown does not apply to an "accident" or "electronic circuitry impairment" caused by or resulting from:

(i) Fire (including fire resulting from an "accident" or "electronic circuitry impairment"), or water or other means used to extinguish a fire;

(ii) Explosion of gas or unconsumed fuel within the furnace of any boiler or fired vessel or within the passages from that furnace to the atmosphere;

(iii) Any other explosion, except as specifically covered under this Additional Coverage;

(iv) Vandalism;

(v) Lightning; smoke; aircraft or vehicles; riot or civil commotion; sprinkler leakage; elevator collision;

(vi) Windstorm or hail; However, this exclusion does not apply when:

1) "Covered equipment" located within a building or structure suffers an "accident" or "electronic circuitry impairment" that results from wind-blown rain, snow, sand or dust; and

2) The building or structure did not first sustain wind or hail damage to its roof or walls through which the rain, snow, sand or dust entered.

(vii) Breakage of glass; falling objects; weight of snow, ice or sleet; freezing (caused by cold weather); collapse or molten material;

(viii) "Flood", surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not; mudslide or mudflow; or water that backs up or overflows from a sewer, drain or sump. However, if electrical "covered equipment" requires drying out because of the above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

(ix) Any earth movement, including but not limited to earthquake, subsidence, sinkhole collapse, landslide, earth sinking, tsunami or volcanic action.

(e) Special Equipment Breakdown Exclusions (5)(d)(v), (5)(d)(vi) and (5)(d)(vii) shall not apply if:

(i) The excluded cause of loss occurs away from any covered location and causes an electrical surge or other electrical disturbance;

(ii) Such surge or disturbance is transmitted through utility service transmission lines to the covered location and results in an "accident" or "electronic circuitry impairment"; and

(iii) The loss, damage or expense caused by such surge or disturbance is not covered elsewhere under the policy.

(f) We will not pay under this Additional Coverage for any loss or damage to animals.

The most we will pay for loss, damage or expense arising from any "one equipment breakdown" is the applicable Limit of Insurance shown in the Declarations. This Additional Coverage does not provide an additional amount of insurance.



OD3 D903901      1001696

**v. Commercial Tools and Small Equipment**

(1) This Additional Coverage is available only when a Limit of Insurance is shown in the Declarations for Business Personal Property.

(2) We will pay for direct physical loss of or damage caused by or resulting from a Covered Cause of Loss to commercial tools and small equipment, including their:

    (a) Accessories, whether attached or not attached; and

    (b) Spare parts that are specifically designed and intended for use in the maintenance and operation of property covered under this Additional Coverage;

That is:

    (c) Your property;

    (d) The property of others in your care, custody or control; or

    (e) The property of your "employees".

Damage to the property of your "employees" is limited to while on the described premises.

Commercial Tools and Small Equipment does not include communication devices and diagnostic equipment unless otherwise covered in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, r. Computer Equipment.**

(3) This coverage only applies to any one tool or piece of small equipment with a replacement cost value of $2,500 or less, unless listed on a schedule included with this policy.

(4) The most we will pay for any loss under this Additional Coverage in any one occurrence is $5,000 unless a higher Limit of Insurance is shown in the Additional Property Coverage Schedule, but not more than $2,500 for any one tool, tool box or piece of small equipment.

(5) In addition to items listed within **SECTION I - PROPERTY, A. Coverage, 2. Property Not Covered,** we will not pay for any loss to the following property:

    (a) Watercraft or watercraft parts and equipment;

    (b) Commercial tools and small equipment that are permanently mounted to a vehicle, including trailers;

    (c) Tires or tire tubes, attached or unattached, for use with commercial tools and small equipment, unless the loss or damage is caused by "theft", malicious mischief, or any of the "specified causes of loss"; or

    (d) Any property while underground, airborne or waterborne.

(6) The following **SECTION I - PROPERTY, B. Exclusions,** in paragraph **1.** do not apply to this Additional Coverage:

    (a) **b. Earth Movement;**

    (b) **g. Water.**

(7) **Special Commercial Tools and Small Equipment Exclusion**

We will not pay for any loss caused by or resulting from any repair, adjusting, servicing, testing or maintenance process unless fire or explosion ensues, then only for the loss caused by such ensuing fire or explosion.

**w. Installation**

(1) This Additional Coverage is available only when a Limit of Insurance is shown in the Declarations for Business Personal Property.

(2) We will pay for direct physical loss of or damage to property sold under an installation agreement where your insurable interest continues until the property is accepted by the purchaser for whom the project is to be performed. Coverage applies under this Additional Coverage when the loss or damage is caused by or resulting from any Covered Cause of Loss.

(3) The property under which this insurance applies includes:

    (a) Materials, supplies, equipment, machinery, fixtures owned by you or in your care, custody or control, and which are to be installed by you or at your direction; and

    (b) Temporary structures built or assembled on-site, including cribbing, scaffolding and construction forms.

This property is covered while:

(c) At any jobsite you do not own, lease or operate;

(d) Awaiting and during installation, or awaiting acceptance by the purchaser;

(e) "In transit"; or

(f) At a temporary storage location.

(4) Coverage provided under this Additional Coverage will end when one of the following first occurs:

(a) This policy expires or is cancelled;

(b) The property covered under this Additional Coverage is accepted by the purchaser;

(c) Your interest in the property covered under this Additional Coverage ceases;

(d) You abandon the project to be performed by you for the purchaser, with no intention to complete it; or

(e) 90 days after the project to be performed by you for the purchaser is completed, unless we specify a different date in writing.

(5) In addition to **SECTION I - PROPERTY, A. Coverage, 2. Property Not Covered**, the following property is not covered with respect to this Additional Coverage:

(a) An existing building or structure to which an addition, alteration, improvement or repair is being made;

(b) Property stored at a permanent premises that you own;

(c) A plan, blueprint, design or specification;

(d) Trees, grass, sod, shrubbery or plants; and

(e) Machinery, tools, equipment, supplies or similar property that does not become a permanent part of the project. This includes contractor's equipment and other tools belonging to a contractor or sub-contractor.

(6) **Special Installation Exclusions**

We will not pay for any loss caused by or resulting from:

(a) The cost to make good or replace faulty or defective materials or workmanship;

(b) Testing. However, if testing results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion;

(c) A fault, defect, deficiency, error or omission in a plan, blueprint, design or specification;

(d) The weight of a load when it exceeds the designed capacity of any property covered under this Additional Coverage to lift, move or support the load from any position; or

(e) Collision, upset or overturn of any property covered under this Additional Coverage to the extent of any loss of or damage to the tires or inner tubes of such property. But we will pay for the loss of or damage to the tires or inner tubes if the same accident causes other covered loss to the same property covered under this Additional Coverage.

(7) The following in **SECTION I - PROPERTY, B. Exclusions**, paragraph **1.** do not apply to this Additional Coverage:

(a) **b. Earth Movement**; and

(b) **g. Water**.

(8) The most we will pay for loss of or damage to property covered under this Additional Coverage in any one occurrence is $5,000, regardless if the property is located at a jobsite, while "in transit", or at a temporary storage location.

This Additional Coverage does not increase **SECTION I - PROPERTY, C. Limits of Insurance**.

x. **Fine Arts**

(1) We will pay for direct physical loss to "fine arts" which are your property or the property of others in your care, custody or control while on the described premises. We also cover your "fine arts" while temporarily on display or exhibit away from the described premises or while "in transit" between the described premises and a location where the



OD3 D903901      1001696

"fine arts" will be temporarily on display or exhibit.

(2) The following of **SECTION I - PROPERTY, B. Exclusions,** paragraph **1.** do not apply to this Additional Coverage:

(a) **b. Earth Movement**; and

(b) **g. Water**

(3) The most we will pay for any loss under this Additional Coverage is $10,000 per occurrence regardless of the number of locations or buildings involved.

(4) **Special Fine Arts Exclusion**

We will not pay for any loss caused by or resulting from:

(a) Breakage of statuary, glassware, bric-a-brac, marble, porcelain and similar fragile property. But we will pay if the loss or damage is caused directly by a "specified cause of loss", earthquake or "flood"; and

(b) Any repairing, restoration or retouching of the "fine arts".

y. **Sales Representative Samples**

(1) We will pay for direct physical loss or damage by a Covered Cause of Loss to samples of your "stock" in trade (including containers) while:

(a) In the custody of your sales representative, agent or any "employee" who travels with sales samples;

(b) In your custody while acting as a sales representative; or

(c) "In transit" between the described premises and your sales representatives.

(2) The following of **SECTION I - PROPERTY, B. Exclusions,** paragraph **1.** do not apply to this Additional Coverage:

(a) **b. Earth Movement**; and

(b) **g. Water**

(3) The most we will pay for any loss or damage under this Additional Coverage is $5,000 unless a higher Limit of Insurance is shown in the Additional Property Coverage Schedule.

(4) We will not pay for loss to the following property:

(a) Property which has been sold;

(b) Jewelry, precious or semiprecious stones, gold, silver, platinum or other precious metals or alloys;

(c) Fur, fur garments or garments trimmed with fur; or

(d) Any property while waterborne.

z. **Leasehold Interest (Tenants Only)**

(1) If your lease is cancelled due to direct physical damage to property at the described premises caused by or resulting from a Covered Cause of Loss, we will pay the net loss you sustain due to increased rent under a replacement lease.

(2) The most we will pay for loss because of the cancellation of any lease or leases due to the same covered cause of loss is the lesser of:

(a) If your lease is cancelled and either:

(i) Your landlord allows you to continue to use your premises under a new lease not to exceed the prevailing lease rate, or

(ii) You relocate to other permanent premises and enter into a new lease.

For the duration of the lease in effect at the time of the loss, we will pay the increase in rent between what you were paying at the time of loss and the rent you will be required to pay for equivalent premises under the replacement lease;

(b) $10,000; or

(c) Nothing if there is not a written or legally binding lease.

(3) The following applies to paragraph **(2),** subparagraphs **(a)(i)** and **(a)(ii)** above:

(a) If the lease in effect at the time of the loss contains a renewal option, the expiration date of the renewal option period will replace the expiration of the current lease.

(b) If the lease has no end date (open-ended), we will pay the difference in rent for a period of no more than 24 months after the date of the direct physical damage to the property at the described premises.

**(4)** The following applies to paragraph **(2)**, subparagraphs **(a)** and **(b)** above:

    **(a)** $10,000 will be the maximum amount payable regardless of the number of leases affected by the same Covered Cause of Loss.

    **(b)** Existence of a renewal option will not increase, or have any other effect on this Limit of Insurance.

**(5) Special Leasehold Interest Exclusion**

We will not pay for any loss or damage:

    **(a)** If the unit or suite rented or leased to you where direct damage occurs has been vacant more than 60 consecutive days before the loss or damage occurs, and you have not entered into an agreement to sublease the unit or suite.

    **(b)** Caused by your cancelling the lease, or

    **(c)** Caused by lessors' lease cancellation at the normal expiration date.

**aa. Unauthorized Business Credit Card Use**

**(1)** We will pay for loss resulting from the "theft" or unauthorized use of Business Credit Cards issued to you or registered in your name.

**(2)** We do not cover use of a Business Credit Card:

    **(a)** By a person who has been entrusted with the card; or

    **(b)** any of your "employees".

**(3)** All loss:

    **(a)** Caused by one or more persons; or

    **(b)** Involving a single act or series of related acts;

is considered one occurrence regardless of the number of individual unauthorized transactions.

**(4)** If a suit is brought against you for liability, we will pay for reasonable legal expenses incurred in that defense under this Additional Coverage.

**(5)** The most we will pay for any loss including legal expenses, under this Additional Coverage is $5,000 per occurrence.

**bb. Utility Services**

**(1)** We will pay for loss of or damage to Covered Property caused by an interruption in service to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to property not on the described premises that provides the services shown in paragraph **(3)** below.

The most we will pay for loss in any one occurrence under this Additional Coverage is $10,000 at each described premises or the Limit of Insurance shown in the Additional Property Coverage Schedule.

**(2)** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur caused by the interruption of service at the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to property not on the described premises that provides the services shown in paragraph **(3)** below.

We will only pay for loss you sustain after the first 24 hours following the direct physical loss of or damage to the property described above.

The most we will pay for loss in any one occurrence under this Additional Coverage is $5,000 at each described premises or the Limit of Insurance shown in the Additional Property Coverage Schedule.

**(3)** Services:

    **(a)** Water Supply Services, meaning the following types of property supplying water to the described premises:

        **(i)** Pumping stations; and

        **(ii)** Water mains.

    **(b)** Communication Supply Services, meaning the following types of property supplying communication services, including but not limited to telephone, radio, microwave, television services, internet access or access to any electronic, cellular or satellite

The **Hanover** Insurance Group.

OD3 D903901        1001696

network to the described premises, such as:

    **(i)** Communication transmission lines, including optic fiber transmission lines;

    **(ii)** Coaxial cables; and

    **(iii)** Microwave radio relays except satellites.

  **(c)** Power Supply Services, meaning the following types of property supplying electricity, steam or gas to the described premises:

    **(i)** Utility generating plants;

    **(ii)** Switching stations;

    **(iii)** Substations;

    **(iv)** Transformers; and

    **(v)** Transmission lines.

**(4)** Services under this Additional Coverage do not include overhead transmission lines that deliver utility services to you. Overhead transmission lines include, but are not limited to:

  **(a)** Overhead transmission and distribution lines;

  **(b)** Overhead transformers and similar equipment; and

  **(c)** Supporting poles and towers.

**(5)** As used in this additional coverage, the term transmission lines includes all lines which serve to transmit communication service or power, including lines which may be identified as distribution lines.

**(6)** This coverage is not an additional amount of insurance.

**(7)** Coverage under this Additional Coverage for loss or damage to Covered Property does not apply to loss or damage to "electronic data", including destruction or corruption of "electronic data".

**(8)** The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Utility Services Additional Coverage.

**cc. Deferred Payments**

**(1)** We will pay for your interest in lost or damaged Business Personal Property sold by you under a conditional sale or trust agreement or any installment or deferred payment plan after delivery to buyers. The loss or damage must be caused by a Covered Cause of Loss.

**(2)** When a total loss to that property occurs, deferred payments are valued on the amount shown on your books as due from the buyer. When a partial loss to that property occurs and the buyer refuses to continue payment, forcing you to repossess, deferred payments are valued as follows:

  **(a)** If the realized value of the repossessed property is greater than or equal to the amount shown on your books as due from the buyer, we will make no payment; but

  **(b)** If the realized value of the repossessed property is less than the amount shown on your books as due from the buyer, we will pay the difference.

**(3)** When loss occurs and the buyer continues to pay you, there will be no loss payment.

**(4)** The most we will pay for loss under this Additional Coverage is $5,000 per occurrence.

**dd. Electronic Vandalism**

**(1)** SECTION I - PROPERTY, A. Coverage, 2. Property Not Covered, paragraph o. is deleted.

**(2)** We cover direct physical loss of or damage to covered "computer equipment" at the described premises caused by "electronic vandalism".

**(3)** The most we will pay in any one occurrence under this Additional Coverage is $10,000. The most we pay for all covered losses under this Additional Coverage during each separate 12-month period of this policy is $10,000.

**(4)** Special Electronic Vandalism Exclusions

  We do not cover:

  **(a)** Loss of proprietary use of any "electronic data" or "proprietary programs" that have been copied, scanned, or altered;

  **(b)** Loss of or reduction in economic or market value of any "electronic

data" or "proprietary programs" that have been copied, scanned, or altered; and

   (c) "Theft" from your "electronic data" or "proprietary programs" of confidential information through the observation of the "electronic data" or "proprietary programs" by accessing covered "computer equipment" without any alteration or other physical loss of or damage to the records or programs. Confidential information includes, but is not limited to, customer information, processing methods, or trade secrets.

**ee. Interruption of Computer Operations**

This Additional Coverage is only available if Business Income is covered under this Coverage Form.

   (1) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a suspension of "operations" at the described premises caused by an interruption in computer operations due to destruction or corruption of "electronic data" occurring at or away from the described premises resulting from any Covered Cause of Loss.

   (2) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

      (a) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss include "electronic vandalism". But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

      (b) If the Businessowners Coverage Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage.

   (3) The most we will pay under this Additional Coverage - Interruption of Computer Operations for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved, is $10,000 unless a higher Limit of Insurance is shown in the Declarations. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

   (4) This Additional Coverage - Interruption of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in paragraph (3) above has not been exhausted.

   (5) Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under paragraphs (1), (2), (3) and (4) of this Additional Coverage.

   (6) Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by "electronic vandalism", except as provided under paragraphs (1), (2), (3) and (4) of this Additional Coverage.

   (7) This Additional Coverage - Interruption of Computer Operations does not apply when loss or damage to "electronic data" involves only "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.



OD3 D903901        1001696

**ff.** **Limited Coverage for Fungi, Wet Rot, or Dry Rot**

(1) The coverage described in paragraphs **(2)** and **(6)** below only applies when the "fungi", wet rot or dry rot is the result of any of the "specified causes of loss" other than fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

(2) We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:

(a) Direct physical loss of or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;

(b) The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

(c) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot is present.

(3) The coverage described under this Limited Coverage is limited to $50,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences caused by or resulting from any of the "specified causes of loss" (other than fire or lightning) which take place in a 12 month period (starting with the beginning of the present policy period). With respect to a particular occurrence of loss which results in "fungi", wet rot or dry rot, we will not pay more than the total of $50,000 even if the "fungi", wet rot or dry rot continues to be present or active, or recurs, in a later policy period.

(4) The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and other loss or damage, we will not pay more for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

(5) The terms of this Limited Coverage do not increase or reduce the coverage provided in **SECTION I - PROPERTY, A. Coverage, 5 Additional Coverages, d. Collapse;** and/or **e. Water Damage, Other Liquids, Powder or Molten Material Damage**.

(6) The following applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all the terms and conditions of the applicable **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, f. Business Income** and/or **g. Extra Expense:**

(a) If the loss which resulted in "fungi", wet rot or dry rot does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungi", wet rot or dry rot, then our payment under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, f. Business Income** and/or **g. Extra Expense** is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

(b) If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet

rot or dry rot, but remediation of "fungi", wet rot, dry rot prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**gg. Theft of Telephonic Services**

(1) We will pay amounts you are obligated to pay that result from the "theft" of your "telephonic services" when someone who is not an "employee" gains unauthorized access to your "telephonic services" used in your business operations.

(2) The most we will pay under this Additional Coverage for acts of "theft" of "telephonic services", regardless of the number of "thefts" of "telephonic services" that you sustain in one policy year is $25,000.

**hh. Computer and Funds Transfer Fraud**

(1) We will pay for:

(a) Loss resulting directly from a fraudulent:

(i) Entry of "electronic data" or "computer program" into; or

(ii) Change of "electronic data" or "computer program" within;

any "computer equipment" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to (1)(a)(i) and (1)(a)(ii) in the above paragraph:

(iii) "Money", "securities" or "other property" to be transferred, paid or delivered; or

(iv) Your account at a "financial institution" to be debited or deleted.

(b) Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that account.

(2) As used in (1)(a) above, fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such entry or

change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for "computer equipment" covered under this Insuring Agreement.

(3) The most we will pay per occurrence under this Additional Coverage is $5,000 unless a higher Limit of Insurance is shown in the Schedule of Amended Limits of Insurance.

(4) Under this Additional Coverage all loss:

(a) Caused by one or more persons; or

(b) Involving a single act or series of acts:

is considered one occurrence.

**ii. Tenant Building Insurance - When Your Lease Requires You to Provide Insurance**

(1) This Additional Coverage is available only when the Named Insured is a tenant and a Limit of Insurance is shown in the Declarations Page for Business Personal Property.

(2) We will pay for direct physical loss of or damage to a building on the described premises owned by your landlord and in your care, custody or control for which you have a written contractual responsibility to insure. The loss or damage must be the result of or caused by a Covered Cause of Loss.

(3) Regardless of the number of described buildings affected, the most we will pay per insured location under this Additional Coverage is $25,000 in any one occurrence.

**jj. Tenant Business Personal Property Insurance - When Your Lease Requires You to Provide Insurance**

(1) This Additional Coverage is available only when the Named Insured is a tenant and a Limit of Insurance is shown in the Declarations Page for Business Personal Property.

(2) Subject to **SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment,** paragraph **d.,** subparagraph **(3)(b),** we will pay for

The **Hanover** Insurance Group

OD3 D903901      1001696

direct physical loss of or damage to your landlord's personal property located inside of a building on the described premises and in your care, custody or control for which you have a written contractual responsibility to insure. The loss or damage must be the result of or caused by a Covered Cause of Loss.

(3) Regardless of the number of buildings where the landlord's personal property is located, the most we will pay per insured location under this Additional Coverage in any one occurrence is $25,000.

**6.   Coverage Extensions**

Except as otherwise provided, the following extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises:

**a.   Newly   Acquired   or   Constructed Property**

**(1) Buildings**

If your policy covers Buildings, you may extend the insurance provided under Building to apply to direct physical loss or damage when such loss or damage is caused by a Covered Cause of Loss to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at premises other than the one described, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Used as a warehouse.

(c) The most we will pay for loss or damage under this Extension for Newly Acquired or Constructed Buildings is $1,000,000 at each building.

**(2) Business Personal Property**

(a) If your policy covers Business Personal Property, you may extend the insurance provided under Business Personal Property to apply to direct physical loss or damage when such loss or damage is caused by a Covered Cause of Loss to:

(i) Business Personal Property, including such property that you newly acquire, at any location you acquire; or

(ii) Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

(iii) Business Personal Property that you newly acquire, located at the described premises.

(b) This Extension does not apply to:

(i) Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

(ii) Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

(c) This insurance may not be used to increase your Business Personal Property Limit. It does not apply to personal property you acquire as part of your usual customary business dealings whether or not such acquisition was related to anticipated seasonal demands. Under the terms of this Coverage Form, such property is not considered newly acquired, but falls within the provisions for Business Personal Property.

(d) The most we will pay for loss or damage under this Extension is $500,000 at each premises.

**(3) Business Income and Extra Expense**

You may extend the insurance that applies to Business Income and Extra Expense to apply to property at any location you acquire. The most we will pay for loss or damage under this Extension is $250,000 at each premise.

**(4) Period of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired or Constructed

Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 180 days after you acquire the property or begin construction of that part of the building that would qualify as Covered Property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as Covered Property.

**b. Personal Property Off Premises**

**(1)** If your policy covers Business Personal Property, you may extend the insurance provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to apply to direct physical loss or damage when such loss or damage is caused by a Covered Cause of Loss while:

**(a)** At a location you do not own, lease or operate; or

**(b)** At any fair, trade show or exhibition.

**(2)** The most we will pay for loss or damage under this Extension is $50,000 or the amount shown in the Additional Property Coverage Schedule, whichever is greater.

**(3) Special Personal Property Off Premises Exclusions**

This extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your sales representative, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**c. Outdoor Property**

**(1)** You may extend insurance provided by this Coverage Form to apply to direct physical loss or damage to your radio and television antennas (including satellite dishes), trees, shrubs, plants and lawns (other than trees, shrubs or plants which are "stock" or are a part of a vegetated roof) including debris removal

expense, caused by or resulting from any of the following causes of loss:

**(a)** Fire;

**(b)** Lightning;

**(c)** Explosion;

**(d)** Riot or civil commotion;

**(e)** Aircraft;

**(f)** Windstorm; or

**(g)** Ice, snow, sleet and hail.

**(2)** Coverage under this Extension does not apply to property held for sale by you.

**(3)** Regardless of the number of described premises involved, the most we will pay for loss or damage under this Extension, including debris removal expense, is $10,000, but not more than $1,000 for any one tree, shrub or plant.

**d. Personal Effects**

**(1)** If your policy covers Business Personal Property, you may extend the insurance provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to apply to direct physical loss or damage to personal effects owned by you, your officers, your partners or "members", your "managers" or your "employees" when such loss or damage is caused by a Covered Cause of Loss.

**(2)** This extension does not apply to:

**(a)** Tools or equipment used in your business; and

**(b)** "Employees" tools and small equipment;

**(3)** The most we will pay for loss or damage under this Extension is $10,000 at each described premises.

**e. Valuable Papers and Records (Other Than Electronic Data)**

**(1)** If your policy covers Business Personal Property, you may extend the insurance provided under **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control caused by or resulting from a Covered Cause



OD3 D903901        1001696

of Loss. This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

(2) The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $25,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Additional Property Coverage Schedule.

(3) The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence not at the described premises is $25,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Additional Property Coverage Schedule.

(4) This Coverage Extension does not apply to:

(a) Property held as samples or for delivery after sale; or

(b) Property in storage away from the premises shown in the Declarations;

(5) **SECTION I - PROPERTY, B. Exclusions** does not apply to this Coverage Extension except for:

(a) Paragraph **1.c. Governmental Action**;

(b) Paragraph **1.d. Nuclear Hazard**;

(c) Paragraph **1.f. War and Military Action**;

(d) Paragraph **2.d. Dishonesty**;

(e) Paragraph **2.e. False Pretense**;

(f) Paragraph **2.k. Errors or Omissions**; and

(g) Paragraph **3.a. Weather Conditions, 3.b. Acts or Decisions** and **3.c. Negligent Work.**

f.   **Accounts Receivable**

(1) If your policy covers Business Personal Property, you may extend the insurance provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to accounts receivable when such loss or damage

is caused by or results from a Covered Cause of Loss. We will pay:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

(d) Other reasonable expenses that you incur to re-establish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

(2) We will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises. The most we will pay is $25,000 for accounts receivable at the described premises, unless a higher Limit of Insurance for accounts receivable is shown in the Additional Property Coverage Schedule.

(3) We will pay under this Coverage Extension for loss or damage in any one occurrence not at the described premises. The most we will pay is $25,000 for accounts receivable not at the described premises.

(4) **SECTION I - PROPERTY, B. Exclusions** does not apply to this Coverage Extension except for:

(a) Paragraph **1.c. Governmental Action**;

(b) Paragraph **1.d. Nuclear Hazard**;

(c) Paragraph **1.f. War and Military Action**;

(d) Paragraph **2.d. Dishonesty**;

(e) Paragraph **2.e. False Pretense**; and

(f) Paragraph **3.a. Weather Conditions, 3.b. Acts or Decisions** and **3.c. Negligent Work.**

(5) **Accounts Receivable Special Exclusion**

We will not pay for:

(a) Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or "other property".

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

(b) Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

(c) Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

**g. Key Replacement and Lock Repair**

(1) You may extend the insurance provided under this Coverage Form to cover the reasonable and necessary expense you incur due to a covered "theft" for:

(a) Replacement of keys if they are stolen;

(b) Lock repair; or

(c) Rekeying, replacing or reprogramming undamaged locks to accept new keys or entry codes when the building security has been compromised.

(2) The most we will pay under this Extension is $1,000. The deductible does not apply to this Extension.

**h. Appurtenant Structures**

(1) If your policy covers Buildings, you may extend the insurance provided under Building to apply to direct physical loss or damage to garages, carports, storage buildings and other appurtenant structures, including, but not limited to, swimming pools, spas and the associated equipment within 1,000 feet of the described premises when such loss or damage is caused by or results from a Covered Cause of Loss.

(2) The most we will pay for loss or damage under this Extension is $50,000 at each described premises regardless of the number of buildings or structures affected.

**i. Personal Property in Transit**

(1) If your policy covers Business Personal Property, you may extend the insurance provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to apply to direct physical loss or damage to your property or property of others that is in your care, custody or control while "in transit" when such loss or damage is caused by or results from a Covered Cause of Loss.

(2) You may extend the insurance that applies to **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to apply to direct physical loss or damage, caused by a Coverage Cause of Loss, to outgoing shipments that have been rejected, while in due course of transit back to you or while awaiting return shipment to you.

(3) This Extension applies to the property while in:

(a) A vehicle owned, leased or operated by you; or

(b) The custody of a common carrier or contract carrier.

(4) The following in **SECTION I - PROPERTY, B. Exclusions,** paragraph **1.** do not apply to this Extension:

(a) **b. Earth Movement**; and

(b) **g. Water**.

(5) The most we will pay for loss or damage under this Coverage Extension is $10,000 unless a higher Limit of Insurance is shown in the Schedule of Amended Limits of Insurance.

(6) **Special Personal Property In Transit Exclusions**

This Extension does not apply to:

(a) Shipments that belong to others that you are transporting for a fee;

(b) Property while waterborne;

(c) Salesperson's Samples; or

(d) Loss to "perishable goods" resulting from a breakdown of refrigeration equipment on any vehicle owned, leased or operated by you or while in the custody of a common or contract carrier.



OD3 D903901          1001696

**j. Inventory and Loss Appraisal**

(1) We will pay for all reasonable expenses you incur at our written request to assist us in:

(a) The investigation of a claim;

(b) The determination of the amount of loss, such as taking inventory;

(c) The cost of preparing specific loss documents and other supporting exhibits; or

(d) Expenses you incur include costs charged to you by others, including property managers, acting on your behalf to assist us with items listed in paragraph (1) above.

(2) Regardless of the number of premises involved, the most we will pay under this Extension is $10,000.

(3) The deductible does not apply to these expenses.

(4) **Special Inventory and Loss Appraisal Exclusion**

We will not pay for expenses:

(a) Incurred to perform your duties in the event of a loss under **SECTION I - PROPERTY, E. Property Loss Conditions;**

(b) To prove that loss or damage is covered;

(c) Billed by and payable to independent or public adjusters; attorneys; claims advocates; or any of their affiliated or associated entities;

(d) To prepare claims not covered by this Coverage Form; or

(e) Incurred under any appraisal provisions within the Coverage Form.

**k. Business Personal Property Temporarily in Portable Storage Units**

(1) If your policy covers Business Personal Property, you may extend the insurance provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, b. Business Personal Property** to apply to direct physical loss or damage to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 1,000 feet of the buildings or structures described in the Declarations or within 1,000 feet of the described premises, whichever distance is greater when such loss or damage is caused by or results from a Covered Cause of Loss.

(2) We will not pay for loss of or damage to Business Personal Property temporarily in portable storage units, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

(a) The portable storage unit first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

(b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(3) Coverage under this Extension:

(a) Will end 90 days after the Business Personal Property has been placed in the storage unit;

(b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the Business Personal Property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to Business Personal Property is $25,000 unless a higher limit is shown in the Additional Property Coverage Schedule for this Extension regardless of the number of storage units.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form, and does not apply to loss or damage to the storage unit itself.

**l. Paved Surfaces**

(1) If your policy covers Buildings, you may extend the insurance provided under **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, a. Building** to apply to direct physical loss or damage to your paved surfaces, including but not limited to bridges, roadways, walks, patios, and parking lots when such loss or

damage is caused by or results from a Covered Cause of Loss.

   (2) Regardless of the number of described premises involved, the most we will pay for loss or damage in any one occurrence is $25,000.

   (3) Payment for loss or damage to this property is included in the applicable Limit of Insurance.

   (4) **Special Paved Surfaces Exclusion**

      We will not pay for loss or damage caused by tree roots, freezing or thawing.

**m. Underground Pipes**

   (1) If your policy covers Buildings, you may extend the insurance provided in **SECTION I - PROPERTY, A. Coverage, 1. Covered Property, a. Building** to apply to direct physical loss or damage to underground pipes, flues and drains when such loss or damage is caused by or results from a Covered Cause of Loss.

   (2) The most we will pay for loss under this Coverage Extension is the applicable Limit of Insurance.

   (3) Payment under this Additional Coverage is included within the Limit of Insurance.

   (4) **Special Underground Pipes Exclusion**

      We will not pay for loss or damage caused by tree roots.

**B. Exclusions**

  1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance or Law**

   (1) The enforcement of or compliance with any ordinance or law:

     (a) Regulating the construction, use or repair of any property; or

     (b) Requiring the tearing down of any property, including the cost of removing its debris.

   (2) This exclusion, Ordinance or Law, applies whether the loss results from:

     (a) An ordinance or law that is enforced even if the property has not been damaged; or

     (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

   This exclusion does not apply to the Ordinance or Law Additional Coverage.

**b. Earth Movement**

   (1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in paragraphs **(1)**, **(2)**, **(3)** and **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

     (a) Airborne volcanic blast or airborne shock waves;

     (b) Ash, dust or particulate matter; or

     (c) Lava flow.

   With respect to coverage for volcanic action as set forth in paragraph **(5)**, subparagraphs **(a)**, **(b)** and **(c)** above, all volcanic eruptions that occur within



OD3D903901      1001696

any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

This exclusion applies regardless of whether or not any of the above, in **SECTION I - PROPERTY, B. Exclusions**, paragraph **1., b Earth Movement**, subparagraphs**(1), (2), (3), (4)** and **(5)**, are caused by an act of nature or is otherwise caused.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Form.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility services to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause

of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

This exclusion does not apply to loss or damage to "computer equipment" and "electronic data" or to **SECTION I - PROPERTY, 5. Additional Coverages, bb. Utility Services**.

**f. War and Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** "Flood", surface water, waves (including tidal wave or tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump; or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in paragraphs **(1), (3)** or **(4)** above, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of paragraphs **(1), (2), (3), (4)** and **(5)** above, are caused by an act of nature or is otherwise caused. An example

of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if Water, as described in paragraphs **(1)**, **(2)**, **(3)**, **(4)** and **(5)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage. If electrical "covered equipment" requires drying out because of paragraphs **(1)**, **(2)**, **(3)**, **(4)** and **(5)** above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and Deductible for Building or Personal Property, whichever applies.

**h. Fungi, Wet Rot or Dry Rot**

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.

But if "fungi", wet rot or dry rot results in any of the "specified causes of loss", we will pay for the loss or damage caused by any of the "specified causes of loss".

This exclusion does not apply:

**(1)** When "fungi", wet rot or dry rot results from fire or lightning; or

**(2)** To the extent that coverage is provided in the **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverage, ff. Limited Coverage for Fungi, Wet Rot or Dry Rot**, with respect to loss or damage by a cause of loss other than fire or lightning.

**i. Virus or Bacteria**

**(1)** Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**(2)** However, the exclusion in paragraph **(1)** above, does not apply to loss or damage caused by or resulting from "fungi", wet rot or dry rot. Such loss or damage is addressed in **SECTION I - PROPERTY, B. Exclusions**, paragraph **1., h. Fungi, Wet Rot or Dry Rot**.

**(3)** With respect to any loss or damage subject to the exclusion in paragraph **(1)** above, such exclusion supersedes any exclusion relating to "pollutants".

**SECTION I - PROPERTY, B. Exclusions**, paragraphs **1.a., 1.b., 1.c., 1.d., 1.e., 1.f., 1.g., 1.h. and 1.i.** apply whether or not the loss

event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

**a. Consequential Losses**

Delay, loss of use or loss of market, however caused.

**b. Smoke, Vapor and Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**c. Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**d. Dishonesty**

Dishonest or criminal act by you, any of your partners, "members", officers, managers, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but "theft" by employees is not covered.

This exclusion does not apply to coverage that is provided under the Employee Theft Including ERISA Additional Coverage.

**e. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have sold, given or otherwise entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

This exclusion does not apply to the Unauthorized Business Card Use Additional Coverage.

**f. Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

**g. Collapse**



OD3 D903901     1001696

(1) Collapse, including any of the following conditions of property or any part of the property:

   (a) An abrupt falling down or caving in;

   (b) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

   (c) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to paragraphs **(a)** or **(b)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

(2) This Exclusion **g.** does not apply:

   (a) To the extent that coverage is provided under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, d. Collapse**; or

   (b) To collapse caused by one or more of the following:

     (i) Any of the "specified causes of loss"

     (ii) Breakage of building glass;

     (iii) Weight of rain that collects on a roof; or

     (iv) Weight of people or personal property

**h. Pollution**

Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in any of the "specified causes of loss", we will pay for the loss or damage caused by any of the "specified causes of loss".

**i. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**j. Other Types of Loss**

(1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals; or

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force.

This exclusion does not apply with respect to the breakdown of "computer equipment".

This exclusion does not apply to the Equipment Breakdown Additional Coverage.

(7) The following causes of loss to personal property:

   (a) Dampness or dryness of the atmosphere;

   (b) Changes in or extremes of temperature; or

   (c) Marring or scratching.

But if an excluded cause of loss that is listed in paragraphs **(1), (2), (3), (4), (5), (6)** and **(7)** above, results in any of the "specified causes of loss", "accident", "electronic circuity impairment" or building glass breakage, we will pay for the loss or damage caused by any of the "specified causes of loss", "accident", "electronic circuity impairment" or building glass breakage.

**k. Errors or Omissions**

Errors or omissions in:

(1) Programming, processing or storing "electronic data" or in any "computer equipment" operations; or

(2) Processing or copying "valuable papers and records".

However, we will pay for direct physical loss or damage caused by resulting fire, "accident", "electronic circuity impairment" or explosion if these causes of loss would be covered by this Coverage Form.

**l. Installation, Testing, Repair**

Errors or deficiency in design, installation, testing, maintenance, modification or

repair of your "computer equipment" system including "software".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Form.

**m. Electrical Disturbance**

Electrical or magnetic injury, disturbance or erasure of "electronic data", except as provided for in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages,** and **6. Coverage Extensions**.

However, we will pay for direct loss or damage caused by lightning.

**n. Artificially Generated Electricity**

Artificially generated electric current including electric arcing, that disturbs electrical devices, appliances or wires except as provided for in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, u. - Equipment Breakdown**. But, if artificially generated electric current results in fire, we will pay for the loss or damage caused by fire.

**o. Computer Processing Exclusion**

(1) Errors or omissions in programming or incorrect instructions to "hardware";

(2) Electrical or magnetic damage, disturbance of recordings or erasure of electronic recordings, except as provided under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, u. Equipment Breakdown**. We will also pay for direct loss caused by lightning;

(3) Mechanical breakdown or malfunction, component failure, faulty installation or blowouts; except as provided for under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, u. Equipment Breakdown**; or

(4) Faulty instruction or incorrect usage, including changes in arrangements or parts.

**p. Loss of Warranty**

Loss of warranty or similar future or potential benefit even when following a covered loss or covered damage.

(1) Loss of this type does not meet direct physical loss or damage.

(2) We agree that reasonable repair or reconditioning measures be pursued to ensure soundness of property after loss or damage:

(a) Where proper and adequate report or reconditioning method is debated, you and we agree to follow the usual and customary industry repair and reconditioning practices; or

(b) For situations not resolved by paragraph **(a)** above, either party may demand that the matter be resolved through Appraisal as provided for elsewhere in the Coverage Form.

**q. Continuous or Repeated Seepage or Leakage of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**r. Authorized Access**

Loss resulting from a fraudulent:

(1) Entry of "electronic data" or "computer program" into; or

(2) Change of "electronic data" or "computer program" within;

any "computer equipment" owned, leased or operated by you by a person or organization with authorized access to that "computer equipment", except when covered under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, hh. Computer and Funds Transfer Fraud**, paragraph **b.**.

**s. Fraudulent Instructions**

Loss resulting from an "employee" or "financial institution" acting upon any instruction to:

(1) Transfer, pay or deliver "money", "securities" or "other property"; or

(2) Debit or delete your account; which instruction proves to be fraudulent, except when covered under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, hh. Computer and Funds Transfer Fraud**, paragraphs **a.(2)** and **b.**.

**3.** We will not pay for loss or damage caused by or resulting from paragraphs **a., b.** and **c.** below. But if an excluded cause of loss that is listed in paragraphs **a., b.** and **c.** below, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**



OD3 D903901      1001696

But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **SECTION I - PROPERTY, B. Exclusions**, paragraph **1.** to produce the loss or damage.

**b. Acts or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

**4. Additional Exclusion**

The following applies only to the property specified in this Additional Exclusion:

**Loss or Damage to Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**5. Business Income and Extra Expense Exclusions**

We will not pay for:

**a.** Any Extra Expense or increase of Business Income loss caused by or resulting from:

(1) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons;

(2) "Suspension", lapse or cancellation of any license, lease or contract. But if the "suspension", lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" in accordance with the terms of **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, f. Business Income, (2) Extended Business Income.**

(3) Damage or destruction of "finished stock"; the time required to reproduce "finished stock"; or

(4) Any other consequential loss.

Paragraph **5.a.(3)** does not apply to Extra Expense.

**C. Limits of Insurance**

1. The most we will pay for loss or damage in any one occurrence is the applicable Limits of Insurance of **SECTION I - PROPERTY** shown in the Declarations.

2. The amounts of insurance applicable to the Coverage Extensions and the following Additional Coverages apply in accordance with the terms of such coverages and are in addition to **SECTION I - PROPERTY, C. Limits of Insurance:**

**a.** Fire Department Service Charge;

**b.** Pollutant Clean-Up and Removal;

**c.** Civil Authority;

**d.** Money Orders and Counterfeit Money;

**e.** Forgery or Alteration;

**f.** Ordinance or Law;

**g.** Business Income from Dependent Properties;

**h.** Glass Expenses;

**i.** Fire Protection Equipment Recharge

**j.** Employee Theft;

**k.** Rewards - Arson and Theft;

**l.** Computer Equipment;

**m.** Tenant Signs (Tenants Only);

**n.** Commercial Tools and Small Equipment;

**o.** Installation;

**p.** Fine Arts;

**q.** Sales Representative Samples;

**r.** Leasehold Interest (Tenants Only);

**s.** Unauthorized Business Credit Card Use;

**t.** Deferred Payments;

u. Money and Securities;

v. Electronic Vandalism;

w. Interruption of Computer Operations;

x. Theft of Telephonic Services;

y. Computer and Funds Transfer Fraud;

z. Tenant Building Insurance - When Your Lease Requires You to Provide Insurance; or

aa. Tenant Business Personal Property Insurance - When Your Lease Requires You to Provide Insurance.

**3. Building Limit - Increase**

If Covered Property is written on a Replacement Cost basis:

a. The Limit of Insurance for Buildings will be revised by changes that occurred in the cost of construction during the preceding policy year.

b. The amount of increase will be determined by reports of a recognized valuation method.

c. We will inform you of such adjusted values. Upon their acceptance, you agree to pay any additional premium for the adjusted limit. Payment of your renewal premium, which includes the revised Limit of Insurance, shall constitute acceptance.

d. We will pay the replacement cost value of the damaged portion of the building at the time of loss, but not more than 125% of the Limit of Insurance for Building if:

   (1) The amount of any loss covered by this Coverage Form exceeds the Limit of Insurance for Building stated in the Declarations for the damaged Building; and

   (2) The actual repair or replacement is completed within one year of the date of loss.

e. The **Building Limit - Increase** clause will not apply if:

   (1) You do not accept the adjusted value; or

   (2) You do not inform us of changes to covered Building:

      (a) Within sixty (60) days of the date any additions, improvements or enlargements to the building are begun, and

      (b) When the replacement value of the changes are more than 5% of

the Limit of Insurance for the building.

**4. Business Personal Property Limit - Seasonal Increase**

a. The Limit of Insurance for Business Personal Property will increase by 25% to provide for seasonal variations.

b. This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

   (1) The 12 months immediately preceding the date the loss or damage occurs; or

   (2) The period of time you have been in business as of the date the loss or damage occurs.

**D. Deductibles**

1. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable limit in **SECTION I - PROPERTY, C. Limit of Insurance**.

2. No Deductible applies to the following Additional Property Coverages and Extensions of Coverage:

   a. Fire Department Service Charge;

   b. Fire Protection Equipment Recharge;

   c. Business Income;

   d. Extra Expense;

   e. Civil Authority;

   f. Key Replacement and Lock Repair;

   g. Deferred Payment;

   h. Debris Removal;

   i. Rewards - Arson, Theft and Vandalism;

   j. ERISA Compliance;

   k. Preservation of Property;

   l. Pollutant Clean-Up and Removal;

   m. Ordinance or Law;

   n. Leasehold Interest (Tenants Only);

   o. Unauthorized Business Credit Card Use;

   p. Business Income from Dependent Properties; and

   q. Inventory and Loss Appraisal.

3. A $250 Deductible applies to the following Coverages:

   a. Glass - Interior and Exterior; and



b. Glass Expenses.

4. A $500 Deductible applies to all of the Additional Property Coverages and Extensions of Coverage scheduled on the Declarations, except Equipment Breakdown, unless otherwise indicated in paragraphs **2.**, **3.** or **5.** of this section.

5. A $1,000 Deductible applies to the following Additional Property Coverages and Extensions of Coverage:

   a. Employee Theft (except ERISA Compliance);

   b. Sales Representative Samples;

   c. Installation;

   d. Personal Property Off Premises;

   e. Personal Property In Transit.

6. The Deductible shown in the Declarations for the Equipment Breakdown Additional Coverage applies to the Additional Coverage for Equipment Breakdown.

7. Each Deductible shall be applied separately, but only to the coverage specified. The total Deductible for all losses in one occurrence will be the highest Deductible amount that applies to that occurrence.

8. The Business Income Waiting Period shown on the Declarations Page for the Business Income and Civil Authority Additional Coverages is applicable in addition to a Deductible.

E. **Property Loss Conditions**

   1. **Abandonment**

      There can be no abandonment of any property to us.

   2. **Appraisal**

      If you and we disagree on the amount of a covered loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

      a. Pay its chosen appraiser; and

      b. Bear the other expenses of the appraisal and umpire equally.

      If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties in the Event of Loss or Damage**

   a. You must see that the following are done in the event of loss or damage to Covered Property:

      (1) Notify the police if a law may have been broken.

      (2) Give us prompt notice of the loss or damage. Include a description of the property involved.

      (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

      (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase **SECTION I - PROPERTY, C. Limits of Insurance.** However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

      (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

      (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

         Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

      (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

      (8) Cooperate with us in the investigation or settlement of the claim.

      (9) Resume all or part of your "operations" as quickly as possible.

   b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter

relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred. The 2 year limitation also applies to indirect or consequential loss covered under this Coverage Form.

**5. Loss Payment**

In the event of loss or damage covered by this Coverage Form:

**a.** At our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to paragraph **d.**, subparagraph **(1)(d)** below.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** We will determine the value of Covered Property as follows:

**(1)** At replacement cost without deduction for depreciation except as provided in paragraphs **(2)**, **(3)**, **(4)**, **(5)**, **(6)**, **(7)**, **(8)**, **(9)**, **(10)**, **(11)**, **(12)**, **(13)**, **(14)**, **(15)** and **(16)** below.

**(a)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(b)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the loss or damaged property is actually repaired or replaced;

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage; and

**(iii)** Unless the repairs or replacement are completed within 24 months for personal property or for buildings and other real property after the loss or damage, unless extended in writing by us.

However, if the cost to repair or replace a damaged building is $2,500 or less we will determine the value at replacement cost without deduction for depreciation.

**(c)** We will not pay more for loss or damage on a replacement cost basis than the least of the following amounts:

**(i)** The cost to replace, on the same premises, the lost or damaged property with other property:

**1)** Of comparable material and quality; and

**2)** Used for the same purpose; or

**(ii)** The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new location, the recoverable amount is limited to the cost which would have been incurred had the building been built at the original premises.

**(d)** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Declarations indicate the Actual Cash Value applies to Building or Personal Property, paragraph **(1)** above does not apply to that property. Instead, we will determine the value of that property at the actual cash value.



OD3 D903901        1001696

(3) The following property at actual cash value:

   (a) Used or second-hand merchandise held in storage or for sale;

   (b) Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

   (c) Household contents, except personal property in apartments or rooms furnished by you as landlord;

   (d) Manuscripts;

   (e) Works of art, "antiques" or rare articles, including but not limited to, etchings, pictures, statuary, marbles, bronzes, porcelains, glassware and bric-a-brac not otherwise covered in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverage, x. Fine Arts;** or

   (f) Commercial Tools and Small Equipment and Contractors Tools and Equipment. This does not apply to your Commercial Tools and Small Equipment permanently installed or exclusively used at the described premises.

(4) Glass at the cost of replacement with safety glazing material if required by law.

(5) Tenant's Improvements and Betterments at:

   (a) Replacement cost if you make repairs promptly.

   (b) A proportion of your original cost if you, as the tenant, do not make repairs promptly. We will determine the proportionate value as follows:

      (i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

      (ii) Divide the amount determined in paragraph (i) above by the number of days from the installation of improvements to the expiration of the lease.

     If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

   (c) Nothing if others pay for repairs or replacement.

(6) "Valuable papers and records" at the cost of restoration or replacement, including the cost of data entry, re-programming, computer consultation services and the "media" on which the data or programs reside. To the extent that the contents of the "valuable papers and records" are not restored, the "valuable papers and records" will be valued at the cost of replacement with blank materials of substantially identical type.

(7) "Money" at its face value; and

(8) "Securities" at their value at the close of business on the day the loss is "discovered".

(9) Accounts Receivable:

   (a) If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

      (i) We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

      (ii) We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

   (b) The following will be deducted from the total amount of accounts receivable, regardless of how that amount is established:

      (i) The amount of the accounts for which there is no loss or damage;

(ii) The amount of the accounts that you are able to re-establish or collect;

(iii) An amount to allow for probable bad debts that you are normally unable to collect; and

(iv) All unearned interest and service charges.

(10) "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

(11) "Finished stock" you manufactured at selling price less discounts and expenses you otherwise would have had.

(12) Personal Property in Transit (other than "stock" you have sold) at the amount of invoice, including your prepaid or advanced freight charges and other charges which may have accrued or become legally due since the shipment. If you have no invoice, actual cash value will apply.

(13) Precious metals, such as gold, silver and platinum, at the average market cost of replacements on the date of loss, or the actual cost of the replacement, if less.

(14) "Fine Arts"

We will pay the lesser of:

(a) The market value at the time of loss or damage;

(b) The reasonable cost of repair or restoration to the condition immediately before the covered loss or damage; or

(c) The cost of replacement with substantially identical property.

e. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive a properly completed sworn proof of loss, provided you have complied with all of the terms of this Coverage Form, and

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

h. In settling covered losses involving a party wall, we will pay a proportion of the loss, to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of **SECTION III - COMMON POLICY CONDITIONS, K. Transfer of Rights of Recovery Against Others to Us** in this policy.

6. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to **SECTION I - PROPERTY, C the Limits of Insurance.**

7. **Vacancy**

a. **Description of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in paragraphs (a) and (b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such leased space is vacant when it does not contain



OD3 D903901        1001696

enough business personal property to conduct customary "operations".

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operation.

(2) Buildings under construction or renovation are not considered vacant when customary "operations" cannot be conducted as a direct result of the construction or renovation.

**b. Vacancy Provisions**

If the building or leased space where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage due to freezing, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) "Theft"; or

(f) Attempted "theft".

(2) With respect to Covered Causes of Loss other than those listed in paragraphs **(a), (b), (c), (d), (e) and (f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**8. Pair, Sets or Parts**

For pairs or sets, we will either:

(a) Repair or replace any part to restore the value and condition of the pair or set to that immediately before the covered loss or damage; or

(b) Pay the difference between the value of the pair or set before and after the covered loss or damage.

(c) Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**F. Property General Conditions**

**1. Control of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**2. Mortgageholders**

a. The term mortgageholder includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Form, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this policy at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Form will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Form:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the

mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f.  If we cancel this policy, we will give written notice to the mortgageholder at least:

   **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

g.  If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**3.  No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**4.  Policy Period, Coverage Territory**

Under **SECTION I - PROPERTY:**

a.  We cover loss or damage commencing:

   **(1)** During the policy period shown in the Declarations; and

   **(2)** Within the coverage territory or, with respect to property "in transit", while it is between points in the coverage territory.

b.  The coverage territory is:

   **(1)** The United States of America (including its territories and possessions);

   **(2)** Puerto Rico; and

   **(3)** Canada.

**5.  Protective Devices**

a.  If you received a discount to the property premium of this policy because of the existence of one of the following protective devices, you are required to maintain that protective device. Existence of an applicable protective devices credit can be found on the Declarations Page.

b.  Protective devices include Automatic Sprinkler Systems including related supervisory services, Automatic Fire Alarms and Central Station Security Alarms.

c.  We will not pay for loss or damage caused by a Covered Cause of Loss which a device is intended to protect against if you:

   **(1)** Knew of any suspension or impairment in any protective device and failed to notify us of that fact; or

   **(2)** Failed to maintain any protective device over which you had control in complete working order.

   If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

**6.  Increase in Hazard**

We will not pay for loss or damage when there has been a material increase in hazard that is within your knowledge or control. This condition applies to any and all portions of a claim.

**G.  Property Definitions**

**1.  "Accident"**

a.  "Accident" means a fortuitous event that causes direct physical damage to "covered equipment". The event must be one of the following:

   **(1)** Mechanical breakdown, including rupture or bursting caused by centrifugal force;

   **(2)** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

   **(3)** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

   **(4)** Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   **(5)** Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

b.  None of the following is an "accident":

   **(1)** Defect, programming error, programming limitation, computer virus, malicious code, loss of data, loss of access, loss of use, loss of functionality or other condition within

The **Hanover** Insurance Group

OD3 D903901      1001696

or involving data or "media" of any kind; or

(2) Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident".

2. "Antique" or "antiques" means an object having value because its:

a. Craftsmanship is in the style or fashion of former times; and

b. Age is 100 years old or older.

3. "Cloud computing services" means professional, on-demand, self-service data storage or data processing services provided through the Internet or over telecommunications lines. This includes services known as IaaS (infrastructure as a service), PaaS (platform as a service), Saas (software as a service) and NaaS (network as a service). This includes business models know as public clouds, community clouds and hybrid clouds. "Cloud computing services" include private clouds if such services are owned and operated by a third party.

4. "Computer equipment" means:

a. "Hardware" and related component parts. Component parts include but are not limited to modems, routers, printers, keyboards, monitors, and scanners;

b. "Software"; and

c. "Protection and control equipment".

"Computer equipment" does not mean "Computer equipment" used to operate production-type machinery or equipment.

5. "Computer hacking" means an unauthorized intrusion by an individual or group of individuals, whether employed by you or not, into "hardware" or "software", a Web site, or a computer network and that results in but is not limited to:

a. Deletion, destruction, generation, or modification of "software";

b. Alteration, contamination, corruption, degradation, or destruction of the integrity, quality or performance of "software";

c. Observation, scanning, or copying of "electronic data", "programs and applications", and "proprietary programs";

d. Damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware'"; or

e. Denial of access to or denial of services from "hardware", "software", computer network, or Web site including related "software".

6. "Computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send "electronic data".

7. "Computer Virus" means the introduction into "hardware", "software", computer network, or Web site of any malicious, self-replicating electronic data processing code or other code and that is intended to result in, but is not limited to:

a. Deletion, destruction, generation, or modification of "software";

b. Alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";

c. Damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

d. Denial of access to or denial of services from "hardware", "software", computer network, or Web site including related "software".

8. "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

9. "Covered equipment" means Covered Property which, during normal usage, operates under vacuum or pressure, other than the weight of its contents, or that generates, transmits or utilizes energy.

"Covered equipment" may utilize conventional design and technology or new or newly commercialized design and technology.

"Covered equipment" does not include:

a. Structure, foundation, cabinet or compartment;

b. Insulating or refractory material;

c. Sewer piping, buried vessels or piping, or piping forming a part of a sprinkler or fire suppression system;

d. Water piping other than boiler feedwater piping, boiler condensate return piping or

water piping forming a part of a refrigerating or air conditioning system;

e. Dragline, excavation equipment or construction equipment;

f. Vehicle, meaning any machine or apparatus that is used for transportation or moves under its own power or any equipment mounted on a vehicle. Vehicle includes but is not limited to: car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester. However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power supplier will not be considered a vehicle;

g. Equipment manufactured by you for sale or

h. Satellite, spacecraft or any equipment mounted on a satellite or spacecraft.

10. "Data" means a representation of information, knowledge, facts, concepts or instructions which are being processed or have been processed in "computer equipment".

11. "Data records" means files, documents and information in an electronic format and that are stored within "electronic data".

12. "Denial of service attack" means the malicious direction or a high volume of worthless inquiries to website or e-mail destinations, effectively denying or limiting legitimate access regardless of whether or not damage to "computer equipment" results.

13. "Dependent property" or "dependent properties" means the property owned by others whom you depend upon to:

a. Deliver materials or services to you or to others for your account. But services do not mean water supply services, wastewater removal services, communication supply services or power supply services;

b. Accept your products or services;

c. Manufacture products for delivery to your customers under contract of sale; or

d. Attract customers to your business.

The "dependent property" must be located in the coverage territory of this Coverage Form.

14. "Discover" or "Discovered" means:

a. The time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this policy has been or will be

incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details may not be known.

b. "Discover" or "Discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this policy.

15. "Electronic circuitry" means microelectronic components, including but not limited to circuit boards, integrated circuits, computer chips and disk drives.

16. "Electronic circuitry impairment"

a. "Electronic circuitry impairment" means a fortuitous event involving "electronic circuitry" within "covered equipment" that causes the "covered equipment" to suddenly lose its ability to function as it had been functioning immediately before such event. This definition is subject to the conditions specified in b., c. and d. below.

b. We shall determine that the reasonable and appropriate remedy to restore such "covered equipment's" ability to function is the replacement of one or more "electronic circuitry" components of the "covered equipment."

c. The "covered equipment" must be owned or leased by you, or operated under your control.

d. None of the following is an "electronic circuitry impairment":

(1) Any condition that can be reasonably remedied by:

(a) Normal maintenance, including but not limited to replacing expendable parts, recharging batteries or cleaning;

(b) Rebooting, reloading or updating software or firmware; or

(c) Providing necessary power or supply.

(2) Any condition caused by or related to:

(a) Incompatibility of the "covered equipment" with any software or equipment installed, introduced or networked within the prior 30 days; or

(b) Insufficient size, capability or capacity of the "covered equipment."



OD3 D903901          1001696

(3) Exposure to adverse environmental conditions, including but not limited to change in temperature or humidity, unless such conditions result in an observable loss of functionality. Loss of warranty shall not be considered an observable loss of functionality.

17. "Electronic data" means files, documents, information and "programs and applications" in an electronic format and that are stored on "media".

18. "Electronic Vandalism" means "computer hacking", "computer virus" or a "denial of service attack". "Electronic vandalism" does not include the "theft" of any property or services.

19. "Employee" or "employees" means:

a. Any natural person or persons:

(1) While in your service and for 30 days after termination of service; and

(2) Who you compensate directly by salary, wages or commissions; and

(3) Who you have the right to direct and control while performing services for you;

b. Any natural person who is furnished temporarily to you:

(1) To substitute for a permanent employee, as defined in paragraph a. above, who is on leave; or

(2) To meet seasonal or short-term workload conditions;

c. Any natural person or persons who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in paragraph b. above;

d. Any natural person who is a former "employee", partner, "manager", director or trustee retained as a consultant while performing services for you; or

e. Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody or property outside the described premises;

f. Any natural person who is:

(1) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; and

(2) A director or trustee of yours while that person is engaged in handling "funds" or "other property" of any "employee benefit plan";

"Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in paragraph 14. of this section.

20. "Financial institution" means:

a. With regard to SECTION I - PROPERTY, A. Coverage, 5. Additional Coverage, s. Money and Securities:

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

(2) An insurance company.

b. SECTION I - PROPERTY, A. Coverage, 5. Additional Coverage, hh. Computer and Funds Transfer Fraud:

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution;

(2) An insurance company; or

(3) A stock brokerage firm or investment company.

c. Other than SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, s. Money and Securities and hh. Computer and Funds Transfer Fraud, any financial institution.

21. "Fine arts" means paintings, etchings, pictures, tapestries, rare art glass, art glass windows, valuable rugs, statuary, sculptures, "antique" jewelry, bric-a-brac, porcelains and similar property of rarity, historical value or artistic merit.

22. "Finished stock" means stock you have manufactured. "Finished stock" also includes whiskey and alcoholic products being aged.

"Finished stock" does not include "stock" you have manufactured that is held for sale on the premises of any retail outlet.

23. "Flood" means a general and temporary condition of partial or complete inundation of normally dry land areas due to:

a. Surface water or waves, tides, tidal waves, tsunami, overflow of any body of water or their spray, all whether driven by wind or not (including storm surge);

b. The unusual or rapid accumulation of runoff of surface waters from any source;

c. Mudslides or mudflows which are caused by "flood" water. A mudslide or mudflow involves a river of liquid and flowing mud on the surface of normally dry land areas as when earth is carried by a current of water and deposited along the path of the current.

d. The release of water impounded by a dam, levee, dike, seawall or "flood" control device, whether driven by wind or not (including storm surge).

When a "flood" is a continuous or protracted event it will constitute a single "flood" occurrence.

24. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

25. "Fraudulent instruction" means:

a. An electronic, telegraphic, cable, teletype, tele facsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction (other than those described in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, k. Forgery or Alteration**) issued by you, which was forged or altered by someone other than you without your knowledge or consent or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent.

26. "Funds" means "money" and "securities".

27. "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by "fungi".

28. "Hardware" means a network of electronic machine components (microprocessors) capable of accepting instructions and information, processing the information according the instructions, and producing desired results. "Hardware" includes but is not limited to:

a. Mainframe and mid-range computers and servers;

b. Personal computers and workstations;

c. Portable electronic devices. Portable electronic devices include laptops, tablets, e-readers, smartphones or other lightweight, hand-held or wearable devices capable of storing, retrieving and processing data; and

d. Peripheral data processing equipment, including but not limited to printers, keyboards, monitors, and modems.

"Hardware" does not mean electronic items that are not similar to the items listed in **a.**, **b.**, **c.** and **.d.** above. "Hardware" does not include:

e. Diagnostic equipment;

f. Electronic items that contain a computer to perform functions other than "hardware"; and

g. Peripheral data processing equipment valued more than the "hardware" itself.

29. "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

30. "In transit" means in the course of shipment from or to the premises shown in the Declarations. It includes such shipments while temporarily stopped or delayed, incidental to the delivery.

31. "Manager" or "managers" means a person or persons serving in a directorial capacity for a limited liability company (LLC).

32. "Media" means an instrument that is used with "hardware" and on which "electronic data", "programs and applications", and "proprietary programs" can be recorded or stored. "Media" includes, but is not limited to, films, tapes, cards, discs, drums, cartridges, cells, DVDs, CD-ROMs and other portable data devices.

33. "Member" or "Members" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

34. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property away from the described premises.

35. "Money" means:

a. Currency, coins and bank notes in current use and having a face value;

b. Traveler's checks and money orders held for sale to the public; and

c. In addition, includes:



OD3 D903901        1001696

(1) For the purposes of **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, p. Employee Theft including ERISA Compliance and k. Forgery or Alteration,** deposits in your account at any "financial institution"; and

(2) For the purposes of **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverage hh. Computer and Funds Transfer Fraud,** deposits in your account at a "financial institution" as defined in **SECTION I - PROPERTY, G. Property Definitions**, paragraph **19.b.**.

36. "One equipment breakdown" means: If an initial "accident" or "electronic circuitry impairment" causes other "accidents" or "electronic circuitry impairments," all will be considered "one equipment breakdown." All "accidents" or "electronic circuitry impairments" that are the result of the same "accident" or "electronic circuitry impairment" will be considered "one equipment breakdown."

37. "Operations" means your business activities occurring at the described premises.

38. "Other property" means tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, "electronic data" or any property specifically excluded under this Coverage Form.

39. "Payment processing device" means any electronic device used to process credit, debit or charge card transactions, including but not limited to, digital pen pad devices, PIN pad devices, Automatic Teller Machines (ATMs), credit card processing machines.

40. "Payroll expense":
   a. Means payroll expenses for all your "employees" except:
      (1) Officers;
      (2) Executive;
      (3) Department Managers;
      (4) "Employees" under contract; and
      (5) Additional Exemptions shown in the Declarations as:
         (a) Job classifications; or
         (b) "Employees".
   b. Includes:
      (1) Payroll;
      (2) Employee Benefits, if directly related to payroll;

      (3) FICA payments you pay;
      (4) Union dues you pay; and
      (5) Workers' Compensation premiums.

41. "Period of Restoration"
   a. Means the period of time that:
      (1) Begins:
         (a) After the number of hours shown as the Business Income Waiting Period in the Declarations after the time of direct physical loss or damage for Business Income Coverage; or
         (b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

         caused by or resulting from any Covered Cause of Loss at the described premises; and
      (2) Ends on the earlier of:
         (a) The date when the property at the described premises should be repaired, rebuilt or replaced (to a condition permitting occupancy) with reasonable speed and similar quality; or
         (b) The date when business is resumed at a new permanent location; or
         (c) Exhaustion of the number of consecutive months as shown on the Policy Declarations Page.
   b. Does not include any increased period required due to the enforcement of any ordinance or law that:
      (1) Regulates the construction, use or repair, or requires the tearing down of any property; or
      (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

      The expiration date of this policy will not cut short the "period of restoration".

42. "Perishable goods" means personal property:
   a. Maintained under controlled temperature or humidity conditions for preservation; and
   b. Susceptible to loss or damage if the controlled temperature or humidity conditions change.

43. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

44. "Programs and applications" means operating programs and applications that you purchase and that are:

   a. Stored on "media"; or

   b. Pre-installed and stored in "hardware".

   Applications include, but are not limited to, programs for word processing, spreadsheet calculations, and graphic design.

45. "Proprietary programs" means proprietary operating programs and applications that you developed or that you had developed specifically for use in your "operations" and that are:

   a. Stored on "media"; or

   b. Installed and stored in "hardware".

46. "Protection and control equipment" means:

   a. Air conditioning or other cooling equipment used exclusively in the operation of the "hardware";

   b. Fire protection equipment used for the protection of the "hardware", including automatic and manual fire suppression equipment and smoke and heat detectors; and

   c. Uninterruptible power supply system, line conditioner, and voltage regulator.

47. "Rental Value" means Business Income that consists of:

   a. New Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

     (1) Payroll; and

     (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

48. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or "other property" and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

49. "Software" means;

   a. "Media";

   b. "Electronic Data";

   c. "Programs and applications"; and

   d. "Proprietary programs".

50. "Specified Causes of Loss" means the following:

   Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

     (1) The cost of filling sinkholes; or

     (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss of or damage to:

     (1) Personal property in the open; or

     (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   c. Water damage means

     (1) Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam; and

     (2) Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal

The Hanover Insurance Group.
OD3 D903901      1001696

sanitary sewer system, if the breakage or cracking is caused by wear or tear.

But water damage does not include loss or damage otherwise excluded in **SECTION I - PROPERTY, B. Exclusions,** paragraph **1. g. Water..** Therefore, for example, there is no coverage in the situation in which discharge or leakage of water results from breaking apart of cracking of a pipe which was caused by or related to weather-induced "flood" water, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced "flood" water which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in paragraphs **(1)** or **(2)** above of this definition of "specified causes of loss", such water is not subject to the provisions of **SECTION I - PROPERTY, B. Exclusions,** paragraph **1., g. Water,** which preclude coverage for surface water or water under the ground surface.

51. "Stock" means merchandise held in storage or for sale, raw materials and in process or finished goods, including supplies used in their packing or shipping.

52. "Suspension" means:

   a. The partial slowdown or complete cessation of your business activities; or

   b. Part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

53. "Telephonic services" means use of your:

   a. Telephone services;

   b. Telephone credit cards; or

   c. Telephone access cards.

54. "Theft" means the unlawful taking of property to the deprivation of the Insured.

55. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "money" and "securities" by means of:

   a. Electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

   b. Written instructions (other than those described in **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, k. Forgery or Alteration**) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

56. "Valuable papers and records" means:

   a. Inscribed, printed or written:

      (1) Documents;

      (2) Manuscripts; and

      (3) Records;

      including abstracts, books, deeds, drawings, films, maps or mortgages;

   b. If you are a Printer, Publisher or Graphic Artist by trade, "valuable papers and records" means negatives, positives, artwork, separations, plates, dies, molds, forms, stock manuscripts and other similar property usual to the graphic arts, printing or publishing industry, including those which exist on electronic or magnetic "media", other than prepackaged software programs.

   But "valuable papers and records" does not mean "money" or "securities".

## SECTION II - LIABILITY

## A. Coverages

1. **Business Liability**

   a. We will pay those sums the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury", to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in **SECTION II - LIABILITY, D - Liability and Medical Expenses Limits of Insurance;** and

      (2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of

judgments, settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **f. Coverage Extension - Supplementary Payments**.

b. This insurance applies:

(1) To "bodily injury" and "property damage" only if:

(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(b) The "bodily injury" or "property damage" occurs during the policy period; and

(c) Prior to the policy period, no insured listed under **C. Who Is An Insured**, paragraph **1.** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

(2) To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under **C. Who Is An Insured**, paragraph **1.** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under **C. Who Is An Insured,** Paragraph **1.** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all or any part of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

f. **Coverage Extension - Supplementary Payments**

(1) We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

(a) All expenses we incur.

(b) Up to $2500 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

(c) The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(d) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

(e) All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

(f) Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any



OD3 D903901        1001696

prejudgment interest based on that period of time after the offer.

(g) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance described in **SECTION II - LIABILITY, D.Liability and Medical Expenses Limits of Insurance.**

(2) If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

(a) The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

(b) This insurance applies to such liability assumed by the insured;

(c) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

(d) The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

(e) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(f) The indemnitee:

(i) Agrees in writing to:

1) Cooperate with us in the investigation, settlement or defense of the "suit";

2) Immediately send us copies of any demands, notices, summonses or

legal papers received in connection with the "suit";

3) Notify any other insurer whose coverage is available to the indemnitee; and

4) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(ii) Provides us with written authorization to:

1) Obtain records and other information related to the "suit"; and

2) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of **SECTION II - LIABILITY, B. Exclusions, 1. Applicable to Business Liability Coverage, b. Contractual Liability,** paragraph **(2),** such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

(g) We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

(h) The conditions set forth above, or the terms of the agreement described in Paragraph **(2)(f)** above are no longer met.

2. **Medical Expenses**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

    (2) On ways next to premises you own or rent; or

    (3) Because of your operations;

    provided that:

        (a) The accident takes place in the "coverage territory" and during the policy period;

        (b) The expenses are incurred and reported to us within one year of the date of the accident; and

        (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable Limits of Insurance as described in **D. Liability and Medical Expenses Limits of Insurance.**

**c.** We will pay reasonable expenses for:

    (1) First aid administered at the time of an accident;

    (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

    (3) Necessary ambulance, hospital, professional nursing and funeral services.

## B. Exclusions

### 1. Applicable To Business Liability Coverage

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    (1) That the insured would have in the absence of the contract or agreement; or

    (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

        (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

        (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    (1) Causing or contributing to the intoxication of any person;

    (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

    (4) The supervision, hiring, employment, training or monitoring of others by that insured; or

    (5) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in paragraphs **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

For the purpose of this exclusion, permitting a person to bring alcoholic beverages on your premises for consumption on your premises, whether or



OD3 D903901          1001696

not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar local, state, federal or foreign law or regulation.

**e. Employer's Liability**

"Bodily Injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(3)** Whether the insured may be liable as an employer or in any other capacity; and

**(4)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location, which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the

building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions

necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto or Watercraft**

**(1) Unmanned Aircraft**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading and unloading".

This paragraph **g. (1)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" or the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

This paragraph **g. (1)** does not apply to:

**(a)** The use of another's advertising idea in your "advertisement"; or

**(b)** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**(2) Aircraft (Other Than Unmanned Aircraft), Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".



OD3 D903901          1001696

This paragraph **g. (2)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" or the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This paragraph **g. (2)** does not apply to:

(a) A watercraft while ashore on premises you own or rent;

(b) A watercraft you do not own that is:

    (i) Less than 51 feet long; and

    (ii) Not being used to carry persons or property for a charge;

(c) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(d) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft (other than "unmanned-aircraft") or watercraft; or

(e) "Bodily injury" or "property damage" arising out of:

    (i) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged; or

    (ii) The operation of any of the following machinery or equipment:

        1) Cherry pickers and similar devices mounted on automobile or truck

chassis and used to raise or lower workers; and

        2) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

(f) An aircraft (other than "unmanned aircraft") that is:

    (i) Chartered by, loaned to, or hired by you with a paid crew; and

    (ii) Not owned by any insured.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage", "personal and advertising injury" caused by the rendering of or failure to render any professional service, advice or instruction:

(1) By you; or

(2) On your behalf; or

(3) From whom any of you assumed liability by reason of a contract or agreement,

regardless of whether any such service, advice or instruction is ordinary to any insured's profession.

Professional services include but are not limited to:

(4) Legal, accounting or advertising services, notary, title abstract, tax preparation, real estate, stockbroker, publishing, architects or insurance services;

(5) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

(6) Supervisory, inspection or engineering services;

(7) Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

(8) Any health or therapeutic service treatment, advice or instruction;

(9) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming, including use or exposure to any sun lamp, tanning booth or other similar appliance;

(10) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

(11) Body piercing services;

(12) Services in the practice of pharmacy;

(13) Management, Human Resource, Testing, Media or Public Relations consulting services.

This exclusion applies even if a claim alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

### k. Damage to Property

"Property damage" to:

(1) Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate Limit of Insurance applies to **Damage to Premises Rented to You** as described in **SECTION II - LIABILITY, D. Liability and Medical Expenses Limit Of Insurance.**

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products - completed operations hazard".

### l. Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

### m. Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products - completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which

The Hanover Insurance Group.

OD3 D903901    1001696

the damage arises was performed on our behalf by a subcontractor.

**n. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p. Aircraft Products, Grounding and Testing**

(1) "Aircraft products " or reliance upon any representation or warranty made with such product;

(2) The "grounding" of any aircraft; or

(3) The "testing" of any aircraft.

For purposes of this Exclusion, the following definitions apply:

(4) "Aircraft Products" means:

(a) Aircraft, including but not limited to missiles, spacecraft, or any other aircraft goods or products you manufacture, sell, handle or distribute;

(b) Aircraft and any ground support or control equipment used in connection therewith;

(c) Any product provided by the insured and installed or used in connection with any aircraft;

(d) Any tooling used in respect to any aircraft;

(e) Training and navigational aids, instructions, manuals, blueprints, engineering or other data in connection with any aircraft;

(f) Any advice, service or labor supplied with any aircraft; or

(g) Services you or others trading under your name provide or recommend for use in the manufacture, repair, operation, maintenance or use of any aircraft.

(5) "Grounding" means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft, due to the existence of or alleged or suspected existence of any defect, fault or condition:

(a) In such aircraft or any part sold, handled or distributed by you or that is manufactured, assembled or processed by any other person or organization according to your specifications, plans, suggestions, orders or drawings; or

(b) With tools, machinery or other equipment furnished to such persons or organizations by you;

whether such withdrawn aircraft are owned or operated by the same or different persons or organizations.

"Grounding" shall be deemed to commence on the date of an "occurrence" which discloses the necessity of "grounding" or on the date an aircraft is first withdrawn from service because of such condition, whichever comes first.

(6) "Testing" means examination, observation, evaluation or measuring of the performance of "aircraft products", while either in the air or on the ground.

**q. Distribution of Material in Violation of Statutes**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

(4) Any other laws, statutes ordinances or regulations, that address, prohibit, or limit the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**r.  Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

(1) Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in paragraphs **(1)** or **(2)** above.

However, unless paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

Exclusions **c., d., e., g., h.,** and **k., l., m., n.** and **o.** above do not apply to damage to premises while rented to you or temporarily occupied by you with permission of the owner. A separate Damage to Premises Rented to You Limit of Insurance applies to this coverage as described in **SECTION II - LIABILITY, D. Liability and Medical Expenses Limits of Insurance.**

**2.  Additional Exclusions Applicable Only to "Personal and Advertising Injury"**

This insurance does not apply to:

**a.  Knowing Violation of Rights of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b.  Material Published With Knowledge of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c.  Material Published Prior to Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d.  Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e.  Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.



OD3 D903901          1001696

**f. Breach of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality or Performance of Goods-Failure to Conform to Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Insureds in Media and Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web-sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to **F. Liability and Medical Expenses Definitions, 15. "Personal and Advertising Injury"**, paragraphs **a.**, **b.** and **c.**

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself considered the business of advertising, broadcasting, publishing or telecasting.

**j. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**k. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**l. Electronic Chatrooms or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control.

**m. Infringement of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**n. Unauthorized Use of Another's Name of Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

**3. Additional Exclusions Applicable to Medical Expenses Coverage Only**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury on Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation and Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for

the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletic Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products - completed operations hazard".

**g. Otherwise Excluded**

Otherwise Excluded under **SECTION II - LIABILITY, B. Exclusions, 1. Applicable To Business Liability Coverage.**

**4. Additional Exclusions Applicable To Both Business Liability Coverage and Medical Expenses Coverage:**

**Nuclear Energy Liability Exclusion**

This insurance does not apply:

**(1)** Under **Business Liability Coverage**, to "bodily injury" or "property damage":

**(a)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(b)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

**(i)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

**(ii)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**(2)** Under **Medical Expenses Coverage**, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear

material" and arising out of the operation of a "nuclear facility" by any person or organization.

**(3)** Under **Business Liability Coverage**, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the "nuclear material"; if:

**(a)** The "nuclear material":

**(i)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

**(ii)** Has been discharged or dispersed therefrom;

**(b)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(c)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property threat.

**(4)** As used in this exclusion:

**(a)** "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(b)** "Hazardous properties" include radioactive, toxic or explosive properties;

**(c)** "Nuclear facility" means:

**(i)** Any "nuclear reactor";

**(ii)** Any equipment or device designed or used for:

**1)** Separating the isotopes of uranium or plutonium;

**2)** Processing or utilizing "spent fuel"; or

**3)** Handling, processing or packaging "waste";

**(iii)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the

custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(iv)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**(d)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

**(e)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**(f)** "Property damage" includes all forms of radioactive contamination of property.

**(g)** "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(h)** "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(i)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

**(j)** "Waste" means any waste material:

**(i)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

**(ii)** Resulting from the operation by any person or organization of any "nuclear facility" included under paragraphs **(i)** and **(ii)** of the definition of "nuclear facility".

**C. Who Is An Insured**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business ;

**(b)** To the spouse, child, parent, brother or sister of that co-

"employee" as a consequence of paragraph **(1) (a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(1)(b)**; or

**(d)** Arising out of his or her providing or failing to provide professional services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by; or

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

**3.** Any organization you newly acquire or form, acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**b.** Business Liability Coverage does not apply to:

**(1)** "Bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**(2)** "Personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D.** **Liability and Medical Expenses Limits of Insurance**

**1.** The Limits of Insurance under **SECTION II - LIABILITY** shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** Subject to the Aggregate Limit identified in paragraph **5.** below, the most we will pay for the sum of all damages because of all:

**a.** "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence"; and

**b.** "Personal and advertising injury" sustained by any one person or organization;

is the Liability And Medical Expenses Limit shown in the Declarations.

**3.** Subject to the Liability And Medical Expenses Limit, the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses Limit shown in the Declarations.

**4.** The Damage to Premises Rented to You Limit shown in the Declarations is the most we will pay for damages because of "property damage" to any one premises while rented to you, or temporarily occupied by you with permission of the owner.

**5.** **Aggregate Limits**

**a.** The most we will pay for:

**(1)** All "bodily injury" and "property damage" that is included in the "products-completed operations hazard" is twice the Liability And Medical Expenses Limit.

**(2)** All:

**(a)** "Bodily injury" and "property damage" except damages because of "bodily injury" and



OD3 D903901          1001696

"property damage" included in the "products-completed operations hazard";

(b) Plus medical expenses;

(c) Plus all "personal and advertising injury" caused by offenses committed;

is twice the Liability And Medical Expenses Limit.

b. The Aggregate Limits of Insurance apply separately to each of your "locations" owned by or rented to you. "Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

6. The Limits of Insurance of **SECTION II - LIABILITY** apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

E. **Liability and Medical Expenses General Conditions**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties in the Event of Occurrence, Offense, Claim or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this policy unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Separation of Insureds**

   Except with respect to the Limits of Insurance under **SECTION II - LIABILITY,** and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

   a. As if each Named Insured were the only Named Insured; and

   b. Separately to each insured against whom claim is made or "suit" is brought.

**F. Liability and Medical Expenses Definitions**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in paragraph a. above;

      (2) The activities of a person whose home is in the territory described in paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work", or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization.

**The Hanover Insurance Group.**

OD3 D903901        1001696

Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in paragraph **(2)** above and supervisory, inspection or engineering services.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in paragraphs **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in paragraphs **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility

law or other motor vehicle insurance law in the state where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products - completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

   b. Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials.

17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

   For the purposes of this insurance, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.



OD3 D903901        1001696

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Unmanned aircraft" means an aircraft that is not:

a. Designed;

b. Manufactured; or

c. Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

21. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

22. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

23. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

## SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY)

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

a. 5 days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy:

(1) The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

(a) Seasonal unoccupancy; or

(b) Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

(2) After damage by a covered cause of loss, permanent repairs to the building:

(a) Have not started, and

(b) Have not been contracted for,

within 30 days of initial payment of loss.

(3) The building has:

    (a) An outstanding order to vacate;

    (b) An outstanding demolition order; or

    (c) Been declared unsafe by governmental authority.

(4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

(5) Failure to:

    (a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

    (b) Pay property taxes that are owed and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**c.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be

amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**1.** This policy;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this policy.

**D. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward. We have the right to make copies of these books and records.

**E. Inspections and Surveys**

**1.** We have the right but not the duty to:

    **a.** Make inspections and surveys at any time;

    **b.** Give you reports on the conditions we find; and

    **c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

    **a.** Are safe and healthful; or

    **b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F. Insurance Under Two or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, you may choose only one of these coverages to apply to that loss.



OD3 D903901     1001696

1. **SECTION I - PROPERTY**, if two or more of this coverage part's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

2. **SECTION II - LIABILITY**, it is our stated intent that the various Coverage Parts, forms, endorsements or policies issued to the named insured by us, or any company affiliated with us, do not provide any duplication or overlap of coverage for the same claim, "suit", "occurrence", offense, accident, "wrongful act" or loss. We will not pay more than the actual amount of the loss or damage.

   If this Coverage Part and any other Coverage Part, form, endorsement or policy issued to the named insured by us, or any company affiliated with us, apply to the same claim, "suit", occurrence, offense, accident, "wrongful act" or loss, the maximum Limit of Insurance under all such Coverage Parts, forms, endorsements or policies combined shall not exceed the highest applicable Limit of Insurance under any one Coverage Part, form, endorsement or policy.

   This condition does not apply to any Excess or Umbrella Policy issued by us specifically to apply as excess insurance over this policy.

G. **Liberalization**

   If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

H. **Other Insurance**

   1. **SECTION I - PROPERTY**

      If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But, we will not pay more than the applicable Limit of Insurance of **SECTION I - PROPERTY**.

   2. **SECTION II - LIABILITY**

      If other valid and collectible insurance is available to the insured for a loss we cover under **SECTION II - LIABILITY**, our obligations are limited as follows:

      a. **Primary Insurance**

         This insurance is primary except when paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in paragraph **c.** below.

However, if you agree in a written contract, written agreement, or written permit that the insurance provided to any person or organization included as an Additional Insured under this Coverage Part is primary and non-contributory, we will not seek contribution from any other insurance available to that Additional Insured which covers the Additional Insured as a Named Insured except:

(1) For the sole negligence of the Additional Insured; or

(2) When the Additional Insured is an Additional Insured under another liability policy.

b. **Excess Insurance**

   This insurance is excess over:

   (1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

       (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

       (b) That is Property Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

       (c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

       (d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to **SECTION II - LIABILITY, Exclusion g. Aircraft, Auto or Watercraft**; and

   (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under **SECTION II - LIABILITY** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the

insured's rights against all those other insurers.

c. When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

d. We will share the remaining loss, if any, with any other insurance that is not described in this provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations for this Coverage.

e. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable limits of insurance of all insurers.

f. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so; but we will be entitled to the insured's rights against all those other insurers.

I. **Premiums**

1. The first Named Insured shown in the Declarations:

a. Is responsible for the payment of all premiums; and

b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the

premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

a. Paid to us prior to the anniversary date; and

b. Determined in accordance with paragraph **2.** above.

Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that is not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

J. **Premium Audit**

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

3. The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

K. **Transfer of Rights of Recovery Against Others to Us**

1. Applicable to **SECTION I - PROPERTY** Coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:



OD3 D903901 1001696

a. Prior to a loss to your Covered Property.

b. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

   (1) Someone insured by this insurance;

   (2) A business firm:

     (a) Owned or controlled by you; or

     (b) That owns or controls you; or

   (3) Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

**2.** Applicable to **SECTION II - LIABILITY** Coverage:

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair such rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We waive any right of recovery we may have against any person or organization with whom you have a written contract, permit or agreement to waive any rights of recovery against such person or organization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard".

This condition does not apply to Medical Expenses Coverage.

**L.** **Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured. If you die, your rights and duties will be transferred to your legal representative but only while that legal representative is acting within the scope of their duties as your legal representative. Until your legal representative is appointed, anyone with proper temporary custody of your property will have your rights and duties but only with respect to that property.



OD3 D903901        1001696

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

**In Witness Whereof,** this company has caused this policy to be signed by its President and Secretary and countersigned on the declarations page, where required, by a duly authorized agent of the company.

John C. Roche
President

Charles Frederick Cronin
Secretary

SIG-1100 11 17

**The Hanover**
Insurance Group.
OD3 D903901      1001696
**BUSINESSOWNERS**
BP 06 86 05 17

POLICY NUMBER:

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALIFORNIA – HIRED AUTO AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| Coverage | Additional Premium |
|---|---|
| **A.  Hired Auto Liability** | $  INCLUDED |
| **B.  Non-owned Auto Liability** | $  INCLUDED |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** Insurance is provided only for those coverages for which a specific premium charge is shown in the Declarations or in the Schedule.

**1. Hired Auto Liability**

The insurance provided under Paragraph **A.1. Business Liability** in **Section II - Liability** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**2. Non-owned Auto Liability**

The insurance provided under Paragraph **A.1. Business Liability** in **Section II - Liability** applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person.

**B.** For insurance provided by this endorsement only:

**1.** The exclusions under Paragraph **B.1. Applicable To Business Liability Coverage** in **Section II - Liability**, other than Exclusions **a., b., d., f.** and **i.** and the Nuclear Energy Liability Exclusion, are deleted and replaced by the following:

**a.** "Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

Copyright, Insurance Services Office, Inc., 2016

(2) To any obligation to share damages with or repay someone else who must pay damages because of injury.

This exclusion does not apply to:

(1) Liability assumed by the insured under an "insured contract"; or

(2) "Bodily injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers' compensation law.

b. "Property damage" to:

(1) Property owned or being transported by, or rented or loaned to the insured; or

(2) Property in the care, custody or control of the insured.

2. Paragraph **C. Who Is An Insured** in **Section II - Liability** is replaced by the following:

1. Each of the following is an insured under this endorsement to the extent set forth below:

a. You;

b. Any other person using a "hired auto" with your permission;

c. For a "non-owned auto":

(1) Any partner or "executive officer" of yours; or

(2) Any "employee" of yours;

but only while such "non-owned auto" is being used in your business; and

d. Any other person or organization, but only for their liability because of acts or omissions of an insured under **a.**, **b.** or **c.** above.

2. None of the following is an insured:

a. Any person engaged in the business of his or her employer for "bodily injury" to any co-"employee" of such person injured in the course of employment, or to the spouse, child, parent, brother or sister of that co-"employee" as a consequence of such "bodily injury", or for any obligation to share damages with or repay someone else who must pay damages because of the injury;

b. Any partner or "executive officer" for any "auto" owned by such partner or officer or a member of his or her household;

c. Any person while employed in or otherwise engaged in duties in connection with an "auto business", other than an "auto business" you operate;

d. The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee; or

e. Any person or organization for the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

C. For the purposes of this endorsement only, Paragraph **H. Other Insurance** in **Section III - Common Policy Conditions** is replaced by the following:

This insurance is excess over any primary insurance covering the "hired auto" or "non-owned auto".

D. The following additional definitions apply:

1. "Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

2. "Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", your partners or your "executive officers" or members of their households.

3. "Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners or your "executive officers", or members of their households, but only while used in your business or your personal affairs.

Copyright, Insurance Services Office, Inc., 2016

BP 06 86 05 17



OD3 D903901      1001696

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AVENUES BUSINESSOWNERS PROPERTY MEDICAL OFFICE BROADENING ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to **SECTION I - PROPERTY**:

The limits applicable to the coverages included in this endorsement may either be in addition to or included within the applicable Limit of Insurance.  For application of the limits, refer to each coverage within this endorsement. Words or phrases in quotation marks have special meanings. The meaning of words or phrases in quotation marks is explained within the applicable coverage section. The coverages in this endorsement amend the coverage provided under the Businessowners Coverage Form through new coverages and replace coverage grants. These coverages are subject to the provisions applicable to this policy, except where amended within this endorsement.

If any of the property covered by this endorsement is also covered under any other provisions of the policy of which this endorsement is made a part of, or if more than one coverage under this endorsement applies, in the event of loss or damage, you may choose only one of these coverages to apply to that loss. The most we will pay in this case is the limit of insurance applying to the coverage you select. Coverages included in this endorsement apply either separately to each described premises or on an occurrence basis. Refer to each coverage within this endorsement for application of coverage.

We provide no coverage for Business Income; Extended Business Income; Extra Expense; or Business Income and Extra Expense from Dependent Properties for any of the Coverages included as part of this endorsement unless specifically stated, and then only to the extent provided for within that Scheduled or Blanket Coverage provision.

## I.   COVERAGES

| A. Scheduled Coverages | Limit | Page |
|---|---|---|
| 1.   Brands and Labels | Included | 2 |
| 2.   Loss Settlement Option - Loss of Business Income and Extra Expense (Per Diem) | Per Diem, 15 days | 2 |
| 3.   Business Income and Extra Expense - Dependent Properties | $25,000 | 3 |
| 4.   Business Income from Websites | $50,000/7 Days | 3 |
| 5.   Consequential Loss to Stock | Included | 4 |
| 6.   Denial of Access to Premises | 30 Days; 72 Hour Waiting Period | 4 |
| 7.   Employee Theft Including ERISA Compliance | $25,000 | 4 |
| 8.   Extended Business Income | 180 days | 4 |
| 9.   Fine Arts | $25,000 | 5 |
| 10.  Marring and Scratching | Included | 5 |
| 11.  Medical Waste and Radioactive Contamination Clean Up | $25,000 | 5 |
| 12.  Money Orders and Counterfeit Money | $25,000 | 5 |
| 13.  Newly Acquired or Constructed Property - Business Income | $500,000 | 5 |
| 14.  Ordinance or Law - Demolition and Increased Cost of Construction | $25,000 | 6 |
| 15.  Ordinance or Law ( Tenants Improvement Extension) | $20,000 | 6 |
| 16.  Outdoor Property | $25,000 | 6 |
| 17.  Physician and Dentist Tools and Small Equipment | $15,000 | 6 |
| 18.  Portable Electronic Devices Coverage Worldwide | $10,000 | 7 |
| 19.  Precious Metal Theft Payment Changes | $25,000 | 7 |
| 20.  Personal Property in Transit | $25,000 | 8 |

| | | | |
|---|---|---|---|
| **21.** | Tenant Signs | $20,000 | 8 |
| **22.** | Utility Services - Direct Damage<br>Utility Services - Business Income | $25,000<br>$25,000 | 8 |

| | **B. Blanket Coverages** | **Limit $250,000** | **Page** |
|---|---|---|---|
| **1.** | Accounts Receivable | Included | 8 |
| **2.** | Backup or Overflow of a Sewer, Drain or Sump | Included | 8 |
| **3.** | Computer Equipment | Included | 9 |
| **4.** | Debris Removal | Included | 9 |
| **5.** | Spoilage | Included | 9 |
| **6.** | Valuable Papers and Records (Other Than Electronic Data) | Included | 11 |

The Blanket Limit of Insurance shown above applies to all Coverages shown in paragraph **B** of this endorsement. At the time of loss, you may elect to apportion this Blanket Limit of Insurance to one or any combination of the Coverages shown, but under no circumstances will the aggregate apportionment be permitted to exceed the Blanket Limit of Insurance shown above. The Blanket Limit of Insurance applies per occurrence.

**II. DEDUCTIBLES**

Deductibles are subject to the provisions applicable to the Businessowners Coverage Form except as provided below. We will not pay for covered loss or damage in any one occurrence unless the amount of loss or damage exceeds the applicable Deductible amount. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

**III. COVERED PROPERTY**

**A. Scheduled Coverages**

**1. Brands and Labels**

The following is added to **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions:**

**Brands and Labels**

**(1)** If Covered Property that has a brand or label is damaged by a Covered Cause of Loss and we elect to take all or any part of the damaged property at an agreed or appraised value, you may extend the insurance that applies to your Business Personal Property to:

**(a)** Pay expenses you incur to:

**(i)** Remove the brand or label and then relabel the damaged property to comply with any applicable law; or

**(ii)** Label or stamp the damaged property Salvage, if doing so will not physically damage the property.

**(b)** Cover any reduction in the salvage value of the damaged property as a result of the removal of the brand or label.

**(2)** Payment under this Extension is included within the Limit of Insurance applicable to your Business Personal Property.

**2. Loss Settlement Option - Loss Business Income and Extra Expense - (Per Diem)**

The following is added to **SECTION I - PROPERTY, A. Coverage, E. Property Loss Conditions, 5. Loss Payment:**

**Loss Settlement Option - Loss Business Income and Extra Expense - (Per Diem)**

**(1)** At your option you may choose to settle a covered Business Income and Extra Expense loss, as described under the Business Income, Extra Expense and Utility Services Additional Coverages, as described below in paragraph **(3)**.

**(2)** This loss settlement option is only available to you prior to your



OD3 D903901        1001696

submission to us of calculations described under **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages f. Business Income.**

(3) For the purpose of this Additional Coverage, we will pay up to $400 per day per physician or dentist and $100 per day per nurse practitioner or dental assistant for billable hours lost, up to a maximum of $800 per day, regardless of the number of medical staff members involved, for each normal working day you are unable to conduct operations due to covered loss or damage for up to a maximum of 15 days. We will also pay for your continuing normal operating expenses incurred, including "payroll expenses"; and "Rental Value".

(4) If damages are such that limited operations can continue, the allowance described in paragraph (3) above will be proportionately reduced.

(5) For any occurrence, the two available methods for adjusting and calculating Business Income and Extra Expense loss may not be combined. When the alternative per diem approach described above is selected, you are not entitled to make claim for periods beyond 15 days on an actual loss sustained basis.

(6) This optional loss settlement does not waive the Waiting Period shown in the Declarations for Business Income Additional Coverage. This Waiting Period does not apply to Extra Expense.

3. **Business Income and Extra Expense - Dependent Properties**

The heading for **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, m. Business Income from Dependent Properties** is replaced by the following:

m. **Business Income and Extra Expense from Dependent Properties**

The following is added to **Business Income and Extra Expense from Dependent Properties:**

We will pay the necessary Extra Expense you incur due to direct physical loss of or damage to "dependent property" caused by or resulting from a Covered Cause of Loss.

The definition of Extra Expense for this Additional Coverage is replaced by the following:

(a) Extra Expense means necessary expenses you incur during the "dependent property period of restoration" that you would not have incurred if there had been no direct physical loss or damage to the premises of any "dependent property" caused by or resulting from a Covered Cause of Loss:

(i) To avoid or minimize the "suspension" of business and to continue "operations"; or

(ii) To minimize the "suspension" of business if you cannot continue "operations".

We will reduce the amount of your Extra Expense loss to the extent you can return "operations" to normal and discontinue such extra expense.

Paragraph (2) of this Additional Coverage is replaced by the following:

(2) The most we will pay under this Additional Coverage is $25,000 per occurrence, regardless of the number of "dependent properties" affected.

The "dependent property" must be located in the coverage territory.

4. **Business Income from Websites**

The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages:**

**Business Income from Websites**

(1) You may extend this insurance to apply to a "suspension" of "operations" caused by direct physical loss or damage to property that you depend on for "web site and communications services" from a Covered Cause of Loss.

(2) We will not pay for any loss of Business Income you incur during the first 12 hours that immediately follows the time when you first discovered the Covered Cause of Loss. This Waiting Period does not apply to Extra Expense.

(3) The most we will pay for the actual loss of Business Income and necessary and reasonable Extra Expense in any one occurrence

under this Additional Coverage is $50,000 and only for the 7-day period immediately following the Covered Cause of Loss.

**(4)** Coverage does not apply to Websites unless there is a duplicate or back-up copy of your Web Page stored at a location that is at least 1,000 feet away from the premises of the vendor that provides "web site and communications services".

**(5)** "Web Site and Communication Services" means:

**(a)** Internet access, e-mail, web hosting, value added network services and application software services at the premises of others; or

**(b)** Network and router infrastructure services, including cable and wireless, located more than 1,000 feet from the described premises.

This Additional Coverage is not subject to **SECTION I - PROPERTY, C. Limits of Insurance.**

**5. Consequential Loss to Stock**

The following is added to **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions**:

**Consequential Loss to Stock**

**(1)** You may extend the insurance that applies to your Business Personal Property to apply to the reduction in value of the remaining parts of "stock" in process of manufacture that are physically undamaged but are unmarketable as a complete product because of direct physical loss or damage from a Covered Cause of Loss to other parts of covered "stock" in process of manufacture at an insured location.

**(2)** Should it be determined that such "stock" retains only a salvage value, we retain the option of paying the full value of the "stock" as agreed within this policy, and taking the damaged property for salvage purposes.

**(3)** Payment under this Coverage Extension is included within the applicable Limit of Insurance.

**6. Denial of Access to Premises**

The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages:**

**Denial of Access to Premises**

**(1)** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur when ingress to or egress from the described premises is prevented, due to direct physical loss of or damage to property that is away from but within 2000 feet of the described premises, caused by or resulting from any Covered Cause of Loss covered under this policy.

**(2)** The coverage for Business Income will begin 72 hours after the loss or damage to the premises that causes the denial of access and will apply for a period of up to 30 consecutive days after coverage begins.

**(3)** The coverage for Extra Expense will begin immediately after the loss or damage to the premises that causes the denial of access and will end:

**(a)** 30 consecutive days after coverage begins; or

**(b)** When your Business Income coverage ends;

whichever is earlier.

**(4)** The definitions of Business Income and Extra Expense contained in the Business Income Additional Coverage and the Extra Expense Additional Coverage also apply to this Denial of Access to Premises Additional Coverage

**7. Employee Theft Including ERISA Compliance**

**SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, p. Employee Theft Including ERISA,** paragraph **(6)** is replaced by the following:

**(6)** The most we will pay for all loss resulting directly from an occurrence is $25,000. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year.

**8. Extended Business Income**

**SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, f. Business Income, (2) Extended Business Income,**

**The Hanover**
Insurance Group.
OD3 D903901        1001696

**(a) Extended Business Income - Other Than Rental Value**, paragraph **(ii)** and **(b) Extended Business Income - Rental Value**, paragraph **(ii)** are replaced by the following:

**(2)(a)    Extended Business Income - Other Than Rental Value**

**(ii)** Ends on the earlier of:

1) The date you could restore your operations, with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

2) 180 consecutive days after the date determined in **(2)(a)(i)** above.

**(2)(b)    Extended Business Income - Rental Value**

**(ii)** Ends on the earlier of:

1) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

2) 180 consecutive days after the date determined in **(2)(b)(i)** above.

**9.  Fine Arts**

**SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, x. Fine Arts**, paragraph **(3)**, is replaced by the following:

(3) The most we will pay for loss under this Additional Coverage is $25,000 per occurrence regardless of the number of locations or buildings involved.

**10.  Marring and Scratching**

The following is added to **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions**:

**Marring and Scratching**

(1) You may extend the insurance that applies to Business Personal Property to apply to damage caused directly by sudden and accidental

marring and scratching of:

(a) Your "stock";

(b) Your printing plates; or

(c) Property of others that is in your care, custody or control.

(2) This Coverage Extension does not apply to:

(a) Property at other than the described premises; or

(b) Personal Property in transit.

(3) Payment under this Coverage Extension is included within Limit of Insurance applicable to your Business Personal Property.

**11.  Medical Waste and Radioactive Contamination Clean Up**

The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages**:

**Medical Waste and Radioactive Contamination Clean Up**

(1) We will pay for direct physical damage or loss to Covered Property, including clean up and debris removal, at a described premises caused by accidental contamination by medical hazardous waste or radioactive contamination.

(2) This additional coverage does not apply to contamination arising from a source away from the described premises.

(3) The most we will pay under this additional coverage is $25,000 per policy period regardless of the number of locations or occurrences involved.

This Additional Coverage is not subject to **SECTION I - PROPERTY, C. Limits of Insurance.**

**12.  Money Orders and Counterfeit Money**

**SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, j. Money Orders and Counterfeit Money**, paragraph **(3)**, is replaced by the following:

(3) The most we will pay for any loss under this Additional Coverage is $25,000.

**13.  Newly Acquired or Constructed Property - Business Income**

**SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, a. Newly Acquired or Constructed Property - Business Income** paragraph **(3)** is replaced by the following:

**(3) Business Income and Extra Expense**

You may extend the insurance that applies to Business Income and Extra Expense to apply to property at any location you acquire. The most we will pay for loss or damage under this Extension is $500,000 at each premise.

**14. Ordinance or Law – Demolition Cost and Increased Cost of Construction**

SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, l. Ordinance or Law, (5) Loss Payment, paragraph (d) is replaced by the following:

**(d)** The most we will pay for the total of all covered losses for Demolition Cost and Increased Cost of Construction for each building described in the Declarations is $25,000 or the amount shown in the Additional Property Schedule. If a damaged building(s) is covered under a Blanket Limit of Insurance and the Blanket Limit of Insurance applies to more than one building or itemof property, then the most we will pay under this Additional Coverage, for each building, is $25,000, or the amount shown in the Additional Property Coverage Schedule.

**15. Ordinance or Law (Tenant's Improvement Extension)**

**a.** The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, l. Ordinance or Law, (4) Coverage:**

Coverage provided under paragraphs (a), (b) and (c) above applies to tenant's improvements and betterments but only if a Limit of Insurance is shown in the Declarations for Business Personal Property. Business Personal Property must be insured on a replacement cost basis.

This extension is provisional and excess to any other valid insurance for tenant's improvements and betterments whether collectible or not.

**b.** The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, l. Ordinance or Law, (5) Loss Payment, paragraph (c):**

Regardless of the number of locations insured or buildings involved, the most we will pay for any loss to tenant's improvements and betterments under this Additional Coverage in any one occurrence is $20,000.

**16. Outdoor Property**

SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, c. Outdoor Property, paragraph (3) is replaced by the following:

**(3)** Regardless of the number of described premises involved, the most we will pay for loss or damage under this Extension, including debris removal expense, is $25,000, but not more than $2,500 for any one tree, shrub or plant.

**17. Physician and Dentist Tools and Small Equipment**

SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, v. Commercial Tools and Equipment, is replaced by the following:

**v. Physician and Dentist Tools and Small Equipment**

**(1)** We will pay for direct physical damage or loss caused by or resulting from a Covered Cause of Loss to physician's tools and physician's small equipment, which are usual to your business operations and which are:

**(a)** Your property; or

**(b)** The property of others in your care, custody or control.

**(2)** This Additional Coverage is extended to provide coverage for the property of your "employees" while on the described premises.

**(3)** This coverage only applies to any one physician tool or piece of physician's small equipment with a replacement cost value of $2,500 or less unless listed on a schedule included with the policy.

**(4)** The most we will pay for loss or damage in any one occurrence under this coverage is $15,000.

**(5)** In addition to items listed within **Property Not Covered**, we will not pay for any loss to physician's tools and physician's small equipment that are permanently

The **Hanover** Insurance Group™

OD3 D903901        1001696

mounted to a vehicle, including trailers.

**(6) SECTION I - PROPERTY, B. Exclusions, 1.b. Earth Movement** and **1.g. Water** do not apply to this Additional Coverage.

**(7) Special Physician and Dentist Tools and Small Equipment Exclusion:**

We will not pay for any loss caused by or resulting from any repair, adjusting, servicing, testing or maintenance process unless fire or explosion ensues, then only for the loss caused by such ensuing fire or explosion.

This Additional Coverage is not subject to **SECTION I - PROPERTY, C. Limits of Insurance.**

**18. Portable Electronic Devices Coverage Worldwide**

The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages:**

**Portable Electronic Devices Coverage Worldwide**

**(1)** We will pay for loss or damage caused by or resulting from a Covered Cause of Loss to portable electronic devices while anywhere in the world, including while "in transit".

**(2)** For the purpose of this Additional Coverage, the following is added to **SECTION I - PROPERTY, G. Definitions:**

Portable electronic devices includes laptops, tablets, e-readers, smartphones or other lightweight, hand-held or wearable devices capable of storing, retrieving and processing data.

**(3)** This coverage is provided when the property is owned by you or owned by others when in your or your "employees'" care, custody or control, subject to **SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment,** paragraph **d.(3)(b).**

**(4)** We will not pay for loss or damage to portable electronic devices when caused by, resulting from, or arising out of "theft" or unexplained loss when the property is checked baggage with a carrier for transit.

**(5)** The provisions for a Business Income loss will be governed by the terms of **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages f. Business Income** except:

**(a)** There is no requirement that a loss occur within 1,000 feet or at the described premises as stated in paragraph **(1)(a);** and

**(b)** The following are not included under this Additional Coverage:

**(i)** Continuing normal operating expenses incurred, including "payroll expense";

**(ii)** Extended Business Income.

**(6)** The provisions for Extra Expense loss will be governed by the terms of **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, g. Extra Expense** except:

**(a)** There is no requirement that a loss occur within 1,000 feet or at the described premises as stated in paragraph **g.(1)** and **g.(2).**

**(7) Limitations,** item **b.** does not apply to this Additional Coverage.

**(8) SECTION I - PROPERTY, B. Exclusions, 5. Business Income and Extra Expense Exclusions,** paragraph **(4)** does not apply to this Additional Coverage.

**(9)** Regardless of the number of lost or damaged portable electronic devices, the most we will pay per occurrence including actual loss of Business Income you sustain and necessary Extra Expense you incur is $10,000.

**(10)** The amount payable under this Additional Coverage is additional insurance.

**19. Precious Metal Theft Payment Changes**

**SECTION I - PROPERTY, A. Coverage, 4. Limitations,** paragraph **c.** is replaced by the following:

**c.** For loss or damage by "theft", the following types of property are covered only up to the limits shown below:

**(1)** $10,000 for furs, fur garments and garments trimmed with fur.

**(2)** $10,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones.

This limit does not apply to jewelry and watches worth $250 or less per item.

(3) $25,000 for bullion, gold, silver, platinum and other precious alloys or metals.

## 20. Personal Property in Transit

**SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, i. Personal Property in Transit**, paragraph **(5)** is replaced by the following:

(5) The most we will pay for loss or damage under this Coverage Extension is $25,000.

## 21. Tenant Signs

**SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, t. Tenant Signs**, paragraph **(4)** is replaced by the following:

(4) The most we will pay for loss or damage in any one occurrence is $20,000 regardless of the number of locations or buildings involved.

## 22. Utility Services

**SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, bb. Utility Services**, paragraphs **(1)** and **(2)** are replaced by the following:

(1) We will pay for loss of or damage to Covered Property caused by an interruption in service to the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to property not on the described premises that provides the services shown in paragraph **(3)** below.

The most we will pay for loss in any one occurrence under this Additional Coverage is $25,000 at each described premises or the Limit of Insurance shown in the Additional Property Coverage Schedule.

(2) We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur caused by the interruption of service at the described premises. The interruption must result from direct physical loss or damage by a Covered Cause of Loss to property not on the described premises that provides the services shown in paragraph **(3)** below.

We will only pay for loss you sustain after the first 24 hours following the direct physical loss or damage to the property described above.

The most we will pay for loss in any one occurrence under this Additional Coverage is $25,000 at each described premises or the Limit of Insurance shown in the Additional Property Coverage Schedule.

## B. Blanket Coverages

### 1. Accounts Receivable

**SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, f. Accounts Receivable**, paragraph **(2)**, is replaced by the following:

(2) The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises or away from the described premises is subject to the Blanket Coverage Limit of Insurance, or the amount shown in the Additional Property Coverage Schedule.

### 2. Backup or Overflow of a Sewer, Drain or Sump

The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages**:

**Backup or Overflow of a Sewer, Drain or Sump**

(1) We will pay for direct physical loss or damage to Covered Property at the described premises, solely caused by or resulting from water or waterborne material carried or moved by water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment. The term drain includes a roof drain and its related fixtures.

(2) For the purpose of this Additional Coverage only, **SECTION I - PROPERTY, B. Exclusions**, paragraph **g. Water (3)** is deleted.

(3) Regardless of the number of insured locations involved, the most we will pay under this Additional Coverage for loss or damage in any one occurrence is subject to the Blanket Limit of Insurance or the amount shown in the Additional Property Coverage Schedule.

(4) **Special Sewer Backup Exclusion**

The **Hanover**
Insurance Group.
OD3 D903901      1001696

We will not pay for:

(a) Loss or damage from water or other materials that back-up or overflow from any sewer or drain, sump, sump pump or related equipment when it is caused by or results from any "flood", regardless of the proximity of the back-up or overflow to the "flood" condition; or

(b) Failure to keep a sump pump or its related equipment in proper working condition; or

(c) Failure to perform routine maintenance or repair necessary to keep a sewer or drain free from obstructions.

3. **Computer Equipment**

SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, r. Computer Equipment, paragraph (6) is replaced by the following:

(6) Regardless of the number of insured locations involved, the most we will pay for loss or damage under this Additional Coverage to property described in paragraphs (1) and (2) above in any one occurrence at insured locations is subject to the Blanket Coverage Limit of Insurance, or the amount shown in the Additional Property Coverage Schedule.

The most we will pay for property listed in paragraphs (1) and (2) above in any one occurrence for such property that you newly acquire is $100,000.

With respect to newly acquired property under this Additional Coverage, coverage will end when any of the following occurs:

(a) The policy expires;

(b) 180 days after you acquire the property listed in (1)(a - d);

(c) You report values to us.

The most we will pay for Extra Expense is $5,000 or the amount shown in the Additional Property Coverage Schedule in any one occurrence. This Additional Coverage is not subject to **SECTION I - PROPERTY, C. Limits of Insurance.**

4. **Debris Removal**

SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages, a. Debris Removal, paragraph (4), is replaced by the following:

(4) We will pay up to the blanket limit of insurance for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if Paragraphs (4)(a) and/or (4)(b) above, apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus the blanket limit of insurance.

5. **Spoilage**

The following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages**:

**Spoilage**

The following provisions (a. through g. inclusive) apply to the insurance provided by this Additional Coverage:

a. For the purpose of this Additional Coverage, the following is added to **SECTION I - PROPERTY, A. Coverage, 5. Additional Coverages:**

(1) Covered Property

Covered Property means "perishable goods" at the insured locations, if "perishable goods" are:

(a) Owned by you and used in your business; or

(b) Owned by others and in your care, custody or control except as otherwise provided

in **Loss Payment Property Loss Condition E.5.d.(3)(b)**·

**b.** The following is added to **SECTION I - PROPERTY, A. Coverage, 2. Property Not Covered:**

Property located:

(1) On the exterior of buildings;

(2) In the open; or

(3) In vehicles.

**c.** **SECTION I - PROPERTY, A. Coverage, 3. Covered Causes Of Loss** is replaced by the following:

**3.** **Covered Causes Of Loss**

Subject to the exclusions described in item **e.** of this Additional Coverage, covered causes of loss means the following:

**a.** Breakdown or Contamination, meaning:

(1) Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment.

Coverage applies only while such apparatus or equipment is at the described premises shown in the Schedule; or

(2) Contamination by a refrigerant. Coverage applies only while the refrigerating apparatus or equipment is at the described premises.

Mechanical breakdown and mechanical failure do not mean power interruption, regardless of how or where the interruption is caused and whether or not the interruption is complete or partial.

**b.** Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

**d.** **SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions** does not apply.

**e.** **SECTION I - PROPERTY, B. Exclusions** does not apply to this Coverage Extension except for:

(1) Paragraph **B.1.b.,** Earth Movement;

(2) Paragraph **B.1.c.,** Governmental Action;

(3) Paragraph **B.1.d.,** Nuclear Hazard;

(4) Paragraph **B.1.f.,** War and Military Action; and

(5) Paragraph **B.1.g.,** Water.

(6) For the purposes of this additional coverage, the following exclusions are added to **SECTION I - PROPERTY, B. Exclusions,** paragraph **2:**

We will not pay for loss or damage caused by or resulting from:

**a.** The disconnection of any refrigerating, cooling or humidity control system from the source of power.

**b.** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

**c.** The inability of an electrical utility company or other power source to provide sufficient power due to:

(1) Lack of fuel; or

(2) Governmental order.

**d.** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

**e.** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

**f. Conditions**

For the purpose of this Additional Coverage, **SECTION I - PROPERTY, E. Property Loss Conditions, 5.**



OD3 D903901      1001696

**Loss Payment,** paragraph **d.** is replaced by the following:

**d.** We will determine the value of Covered Property as follows:

    **(1)** For "perishable goods" you have sold but not delivered, at the selling price less discounts and expenses you otherwise would have had;

    **(2)** For other "perishable goods", at actual cash value.

**g.** Regardless of the number of insured locations involved, the most we will pay under this Additional Coverage for loss or damage in any one occurrence is subject to the Blanket Coverage Limit of Insurance.

**6. Valuable Papers and Records (Other Than Electronic Data)**

SECTION I - PROPERTY, A. Coverage, 6. Coverage Extensions, e. Valuable Papers and Records (Other Than Electronic Data), paragraph **(3)** is replaced by the following:

**(3)** Regardless of the number of locations involved, the most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is subject to the Blanket Limit of Insurance, or the amount shown in the Additional Coverage Schedule.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BUSINESSOWNERS LIABILITY SPECIAL BROADENING ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

| SUMMARY OF COVERAGES | Limits | Page |
|---|---|---|
| 1. Additional Insured by Contract, Agreement or Permit | Included | 1 |
| 2. Additional Insured - Broad Form Vendors | Included | 2 |
| 3. Alienated Premises | Included | 3 |
| 4. Broad Form Property Damage - Borrowed Equipment, Customers Goods and Use of Elevators | Included | 3 |
| 5. Incidental Malpractice (Employed Nurses, EMT's and Paramedics) | Included | 3 |
| 6. Personal and Advertising Injury - Broad Form | Included | 4 |
| 7. Product Recall Expense | Included | 4 |
| Product Recall Expense Each Occurrence Limit | $25,000 Occurrence | 5 |
| Product Recall Expense Aggregate Limit | $50,000 Aggregate | 5 |
| Product Recall Deductible | $500 | 5 |
| 8. Unintentional Failure to Disclose Hazards | Included | 6 |
| 9. Unintentional Failure to Notify | Included | 6 |

This endorsement amends coverages provided under the Businessowners Coverage Form through new coverages and broader coverage grants. This coverage is subject to the provisions applicable to the Businessowners Coverage Form, except as provided below.

The following changes are made to **SECTION II - LIABILITY:**

1. **Additional Insured by Contract, Agreement or Permit**

   The following is added to **SECTION II - LIABILITY, C. Who Is An Insured:**

   **Additional Insured by Contract, Agreement or Permit**

   a. Any person or organization with whom you agreed in a written contract, written agreement or permit to add such person or organization as an additional insured on your policy is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by your acts or omissions, or the acts or omissions of those acting on your behalf, but only with respect to:

   (1) "Your work" for the additional insured(s) designated in the contract, agreement or permit;

   (2) Premises you own, rent, lease or occupy; or

   (3) Your maintenance, operation or use of equipment leased to you.

   b. The insurance afforded to such additional insured described above:

   (1) Only applies to the extent permitted by law; and

   (2) Will not be broader than the insurance which you are required by the contract, agreement or permit to provide for such additional insured.

   (3) Applies on a primary basis if that is required by the written contract, written agreement or permit.

   (4) Will not be broader than coverage provided to any other insured.

   (5) Does not apply if the "bodily injury", "property damage" or "personal and advertising injury" is otherwise excluded from coverage under this Coverage Part, including any endorsements thereto.



OD3 D903901      1001696

c. This provision does not apply:

(1) Unless the written contract or written agreement was executed or permit was issued prior to the "bodily injury", "property damage", or "personal injury and advertising injury".

(2) To any person or organization included as an insured by another endorsement issued by us and made part of this Coverage Part.

(3) To any lessor of equipment:

    (a) After the equipment lease expires; or

    (b) If the "bodily injury", "property damage", "personal and advertising injury" arises out of sole negligence of the lessor.

(4) To any:

    (a) Owners or other interests from whom land has been leased if the "occurrence" takes place or the offense is committed after the lease for the land expires; or

    (b) Managers or lessors of premises if:

       (i) The "occurrence" takes place or the offense is committed after you cease to be a tenant in that premises; or

       (ii) The "bodily injury", "property damage", "personal injury" or "advertising injury" arises out of structural alterations, new construction or demolition operations performed by or on behalf of the manager or lessor.

(5) To "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or the failure to render any professional services.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" or the offense which caused the "personal and advertising injury" involved the rendering of or failure to render any professional services by or for you.

d. With respect to the insurance afforded to these additional insureds, the following is added to **SECTION II - LIABILITY, D. Liability and Medical Expense Limits of Insurance**:

The most we will pay on behalf of the additional insured for a covered claim is the lesser of the amount of insurance:

1. Required by the contract, agreement or permit described in Paragraph **a.**; or

2. Available under the applicable Limits of Insurance shown in the Declarations.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations

e. All other insuring agreements, exclusions, and conditions of the policy apply.

2. **Additional Insured - Broad Form Vendors**

The following is added to **SECTION II - LIABILITY, C. Who Is An Insured:**

**Additional Insured - Broad Form Vendors**

a. Any person or organization that is a vendor with whom you agreed in a written contract or written agreement to include as an additional insured under this Coverage Part is an insured, but only with respect to liability for "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business.

b. The insurance afforded to such vendor described above:

(1) Only applies to the extent permitted by law;

(2) Will not be broader than the insurance which you are required by the contract or agreement to provide for such vendor;

(3) Will not be broader than coverage provided to any other insured; and

(4) Does not apply if the "bodily injury", "property damage" or "personal and advertising injury" is otherwise excluded from coverage under this Coverage Part, including any endorsements thereto

c. With respect to insurance afforded to such vendors, the following additional exclusions apply:

The insurance afforded to the vendor does not apply to:

(1) "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reasons of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(2) Any express warranty unauthorized by you;

(3) Any physical or chemical change in the product made intentionally by the vendor;

(4) Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instruction from the manufacturer, and then repackaged in the original container;

(5) Any failure to make such inspection, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business in connection with the sale of the product;

(6) Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

(7) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor;

(8) "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

(a) The exceptions contained within the exclusion in subparagraphs (4) or (6) above; or

(b) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

(9) "Bodily injury" or "property damage" arising out of an "occurrence" that took place before you have signed the contract or agreement with the vendor.

(10) To any person or organization included as an insured by another endorsement issued by us and made part of this Coverage Part.

(11) Any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

d. With respect to the insurance afforded to these vendors, the following is added to **SECTION II - LIABILITY, D. Liability and Medical Expense Limits of Insurance**:

The most we will pay on behalf of the vendor for a covered claim is the lesser of the amount of insurance:

**1.** Required by the contract or agreement described in Paragraph **a.**; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**3. Alienated Premises**

**SECTION II - LIABILITY, B. Exclusions, 1. Applicable To Business Liability Coverage k. Damage to Property, paragraph (2)** is replaced by the following:

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

**4. Broad Form Property Damage - Borrowed Equipment, Customers Goods, Use of Elevators**

**a.** The following is added to **SECTION II - LIABILITY, B. Exclusions, 1. Applicable To Business Liability Coverage, k. Damage to Property**:

Paragraph **(4)** does not apply to "property damage" to borrowed equipment while at a jobsite and not being used to perform operations.

Paragraph **(3)**, **(4)** and **(6)** do not apply to "property damage" to "customers goods" while on your premises nor to the use of elevators.

**b.** For the purposes of this endorsement, the following definition is added to **SECTION II - LIABILITY, F. Liability and Medical Expenses Definitions**:

**1.** "Customers goods" means property of your customer on your premises for the purpose of being:

**a.** Worked on; or

**b.** Used in your manufacturing process.

**c.** The insurance afforded under this provision is excess over any other valid and collectible property insurance (including deductible) available to the insured whether primary, excess, contingent or on any other basis.

**5. Incidental Malpractice - Employed Nurses, EMT's and Paramedics**

**SECTION II - LIABILITY, C. Who Is An Insured,** paragraph **2.a.(1)(d)** does not apply to a nurse,



OD3 D903901        1001696

emergency medical technician or paramedic employed by you if you are not engaged in the business or occupation of providing medical, paramedical, surgical, dental, x-ray or nursing services.

6. **Personal Injury - Broad Form**

   a. **SECTION II - LIABILITY, B. Exclusions, 2. Additional Exclusions Applicable only to "Personal and Advertising Injury", paragraph e.** is deleted.

   b. **SECTION II - LIABILITY, F. Liability and Medical Expenses Definitions, 14. "Personal and advertising injury", paragraph b.** is replaced by the following:

      b. Malicious prosecution or abuse of process.

   c. The following is added to **SECTION II - LIABILITY, F. Liability and Medical Expenses Definitions,** Definition **14.** "Personal and advertising injury":

      "Discrimination" (unless insurance thereof is prohibited by law) that results in injury to the feelings or reputation of a natural person, but only if such "discrimination" is:

      (1) Not done intentionally by or at the direction of:

         (a) The insured;

         (b) Any officer of the corporation, director, stockholder, partner or member of the insured; and

      (2) Not directly or indirectly related to an "employee", not to the employment, prospective employment or termination of any person or persons by an insured.

   d. For purposes of this endorsement, the following definition is added to **SECTION II - LIABILITY, F. Liability and Medical Expenses Definitions:**

      1. "Discrimination" means the unlawful treatment of individuals based upon race, color, ethnic origin, gender, religion, age, or sexual preference. "Discrimination" does not include the unlawful treatment of individuals based upon developmental, physical, cognitive, mental, sensory or emotional impairment or any combination of these.

   e. This coverage does not apply if liability coverage for "personal and advertising injury" is excluded either by the provisions of the Coverage Form or any endorsement thereto.

7. **Product Recall Expense**

   a. **SECTION II - LIABILITY,  B. Exclusions, 1. Applicable To Business Liability Coverage,**

   o. **Recall of Products, Work or Impaired Property** is replaced by the following:

   o. **Recall of Products, Work or Impaired Property**

      Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

      (1) "Your product";

      (2) "Your work"; or

      (3) "Impaired property";

      If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it, but this exclusion does not apply to "product recall expenses" that you incur for the "covered recall" of "your product".

      However, the exception to the exclusion does not apply to "product recall expenses" resulting from:

      (4) Failure of any products to accomplish their intended purpose;

      (5) Breach of warranties of fitness, quality, durability or performance;

      (6) Loss of customer approval, or any cost incurred to regain customer approval;

      (7) Redistribution or replacement of "your product" which has been recalled by like products or substitutes;

      (8) Caprice or whim of the insured;

      (9) A condition likely to cause loss of which any insured knew or had reason to know at the inception of this insurance;

      (10) Asbestos, including loss, damage or clean up resulting from asbestos or asbestos containing materials; or

      (11) Recall of "your products" that have no known or suspected defect solely because a known or suspected defect in another of "your products" has been found.

   b. The following is added to **SECTION II - LIABILITY, C. Who Is An Insured,** paragraph **3.b.:**

      "Product recall expense" arising out of any withdrawal or recall that occurred before you acquired or formed the organization.

c. The following is added to **SECTION II - LIABILITY, D. Liability and Medical Expenses Limits of Insurance**:

**Product Recall Expense Limits of Insurance**

a. The Limits of Insurance shown in the SUMMARY OF COVERAGES of this endorsement and the rules stated below fix the most that we will pay under this Product Recall Expense Coverage regardless of the number of:

   (1) Insureds;

   (2) "Covered Recalls" initiated; or

   (3) Number of "your products" withdrawn.

b. The Product Recall Expense Aggregate Limit is the most that we will reimburse you for the sum of all "product recall expenses" incurred for all "covered recalls" initiated during the policy period.

c. The Product Recall Each Occurrence Limit is the most we will pay in connection with any one defect or deficiency.

d. All "product recall expenses" in connection with substantially the same general harmful condition will be deemed to arise out of the same defect or deficiency and considered one "occurrence".

e. Any amount reimbursed for "product recall expenses" in connection with any one "occurrence" will reduce the amount of the Product Recall Expense Aggregate Limit available for reimbursement of "product recall expenses" in connection with any other defect or deficiency.

f. If the Product Recall Expense Aggregate Limit has been reduced by reimbursement of "product recall expenses" to an amount that is less than the Product Recall Expense Each Occurrence Limit, the remaining Aggregate Limit is the most that will be available for reimbursement of "product recall expenses" in connection with any other defect or deficiency.

g. **Product Recall Deductible**

   We will only pay for the amount of "product recall expenses" which are in excess of the $500 Product Recall Deductible. The Product Recall Deductible applies separately to each "covered recall". The limits of insurance will not be reduced by the amount of this deductible.

   We may, or will if required by law, pay all or any part of any deductible amount, if applicable.  Upon notice of our payment of a deductible amount, you shall promptly reimburse us for the part of the deductible amount we paid.

The Product Recall Expense Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Insurance.

d. The following is added to **SECTION II - LIABILITY, E. Liability and Medical Expense General Conditions, 2. Duties in the Event of Occurrence, Offense, Claim or Suit**:

You must see to it that the following are done in the event of an actual or anticipated "covered recall" that may result in "product recall expense":

   (1) Give us prompt notice of any discovery or notification that "your product" must be withdrawn or recalled. Include a description of "your product" and the reason for the withdrawal or recall;

   (2) Cease any further release, shipment, consignment or any other method of distribution of like or similar products until it has been determined that all such products are free from defects that could be a cause of loss under this insurance.

e. For the purpose of this endorsement, the following definitions are added to **SECTION II - LIABILITY, F. Liability and Medical Expenses Definitions**:

1. "Covered recall" means a recall made necessary because you or a government body has determined that a known or suspected defect, deficiency, inadequacy, or dangerous condition in "your product" has resulted or will result in "bodily injury" or "property damage".

2. "Product recall expense(s)" means:

   a. Necessary and reasonable expenses for:

      (1) Communications, including radio or television announcements or printed advertisements including stationary, envelopes and postage;

The **Hanover**
Insurance Group.
OD3 D903901     1001696

(2) Shipping the recalled products from any purchaser, distributor or user to the place or places designated by you;

(3) Remuneration paid to your regular "employees" for necessary overtime;

(4) Hiring additional persons, other than your regular "employees";

(5) Expenses incurred by "employees" including transportation and accommodations;

(6) Expenses to rent additional warehouse or storage space;

(7) Disposal of "your product", but only to the extent that specific methods of destruction other than those employed for trash discarding or disposal are required to avoid "bodily injury" or "property damage" as a result of such disposal,

you incur exclusively for the purpose of recalling "your product"; and

**b.** Your lost profit resulting from such "covered recall".

**f.** This Product Recall Expense Coverage does not apply:

(1) If the "products - completed operations hazard" is excluded from coverage under this Coverage Part including any endorsement thereto; or

(2) To "product recall expense" arising out of any of "your products" that are otherwise excluded from coverage under this Coverage Part including endorsements thereto.

**8. Unintentional Failure to Disclose Hazards**

The following is added to **SECTION II - LIABILITY, E. Liability and Medical Expenses General Conditions:**

**Representations**

We will not disclaim coverage under this Coverage Part if you fail to disclose all hazards existing as of the inception date of the policy provided such failure is not intentional.

**9. Unintentional Failure to Notify**

The following is added to **SECTION II - LIABILITY, E. Liability and Medical Expenses General Conditions, 2. Duties in the Event of Occurrence, Offense, Claim or Suit:**

Your rights afforded under this Coverage Part shall not be prejudiced if you fail to give us notice of an "occurrence", offense, claim or "suit", solely due to your reasonable and documented belief that the "bodily injury", "property damage" or "personal and advertising injury" is not covered under this Policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ASBESTOS LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of any actual or alleged:

1. Inhaling, ingesting or prolonged physical exposure by any person to asbestos or asbestos fibers or goods or products containing asbestos;
2. Use of asbestos in constructing or manufacturing any good, product or structure;
3. Intentional or accidental removal including encapsulation, dispersal, sealing or disposal of asbestos or asbestos fibers from any good, product or structure;
4. Manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;
5. Product manufactured, sold, handled or distributed by or on behalf of the insured which contain asbestos; or
6. Acts or omissions of the insured in connection with the general supervision of any job involving the removal, enclosure, encapsulation, dispersal, sealing or disposal of asbestos, asbestos fibers or products containing asbestos.

General supervision includes the rendering of or failure to render any instructions, recommendations, warnings or advice.



OD3 D903901          1001696

# NOTICE

If a claim is filed on the insured property, information on the claim may be given to the Property Insurance Loss Register (PILR) for use by insurance companies in investigating that claim as well as other claims for loss on the property. Information which may be given to PILR includes name, age and sex, current and previous addresses, loss location, insurance policy information, cause of loss, type of property, and identification of others who have an interest in the property or who are involved in the claimed loss. Such information may be collected by an insurer or an adjuster from you, your spouse, others who have an interest in the property, those who are involved in the claimed loss, and fire department personnel. Information on you may be given by PILR to insurance companies which subscribe to its services. On request, PILR will tell you whether it has information on you, will let you see and copy such information (in person or by mail), and will give you the nature and substance of such information by telephone. PILR may charge a reasonable fee for copies of information provided. If you think information on you is incomplete or inaccurate, you may request PILR to make corrections. PILR will then investigate and: (1) give your correction to subscribers who previously received such information; or (2) inform you that it refuses to make your correction and give you its reasons. If PILR refuses to make your correction, you can have a statement of the reasons for your disagreement placed in PILR; and all subscribers who received or will receive information on you will also receive a copy of the statement. Information on your claim will normally be stored by PILR for five years.

Inquiries to PILR should be addressed:

Property Insurance Loss Register
700 New Brunswick Avenue
Rahway, New Jersey 07065

231-0475 (6-89)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - FUNGI OR BACTERIA (LIABILITY)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A.** The following exclusion is added to **SECTION II - LIABILITY, B. Exclusions, 1. Applicable to Business Liability Coverage:**

**"Fungi" or Bacteria**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**(2)** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** For the purpose of this endorsement, the following definition is added to **Section II - Liability** Paragraph **F., Liability and Medical Expenses Definitions:**

**1.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi".

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.



OD3 D903901      1001696

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Policy and apply to Property and Liability Coverages:

**A. CAP ON CERTIFIED TERRORISM LOSSES**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to **Section II - Liability** paragraph **B. Exclusions** of the Businessowners Coverage Form **391-1003:**

A. The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

B. The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

The **Hanover**
Insurance Group

OD3 D903901       1001696

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A. SECTION I - PROPERTY**

1. With respect to an "open policy", the following is added to any provision which uses the term actual cash value:

   a. In the event of a total loss to a building or structure, actual cash value is calculated as the Limit of Insurance applicable to that building or structure or the fair market value of the building or structure, whichever is less.

   b. In the event of a partial loss to a building or structure, actual cash value is calculated as **b.(1)** or **b.(2)**, whichever is less:

      (1) The amount it would cost to repair, rebuild or replace the property less a fair and reasonable deduction for physical depreciation of the components of the building or structure that are normally subjected to repair or replacement during its useful life. Physical depreciation is based upon the condition of the property at the time of loss;

      (2) The Limit of Insurance applicable to the property.

   c. In the event of a partial or total loss to Covered Property other than a building or structure, actual cash value is calculated as **c.(1)** or **c.(2)**, whichever is less:

      (1) The amount it would cost to repair or replace the property less a fair and reasonable deduction for physical depreciation, based on the condition of the property at the time of loss;

      (2) The Limit of Insurance applicable to the property.

   d. An "open policy" is a policy under which the value of Covered Property is not fixed at policy inception, but is determined at the time of loss in accordance with policy provisions on valuation.

2. **SECTION I - PROPERTY, E. Property Loss Conditions, 2. Appraisal** is replaced by the following:

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written request for an appraisal of the loss. If the request is accepted, each party will select a competent and impartial appraiser. Each party shall notify the other of the appraiser selected within 20 days of the request. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

3. **SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment,** paragraph **d.(1)(a)** is deleted.

4. **SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment,** paragraph **d.(1)(b)** and **SECTION I - PROPERTY, E. Property Loss Conditions, 5. Loss Payment,** paragraph **d.(5)** are replaced by the following:

   (b) We will not pay on a replacement cost basis for any loss or damage until the lost or damaged property is actually repaired or replaced. Prior to such repair or replacement, we will pay the actual cash value of the lost or damaged property as described in paragraph **A.1.** of this Endorsement. If the actual cash value does not exhaust the applicable Limit of Insurance, we will then pay the difference between the actual cash value and the replacement cost, provided that the repair or replacement is completed:

Includes copyrighted materials of Insurance Services Office, Inc. with its permission.
Copyright 2016 The Hanover Insurance Group, Inc. All Rights Reserved.

**(i)** Within 12 months after we pay the actual cash value; or

**(ii)** Within 24 months after we pay the actual cash value if the loss or damage relates to a state of emergency as described in Section 8558 of the Government Code;

unless we extend the time period for good cause.

Nothing in this Paragraph **(d)** constitutes a waiver of our right to deny the claim for any valid reason or to restrict payment in cases of suspected fraud.

**(5)** Tenants' Improvements and Betterments at:

**(a)** Replacement cost in accordance with the terms set forth in Paragraph **(d)** above.

**(b)** A proportion of your original cost if the property is not repaired or replaced. We will determine the proportionate value as follows:

**(i)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(ii)** Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(c)** Nothing if others pay for repairs or replacement.

**(d)** Nothing if you have no lease.

**B. SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY)**

**1. SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY), A. Cancellation,** paragraphs **2.** and **3.** are replaced by the following:

**2. All Policies In Effect For 60 Days Or Less**

If this Policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this Policy by mailing or delivering to the first Named Insured at the mailing address shown in the Policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium; or

**(2)** Discovery of fraud by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this Policy.

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3. All Policies In Effect For More Than 60 Days**

**a.** If this Policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this Policy only upon the occurrence, after the effective date of the Policy, of one or more of the following:

**(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(2)** Discovery of fraud or material misrepresentation by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this Policy.

**(3)** A judgment by a court or an administrative tribunal that you have violated a California or federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

Includes copyrighted materials of Insurance Services Office, Inc. with its permission.
Copyright 2016 The Hanover Insurance Group, Inc. All Rights Reserved.

**The Hanover Insurance Group**

OD3 D903901      1001696

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

**(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

**(b)** Continuation of the policy coverage would:

**(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

**(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the Policy.

**b.** We will mail or deliver advance written notice of cancellation stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the Policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **3.a.**

**2.** The following provision is added to **SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY), A. Cancellation:**

**Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit. If such coverage has been in effect for 60 days or less and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except that we may not cancel this Policy solely because:

**a.** Corrosive soil conditions exist on the premises; or

**b.** The first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

However, we shall cancel this Policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**3.** **SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY), C. Concealment, Misrepresentation Or Fraud** is replaced by the following with respect to loss or damage caused by fire:

**C. Concealment, Misrepresentation or Fraud**

We do not provide coverage to the insured who, whether before or after a loss, has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

**1.** This Policy;

**2.** The Covered Property;

**3.** That insured's interest in the Covered Property; or

**4.** A claim under this Policy.

**4.** **SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY), C. Concealment, Misrepresentation Or Fraud** is replaced by the following with respect to loss or damage caused by a Covered Cause of Loss other than fire:

**C. Concealment, Misrepresentation or Fraud**

This Policy is void if any insured, whether before or after a loss, has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

1. This Policy;
2. The Covered Property;
3. An insured's interest in the Covered Property; or
4. A claim under this Policy.

5. **SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY), H. Other Insurance, 1. SECTION I - PROPERTY** is replaced by the following:

   1. **SECTION I - PROPERTY**

      If there is other insurance covering the same loss or damage, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance bears to the Limits of Insurance of all insurance covering on the same basis.

      We will not pay more than the applicable Limit of Insurance of **SECTION I - PROPERTY**.

6. The following is added to **SECTION III - COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I - PROPERTY AND SECTION II - LIABILITY)**:

   **Nonrenewal**

   1. Subject to the provisions of Paragraphs **2.** and **3.** below, if we elect not to renew this Policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

      We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the Policy.

   2. **Residential Property**

      This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit.

      We may elect not to renew such coverage for any reason, except that we

will not refuse to renew such coverage solely because:

a. The first Named Insured has accepted an offer of earthquake coverage.

   However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

   (1) The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this Policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

   (2) The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

   (3) We have:

      (a) Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

      (b) Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

      the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance coverage.

b. The first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake

Includes copyrighted materials of Insurance Services Office, Inc. with its permission. Copyright 2016 The Hanover Insurance Group, Inc. All Rights Reserved.

The
**Hanover**
Insurance Group.
OD3 D903901          1001696

Authority that included an earthquake policy premium surcharge.

c. Corrosive soil conditions exist on the premises.

3. We are not required to send notice of nonrenewal in the following situations:

a. If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

b. If the Policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph 1.

c. If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing,

within 60 days of the termination of the Policy, to obtain that coverage.

d. If the Policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

e. If the first Named Insured requests a change in the terms or conditions or risks covered by the Policy within 60 days of the end of the policy period.

f. If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph 1., to renew the Policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

 Includes copyrighted materials of Insurance Services Office, Inc. with its permission.
Copyright 2016 The Hanover Insurance Group, Inc. All Rights Reserved.



OD3 D903901          1001696

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following exclusion is added to Paragraph **B.1. Exclusions - Applicable To Business Liability Coverage in Section II - Liability:**

This insurance does not apply to "bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraph **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraph **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Copyright, Insurance Services Office, Inc., 2009



OD3 D903901        1001696

## THIS IS A CLAIMS-MADE AND REPORTED COVERAGE ENDORSEMENT.

# EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE ENDORSEMENT

Throughout this Coverage Endorsement (hereinafter referred to as "EPL Endorsement"), the words "you" and "your" refer to the "named insured(s)" shown in the Supplemental Declarations of this EPL Endorsement and any other person(s) or organization(s) qualifying as a "named insured" under this EPL Endorsement. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION III. WHO IS AN INSURED.

Other words and phrases that appear in "quotations" have special meaning. Refer to SECTION VII. DEFINITIONS.

The terms and conditions of the Cancellation Clause of the Common Policy Conditions, 391-1003 are hereby incorporated herein and shall apply to coverage as is afforded by this EPL Endorsement, unless specifically stated otherwise in an endorsement(s) attached hereto.

## SECTION I. WHAT IS COVERED

### A.  Insuring Agreement

1.  "We" shall pay those "losses" arising out of "your" "wrongful employment act" against "your" "employees", to which this insurance applies. The "wrongful employment act" must commence or take place after the "original inception date", but before the end of the "EPL coverage period". A "claim" or "suit" for a "wrongful employment act" must be first made against "you" during the "EPL coverage period" or any Extended Reporting Period (if applicable) and reported to "us" pursuant to the terms of this EPL Endorsement.

2.  A "claim" or "suit" by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

    a.  When written notice of such "claim" or "suit" is received and recorded by any "insured" or by "us", whichever comes first; or

    b.  When "we" make any settlement in accordance with the terms of this EPL Endorsement.

### B.  Defense

1.  "We" have the right and duty to defend and appoint an attorney to defend any "claim" or "suit" brought against any "insured" for a "wrongful employment act" to which this insurance applies, even if the "claim" or "suit" is groundless or fraudulent.

2.  "We" have the right to investigate and settle any "claim" or "suit" that "we" believe is proper. "You" shall be entitled to effectively associate in the defense of any "claim".

3.  "We" shall pay all reasonable costs "we" ask the "insured" to incur while helping "us" investigate or defend a "claim" or "suit". "We", however, will not pay more than $100 per day for earnings lost by the insured because of time taken off from work.

4.  "We" shall pay premiums for appeal bonds, or bonds to release property being used to secure a legal obligation, for a covered "suit". "We" shall only pay, however, for bonds valued up to "our" Aggregate EPL Limit of Liability. "We" shall have no obligation to appeal or to obtain these bonds.

5.  Payments for "defense costs" are included within the Aggregate EPL Limit of Liability. They are not in addition to the Aggregate EPL Limit of Liability. "Our" duty to defend or to make payment of any "claim" or "suit"

391-1209 03 06

pursuant to paragraphs 1-4 above, ends after the Aggregate EPL Limit of Liability has been exhausted by payment of "loss", including "defense costs".

6. "We" shall pay all interest on that amount of any judgment within the Aggregate EPL Limit of Liability:

a. which accrues after entry of judgment; and

b. before "we" pay, offer to pay, or deposit in court that part of the judgment within the Aggregate EPL Limit of Liability.

These interest payments are included within "our" Aggregate EPL Limit of Liability.

C. Transfer of Control

1. "You" may take over control of any outstanding "claim" or "suit" previously reported to "us", but only if "we", in "our" sole discretion, decide that you should, or if a court orders "you" to do so.

2. Notwithstanding subsection 1 of this Clause C, in all events, if the Aggregate EPL Limit of Liability is exhausted, "we" will notify "you" of all outstanding "claims" or "suits" and "you" will take over control of the defense. "We" will help transfer control of the "claims" and "suits" to "you".

3. "We" shall take whatever steps are necessary to continue the defense of any outstanding "claim" or "suit" and avoid a default judgment during the transfer of control to "you". If "we" do so, "we" shall not waive or give up any of "our" rights. "You" shall pay all reasonable expenses "we" incur for taking such steps after the Aggregate EPL Limit of Liability is exhausted.

## SECTION II. EXCLUSIONS-WHAT IS NOT COVERED

This insurance does not apply to:

A. Profit or Advantage

Any liability arising out of the gaining of any profit or advantage to which an "insured" was not legally entitled. However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Endorsement, we will defend a "claim" or "suit" asserting that an "insured" gained a

profit or advantage to which the "insured" was not legally entitled, until such time as the "insured" is determined to have gained a profit or advantage to which the "insured" was not legally entitled;

B. Criminal Acts

Any liability arising out of any dishonest, fraudulent, criminal, or malicious act by or at the direction of any "insured". However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Endorsement we will defend a "claim" or "suit" asserting a dishonest, fraudulent, criminal or malicious act until such time as the "insured" is determined to have committed such dishonest, fraudulent, criminal or malicious act;

The "wrongful employment act(s)" of an "insured" shall not be imputed to any other "insured" for the purpose of determining the applicability of the foregoing exclusions A and B.

C. "Property Damage"

Any liability arising out of "property damage";

D. "Bodily Injury"

Any liability arising out of "bodily injury";

E. Worker's Compensation, Social Security and Unemployment, Disability and Retirement Benefits

Any liability arising out of any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law. This exclusion, however, shall not apply to "loss" arising from a "claim" or "suit" for "retaliation";

F. Contractual Liability

Any liability arising out of any actual or alleged contractual liability of any "insured" under any express contract or agreement. This exclusion, however, shall not apply to the extent any liability does not arise under such express contract or agreement;

G. ERISA, COBRA, WARN, OSHA and NLRA

Any liability arising out of the "insured's" failure to fulfill any responsibility, duty or obligation imposed by the Employment Retirement Income Security Act of 1974 (ERISA), Consolidated Omnibus Budget

**The Hanover** Insurance Group

OD3 D903901          1001696

Reconciliation Act of 1985 (COBRA), Worker's Adjustment and Retraining Notification Act, Public Law 100-379 (1988) (WARN), Occupational Safety and Health Act (OSHA), National Labor Relations Act of 1947 (NLRA), any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar provisions of any federal, state, or local statutory or common law. This exclusion, however, shall not apply to "loss" arising from a "claim" or "suit" for "retaliation";

**H.  FLSA**

Any liability arising out of any obligation under the Fair Labor Standards Act, or any violations of any federal, state, local or foreign statutory law or common law that governs the same topic or subject and any rules, regulations and amendments thereto (except the Equal Pay Act). This exclusion, however, shall not apply to "loss" arising from a "claim" or "suit" for "retaliation";

Any liability arising out of claims for unpaid wages or overtime pay for hours actually worked or labor actually performed by any "employee" of the "insured", for improper payroll deductions or any violations of any federal, state, local or foreign statutory law or common law that governs the same topic or subject and any rules, regulations and amendments thereto.

**I.  Non-Monetary Relief**

That part of any "claim" or "suit" seeking any non-monetary relief, including but not limited to: (1) injunctive relief; (2) declaratory relief; (3) disgorgement; (4) job reinstatement; (5) costs or expenses incurred in accommodating any disabled person, pursuant to the Americans with Disabilities Act of 1990 (ADA), including amendments to that law or similar federal, state or local statutory or common law; (6) any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to a "claim" or "suit" alleging discrimination or other "wrongful employment act"; or (7) other equitable remedies, including as to all of the above, the cost of compliance therewith; provided, however, if such request for non-monetary relief is part of an otherwise covered "claim" or "suit", "we" will not seek to allocate "defense costs" for the portion of the "claim" or "suit" seeking non-monetary relief;

**J.  Certain "Insureds"**

Any "claim" or "suit" brought by any "insured". This exclusion, however, shall not apply to a "claim" or "suit" brought by an "employee" of the "insured", other than an "employee" who is or was a director of the "insured";

**K.  Prior Knowledge**

Any liability arising out of incidents, circumstances or "wrongful employment acts", which an "insured", prior to the "original inception date" as shown in the Supplemental Declarations of this EPL Endorsement, had knowledge or which an "insured" could have reasonably foreseen might result in a "claim" or "suit";

**L.  Prior Notice**

Any liability arising out of the facts alleged, or to the same or "related wrongful employment acts" alleged or contained in any "claim" or "suit" which has been reported, or in any circumstances of which notice has been given, under any policy of which this EPL Endorsement is a renewal or replacement or which it may succeed in time;

**M.  Securities Holder**

Any "claim" or "suit" brought by a securities holder of the "insured" in their capacity as such, whether directly, derivatively on behalf of the "insured", or by class action;

**N.  Outside Boards**

Any liability arising out of any actual or alleged act or omission of an "insured" serving in any capacity, other than as a director, officer or "employee" of the "insured" entity.

---

**SECTION III. WHO IS AN INSURED**

**A.  Individual**

If "you" are shown in the Supplemental Declarations of this EPL Endorsement as an individual, "you" and "your" spouse are "insureds", only for the conduct of a business of which "you" are the sole owner.

**B.  Corporation**

If "you" are shown in the Supplemental Declarations of this EPL Endorsement as a corporation or organization other than a partnership or joint venture, "you" and "your" "subsidiaries" are "insureds".

### C. Partnership or Joint Venture

If "you" are shown in the Supplemental Declarations of this EPL Endorsement as a partnership or joint venture, "you" are an "insured". "Your" partners or co-venturers and their spouses are also "insureds", but only for the conduct of "your" business.

### D. "Employees"

"Your" "employee", executive officers and directors are "insureds", only for the conduct of "your" business within the scope of their employment or their duties as executive officers or directors.

### E. Extensions

1. Subject otherwise to the terms hereof, this EPL Endorsement shall cover "loss" arising from any "claims" or "suits" made against the estates, heirs, or legal representative of deceased individual "insureds", and the legal representatives of individual "insureds", in the event of incompetency, who were individual "insureds" at the time the "wrongful employment acts", upon which such "claims" or "suits" are based, were committed.

2. Subject otherwise to the terms hereof, this EPL Endorsement shall cover "loss" arising from all "claims" and "suits" made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an individual "insured", including a "claim" or "suit" that seeks damages recoverable from marital community property, property jointly held by the individual "insured" and the spouse, or property transferred from the individual "insured" to the spouse; provided, however, that this extension shall not afford coverage for a "claim" or "suit" arising out of any "wrongful employment act" of the spouse, but shall apply only to "claims" or "suits" arising out of any "wrongful employment acts" of an individual "insured", subject to this EPL Endorsement's terms, conditions and exclusions.

### SECTION IV. LIMIT OF LIABILITY (including "defense costs")

**A.** The Aggregate EPL Limit of Liability shown in the Supplemental Declarations of this EPL Endorsement and the information contained in this section limits the most "we" shall pay for all "loss" arising out of "claims" and "suits" first made against "insureds" during the "EPL coverage period" or Extended Reporting Period (if applicable), regardless of:

1. the number of persons or organizations covered by this EPL Endorsement; or

2. the number of "claims" made or "suits" brought; or

3. the length of the "EPL coverage period".

**B.** The Aggregate EPL Limit of Liability is the most "we" shall pay for all "losses" covered under this EPL Endorsement, including amounts incurred for "defense costs".

**C.** The Aggregate EPL Limit of Liability for the Extended Reporting Period shall be part of, and not in addition to the Aggregate EPL Limit of Liability for the "EPL coverage period".

**D.** All "claims" and "suits" arising from the same or "related wrongful employment acts" shall be treated as arising out of a single "wrongful employment act".

**E.** All "claims" or "suits" arising out of one "wrongful employment act" shall be deemed to be made on the date that the first such "claim" is made or "suit" is brought. All "claims" asserted in a "class action suit" will be treated as arising out of a single "wrongful employment act".

**F.** Any "claim" or "suit" which is made subsequent to the "EPL coverage period" or Extended Reporting Period (if applicable) which, pursuant to Section VI, Clause D(3) and (4) is considered made during the "EPL coverage period" or Extended Reporting Period shall also be subject to the one Aggregate EPL Limit of Liability stated in the Supplemental Declarations of this EPL Endorsement.

### SECTION V. DEDUCTIBLE

"You" shall be responsible for the deductible amount shown in the Supplemental Declarations of this EPL Endorsement with respect to each "claim" and "suit" and "you" may not insure against it. A single deductible amount shall apply to "loss" arising from all "claims" and "suits" alleging the same "wrongful employment act" or "related wrongful employment acts". Expenses



OD3 D903901      1001696

"we" incur in investigating, defending and settling "claims" and "suits" are included in the deductible. The deductible is not included within the Aggregate EPL Limit of Liability.

## SECTION VI. CONDITIONS

"We" have no duty to provide coverage under this EPL Coverage Endorsement, unless there has been full compliance with all the Conditions contained in this EPL Endorsement.

### A. Assignment

The interest of any "insured" is not assignable. "You" cannot assign or transfer "your" interest in this EPL Endorsement without "our" written consent attached to the EPL Coverage Endorsement.

### B. Bankruptcy or Insolvency

"Your" bankruptcy, insolvency or inability to pay, will not relieve "us" from the payment of any "claim" or "suit" covered by this EPL Endorsement.

Under no circumstances will "your" bankruptcy, insolvency, or inability to pay require "us" to drop down, in any way replace, or assume any of "your" obligations with respect to the Deductible provisions of this EPL Endorsement.

### C. Coverage Territory

"We" cover "wrongful employment acts" in the United States of America, its territories and possessions, Puerto Rico, or Canada, but only if the "claim" is made and the "suit" is brought for such "wrongful employment act" in the United States of America, its territories and possessions, Puerto Rico, or Canada.

### D. Duties in the Event of an Incident, "Claim" or "Suit"

1. If, during the "EPL coverage period", incidents or events occur which "you" reasonably believe may give rise to a "claim" or "suit" for which coverage may be provided hereunder, such belief being based upon either written notice from the potential claimant or the potential claimant's representative; or notice of a complaint filed with EEOC, DOL or OFCCP (or similar federal, state or local agency); or upon a contemporaneously made memorandum of an oral "claim", allegation or threat, "you" shall give written notice to "us" as soon as practicable and either:

   a. anytime during the "EPL coverage period" or the Extended Reporting Period (if applicable); or

   b. within thirty (30) days after the end of the "EPL coverage period" or Extended Reporting Period (if applicable), as long as such "claim" or "suit" is reported no later than thirty (30) days after the date such "claim" or "suit" was first made against an "insured".

2. If a "claim" is made or a "suit" is brought against any "insured", "you" must:

   a. Immediately record the specifics of the "claim" or "suit" and the date received; and

   b. Provide "us" with written notice, as described in subsection 3. below, as soon as practicable.

3. Such written notice of "claim" or "suit" shall contain:

   a. The identity of the person(s) alleging a "wrongful employment act";

   b. The identity of the "insured(s)" who allegedly were involved in the incidents or events;

   c. The date the alleged incidents or events took place; and

   d. The written notice or contemporaneously prepared memorandum referred to above.

   If written notice is given to "us" during the "EPL coverage period" or Extended Reporting Period (if applicable), pursuant to the above requirements, then any "claim" or "suit" which is subsequently made against any "insureds" and reported to "us" alleging, arising out of, based upon or attributable to such circumstances or alleging any "related wrongful employment act" to such circumstances, shall be considered made at the time such notice of such circumstances was first given.

4. If "you" submit written notice of a "claim" or "suit", pursuant to this Clause D, then any "claim" or "suit" that may subsequently be made against an " insured" and reported to "us" alleging the same or a "related wrongful employment act" to the "claim" or "suit" for which such notice has been given shall be deemed, for the purpose of this insurance, to have been first made during the "EPL

coverage period" in effect at the time such written notice was first submitted to "us".

5. "You" and any other "insured" must:

   a. Immediately send "us" copies of any demands, notices, summonses or legal papers received in connection with any "claim" or "suit";

   b. Authorize "us" to obtain records and other information;

   c. Cooperate with "us" in the investigation, settlement or defense of the "claim" or "suit";

   d. Assist "us", upon "our" request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of injury or damage to which this insurance may also apply;

   e. Take no action, or fail to take any required action, that prejudices the rights of the "insureds" or "us" with respect to such "claim" or "suit".

6. No "insureds" will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without "our" prior written consent.

**E. Transfer of Rights of Recovery Against Others to "Us"**

"You" may be able to recover all or part of a "loss" from someone other than "us". "You", therefore, shall do all that is possible after a "loss" to preserve any such right of recovery. If "we" make a payment under this EPL Endorsement, that right of recovery shall belong to "us". "You" shall do whatever is necessary, including signing documents, to help "us" obtain that recovery.

**F. Extended Reporting Period**

1. Solely with respect to this EPL Endorsement and except as indicated below, if "you" shall cancel or "we" shall cancel for any reason other than for non-payment of premium, or "you" or "we" shall refuse to renew this EPL Endorsement, "you" shall have the right, upon payment of an additional premium of 100% of the full annual premium applicable to this EPL Endorsement, to buy an Extended Reporting Period Endorsement, providing an Extended Reporting

Period of one (1) year following the effective date of the cancellation or nonrenewal, in which to give "us" written notice of "claims" first made or "suits" first brought against the "insureds" during said Extended Reporting Period for any "wrongful employment acts" which take place after the "original inception date" and before the end of the "EPL coverage period" and are otherwise covered by this EPL Endorsement.

To obtain an Extended Reporting Period Endorsement, "you" must request it in writing and pay the additional premium due, within thirty (30) days of the effective date of cancellation or nonrenewal.

2. The Extended Reporting Period Endorsement cannot be canceled by either party, except for nonpayment of premium. The additional premium for the Extended Reporting Period shall be fully earned at the inception of the Extended Reporting Period and this EPL Endorsement cannot be canceled after such additional premium is paid. If "we" do not receive the written request as required, you may not exercise this right at a later date.

3. This insurance, provided during the Extended Reporting Period, is excess over any other valid and collectible insurance that begins or continues in effect after the Extended Reporting Period Endorsement becomes effective, whether the other insurance applies on a primary, excess, contingent, or any other basis.

4. This Clause F and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

5. In the event of a "Transaction", as defined in Clause G below, the "named insured" shall have the right, within thirty (30) days before the end of the "EPL coverage period", to request an offer from "us" of an Extended Reporting Period (with respect to "wrongful employment acts" which take place after the "original inception date" and prior to the effective time of the "Transaction"). We shall offer such Extended Reporting Period pursuant to such terms, conditions, and premium as we may reasonably decide. In the



OD3 D903901        1001696

event of a "Transaction", the right to
an Extended Reporting Period shall not
otherwise exist except as indicated in
this paragraph.

**G. Change in Control of "Named Insured"**

If during the "EPL coverage period":

1. the "named insured" shall consolidate
   with or merge into, or sell all or
   substantially all of its assets to any
   other person or entity or group of
   persons or entities acting in concert;
   or

2. any person or entity or group of
   persons or entities acting in concert
   shall acquire an amount of the
   outstanding securities representing
   more than fifty (50%) percent of the
   voting power for the election of
   directors or General Partners of the
   "named insured"    (in the event the
   "named insured" is a Partnership), or
   acquires the voting rights of such an
   amount of such securities; or

3. a General Partner of the "named
   insured"    (in the event the "named
   insured" is a partnership) withdraws,
   resigns or is terminated;

(any of the above events herein referred to
as the "Transaction"),

then this EPL Endorsement shall continue
in full force and effect as to "wrongful
employment acts" occurring after the
"original inception date" and prior to the
effective time of the "Transaction", but
there shall be no coverage afforded by any
provision of this EPL Endorsement for any
actual or alleged "wrongful employment
acts"  occurring after the effective time of
the "Transaction". This EPL Endorsement
may not be canceled after the effective
time of the "Transaction" and the entire
premium for this EPL Endorsement shall
be deemed earned as of such time. "You"
shall also have the right to an offer by "us"
of an Extended Reporting Period described
in Clause F of this EPL Endorsement.

"You" shall give "us" written notice of the
"Transaction" as soon as practicable, but
not later than thirty (30) days after the
effective date of the "Transaction".

**H. Legal Action Against "Us"**

No person or organization has the right to
join    "us" as a party or otherwise bring
"us" into a "suit" asking for damages from
an "insured".

**I. Other Insurance**

Unless expressly written to be excess over
other applicable insurance, it is intended
that the insurance provided by this EPL
Endorsement shall be primary.

**J. EPL Endorsement Changes**

This EPL Endorsement contains all the
agreements between "you"    and "us"
concerning this insurance. The first
"named insured"  in the Supplemental
Declarations of this EPL Endorsement is
authorized to request changes in this EPL
Endorsement. This EPL Endorsement can
only be changed by a written endorsement
"we" issue and make part of this EPL
Endorsement.

**K. Representations**

Any and all relevant provisions of this EPL
Endorsement may be voidable by "us"  in
any case of fraud, intentional concealment,
or misrepresentation of material fact by
any "insured".

**L. Special Rights and Duties of the
"Named Insured"**

"You" agree that when there is more than
one person and/or entity covered under
this EPL    Endorsement, the "named
insured" in the Supplemental Declarations
of this EPL  Endorsement shall act on
behalf of all "insureds" as to:

1. Giving of notice of a "claim"  or "suit";

2. Giving and receiving notice of
   cancellation or nonrenewal;

3. Payment of premiums and receipt of
   return premiums;

4. Acceptance of any endorsements
   issued to form a part of this EPL
   Endorsement; or

5. Purchasing or deciding not to purchase
   the    Extended    Reporting    Period
   Endorsement.

**M. Headings**

The description in the headings of this
EPL Endorsement are solely for
convenience, and form  no part of
the terms and    conditions of coverage.

## SECTION VII. DEFINITIONS

A. "Bodily injury" means physical injury, sickness, or disease, including death resulting therefrom

B. "Claim" means a written demand for money. The term "claim" shall also mean an Equal Employment Opportunity Commission (EEOC), Department of Labor (DOL) or Office of Federal Contract Compliance Program (OFCCP) (or similiar federal, state or local agency) proceeding or investigation commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to "you". However, in no event, shall the term"claim" include any labor or grievance proceeding, which is subject to a collective bargaining agreement.

C. "Class Action Suit" means any suit seeking certification or certified as a class action by a federal or state court.

D. "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by "us" resulting solely from the investigation, adjustment, defense and appeal of a "claim" or "suit" against "you".

E. "Employee" means an individual whose labor or service is engaged by and directed by "you" for remuneration, whether such individual is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal, and temporary "employees". Independent contractors and individuals who are leased to the "insured " are not "employees".

F. "Loss(es)" means damages (including front pay and back pay), judgments, settlements, pre- and post-judgment interest on that part of any judgment paid by "us", statutory attorney fees, and "defense costs", however, "loss" shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages (3) the multiplied portion of multiplied damages; (4) taxes; (5) any amount for which the "insureds" are not financially liable or which are without legal recourse to the "insureds"; (6) employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; or (7) matters which may be deemed uninsurable under the law

pursuant to which this EPL Coverage Endorsement shall be construed.

G. "Named Insured" means the person or organization designated in the Supplemental Declarations page of this EPL Endorsement.

H. "Original inception date" refers to the date specified in the Supplemental Declarations of this EPL Endorsement.

I. "EPL coverage period" means the period commencing on the effective date shown in the Supplemental Declarations of this EPL Endorsement. This period ends on the earlier of the expiration date or the effective date of cancellation of this EPL Endorsement. If "you" became an "insured" under this EPL Endorsement after the effective date, the "EPL coverage period" begins on the date "you" became an "insured".

J. "Property Damage" means physical injury to, or destruction of, tangible property including the loss of use thereof, or loss of use of tangible property, which has not been physically injured or destroyed.

K. "Related Wrongful Employment Act(s)" means "wrongful employment acts" which are the same, related or continuous, or "wrongful employment acts" which arise from a common nucleus of facts. "Claims" or "suits" can allege "related wrongful employment acts", regardless of whether such "claims" or "suits" involve the same or different claimants, "insureds" or legal causes of actions.

L. "Retaliation" means a "wrongful employment act" of an "insured" alleged to be in response to, the actual or attempted exercise by an "employee" of any right that such "employee" has under the law. Provided, however, "retaliation" shall not include the "wrongful employment act" of an "insured" alleged to be in response to the threat of or the actual filing of any claim or suit under the Federal False Claims Act or any other federal state, local or foreign "whistleblower law".

M. "Subsidiary" means:

1. Any for-profit organization which, on or before the inception of the "EPL coverage period", is more than 50% owned by the "named insured", either directly or indirectly through one or more of its "subsidiaries"; or

2. A for-profit organization which becomes a "subsidiary" during the "EPL coverage period", but only upon the condition that within 90 days of its becoming a "subsidiary", the "named insured" shall have provided "us" with full particulars of the new "subsidiary" and agreed to any additional premium or amendment of the provisions of this EPL Endorsement required by "us" relating to such new "subsidiary". Further, coverage as shall be afforded to the new "subsidiary" is conditioned upon the "named insured" paying when due any additional premium required by "us" relating to such new "subsidiary".

An organization becomes a "subsidiary" when the "named insured" owns more than fifty (50%) percent ownership interest in such "subsidiary", either directly, or indirectly through one or more of its "subsidiaries". An organization ceases to be a "subsidiary" when the "named insured" ceases to own more than a fifty (50%) percent ownership in such "subsidiary", either directly, or indirectly through one or more of its "subsidiaries".

In all events, coverage as is afforded under this EPL Endorsement with respect to a "claim" made or "suit" brought against any "subsidiary" or an "insured" of any "subsidiary", shall only apply to "wrongful employment act(s)" commenced or allegedly commenced after the effective time that such "subsidiary" became a "subsidiary", and prior to the time that such "subsidiary" ceased to be a "subsidiary".

N. "Suit" means a civil proceeding or an administrative proceeding seeking money damages, and includes an arbitration, mediation or any other alternative dispute resolution procedure seeking such damages, to which the "insured" must submit or may submit with "our" consent. "Suit" shall not include any civil proceeding or administrative proceeding arising from any labor or grievance dispute which is subject to a collective bargaining agreement.

O. "Whistleblower law" means a statute, rule or regulation, which protects an employee against discrimination from his or her employer, if the employee discloses or threatens to disclose to a superior or any governmental agency; or who gives testimony relating to, any action with respect to the employer's operations, which may be a violation of public policy as reflected in legislation, administrative rules, regulations or decisions, judicial decisions, and professional codes of ethics.

P. "Wrongful Employment Act(s)" means any actual or alleged:

1. wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;

2. harassment (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);

3. discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

4. "retaliation" (including lockouts);

5. employment-related misrepresentation(s) to "your" "employee" or applicant for employment with "you";

6. employment-related libel, slander, humiliation, mental anguish, infliction of emotional distress, defamation, or invasion of privacy;

7. wrongful failure to employ or promote;

8. wrongful deprivation of career opportunity, wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;

9. wrongful discipline;

10. failure to grant tenure;

11. failure to provide or enforce adequate or consistent corporate policies and procedures relating to any "wrongful employment act"

12. negligent supervision or hiring by an "insured", relating to any of the above;

13. violation of an individual's civil rights relating to any of the above.



OD3 D903901        1001696

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDMENT - LIMITS OF INSURANCE PERSONAL AND ADVERTISING INJURY SEPARATE LIMIT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A.** Under **SECTION II - LIABILITY, D. Liability and Medical Expenses Limits of Insurance,** Paragraph **2.** is replaced with the following:

**2.** The most we will pay for the sum of all damages because of all "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence" are the Liability limit and the Medical Expenses limit, respectively, shown in the Declarations.

But the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses limit shown in the Declarations.

**B.** Under **SECTION II - LIABILITY, D. Liability and Medical Expenses Limits of Insurance,** the following is added:

The most we will pay for the sum of all damages because of "personal and advertising injury" sustained by any one person or organization is the same as the Business Liability Limit shown in the Declarations.

**391-1375 01 10**        Includes copyrighted material of Insurance Services Office., Inc., with its permission        **Page 1 of 1**

175

# EXHIBIT B

David A. Fox, SBN 254651
Joanna L. Fox, SBN 272593
Christopher L. Hendricks, SBN 258958
Michael F. Gosling, SBN 305845
**FOX LAW, APC**
225 West Plaza Street, Suite 102
Solana Beach, California 92075
Tel:   (858) 256-7616
Fax:   (858) 256-7618

Attorneys for Plaintiffs Rigoberto Bernal and Marilena Bernal

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

SEP 0 9 2020

S. Acosta

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF RIVERSIDE, CENTRAL DISTRICT

| | |
|---|---|
| RIGOBERTO BERNAL; an individual; and, MARILENA BERNAL; an individual, <br><br> Plaintiffs. <br><br> v. <br><br> RALPH HIGHSHAW, M.D.; an individual; ELITE MEDICAL GROUP, PC; a California Corporation; NEUROPATHY SOLUTIONS dba SUPERIOR HEALTH CENTERS; a California Corporation; ALEXA BENSON; an individual; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. **RIC 2 0 0 3 6 0 0** <br><br> **COMPLAINT** <br><br> 1. **NEGLIGENCE - MEDICAL MALPRACTICE** <br> 2. **NEGLIGENCE – FAILURE TO WARN** <br> 3. **LOSS OF CONSORTIUM** <br> 4. **FINANCIAL ELDER ABUSE** <br> 5. **FRAUD** <br><br> **[DEMAND FOR JURY TRIAL]** |

COME NOW Plaintiffs Rigoberto Bernal ("Mr. Bernal"), and Marilena Bernal ("Mrs. Bernal"), complain against Ralph Highshaw, M.D. ("Dr. Highshaw"); Elite Medical Group, PC ("Elite Medical Group"); Neuropathy Solutions dba Superior Health Centers ("Superior Health Centers"); Alexa Benson ("Nurse Benson"); and DOES 1-50, inclusive, and allege as follows:

## NATURE OF ACTION

1.      This complaint arises from a series of recklessly administered injections Mr. Bernal received that nearly killed him and left him paralyzed from the waist down. Mr. Bernal sought treatment for knee pain at Superior Health Centers in Corona, California. Staff at Superior Health

- 1 -
COMPLAINT

1   Centers in Corona directed him to receive stem cell injections in his knees to relieve pain and increase

2   mobility. Mr. Bernal agreed to proceed with the injections.

3        2.     Superior Health Centers, through its employees and/or agents, informed Mr. Bernal

4   that the only way to obtain this "miracle" treatment was to finance the injections for $13,250 – an

5   amount many times more than usual and customary rates for joint injections. Unbeknownst to Mr.

6   Bernal, the injections he received did not contain live stem cells.  Even worse, the injections were

7   performed without proper medical recommendation, without proper physician oversight, without

8   complete medical disclosures, without informed consent, without adherence to proper sterile or clean

9   technique, and in a manner that fell far below the standard of care for joint injections. As a result of

10  these failures, Mr. Bernal went into septic shock, subsequently endured numerous surgeries, and is

11  now a permanent paraplegic. He will never walk again.

12       3.     These allegations are nothing new to Superior Health Centers, as they have been sued

13  and investigated for fraud, elder abuse, and medical malpractice on numerous occasions[123].

14  **PARTIES**

15       4.     Plaintiff Rigoberto Bernal is now, and at all times relevant to this Complaint was a

16  resident of the County of Riverside, State of California. He is the husband of Plaintiff Mary Bernal.

17       5.     Plaintiff Mary Bernal is now, and at all times relevant to this Complaint was a resident

18  of the County of Riverside, State of California. She is the wife of Plaintiff Rigoberto Bernal.

19       6.     Plaintiffs are informed and believe, and thereon allege that Defendant Ralph

20  Highshaw, M.D. is a medical doctor and licensed urologist. Plaintiffs are further informed and believe

21  that Dr. Highshaw is a resident of Pasco County, Florida, conducting business in the State of

22  California. Plaintiffs are further informed and believe, and allege thereon, that Dr. Highshaw is now,

23  and at all times relevant to this complaint, was an employee, agent, servant, and/or ostensible agent

24

25

26  [1] https://www.nbclosangeles.com/investigations/couple-accuses-socal-chiropractic-business-of-swindling-them-out-of-18k/2291865/

27  [2] https://www.nbclosangeles.com/news/local/southern-california-chiropractor-neuropathy-treatment-investigation/179194/

28  [3] See LASC Case No. BC677958.

COMPLAINT

1    of Defendant of Elite Medical Group and Superior Health Centers and at all times herein mentioned

2    was acting within the course, scope and authority of said agency and/or employment.

3            7.      Plaintiffs are informed and believe, and thereon allege that Defendant Elite Medical

4    Group is a corporation duly authorized and doing business in the State of California, County of

5    Riverside.

6            8.      Plaintiffs are informed and believe, and thereon allege that Defendant Neuropathy

7    Solutions is a corporation doing business as Superior Health Centers and is duly authorized and doing

8    business in the State of California, County of Riverside.

9            9.      Plaintiffs are informed and believe, and thereon allege that Nurse Benson is a licensed

10   nurse practitioner. Plaintiffs are further informed and believe that Nurse Benson is a resident of Los

11   Angeles County, California, and conducting business in the County of Riverside.

12           10.     Plaintiffs are informed and believe, and thereon allege, that DOES 1 through 50, are

13   now and at all times relevant to this complaint, were corporations, clinics, medical groups consisting

14   of licensed physicians and other health care providers, and/or medical groups consisting of partners,

15   shareholders, limited partnerships, professional medical corporations or other corporations, medical

16   or hospital associations, medical or hospital corporations or organizations, including groups of

17   physicians practicing medicine in the State of California, and authorized by and existing pursuant to

18   the laws of the State of California, and/or authorized to practice medicine and/or operate health care

19   facilities (or facilities including hospitals, medical clinics, groups or similar health care provider

20   facilities) and/or practice medicine individually or in a group, including other health care providers,

21   and were in the position to provide health care services to the public, including Mr. Bernal.

22           11.     Plaintiffs are further informed and believe and based thereon allege, that at all relevant

23   times herein mentioned, the Defendants herein, and the nurses, technicians, and other health care

24   providers providing care to Rigoberto Bernal were the agents and/or employees of Defendants, and

25   were at all times relevant acting within the course and scope of such agency and employment.

26           12.     Plaintiffs are ignorant of the true names and identities of Defendants DOES 1 through

27   50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this

28   complaint to allege the true names and capacities of these Defendants when such names are

- 3 -
COMPLAINT

ascertained. Plaintiffs allege that each fictitiously named Defendant is responsible in some manner for the occurrences alleged herein, and that Plaintiffs' injuries alleged herein were proximately caused by their conduct.

**VENUE**

13. Venue is proper in this Court pursuant to California Code of Civil Procedure section 395, because the liability alleged herein arose in Riverside County.

**GENERAL ALLEGATIONS**

**Mr. Bernal's Medical Treatment by Defendants**

14. In or around September 2019, Mr. Bernal attended an "informational sales pitch" from Superior Health Centers wherein he was informed that stem cell injections would cure pain and mobility limitations in his knees.

15. At the "informational sales pitch" in September of 2019, representatives of Superior Health Centers, who were not medical professionals, falsely informed Mr. Bernal they had many licensed doctors under their employ and that a single stem cell injection would permanently cure his pain.

16. There was no reasonable medical basis to assert that one single stem cell injection would cure Mr. Bernal's long-standing knee issues. Such assertions by Superior Health Centers were part of a sales tactic and had no medical foundation.

17. Mr. Bernal agreed to proceed with the stem cell treatment and went to Superior Health Center – Corona, located at 2083 Compton Ave., Ste. 202, Corona, CA 92881 on October 9, 2019 for treatment.

18. Upon information and belief, Dr. Highshaw, through his professional corporation, Elite Medical Group, PC, is supposed to facilitate and oversee medical treatment at Superior Health Center – Corona, including, in part, Mr. Bernal's medical treatment. Dr. Highshaw, who, upon information and belief, owns and operates a urological practice and lives in Florida, failed to properly facilitate and oversee the medical practice at Superior Health Centers – Corona. Specifically, he failed to supervise the treatment of Mr. Bernal.

19.     On October 9, 2019, Mr. Bernal, accompanied by his wife, Mrs. Bernal, checked in for treatment at Superior Health Center – Corona.  Defendant Nurse Benson told him that he would have to wait for fresh "stem cells."

20.     Nurse Benson then took Mr. Bernal and Mrs. Bernal into a procedure room. She stated that she was going to draw blood from Mr. Bernal and mix it with the stem cells. Nurse Benson then drew blood from Mr. Bernal and mixed it with CoreCyte and Polycyte, a material Predictive Biotech markets, neither of which contain live stem cells and neither of which are FDA approved or licensed for the prevention or treatment of any disease, including knee pain/arthritis.

21.     Nurse Benson then injected the mixture into both of Mr. Bernal's knees.

22.     After the injections were complete, Nurse Benson stated there was additional stem cells left in the syringe. She asked if Mr. Bernal had pain anywhere else and he said he did have pain in his shoulder. Nurse Benson then injected the mixture in Mr. Bernal's shoulder as well.

23.     Nurse Benson informed Mr. and Mrs. Bernal that body aches and fever were normal after the stem cell injection and that no further treatment was necessary. She further informed him that any future follow-up would cost additional money.

24.     In the following days, Mr. Bernal began to run a fever and was in pain. He and/or Mrs. Bernal called Superior Health Center to report the fever and pain.  They were informed that this was to be expected and that no further intervention was necessary.

25.     On October 14, 2020, Mr. Bernal was rushed to the hospital. He had septic infections in each of the areas that was injected by Nurse Benson, as well as in his spine. Mr. Bernal was also in renal failure because of multiple infections from the injections. He underwent numerous surgeries, including spine surgery and spent nearly two months in the hospital. Despite such medical intervention, Mr. Bernal is now permanently paraplegic and suffers from other catastrophic injuries as well.

**Vicarious Liability and Agency Allegations**

26.     Plaintiffs are informed and believe, and on that basis allege, that Dr. Highshaw and Nurse Benson were the agents or employee of the other Defendants, and were acting within the course and scope of their employment or agency at all times they provided medical treatment to Mr. Bernal.

27.     In the alternative, Plaintiffs are informed and believe, and on that basis allege, that Dr. Highshaw and Nurse Benson are, and at all times relevant to this complaint, were ostensible agents of the other Defendants. Defendants hold themselves out to the public as a provider of care. Plaintiffs are informed and believe, and on that basis allege, that at all times Dr. Highshaw and Nurse Benson provided medical treatment to Mr. Bernal, Defendants created the impression to Mr. Bernal that Dr. Highshaw and Nurse Benson were Defendants' agents, and that Dr. Highshaw and Nurse Benson were acting on Defendants' behalf. Plaintiffs are further informed and believe, and on that basis allege, that Dr. Highshaw and Nurse Benson are affiliated with Defendants and provided all medical services to Mr. Bernal on Defendants' premises. Plaintiffs are further informed and believe, and on that basis allege, that Dr. Highshaw and Nurse Benson enjoy use of Defendants' equipment, facilities, and medical staff privileges, and Mr. Bernal's medical records contain Defendant's letterhead identifying Dr. Highshaw and Nurse Benson as the ordering provider of medical treatment. A reasonable person in Mr. Bernal's position would have believed that Dr. Highshaw and Nurse Benson were Defendants' agent.

28.     Dr. Highshaw and Nurse Benson provided medical treatment to Mr. Bernal, such that Mr. Bernal reasonably believed that Dr. Highshaw and Nurse Benson were Defendants' agent and Defendants did nothing to dispel this belief.

### Abusive Financial Relationship

29.     Mr. Bernal is an elder as defined by Welfare and Institutions Code section 15610.27.

30.     On or around October 9, 2019, Defendants required that Mr. Bernal enter into a financing agreement to receive the stem cell treatment promised.

31.     The financing agreement, which was meant to cover two stem cell knee injections was $13,250 – many times in excess of the usual and customary rate for such procedures and at extremely high interested rates.

32.     Defendants did not offer Mr. Bernal a cash pay or insurance-based option even though he had medical insurance.

33.     Defendants did not provide the promised stem cell treatment and instead injected him with CoreCyte and Polycyte, which do not contain live stem cells.

1       **Notice of Intent to Commence Action**

2       34.     On or about May 14, and May 29, 2020, Plaintiffs sent to Defendants, Notices of Intent

3 to Commence Action Against Health Care Provider, pursuant to California Code of Civil Procedure

4 Section 364.

5                      **FIRST CAUSE OF ACTION**

6                      **Negligence – Medical Malpractice**

7   **(By Mr. Bernal Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy**

8         **Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

9       35.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though

10 fully set forth herein.

11       36.     In September and October of 2019, Mr. Bernal was under the care and treatment of

12 Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or

13 employees: Dr. Highshaw, Nurse Benson, and Does 1-50.

14       37.     Each of them owed a duty of care to Plaintiffs arising from their relationship in

15 providing Mr. Bernal with medical treatment.

16       38.     Each of them negligently and carelessly breached such duty of care by providing

17 medical care to Mr. Bernal that fell below the requisite standard of care for such medical professionals

18 by, including, but not limited to, informing Mr. Bernal that he would benefit from stem cell injections,

19 by performing injections on Mr. Bernal that did not contain stem cells, by failing to perform the

20 injections with proper sterile or clean technique, by failing to warn of the potential risks of the

21 injections, and by failing to perform the injections with proper oversight.

22       39.     As a direct and proximate cause of the above-described conduct, Mr. Bernal suffered

23 catastrophic injuries, including by not limited multiple surgeries and permanent paraplegia.

24       40.     As a further direct and proximate cause of the above-described conduct, Mr. Bernal

25 has sustained both special and general damages in an amount that exceeds this Court's jurisdictional

26 limits and to be proved at trial.

27 / / /

28 / / /

1

2

3

4

**SECOND CAUSE OF ACTION**

**Negligence - Failure to Warn Patient**

**(By All Plaintiffs Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

5

6

41.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

7

8

9

10

42.     Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50 and each of them owed a duty of care to Mr. Bernal to completely inform him of the matters above with regard to the treatment rendered.

11

12

13

14

15

43.     Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50 breached such duty by failing to provide Mr. Bernal with all of the material information to enable him to make an informed choice regarding whether to accept or decline the injections and of the dangers inherently and potentially involved with the recommended treatment.

16

17

18

19

44.     As a direct and proximate result of the negligence of Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50, as aforesaid, and their failure to inform, Mr. Bernal suffered catastrophic injuries, including by not limited multiple surgeries and paraplegia.

20

21

22

45.      As a further direct and proximate cause of the above-described conduct, Mr. Bernal has sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

23

24

25

26

**THIRD CAUSE OF ACTION**

**Loss of Consortium**

**(By Mrs. Bernal Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

27

28

46.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

- 8 -

COMPLAINT

47.     Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, Philip Straw and Does 1-50 and each of them owed a duty of care to Mrs. Bernal by way of their negligent treatment of Mr. Bernal, it was foreseeable that an injury to Mr. Bernal would cause damage to Mrs. Bernal.

48.     Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, Philip Straw and Does 1-50 breached such duty by rendering medical treatment to Mr. Bernal that fell below the standard of care and by failing to provide Mr. Bernal with all material information concerning the medical treatment rendered.

49.     As a direct and proximate result of the negligence of Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50, as aforesaid, and their failure to inform, Mr. Bernal suffered catastrophic injuries, including but not limited multiple surgeries and paraplegia.

50.     As a direct and proximate result of Mr. Bernal's permanent injuries, Mrs. Bernal suffered general damages in the form of loss of love, companionship, comfort, care, assistance, protection, society, moral support and sexual relations.

**FOURTH CAUSE OF ACTION**

**Financial Elder Abuse**

**(By Mr. Bernal against All Defendants)**

51.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

52.     Defendants, and each of them took or assisted in the taking of Mr. Bernal's property in the form of $13,250 on October 9, 2019, in relation to the promised stem cell treatment detailed above for a wrongful use and/or with intent to defraud. More specifically, Defendants, and each of them, knew at all times that the CoreCyte and Polycyte Mr. Bernal would be injected with did not contain live stem cells and would not cure his knee pain and limitations.

53.     Mr. Bernal was 73 years old on October 9, 2019, thus qualifying as a protected individual pursuant to Welfare and Institutions Code section 15610.27.

54.     Defendants took Mr. Bernal's property and knew or should have known that such conduct is likely to be harmful to Mr. Bernal.

55.     As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

## **FIFTH CAUSE OF ACTION**

### **Fraud**

**(By Mr. Bernal against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

56.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

57.     On or about September and October 2019, representatives of Superior Health Centers, Elite Medical Group, and Nurse Benson affirmatively misrepresented that Mr. Bernal would benefit from and that they would provide him with live stem cell injections to cure him of knee pain and limitations.

58.     On or about September and October 2019, representatives of Superior Health Centers, Elite Medical Group, and Nurse Benson concealed the fact that the injections that Mr. Bernal would, and did in fact receive, did not contain live stem cells.

59.     Such statements were made with knowledge of their falsity and knowledge of the effect of concealment on Mr. Bernal.

60.     Such statements were made with the intent to induce Mr. Bernal to proceed with the injections. Mr. Bernal would not have agreed to the injections, but for the fraudulent statements by Defendants.

61.     Mr. Bernal justifiably relied on Defendant's fraudulent statements and concealment.

62.     As a direct and proximate result Mr. Bernal suffered catastrophic injuries, including but not limited multiple surgeries, permanent paraplegia, and financial loss.

1    63.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal

2    sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits

3    and to be proved at trial.

## PRAYER FOR RELIEF

5    WHEREFORE Plaintiffs pray for judgment against Defendants as follows:

6    1.    For compensatory damages;

7    2.    For general damages;

8    3.    For Punitive damages (as to claims for financial elder abuse and fraud);

9    4.    Attorneys' fees;

10    5.    For pre-judgment interest according to proof;

11    6.    For all costs of suit; and

12    7.    For such other relief as the Court may deem just and proper.

14    Dated: September 8, 2020                **FOX LAW, APC**

16    By: _____
                                            DAVID FOX
17                                          CHRISTOPHER L. HENDRICKS
                                            Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

20    Plaintiffs demand trial by jury on all issues of which it is permitted by law.

22    Dated: September 8, 2020                **FOX LAW, APC**

23    By: _____
                                            DAVID FOX
24                                          CHRISTOPHER L. HENDRICKS
                                            Attorneys for Plaintiffs

# EXHIBIT C

David A. Fox, SBN 254651
Joanna L. Fox, SBN 272593
Christopher L. Hendricks, SBN 258958
**FOX LAW, APC**
225 West Plaza Street, Suite 102
Solana Beach, California 92075
Tel:    (858) 256-7616
Fax:    (858) 256-7618

Attorneys for Plaintiffs Rigoberto Bernal and Marilena Bernal

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF RIVERSIDE, CENTRAL DISTRICT

| | |
|---|---|
| RIGOBERTO BERNAL; an individual and MARILENA BERNAL; an individual. | Case No.: 37-2016-00009973-CU-PA-CTL |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | 1. NEGLIGENT MISREPRESENTATION<br>2. NEGLIGENCE – GENERAL<br>3. NEGLIGENCE PER SE<br>4. FINANCIAL ELDER ABUSE<br>5. FRAUD |
| RALPH HIGHSHAW, M.D.; an individual; ELITE MEDICAL GROUP, PC; a California Corporation; NEUROPATHY SOLUTIONS dba SUPERIOR HEALTH CENTERS; a California Corporation; ALEXA BENSON; an individual; and DOES 1-50, inclusive, | 6. NEGLIGENCE - MEDICAL MALPRACTICE<br>7. NEGLIGENCE – FAILURE TO WARN<br>8. LOSS OF CONSORTIUM<br>9. CA BUS & PROF CODE SECTION 17200 *ET SEQ.*<br>10. CA BUS & PROF CODE SECTION 17500 *ET SEQ.* |
| Defendants. | **[DEMAND FOR JURY TRIAL]** |

COME NOW Plaintiffs Rigoberto Bernal ("Mr. Bernal") and Marilena Bernal ("Mrs. Bernal") and complain against Ralph Highshaw, M.D. ("Dr. Highshaw"); Elite Medical Group, PC ("Elite Medical Group"); Neuropathy Solutions dba Superior Health Centers ("Superior Health Centers"); Alexa Benson ("Nurse Benson"); and DOES 1-50, inclusive, and allege as follows:

///

///

## NATURE OF ACTION

1.      This complaint arises from a series of falsely advertised, recklessly administered, non-FDA approved "stem cell" injections Mr. Bernal received that nearly killed him and left him a permanent paraplegic from the waist down. In fact, the FDA warned the manufacturer of the "stem cells" that the product is not legal to sell/use in the United States.[1]

2.      Superior Health Centers is a company that creates false and misleading advertisements for medical services and products and markets them directly to consumers.  These advertisements boast that Superior Health Centers offers the "most effective non-surgical Regenerative Medicine Therapy available" and that patients will get "AMAZING Results in Just ONE Treatment" using "Stem Cells" for Knees. (*See* Figure 1, Figure 2.)

### Figure 1 – Superior Health Centers Example Advertisements



---

[1] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/predictive-biotech-608322-08172020

1

**Figure 2 – Superior Health Center's Facebook Page Describing Stem Cell Treatment**

2

3

4

5

6

7

8

9

10

11

12

13

14



15       3.      Then, taking a page from the timeshare industry, Superior Health Centers holds

16   misleading sales meetings where non-medical professionals promise miracle cures to serious

17   medical conditions. In these sales meetings, Superior Health Centers' employees inform consumers

18   they have a serious medical condition, falsely state that traditional medicine and doctors are

19   incapable of treating the condition effectively, then recommend snake oil medicine at exorbitant

20   prices that can only be afforded through financing. They then proceed to sign the consumers—who

21   are usually elderly—up for third-party financing to afford the "treatment." Next, Superior Health

22   Centers sends consumer off to an unqualified provider to perform the medical service at a Superior

23   Health Center location.  Superior Health Centers never tells the consumer that the medical provider

24   is not employed by Superior Health Centers.

25       4.      Specific to Mr. Bernal, Superior Health Centers created a series of targeted, false and

26   misleading advertisements stating that "stem cell" treatments would cure Mr. Bernal of knee pain.

27   After viewing the deceptive advertisements, Mr. Bernal called Superior Health Centers, which made

28

- 3 -

FIRST AMENDED COMPLAINT

an appointment for him to meet with employees of Superior Health Centers.  Unbeknownst to Mr. Bernal at the time, the sales agents who Mr. Bernal was scheduled to meet with were not medical professionals, but rather non-professional sales employees of Superior Health Centers.

5.     At the meeting, these non-medical professionals informed Mr. Bernal he had osteoarthritis.  They continued that "stem cell" injections would be a cure for his pain.  The assured him that the stem cell injections were 100% safe, legal to sell/use, and would alleviate Mr. Bernal's knee pain and increase his mobility.

6.     Based on these representations, Mr. Bernal agreed to proceed with the injections.  At the time, Mr. Bernal did not know that these representations were false and were being made by employees who were not medical professionals.

7.     Superior Health Centers, through its employees and/or agents, informed Mr. Bernal that the only way to obtain this "miracle" treatment was to finance the injections at a cost of $13,250.  Mr. Bernal did not know it, but this was an amount many times more than usual and customary rates for joint injections.

8.     Because he desired the miracle treatment, Superior Health Centers signed Mr. Bernal up for third-party financing.

9.     Mr. Bernal believed Superior Health Centers that $13,250 was the true cost for these injections and that the injections would cure his knee pain, as he was promised.

10.    Without Mr. Bernal's knowledge, Superior Health Care then negligently passed on the task of performing Mr. Bernal's injections to Elite Medical Group, and its employees Nurse Benson and Dr. Highshaw, both of whom were unqualified to perform/oversee the injections.  At all times relevant, Mr. Bernal believed that Nurse Benson was an employee of Superior Health Centers. This belief was reasonable and furthered by the fact that the injections took place in Superior Health Centers' offices in Corona located at 2083 Compton Ave., Ste. 202, Corona, CA 92881 ("Superior Health Centers – Corona").

11.    The injections that were administered to Mr. Bernal did not contain live stem cells at all.  In fact, the product injected into Mr. Bernal was not legal to sell/use pursuant to FDA regulations.

- 4 -

FIRST AMENDED COMPLAINT

12.  The injections were performed:

a.  without proper medical recommendation

b.  without proper physician oversight

c.  without complete medical disclosures

d.  without informed consent

e.  without adherence to proper sterile or clean technique, and

f.  in a manner that fell far below the standard of care for joint injections.

13.  As a result of these failures, Mr. Bernal went into septic shock, subsequently endured numerous surgeries, and is now a permanent paraplegic. He will never walk again.

14.  These allegations are nothing new to Superior Health Centers, as they have been sued and investigated for fraud, elder abuse, and medical malpractice on numerous occasions.[2]

**PARTIES**

15.  Plaintiff Rigoberto Bernal is now, and at all times relevant to this Complaint was a resident of the County of Riverside, State of California. He is the husband of Plaintiff Mary Bernal.

16.  Plaintiff Mary Bernal is now, and at all times relevant to this Complaint was a resident of the County of Riverside, State of California. She is the wife of Plaintiff Rigoberto Bernal.

17.  Plaintiffs are informed and believe, and thereon allege that Defendant Ralph Highshaw, M.D. is a medical doctor and board-certified urologist. Plaintiffs are further informed and believe that Dr. Highshaw is a resident of Pasco County, Florida, conducting business in the State of California pursuant to California Medical License A 56419. Plaintiffs are further informed and believe, and allege thereon, that Dr. Highshaw is now, and at all relevant times, was the owner, an employee, agent, servant, and/or ostensible agent of Defendant of Elite Medical Group[3]

---

[2] *See* https://www.nbclosangeles.com/investigations/couple-accuses-socal-chiropractic-business-of-swindling-them-out-of-18k/2291865/; *See also* https://www.nbclosangeles.com/news/local/southern-california-chiropractor-neuropathy-treatment-investigation/179194/; and *see also*  LASC Case No. BC677958.

[3] Plaintiffs understand that Ralph Highshaw is indeed the owner/authorized official of Elite Medical Group based on available NPI Records.  He also acts as the CEO, Secretary, CFO and sole director of Elite Medical Group.

1   (National Provider ID #1083233902) and Superior Health Centers and at all times herein mentioned

2   was acting within the course, scope and authority of said agency and/or employment.

3       18.     Plaintiffs are informed and believe, and thereon allege that Defendant Elite Medical

4   Group is a corporation duly authorized and doing business in the State of California, County of

5   Riverside.   Its most recent California Secretary of State filing, Elite Medical Group identifies its

6   principal place of business as **17784 Sky Park Circle, #240, Irvine, CA 92614** and its type of

7   business as Medical.

8       19.     Plaintiffs are informed and believe, and thereon allege that Defendant Neuropathy

9   Solutions is a corporation doing business as Superior Health Centers and is duly authorized and

10  doing business in the State of California, County of Riverside.  Notably, in its most recent

11  California Secretary of State filing, Defendant Neuropathy Solutions dba Superior Health Centers

12  identifies its principal place of business at the exact same address as Defendant Elite Medical

13  Group, **17784 Sky Park Circle, #240, Irvine, CA 92614,** and its type of business as Management.

14  Superior Health Centers was responsible for the sale and marketing of the products and services that

15  caused Plaintiffs damages.[4]

16      20.     Plaintiffs are informed and believe, and thereon allege that Nurse Benson is a

17  licensed nurse practitioner. Plaintiffs are further informed and believe that Nurse Benson is a

18  resident of the State of Oregon, conducting business in the County of Riverside. Plaintiffs are

19  further informed and believe, and allege thereon, that Nurse Benson is now, and at all relevant

20  times, was an employee, agent, servant, and/or ostensible agent of Defendants of Elite Medical

21  Group and Superior Health Centers and at all times herein mentioned was acting within the course,

22  scope and authority of said agency and/or employment.

23      21.     Plaintiffs are informed and believe, and thereon allege, that DOES 1 through 50, are

24  now and at all times relevant to this complaint, were individuals, corporations, clinics, medical

25  groups consisting of licensed physicians and other health care providers, and/or medical groups

---

27  [4] The sale and marketing of products used by professionals is not itself provision of professional
    services.  *Braden Partners, LP v. Twin City Fire Ins. Co.*, 2017 WL 63019 at *7 (N.D. Cal. Jan. 5,
28  2017); *Scottsdale Ins. Co. v. Coapt Systems Inc.*, 2013 WL 3146781 at *5-6 (N.D. Cal. June 18,
    2013).

1  consisting of partners, shareholders, limited partnerships, professional medical corporations or other

2  corporations, medical or hospital associations, medical or hospital corporations or organizations,

3  including groups of physicians practicing medicine in the State of California, and authorized by and

4  existing pursuant to the laws of the State of California, and/or authorized to practice medicine

5  and/or operate health care facilities (or facilities including hospitals, medical clinics, groups or

6  similar health care provider facilities) and/or practice medicine individually or in a group, including

7  other health care providers, and were in the position to provide health care services to the public,

8  including Mr. Bernal or were the employees/agents of the other defendants, the manufacturers of

9  medical products, and/or involved in the marketing, advertising, sale, financing or similar services

10  of medical products and procedures for other medical professionals.

11      22.    Plaintiffs are further informed and believe and based thereon allege, that at all

12  relevant times herein mentioned, the Defendants herein, were the agents and/or employees of

13  Defendants, and were at all times relevant, acting within the course and scope of such agency and

14  employment.

15      23.    Plaintiffs are ignorant of the true names and identities of Defendants DOES 1

16  through 50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will

17  amend this complaint to allege the true names and capacities of these Defendants when such names

18  are ascertained. Plaintiffs allege that each fictitiously named Defendant is responsible in some

19  manner for the occurrences alleged herein, and that Plaintiffs' injuries alleged herein were

20  proximately caused by their conduct.

21                                      **<u>VENUE</u>**

22      24.    Venue is proper in this Court pursuant to California Code of Civil Procedure section

23  395, because the liability alleged herein arose in Riverside County.

24  ///

25  ///

26  ///

27  ///

28  ///

FIRST AMENDED COMPLAINT

1

## GENERAL ALLEGATIONS

2

**Superior Health Centers' Material Misrepresentations**

3   25.   In or around September 2019, Plaintiffs viewed a targeted advertisement from

4   Superior Health Centers promising a "AMAZING RESULTS" for arthritis knee pain in just one

5   treatment.

6   26.   In reliance on Superior Health Centers' advertisement, Mr. Bernal contacted

7   Superior Health Centers - Corona, where they made an appointment ostensibly for him to see if he

8   was a candidate for stem cell treatment on or about September 20, 2019.

9   27.   Mr. Bernal arrived at Superior Health Centers – Corona, on September 20, 2019,

10   where he was given a sales pitch from a non-medical professional sales agent who was an employee

11   or agent of Superior Health Centers.  The sales pitch was couched as an informational presentation

12   (though it was indeed a hard sale).  The Superior Health Centers' employee/agent assured Mr.

13   Bernal that joint stem cell injections were entirely safe, the stem cells were FDA approved, and that

14   one injection in each knee would cure him of his pain and mobility limitations.

15   28.   The non-medical professional sales agent then informed Mr. Bernal he had arthritis

16   of the knees and ordered him stem cell and PRP injections in each knee. Even though Mr. Bernal

17   had health insurance, the non-medical professional told Mr. Bernal that the only way to obtain the

18   stem cell treatment was through third-party financing for $13,250. Mr. Bernal was instructed to fill

19   out the third-party financing application.  After it was approved that day, Mr. Bernal was instructed

20   to return to Superior Health Centers – Corona on October 9, 2019 for his injections, which would be

21   performed by one of the many doctors that Superior Health Centers employs.

22   29.   There was no reasonable medical basis for Superior Health Centers to assert that

23   joint stem cell injections were entirely safe, legal for sale, or that one single stem cell injection

24   would cure Mr. Bernal's longstanding knee issues.

25   30.   There was no reasonable basis for Superior Health Centers to market, advertise,

26   prescribe, or order non-FDA approved drugs for joint injections.

27   ///

28   ///

- 8 -

**Unknown to Mr. Bernal, Superior Health Transfers Mr. Bernal to Elite Medical Group for Further Treatment**

31.     Upon information and belief, Dr. Highshaw, a urologist in Florida, through his professional corporation, Elite Medical Group, PC, is supposed to facilitate and oversee medical treatment for at least five Superior Health Centers, including Superior Health Centers – Corona.

32.     Elite Medical Group and Superior Health Centers have the same principal place of business in Irvine, California.  Superior Health Centers and Elite Medical Group purposely disguise the entity performing various services to trick consumers into believing that all medical services are being rendered by Superior Health Centers.  But Superior Health Centers is not qualified to, nor can it, provide medical services to consumers.  To the extent it does so (if at all), it is engaging in the unlawful, unlicensed practice of medicine.

33.     Superior Health Centers provides "management" services to Elite Medical Group, including, but not limited, marketing and advertising, acquiring clients/patients, billing, facilitating third-party financing, renting office space, and other non-medical/non-professional services. On information and belief, the rendering of any medical care is to be done solely by Elite Medical Group and its employees under the purported supervision of Defendant Highshaw.

34.     To this end, in 2019 Elite Medical Group and Superior Health Centers entered into a Management Service Agreement through which Superior Health Centers would "provide management services to EMG [Elite], including billing, collections, acquisition of phone numbers and related telecommunications services, marketing support, the leasing or subleasing of space and equipment, utilities, communications, and other related business administration services."

35.     Under the terms of the Management Services Agreement, "[t]he Management Services shall not include services which relate the providing of professional services."

36.     Further, pursuant to the Management Services Agreement, Superior Health Centers provides all non-licensed staff that support, but do not deliver, the provision of the medical services by Elite Medical Group.  This includes administrative staff and agents for sales and marketing.

Superior Health Centers was also responsible for the development and maintenance of the website and all related pages or mobile applicable software.[5]

37.     The Management Services Agreement was signed by Defendant Ralph Highshaw and by Vivienne Reign, the owner and CEO of Superior Health Centers.

38.     Upon information and belief, Nurse Benson is an employee of Defendant Elite Medical Group, PC, but also holds herself out as an agent/employee and nurse for Superior Health Centers.  Consumers, including Mr. Bernal, have no way of knowing that Nurse Benson and others like her are not actually employed by Superior Health Centers.

39.     On October 9, 2019, Mr. Bernal, accompanied by his wife, Mrs. Bernal, checked in for treatment at Superior Health Centers – Corona.  The staff at Superior Health Centers – Corona, informed him that he would be obtaining treatment from Defendant Nurse Benson. Defendant Nurse Benson told Mr. Bernal that he would have to wait for fresh "stem cells." At no point was Mr. Bernal made aware of Elite Medical Group.  He believed that all his treatment was being performed by Superior Health Centers.

40.     Nurse Benson took Mr. and Mrs. Bernal into a procedure room. She stated that she was going to draw blood from Mr. Bernal and mix it with the stem cells. Nurse Benson then drew blood from Mr. Bernal and mixed it with CoreCyte and Polycyte, products manufactured by a company called Predictive Biotech.  This is noted in Mr. Bernal's record of treatment.  *See* Figure 3.

**Figure 3, Mr. Bernal's Records Demonstrating Use of CoreCyte and Polycyte**



5.   Procedure Notes:
First extracted PRP (3cc each syringe), then added 1 cc CoreCyte and . 5 cc Polycyte to each syring for a total of 4.5cc of Regen Med product in two syringes. Next, Using aseptic technique, both knees were cleaned and prepped with ETOH and Chlorhexadine. Applied topical anesthetic (Ethyl Chloride spray) to area. Inserted 27 gauge needle using lateral approach , no blood returned, injected mixed product as above to each knee. Bandaid applied. Pt tolerated procedure well. Post injection instructions reviewed, pt verbalized understanding. F/U in 2-3 weeks.

---

[5] The Superior Health Centers website has been taken down since the filing of this lawsuit.

- 10 -

41.     On information and belief, neither CoreCyte nor Polycyte contain live stem cells. And neither CoreCyte nor Polycyte are FDA approved or licensed for the prevention or treatment of any disease, including knee pain/arthritis. In fact, the sale/use of CoreCyte is expressly prohibited in the United States.  Indeed, the Federal Food and Drug Administration (FDA) has sent Predictive Biotech warning letters advising that the product is unapproved and misbranded.  *See* Figure 4.

**Figure 4, FDA Warning Letter Concerning CoreCyte**

CoreCyte[TM] is an unapproved new drug under section 505 of the FD&C Act, 21 U.S.C. § 355.  Furthermore, this product is a misbranded drug under section 502 of the FD&C Act, 21 U.S.C. § 352.  The introduction or delivery for introduction of this product into interstate commerce is prohibited under sections 301(a) and (d) of the FD&C Act, 21 U.S.C. § 331(a) and (d), and misbranding your product while it is held for sale after shipment of the drug or one or more of its components in interstate commerce is prohibited under section 301(k) of the FD&C Act, 21 U.S.C. § 331(k).

42.     In fact, former FDA commissioner Dr. Stephen Hahn (FDA commissioner 2019-January 2021) recently published a viewpoint article stating "[i]t is time for unproven and unapproved regenerative medicine products to be identified and recognized for what they frequently are: uncontrolled experimental procedures at a cost to patients, both financially and physically."[6]

43.     Further, the FDA recently issued a consumer alert stating "[a]nyone considering the use of anything purported to be a regenerative medicine product, including stem cell products, exosome products, or other widely promoted products such as products derived from ....... human umbilical cord blood, Wharton's Jelly or amniotic fluid should know" among other material facts, that none of these products have been approved to treat any orthopedic condition, neurological disorder, or cardiovascular or pulmonary diseases.[7]

44.     The FDA has even released a video warning about the proliferation of illegal stem cell therapy centers. *See*  https://www.youtube.com/watch?v=onnlZeQlai0.

---

[6] *See* https://jamanetwork.com/journals/jama/article-abstract/2767586 (last accessed April 12, 2021).
[7] *See* https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes (last accessed April 12, 2021).

45.     Despite that it is illegal to market, sell and administer these products in the United States, both Superior Health Centers and Nurse Benson, as an agent/ostensible agent of Elite Medical Group and Superior Health Centers, did just that.  Superior Health Centers marketed these products to aged and elderly individuals, including Mr. Bernal, as essentially miracle cures for his pain.  Indeed, the Facebook advertising campaign was specifically designed to target consumers with diseases that substantially limit consumers' major life activities, including but not limited to orthopedic conditions like Mr. Bernal's.

46.     Once Mr. Bernal was in the door and sold the illegal product/services, Elite Medical Group, through Nurse Benson, illegally injected the "stem cells" into his knees.

47.     After the knee injections were complete, Nurse Benson stated there was additional "stem cells" left in the syringe. She asked if Mr. Bernal had pain anywhere else and he said he did have pain in his shoulder. Nurse Benson then injected the rest of the mixture in Mr. Bernal's shoulder.

48.     Nurse Benson informed Mr. and Mrs. Bernal that body aches and fever were normal after the stem cell injection and that no further treatment would necessary. She further informed him that any future follow-up would cost additional money.

49.     In the following days, Mr. Bernal began to run a fever and was in pain. He and/or Mrs. Bernal called Superior Health Center to report the fever and pain.  They were informed that this was to be expected and that no further intervention was necessary.

50.     On October 14, 2020, Mr. Bernal was rushed to the hospital. He had septic infections in each of the areas that was injected by Nurse Benson, as well as in his spine. Mr. Bernal was also in renal failure because of multiple infections from the injections. He underwent numerous surgeries, including spine surgery.  He spent nearly two months in the hospital.

51.     Mr. Bernal is now permanently paraplegic and suffers from other catastrophic injuries.

///

///

///

**Vicarious Liability and Agency Allegations**

52.     Plaintiffs are informed and believe, and on that basis allege, that each defendant was the agent or employee of the other Defendants and were acting within the course and scope of their employment or agency at all times relevant hereto.

53.     In the alternative, Plaintiffs are informed and believe, and on that basis allege, that each defendant was, at all times relevant to this complaint, an ostensible agent of the other Defendants. Defendants hold themselves out to the public as a provider of care called Superior Health Centers, though Superior Health Centers itself is not actually capable of rendering professional medical services.  Plaintiffs are informed and believe, and on that basis allege, that at all relevant times when Dr. Highshaw and Nurse Benson provided the medical services to Mr. Bernal., Mr. Bernal was given the impression that Dr. Highshaw and Nurse Benson were Superior Heath Centers' agents, and that Dr. Highshaw and Nurse Benson were acting on its behalf.  In reality, however, Dr. Highshaw and Nurse Benson were employed by Elite Medical Group, and Superior Health Centers provided non-professional services such as marketing and advertising on Elite Medical Group's behalf.

54.     Plaintiffs are further informed and believe, and on that basis allege, that Dr. Highshaw and Nurse Benson are affiliated with Superior Health Centers and provided all medical services to Mr. Bernal on Superior Health Centers' premises. Plaintiffs are further informed and believe, and on that basis allege, that Dr. Highshaw and Nurse Benson enjoy use of Superior Health Centers' equipment, facilities, and medical staff privileges, and Mr. Bernal's medical records contain Superior Health Centers' letterhead identifying Dr. Highshaw and Nurse Benson as the ordering provider of medical treatment. A reasonable person in Mr. Bernal's position would have believed that Dr. Highshaw and Nurse Benson were Superior Health Centers' agents.

55.     Indeed, under the express terms of the Management Services Agreement entered between Elite Medical Group and Superior Health Centers, Superior Health Centers was expressly authorized "to perform all services" on Elite Medical Group's behalf and Elite Medical Group "appoint[ed] Manager [Superior Health Services]…as its true and lawful agent…"

56.     Dr. Highshaw and Nurse Benson provided medical treatment to Mr. Bernal, such that Mr. Bernal reasonably believed that Dr. Highshaw and Nurse Benson were Superior Health Centers' agents and Superior Health Centers did nothing to dispel this belief.

**Abusive Financial Relationship**

57.     Mr. Bernal is an elder as defined by Welfare and Institutions Code section 15610.27.

58.     On or around September 20, 2019, Defendants required that Mr. Bernal enter into a third-party financing agreement to receive the recommended stem cell treatment.

59.     The financing agreement, which was meant to cover two stem cell knee injections was $13,250 – many times in excess of the usual and customary rate for such procedures and at extremely high interested rates.

60.     Defendants did not offer Mr. Bernal a cash pay or insurance-based option even though he had medical insurance, instead telling Mr. Bernal that, to receive the treatment he was led to believe he needed, he was required to finance it.

61.     Superior Health Centers targeted Mr. Bernal in a discriminatory manner because he was elderly and Hispanic.  Superior Health Centers used marketing techniques and high-pressure sales tactics designed to convince Mr. Bernal that he needed the "treatment" that was being offered.[8]  Similar cases have been documented across the United States, some resulting in state-backed lawsuits.[9]

---

[8] *See* https://www.rocketcitynow.com/article/news/stem-cell-scams-elderly-targeted/525-c961192c-69f1-4adb-b9b7-f46366f85861 (last accessed April 12, 2021) ("hundreds of stem cell clinics have appeared around the country in recent years, and these clinics are targeting the elderly demographic.")

[9] *See* https://law.georgia.gov/press-releases/2020-09-14/carr-sues-elite-integrated-medical-deceptive-claims-made-elderly-and ("The complaint contends that Elite made over $6.4 million by using aggressive marketing techniques and high-pressure sales tactics to convince at least 842 consumers, **most of whom were elderly and/or disabled**, to purchase expensive, unproven medical treatments that are not covered by Medicare or health insurance. The office seeks injunctive relief, consumer restitution and civil penalties of up to $5,000 per violation of the FBPA and up to $10,000 per FBPA violation committed against elderly and/or disabled consumers.  According to the complaint, Elite represents that it has a staff of medical doctors who provide its products to patients, when in fact, medical doctors administer a very limited number of product injections. The vast majority of patients interact only with chiropractors and nurse practitioners, and most of the injections are administered by nurse practitioners.")

62.     It is well -documented that racial and ethnic minorities like Mr. Bernal suffer disproportionate morbidity, mortality, and other poor health outcomes due in part to poorer care they receive when they enter the health care system.[10]  Mr. Bernal had a poor understanding of the health care system and received poor care from Superior Health Centers and Elite Medical Group. Mr. Bernal has suffered injury both to his reputation and feelings due to Superior Health Centers' targeting of him (whether intentional or not) based on his age and race.

63.     Defendants did not provide Mr. Bernal with the promised "live" stem cell treatment and instead injected him with CoreCyte and Polycyte, which do not contain live stem cells, and which were not legal for sale or injection in the United States.

**Notice of Intent to Commence Action**

64.     On or about May 14, and May 29, 2020, Plaintiffs sent to Defendants, Notices of Intent to Commence Action Against Health Care Provider, pursuant to California Code of Civil Procedure Section 364.

## FIRST CAUSE OF ACTION

### Negligent Misrepresentation

### (By Mr. Bernal Against Defendants Neuropathy Solutions dba Superior Health Centers and Does 1-50)

65.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

66.     Defendant Superior Health Centers falsely advertised and marketed "stem cell" treatments as cures for joint pain.  The advertising was targeted in in a discriminatory manner towards Mr. Bernal because he was Hispanic and elderly.  The representations were made on websites, Facebook and in other written materials.  These representations included that regenerative medicine products offered by Superior Health Centers treated, cured, or mitigated a variety of diseases, including orthopedic conditions.

---

[10] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/mid/NIHMS370135/ (last accessed April 12, 2021).

67.     On or about early September 2019, September 20, 2019, and October 9, 2019, Superior Health Centers and its non-professional representatives falsely advertised and misrepresented to Mr. Bernal that joint injections are entirely safe, that the "stem cell" treatment it suggested was legal and approved by the FDA, that the treatment it suggested contained live stem cells, that one injection in each knee would cure him of pain and mobility limitations and that the joint injection procedures would be performed by a competent medical professional with the requisite care required for the procedure.

68.     Defendant Superior Health Centers and its representatives made such representations without any reasonable ground for believing them to be true and in a manner not warranted by the information possessed by Superior Health Centers.  The representations are not substantiated by reliable scientific or competent evidence and, in fact, the FDA publicly stated that such representations are not true.

69.     Such statements were, in fact, untrue.   The truth was that the procedures sold to Mr. Bernal by Superior Health's non-professional sales agents were not safe, the "stem cell" treatment recommended was not legal nor approved by the FDA, Mr. Bernal was not likely to substantially benefit from such treatment, that the treatment did not contain live stem cells, and that the procedures would not be performed by a competent medical professional with the requisite care required for the procedure.

70.     Superior Health Centers and its representatives made such representations with the intent to induce Mr. Bernal to agree to pay $13,250 for the treatment (through financing) and proceed with the injections. Mr. Bernal would not have agreed to the injections, but for the misrepresentations by Superior Health Centers.

71.     Mr. Bernal justifiably relied on Superior Health Centers' false representations.

72.     As a direct and proximate result Mr. Bernal suffered catastrophic injuries, including but not limited multiple surgeries, permanent paraplegia, and financial loss, hurt feelings and reputational injury.

FIRST AMENDED COMPLAINT

73.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

### SECOND CAUSE OF ACTION

### Negligence

### (By Mr. Bernal Against Defendants Neuropathy Solutions dba Superior Health Centers and Does 1-50)

74.    Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

75.    Defendant Superior Health Centers owed Mr. Bernal a duty of care to accurately represent the products it advertised, marketed and sold to Mr. Bernal, select products for treatment that were legal for sale and approved by the FDA, to disclose the risks associated with the products it advertised, and to select qualified medical professionals to perform the procedures with the requisite care required.

76.    Defendant Superior Health Centers breached such duty of care by failing to accurately represent the products it advertised, marketed and sold to Mr. Bernal, by failing to select products for Mr. Bernal's treatment that were legal for sale and approved by the FDA, by failing to disclose to Mr. Bernal the risks associated with the products it advertised, and by failing to select qualified medical professionals to perform the procedures on Mr. Bernal.

77.    As a direct and proximate result of Defendants' negligent acts, Mr. Bernal suffered catastrophic injuries, including but not limited multiple surgeries, permanent paraplegia, and financial loss.

78.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

///

///

///

- 17 -

FIRST AMENDED COMPLAINT

**THIRD CAUSE OF ACTION**

**Negligence Per Se**

**(By Mr. Bernal Against Defendants Neuropathy Solutions dba Superior Health Centers and Does 1-50)**

79.     Superior Health Centers holds itself out as a medical clinic.  It advertises, markets, offers for sale, and sells "Regenerative Medicine" products derived from birth tissues including placental tissue, umbilical cord blood and Wharton's Jelly.  It called these products "stem cells" in its advertising and its dealing with Mr. Bernal.

80.     Superior Health Centers purchased the regenerative medicine products that were administered to Mr. Bernal from Predictive Biotech, Inc.

81.     Predictive Biotech, Inc describes CoreCyte as "a minimally manipulated human tissue allograft derived from the Wharton's Jelly of the umbilical cord…"[11]

82.     Predictive Biotech, Inc. describes PolyCyte as "a non-cryopreseved minimally manipulated Wharton's Jelly allograft…processed to preserve cytokines, growth factors, and proteins of Wharton's jelly for homologous use."[12]

83.     These regenerative medicine products are human cellular tissue that are regulated by the FDA.

84.     These regenerative medicine products do not fall under any exception from the FDA's regulation of human cellular tissue.

85.     These regenerative medicine products are also regulated by the FDA as "drug" and "biologic" products.

86.     These regenerative medicine products require pre-market approval from the FDA and an investigation new drug applicable for clinical use in humans.

87.     Neither CoreCyte nor PolyCyte have been approved by the FDA for marketing and distribution in the United States.

---

[11] *See* https://www.predictivebiotech.com/products/ (Last accessed April 13, 2021).
[12] *Id.*

88.     The FDA sent a warning letter to Predictive Biotech on August 17, 2020, stating that CoreCyte is an unapproved drug and biologic product that may not be distributed for clinical use.

89.     On information and belief, Superior Health Centers has not conducted its own clinical or scientific study to evaluate the reliability, safety, or efficacy of these regenerative medicine products.

90.     Instead, Superior Health Centers represented that studies and reports of third parties that involve live stem cells derived from a patient's own bone marrow or fat that are injected back into the patient substantiate the claims they make about these regenerative medicine products.  But the regenerative medicine products are not the equivalent of live stem cell therapies even though that is how these regenerative medicine products are marketed and sold by Superior Health Centers.

91.     In reality, there is no competent and reliable scientific evidence establishing that the regenerative medicine products cure, treat, or mitigate any diseases, particularly the orthopedic issues that Mr. Bernal was suffering from.

92.     CoreCyte is an unapproved new drug under section 505 of the Food, Drug and Cosmetic Act, 21 U.S.C. § 355.

93.     Under 21 U.S.C. § 355, no person shall introduce or deliver for introduction any new drug unless it is approved by the FDA.

94.     The FDA has not approved the regenerative medicine products administered to Mr. Bernal.

95.     Superior Health Centers marketed, sold, introduced and delivered the illegal regenerative medicine products to Mr. Bernal in violation of 21 U.S. § 355.

96.     21 U.S.C. § 355 is designed to prevent the kind of occurrence that happened here— an unsafe drug/biologic/human tissue product causing serious adverse effects in a person because it has not been properly tested and its health benefits/outcomes properly studied.

97.     Superior Health Centers violation of 21 U.S.C. § 355 was a substantial factor in causing Mr. Bernal's injuries.

FIRST AMENDED COMPLAINT

98.     As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

### FOURTH CAUSE OF ACTION

**Financial Elder Abuse**

**(By Mr. Bernal against All Defendants)**

99.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

100.    Defendants, and each of them took or assisted in the taking of Mr. Bernal's property in the form of $13,250 on October 9, 2019, in relation to the promised stem cell treatment detailed above for a wrongful use and/or with intent to defraud.

101.    Defendants, and each of them, knew, or should have known, at all times that the procedures recommended were not safe, the "stem cell" treatment recommended was not legal nor approved by the FDA, that Mr. Bernal was not likely to substantially benefit from such treatment, that the treatment did not contain live stem cells, that the procedures would not be performed by a competent medical professional with the requisite care required for the procedure, and that most joint injections only cost a fraction of the exorbitant and abusive price charged to Mr. Bernal.

102.    Mr. Bernal was 73 years old on October 9, 2019, thus qualifying as a protected individual pursuant to Welfare and Institutions Code section 15610.27.

103.    Defendants took Mr. Bernal's property and knew or should have known that such conduct is likely to be harmful to Mr. Bernal.

104.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

///

///

///

///

**FIFTH CAUSE OF ACTION**

**Fraud**

**(By Mr. Bernal against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

105.    Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

106.    On or about early September 2019, September 20, 2019, and October 9, 2019, Superior Health Centers and its representatives affirmatively misrepresented to Mr. Bernal that joint injections are entirely safe, that the "stem cell" treatment it suggested was legal and approved by the FDA, that the treatment it suggested contained live stem cells, that one injection in each knee would cure him of pain and mobility limitations and that the joint injection procedures would be performed by a competent medical professional with the requisite care required for the procedure.

107.    On or about September and October 2019, representatives of Superior Health Centers, Elite Medical Group, and Nurse Benson concealed the fact that the procedures recommended were not safe, the "stem cell" treatment recommended was not legal nor approved by the FDA, that Mr. Bernal was not likely to substantially benefit from such treatment, that the treatment did not contain live stem cells, and that the procedures would not be performed by a competent medical professional with the requisite care required for the procedure.

108.    Such statements were made with knowledge of their falsity and knowledge of the effect of concealment on Mr. Bernal.

109.    Such statements were made with the intent to induce Mr. Bernal to proceed with the injections. Mr. Bernal would not have agreed to the injections, but for the fraudulent statements by Defendants.

110.    Mr. Bernal justifiably relied on Defendant's fraudulent statements and concealment.

111.    As a direct and proximate result Mr. Bernal suffered catastrophic injuries, including but not limited multiple surgeries, permanent paraplegia, and financial loss.

112.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

## **SIXTH CAUSE OF ACTION**

### **Negligence – Medical Malpractice**

### **(By Mr. Bernal Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

113.    Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

114.    In September and October of 2019, Mr. Bernal was under the care and treatment of Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50.

115.    Each of them owed a duty of care to Plaintiffs arising from their relationship in providing Mr. Bernal with medical treatment.

116.    Each of them negligently and carelessly breached such duty of care by providing medical advice, diagnosis, care, and treatment to Mr. Bernal that fell below the requisite standard of care for such medical professionals by, including, but not limited to, informing Mr. Bernal that he would benefit from stem cell injections, by selling him a product that is not legal for sale/use in the United States, by performing injections on Mr. Bernal that did not contain stem cells, by failing to perform the injections with proper sterile or clean technique, by failing to warn of the potential risks of the injections, by failing to perform the injections with proper oversight, and by offering improper medical advice after the injections.

117.    As a direct and proximate cause of the above-described conduct, Mr. Bernal suffered catastrophic injuries, including by not limited to multiple surgeries and permanent paraplegia.

118.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal sustained both special and general damages in an amount that exceeds this Court's jurisdictional limits and to be proved at trial.

///

1

2

3

4

## **SEVENTH CAUSE OF ACTION**

### **Negligence - Failure to Warn Patient**

**(By All Plaintiffs Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

5       119.    Plaintiffs re-allege the foregoing allegations, incorporating those allegations as

6   though fully set forth herein.

7       120.    Defendants Superior Health Centers and Elite Medical Group, by way of their agents

8   and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50 and each of them owed a duty of

9   care to Mr. Bernal to completely inform him of the matters above with regard to the treatment

10  rendered.

11      121.    Defendants Superior Health Centers and Elite Medical Group, by way of their agents

12  and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50 breached such duty by failing to

13  provide Mr. Bernal with all of the material information to enable him to make an informed choice

14  regarding whether to accept or decline the injections and of the dangers inherently and potentially

15  involved with the recommended treatment.

16      122.    As a direct and proximate result of the negligence of Defendants Superior Health

17  Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse

18  Benson, and Does 1-50, as aforesaid, and their failure to inform, Mr. Bernal suffered catastrophic

19  injuries, including by not limited multiple surgeries and paraplegia.

20      123.    As a further direct and proximate cause of the above-described conduct, Mr. Bernal

21  has sustained both special and general damages in an amount that exceeds this Court's jurisdictional

22  limits and to be proved at trial.

23

## **EIGHTH CAUSE OF ACTION**

### **Loss of Consortium**

**(By Mrs. Bernal Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

27      124.    Plaintiffs re-allege the foregoing allegations, incorporating those allegations as

28  though fully set forth herein.

125.     Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, Philip Straw and Does 1-50 and each of them owed a duty of care to Mrs. Bernal by way of their negligent treatment of and false representations to Mr. Bernal, it was foreseeable that an injury to Mr. Bernal would cause damage to Mrs. Bernal.

126.     Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, Philip Straw and Does 1-50 breached such duty by rendering medical treatment to Mr. Bernal that fell below the standard of care, by failing to provide Mr. Bernal with all material information concerning the medical treatment rendered, and by making false representations to Mr. Bernal that was a substantial factor in Mr. Bernal receiving the injection that injured him and left him paraplegic.

127.     As a direct and proximate result of the negligence of Defendants Superior Health Centers and Elite Medical Group, by way of their agents and/or employees: Dr. Highshaw, Nurse Benson, and Does 1-50, as aforesaid, their failure to inform, and material misrepresentations, Mr. Bernal suffered catastrophic injuries, including but not limited multiple surgeries and paraplegia.

128.     As a direct and proximate result of Mr. Bernal's permanent injuries, Mrs. Bernal suffered general damages in the form of loss of love, companionship, comfort, care, assistance, protection, society, moral support and sexual relations.

## NINTH CAUSE OF ACTION

**Bus. & Prof. Code § 17200 – Unfair, Unlawful and Fraudulent Business Practices**

**(By Plaintiffs Against Defendants Dr. Highshaw, Elite Medical Group, PC, Neuropathy Solutions dba Superior Health Centers, Alexa Benson, and Does 1-50)**

129.     Plaintiffs re-allege the foregoing allegations, incorporating those allegations as though fully set forth herein.

130.     Superior Health Centers holds itself out as a medical clinic.  It advertises, markets, offers for sale, and sells "Regenerative Medicine" products derived from birth tissues including placental tissue, umbilical cord blood and Wharton's Jelly.  It called these products "stem cells" in its advertising and its dealing with Mr. Bernal.

131.    Superior Health Centers purchased the regenerative medicine products that were administered to Mr. Bernal from Predictive Biotech, Inc.

132.    Predictive Biotech, Inc describes CoreCyte as a "s a minimally manipulated human tissue allograft derived from the Wharton's jelly of the umbilical cord…"[13]

133.    Predictive Biotech, Inc. describes PolyCyte as "a non-cryopreseved minimally manipulated Wharton's Jelly allograft…processed to preserve cytokines, growth factors, and proteins of Wharton's jelly for homologous use."[14]

134.    These regenerative medicine products are human cellular tissue that are regulated by the FDA.

135.    These regenerative medicine products do not fall under any exception from the FDA's regulation of human cellular tissue.

136.    These regenerative medicine products are also regulated by the FDA as "drug: and "biologic" products.

137.    These regenerative medicine products require pre-market approval from the FDA and an investigation new drug applicable for clinical use in humans.

138.    Neither CoreCyte nor PolyCyte have been approved by the FDA for marketing and distribution in the United States.

139.    The FDA sent a warning letter to Predictive Biotech on August 17, 2020, stating that CoreCyte is an unapproved drug and biologic product that may not be distributed for clinical use.

140.    On information and belief, Superior Health Centers has not conducted its own clinical or scientific study to evaluate the reliability, safety, or efficacy of these regenerative medicine products.

141.    Instead, Superior Health Centers represented that studies and reports of third-parties that involve live stem cells derived from a patient's own bone marrow or fat that are injected back into the patient substantiate the claims they make about these regenerative medicine products.  But

---

[13] *See* https://www.predictivebiotech.com/products/ (Last accessed April 13, 2021).
[14] *Id.*

the regenerative medicine products are not the equivalent of live stem cell therapies even though that is how these regenerative medicine products are marketed and sold by Superior Health Centers.

142. In reality, there is no competent and reliable scientific evidence establishing that the regenerative medicine products cure, treat, or mitigate any diseases, particularly the orthopedic issues that Mr. Bernal was suffering from.

143. CoreCyte is an unapproved new drug under section 505 of the Food, Drug and Cosmetic Act, 21 U.S.C. § 355.

144. Under 21 U.S.C. § 355, no person shall introduce or deliver for introduction any new drug unless it is approved by the FDA.

145. The FDA has not approved the regenerative medicine products administered to Mr. Bernal.

146. Superior Health Centers marketed, sold, introduced and delivered the illegal regenerative medicine products to Mr. Bernal in violation of 21 U.S. § 355.

147. 21 U.S.C. § 355 is designed to prevent the kind of occurrence that happened here— an unsafe drug/biologic/human tissue product causing serious adverse effects in a person because it has not been properly tested and its health benefits/outcomes properly studied.

148. Superior Health Centers violation of 21 U.S.C. § 355 was a substantial factor in causing Mr. Bernal's injuries.

149. As specified in the preceding paragraphs, Defendants committed "unfair" business practices by, among other things (1) making the false and misleading statements described herein; (2) falsely and deceptively advertising their products as described herein; (3) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs; (4) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs; (5) engaging in conduct that undermines or violates the spirit or intent of section 17200 or the laws detailed herein; and/or (6) engaging in conduct that is expressly prohibited by law with respect to the illegal sales of the regenerative medicine products in violation of the Food, Drug and Cosmetic Act.

150.     As specified in the preceding paragraphs, Defendants committed "fraudulent" business acts or practices by making uniform misrepresentations and omissions of material fact regarding the regenerative medicine products.  Defendants' business practices as alleged herein are fraudulent under section 17200 because they are likely to deceive consumers into believing that the regenerative medicine products Defendants offer are true stem cell treatments even though they are not.  This conduct is also fraudulent because Plaintiffs and consumers are reasonably led to believe that Defendants may legally offer such products and services, when in fact they are prohibited by law from doing so.  Plaintiffs were in fact been deceived as a result of Defendants' material representations, which are outlined in detail above.

151.     As specified in the preceding paragraphs and as detailed in the factual and legal allegations, Defendants committed "unlawful" business acts or practices by, among other things: (1) violating the Food, Drug and Cosmetic Act; (2) engaging in conduct that constitutes fraud and deceit as defined in California Civil Code section 1709; (3) engaging in conduct that violates other state laws as may be identified in the course of this action.

152.     Plaintiffs reserve the right to allege other conduct that constitutes other unfair, fraudulent, or unlawful business acts or practices, as Defendants' conduct is ongoing.

153.     Plaintiffs have suffered injury in fact and lost money as a result of Defendants' unlawful, unfair, or fraudulent business practices, as set forth above.  Plaintiffs were harmed by entering into transaction and paying for a product or service that is not what Defendants represented it to be, thereby surrendering more in a transaction than they otherwise would have if the true facts had been timely disclosed.  Defendants were thereby unjustly enriched by such business acts and practices.

154.     Pursuant to Business & Professions Code section 17203, Plaintiffs request all applicable remedies and relief allowable under section 17200.  Plaintiffs seek an order enjoining Defendants from engaging in the illegal business acts and practices alleged herein.  Plaintiffs also seek an order awarding Plaintiffs restitution and disgorgement of the money wrongfully acquired and/or retained by Defendants by means of illegal business acts and practices alleged herein.  The

FIRST AMENDED COMPLAINT

1  remedies requested by statute are cumulative of and in addition to any other remedies that are

2  available to Plaintiffs.

3       155.    Plaintiffs are further entitled to prejudgment interest as a direct result of Defendants'

4  illegal business acts and practices.  The amount on which interest is to be calculated is a sum certain

5  and capable of calculation, in an amount according to proof.

6       156.    Plaintiffs' counsel are also entitled to fees and costs pursuant to, inter alia, California

7  Code of Civil Procedure section 1021.5.

8  **<u>TENTH CAUSE OF ACTION</u>**

9  **False and Misleading Advertising in Violation of California Bus. & Prof. Code § 17500 *et seq*.**

10  **(By Plaintiffs Against Neuropathy Solutions dba Superior Health Centers and Does 1-50)**

11      157.    Plaintiffs re-allege the foregoing allegations, incorporating those allegations as

12  though fully set forth herein.

13      158.    As specified in the preceding paragraphs, Superior Health Centers uses and

14  disseminates marketing and advertising to sell the regenerative medicine products and services,

15  including through use of the internet.

16      159.    As set forth above, this advertising is deceptive, untrue, or misleading within the

17  meaning of California Business & Professions Code section 17500 *et seq.* ("section 17500"),

18  because the statements made on websites, and by non-professional sales representatives, are

19  misleading or likely to deceive, and did deceive Plaintiffs.

20      160.    In making and disseminating the statements alleged herein, Superior Health Centers

21  knew or, by the exercise of reasonable care should have known, that the statements were untrue or

22  misleading.

23      161.    The misrepresentations and omissions by Superior Health Centers of the material

24  facts detailed above are false and misleading advertising and therefore violate section 17500

25  because it is likely that a significant portion of the general public and/or Superior Health Centers'

26  targeted customers, acting reasonably under the circumstances, could be misled.

27      162.    As a result of these acts and practices, Superior Health Centers have improperly and

28  illegally obtained money from Plaintiffs.

163.   Defendants' conduct is ongoing.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment against Defendants as follows:

1.   For compensatory damages;

2.   For general damages;

3.   For punitive damages;

4.   All available statutory damages;

5.   Attorneys' fees;

6.   For pre-judgment interest according to proof;

7.   For all costs of suit;

8.   Temporary, preliminary, and permanent injunctive relief, including enjoining Defendants from continuing the illegal practices as set forth herein and ordering Defendants to engage in a corrective advertising campaign; and

9.   For such other relief as the Court may deem just and proper.

Dated: April 14, 2021                          **FOX LAW, APC**

By: _____
                                               DAVID FOX
                                               JOANNA FOX
                                               CHRISTOPHER L. HENDRICKS
                                               Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues of which it is permitted by law.

Dated: April 14, 2021                          **FOX LAW, APC**

By: _____
                                               DAVID FOX
                                               JOANNA FOX
                                               CHRISTOPHER L. HENDRICKS
                                               Attorneys for Plaintiffs

# EXHIBIT D

CONTINUING COVERAGE      Ex-Officer on Trial in Death of George Floyd



52°

TRENDING    Plan Your Vaccine    SoCal Reopenings    Education News & Resources    Project Innovation

CALIFORNIA

## 'I've Been Duped': Disabled Veteran Says He Spent Thousands at Health Center With No Improvement

"I've been duped. That's the first thing I thought … I've been taken," he said.

Published September 24, 2019 • Updated on January 10, 2020 at 3:47 pm



A disabled veteran said he was duped by a health center after spending thousands after they diagnosed... **Read more**

Stephanie Burnette reached out to us after our first I-Team report about an expensive nerve treatment marketed to seniors. She says she and her husband still owe thousands of dollars for treatment they say didn't work for them.

While she and her husband both have neuropathy, Carlos Dominguez does not. This was confirmed by his neurologist in June and again in August.

But after his visit to Superior Health Centers in Aug. 2019, Dominguez says he didn't know what to think.

**Local**

Local news from across Southern California



**37 MINS AGO**

Lakers to Play in Front of Staples Center Crowd for First Time in More Than a Year



**1 HOUR AGO**

Nacho, Nacho Fan: Justin Turner Home Run Ball Splatters Fan With Nacho Cheese

"They tell me they're going to put me through treatment to cure me," he said.

The disabled veteran says he was drawn to Superior Health Centers by an invitation offering a free dinner and the promise of stem cell treatments.

*Have a tip for our NBC4 I-Team? Send it straight to their inbox.*

"That's what I keep hearing is going to help people who have arthritis, which is what I have in my knee," Dominguez said of stem cells.

To his surprise, he says they also told him he had the debilitating nerve condition called neuropathy and Superior Health warned of dire consequences.

"He told me that later on you could basically have an amputation whether it be your toes or your feet ... so how are you feeling? Of course I'm scared," he said.

Dominguez said Superior Health bombarded him with paperwork — he showed us the documents and pointed out more than a dozen places he had to initial and sign.

"They keep shoving one after another after another. They don't even give you a chance to stop and you know, get your thoughts straight."

- Some Patients Say SoCal Chiropractic Business Has Drained Their Bank Accounts and Their Hope

When it was all said and done, Dominguez had signed up for 2 1/2 months treatment at a cost of $15,602.

The financing was arranged by Superior Health and none of the treatment costs were covered by insurance. Dominguez's neurologist confirmed after his visit with Superior that he does not have neuropathy.

And what about the promise of stem cells? Dominguez showed us a document which says Superior Health uses "human umbilical cord tissue."

"The tissue has no stem cells or anything that could play any role in regenerating damaged organs or tissues or anything," Kevin McCormack, a spokesman for California Institute for Regenerative Medicine said.

5:54
## Chiropractic Company Accused of Scamming Patients

A local chiropractic company is accused of using scare tactics and aggressive marketing to dupe patients into a treatment plan that doesn't work. Carolyn Johnson and the I-Team report for NBC4... **Read more**

CIRM is the state agency that funds stem cell research. McCormack warns many clinics are making big promises with no scientific proof.

"Long term it doesn't work, it doesn't repair the damage, it doesn't restore functions. It doesn't do anything. The only thing it improves is the bank account of these clinics," he said.

Chiropractor Philip Straw first came to the NBCLA I-Team's attention when viewers reached out to our investigative unit with complaints about the neuropathy treatment they received from Optimal Health/Straw Chiropractic. The I-Team started asking questions late last year. We were told in January that the business was closing its doors, but they appear to have reopened as Superior Health Centers — where Carlos went.

For example, Straw is seen in television commercials advertising neuropathy treatment. When we've called the number displayed on the commercial, it connects to Superior Health Centers.

NBCLA has tried unsuccessfully to reach Straw and an attorney for Superior Health for comment.

**5:22**
## More Patients Come Forward After Chiropractic Investigation

Following an NBCLA I-Team investigation, more patients have come forward saying they also paid thousands of dollars for help from a SoCal chiropractic firm. Carolyn Johnson reports for... **Read more**

But in a previously issued statement, the attorney wrote:

"Philip Straw is neither practicing at the facility nor is he a professional tenant of Superior Health Centers ... While patients acknowledge that there is no guaranty that they will improve from the treatment, many patients report significant improvement."

When Dominguez heard patient Michele Botts in our first I-Team report, he said her words resonated with him.

"I go, oh boy. I've been duped. That's the first thing I thought ... I've been taken," he said.

Taken for thousands of dollars and left, he says, with no improvement and no hope.

Dominguez never received any stem cell treatments. Instead, he says he told Superior Health he wanted out of his contract and cleared of his financial obligation. He says Superior has not agreed to that.

Consumers can contact the California Chiropractic Examiners Board online here or call 916-263-5355 to speak with someone.

---

This article tagged under:

**CALIFORNIA • HEALTH • CAROLYN JOHNSON • NBC4 • MEDICAL**

---

CCPA Notice

Owe Lenders Upset Disabled Veteran Says He Spent Thousands at Healthcenter Writing Invoice Over 2.6B Google Las

**SPONSORED** · LOWERMYBILLS NMLS#167283; 3306

**Forget the 30yr mortgage if you owe less than $356K. (Do this instead)**

**SPONSORED** · UNIFY HEALTH LABS MULTI-GI 5 SUPPLE...

**Randy Jackson: This 3 Minute Routine Transformed My Health**

**SPONSORED** · BLISSY

**This Pillowcase is Becoming The Must-Have Mother's Day Gift of 2021**

**SPONSORED** · THENOCOSTSOLARPROGRAM.LEADSHOOK.IO

**Local Program Pays California Homeowners Up To $1,000 To Go Solar + Battery For No Cost**

**SPONSORED** · QUICKEN LOANS NMLS#3030

**Why not switch to a 15-Year Mortgage if you owe less than $356K? (Evaluate your options.)**

SPONSORED • DAILY FINANCE STORIES

**Chrissy Metz, 40, Shows Off Massive Weight Loss In Fierce New Photo**

SPONSORED • GUNDRY MD

**Doctor Reveals: How To Control Your Farts (Eat This!)**

SPONSORED • GUNDRY MD TOTAL RESTORE SUPPLEMENT

**What Rice Does to the Human Body**

SPONSORED • GUNDRY MD

**How to Banish Dark Spots (Takes Less Than a Minute a Day)**

SPONSORED • HEALTHNEWS

**Saggy jowls? Plastic Surgeon Says Throw Away Your Moisturizer and D…**

**QUEENS**

**NYPD Cops Spot 4 Men Carrying Large Object That Turns Out to Be Woman's Body**

**SANTA CRUZ**

**Man Pleads Guilty as Juvenile to Murder of Santa Cruz Girl**

**SPONSORED · MY DEEJO**

**This Only Looks Like A Regular Pocketknife - A Deejo Is Anything Bu…**

**SPONSORED · UNIFY HEALTH LABS**

**Randy Jackson: "This Drink Is Like A Powerwash For Your Gut"**

**SPONSORED · EFFUEL**

**Plug This Into Your Car, Wait 2 Minutes, And Watch What Happens To Your Fuel Tank**

**SPONSORED · GUNDRY MD BIO COMPLETE 3 SUPPLEME…**

**Top Surgeon: This Simple Trick Empties Your Bowels Every Morning…**

**COVID-19 VACCINES**

**What to Do Now If You Got the J&J Vaccine**

**DAUNTE WRIGHT**

### Ex-Cop Charged in Daunte Wright Shooting Due in Court

---

**Weather Forecast**

LOS ANGELES, CA

# 52°

Sunny
0% Precip

TONIGHT

52°

TOMORROW

71°

---

## WHAT DO YOU THINK?                                             ⋮

**Do you often feel an undue amount of pressure to spend time outdoors in early Spring because "it's nice out"?**

○ Yes, I often do

○ Yes, sometimes

○ Not really, but I know people who do

○ No, not at all

○ Other / Does not apply

NEXT



**SUBMIT TIPS FOR INVESTIGATIONS**

**NEWSLETTERS**

**CONTACT US AND MEET THE NEWS TEAM**

**INTERNSHIPS**

KNBC Public Inspection File
FCC Applications
KNBC Employment Information
Send Feedback
Advertise With Us
Terms of Service
Privacy Policy
Do Not Sell My Personal Information
CA Notice
AdChoices

Copyright © 2021 NBCUniversal Media, LLC. All rights reserved

# EXHIBIT E

CONTINUING COVERAGE    Ex-Officer on Trial in Death of George Floyd



52°

TRENDING    Plan Your Vaccine    SoCal Reopenings    Education News & Resources    Project Innovation

## Couple Accuses SoCal Chiropractic Business of Swindling Them Out of $18K

"Our total bill was over $18,000. And for someone who is not cured and injured, and someone who never had the disease and hence not cured, that's a lot of money to be swindled out of."

By Carolyn Johnson and Christine Roher • Published January 15, 2020 • Updated on January 15, 2020 at 7:51 pm



A couple is suing a Glendale chiropractic office after the service severely burned a man's leg. Carolyn Johnson and the I-Team reported on NBC4 News at 4 p.m. on Wednesday, Jan. 15, 2020.

Another couple reached out to the NBCLA I-Team after they paid thousands of dollars to a Southern California based chiropractor for neuropathy treatments they say didn't work and in their case, caused harm.

Donna and Harvey Stone are now suing Optimal Health and the chiropractor who ran the business, Philip Straw, after they spent thousands of dollars for what they call bogus treatments. Harvey Stone says he was also burned by the equipment.

The Stones say the smell of burning flesh in the Optimal Health/Straw Chiropractic Glendale office turned out to be Harvey's leg.

"We both smelled something burning and we realized that it was burning flesh," Donna Stone said.

"And they pulled the pad off and I looked at his leg and went, 'Oh my God!'" she recalled.

And because Harvey Stone suffers from neuropathy he couldn't feel what was happening. His primary care doctor sent him to a wound care facility for weeks of treatment.



**AUG 14, 2019**
Some Patients Say SoCal Chiropractic Business Has Drained Their Bank Accounts and Their Hope



**SEP 24, 2019**
'I've Been Duped': Disabled Veteran Says He Spent Thousands at Health Center With No Improvement

"The medical bills themselves were well in excess of $10,000," Harvey Stone said.

So how did the Stones wind up seeing a chiropractor to treat a disabling nerve disorder? Like other patients who have reached out to the I-Team, the Stones received an invitation in the mail, offering a free dinner to learn about treating neuropathy.

The I-Team brought a hidden camera to one of those dinners so we could see the presentation.

"Do not let me run into you a year and a half from now and find you with an amputation," the presenter can be heard saying.

The Stones say they were frightened by what they heard and felt pressured to finance treatment right away for both of them. But after she started treatment, Donna Stone's own doctor told her she does not have neuropathy. The Stones feel they were duped.

"I'm a college graduate, a computer engineer. You know, I think I have some smarts, but yet they were able to tell me that if I don't go through with their treatments my toes are going to fall off," Harvey Stone said.

The Stones said they did not understand the people they were dealing with were chiropractors.

"They introduced themselves as doctors," Harvey Stone added.



**SEP 12, 2019**
'This Is What We Went Through': More Patients Come Forward After I-Team's Investigation Into a SoCal Chiropractic Business

**JAN 14, 2020**
US Drinks More Alcohol Now Than Just Before Prohibition

That's just one of the allegations that attorneys Jennifer Ruiz and Arnold Gross made in a lawsuit filed in Sept. 2017 against Optimal Health and Straw, as well as the maker of the device they say burned Harvey Stone.

"Chiropractors have no license to treat peripheral neuropathy," Ruiz said. "They can treat musculoskeletal complaints."

The attorneys say the case is much bigger than faulty equipment.

"As we dug in deeper, we really understood that what was happening here was really elder abuse financial. There was a fraud being committed on these seniors. They were given all these false hopes and preying upon the desperation of an extremely vulnerable population," Ruiz said.

"This is targeting people who are desperate for care and it's fraud. It's snake oil," Gross said.

We reached out to the attorneys representing Straw and Optimal Health. They pointed out that the Stone's attorneys offered not to share their story with the I-Team in exchange for a settlement. They call the allegations defamatory and say there is "no evidence that Mr. Stone's burn occurred as a result of negligent professional care" and that the Stones "experienced improvement from the treatment."

The Stone's attorneys tell us that in court depositions Harvey Stone did say initially he felt a slight improvement of 10 to 15 percent, but that didn't last. They say that's equivalent to a placebo effect.

"You're kind of in this corner where people who are desperate or don't understand 100% what's going on can be led to believe that they should have a therapy because it might be helpful," said Dr. Jonathan Katz, a neurologist specializing in neuropathy.

He understands why patients are tempted to seek alternative treatments, but offers this warning: "If it feels too expensive, it's probably too expensive. If your insurance isn't going to cover it, it's a good chance that there's no evidence behind what's going on."

Optimal Health/Straw Chiropractic shut its doors in Jan. 2019, but three of its four locations reopened as Superior Health Centers. The fourth is located just a short distance away from the original Optimal Health office. In addition, the marketing materials for Optimal Health and Superior Health appear identical.

Superior Health Locations  ☆

This map was created by a user. Learn how to create your own.



Terms

"All they've done is they've reinvented Optimal Health into Superior Health and again, neither one of those names sounds like a chiropractic office, and that's done intentionally to mislead the senior citizens into believing they're going to see a medical doctor to get medical treatment," Ruiz said.

And patients like the Stones quickly learn none of it is covered by insurance.

"Our total bill was over $18,000. And for someone who is not cured and injured, and someone who never had the disease and hence not cured, that's a lot of money to be swindled out of," Harvey Stone said.

The Stones case is set for trial in February. Their attorneys want other patients to know they likely have legal recourse, too.

**Do you have a tip for the I-Team?** **Submit it here.**

**If you would like to call the I-Team's Investigative Tip Line, you may do so here: 818-520-TIPS (8477)**

For more information on filing a complaint with the State Board of Chiropractic Examiners, click here.

For more information on submitting a consumer complaint to the FTC, click here.

CCPA Notice

SPONSORED · LOWERMYBILLS NMLS#167283; 3306

**Forget the 30yr mortgage if you owe less than $356K. (Do this instead)**

SPONSORED · UNIFY HEALTH LABS MULTI-GI 5 SUPPLE...

**Randy Jackson: This 3 Minute Routine Transformed My Health**

SPONSORED · QUICKEN LOANS NMLS#3030

**Why not switch to a 15-Year Mortgage if you owe less than $356K? (Evaluat...**

SPONSORED · THENOCOSTSOLARPROGRAM.LEADSHOOK.IO

**Local Program Pays California Homeowners Up To $1,000 To Go Solar + Battery For No Cost**

SPONSORED · BLISSY

**This Pillowcase is Becoming The Must-Have Mother's Day Gift of 2021**

SPONSORED · MY DEEJO

**This Only Looks Like A Regular Pocketknife - A Deejo Is Anything Bu...**

**Weather Forecast**

LOS ANGELES, CA

52°

Sunny
0% Precip

TONIGHT

52°

TOMORROW

71°

WHAT DO YOU THINK?                                                ⋮

**What is your honest opinion of lasagna?**

○ Love it / Can't get enough of it

○ My nana's recipe is the only one I'll eat

○ It's generally a decent dish

○ Meh.

○ I don't like it that much

○ I don't like it at all

○ Other / No opinion

NEXT

Case 8:21-cv-00607-DOC-JDE Document 13-2 Filed 04/26/21 Page 213 of 263 Page ID #:299



SUBMIT TIPS FOR INVESTIGATIONS

NEWSLETTERS

CONTACT US AND MEET THE NEWS TEAM

INTERNSHIPS

KNBC Public Inspection File
FCC Applications
KNBC Employment Information
Send Feedback
Advertise With Us
Terms of Service
Privacy Policy
Do Not Sell My Personal Information
CA Notice
AdChoices

Copyright © 2021 NBCUniversal Media, LLC. All rights reserved



# EXHIBIT F

Electronically FILED by Superior Court of California, County of Los Angeles on 03/12/2019 02:04 PM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Ramos,Deputy Clerk

Case 8:21-cv-00607-DOC-JDE   Document 13-2   Filed 04/26/21   Page 215 of 263   Page ID
#:301

ARNOLD W. GROSS (SBN: 57179)
ADAM J. SAVIN (SBN: 274899)
JENNIFER A. RUIZ (SBN: 181085)
**LAW OFFICES OF SAVIN & BURSK**
15915 Ventura Blvd., Suite 201
Encino, CA 91436
Tel:  (818) 960-0011
Fax: (818) 285-8474
ATTORNEYS FOR PLAINTIFFS HARVEY STONE AND DONNA STONE

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| HARVEY STONE, an individual;<br>DONNA STONE, an individual;<br><br>           Plaintiffs,<br><br>  vs.<br><br>PHILIP STRAW, D.C., an individual;<br>OPTIMAL HEALTH STRAW<br>CHIROPRACTIC SOUTHERN<br>CALIFORNIA, INC., a California<br>Corporation; HAKO-MED<br>ELECTROMEDICINE, an unknown<br>business entity; HAKO-MED USA,<br>INC., a Hawaii Corporation; ALIVE,<br>INC., a Hawaii Corporation; HAKO-<br>MED HOLDINGS, INC., a Nevada<br>Corporation; AND DOES 1<br>THROUGH 50, Inclusive,<br><br><br>       Defendants.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NUMBER: BC677958
Dept. 50
Hon. Teresa A. Beaudet

**SECOND AMENDED COMPLAINT FOR**:

1) MEDICAL NEGLIGENCE (As to Plaintiff Harvey Stone
2) ELDER ABUSE-FINANCIAL ABUSE (As to Plaintiffs Harvey stone and Donna stone)
3) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (As to Plaintiffs Harvey Stone and Donna Stone)
4) FRAUD-INTENTIONAL MISREPRESENTATION (As to Plaintiffs Harvey Stone and Donna Stone)
5) CONCEALMENT (As to Plaintiffs Harvey Stone and Donna Stone)

Trial Date: July 31, 2019

PLAINTIFFS, HARVEY STONE and DONNA STONE, are informed and believe and thereon allege as follows:

## GENERAL ALLEGATIONS

1.    PLAINITFF HARVEY STONE is, and at all times mentioned herein, was an individual residing in the County of Los Angeles, State of California.

2.    PLAINTIFF DONNA STONE is, and at all times mentioned herein, was an individual residing in the County of Los Angeles, State of California.

3.    PLAINTIFF HARVEY STONE and DONNA STONE have been married for 25 years.

4.    DEFENDANT PHILIP STRAW, D.C. is, and all times mentioned herein, was a chiropractor licensed by the California Board of Chiropractic Examiners, who owned and operated multiple chiropractic offices within the counties of Los Angeles and Orange, in the State of California, including, but not limited to, DEFENDANT OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC. DEFENDANT PHILIP STRAW, D.C. regularly engages in the practice of chiropractic medicine in the County of Los Angeles, State of California.

5.    DEFENDANT DAVID ZENG, D.C. is, and all times mentioned herein, was a chiropractor licensed by the California Board of Chiropractic Examiners who was employed by Defendants OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC., DEFENDANT PHILIP STRAW, D.C. and NEUROPATHY SOLUTIONS, INC.

6.    DEFENDANT OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC. (Hereinafter "OPTIMAL HEALTH") is a California corporation or other entity authorized to do business in the State of California and was and is organized and existing under and by virtue of the laws of the State of California, County of Los Angeles.  DEFENDANT OPTIMAL HEALTH was engaged in the business of operating a chiropractic office located at  411 N. Central Avenue, #115, Glendale, in the State of California, County of Los Angeles.

Second Amended Complaint

7.     DEFENDANT NEUROPATHY SOLUTIONS, INC. is a California corporation or other entity authorized to do business in the State of California and was and is organized and existing under and by virtue of the laws of the State of California. DEFENDANT NEUROPATHY SOLUTIONS, INC. was also engaged in the business of operating a chiropractic office located at  411 N. Central Avenue, #115,  Glendale, in the State of California, County of Los Angeles.

8.     DEFENDANT HAKO-MED ELECTROMEDICINE is an unknown business entity authorized to do business in the State of California.  PLAINTIFFS are informed and believe that DEFENDANT HAKO-MED ELECTROMEDICINE was engaged in the business of manufacturing, designing, assembling, repairing, maintaining, renting, leasing, testing, constructing, fabricating, analyzing, recommending, distributing, merchandising, advertising, modifying, warranting, promoting, selling and marketing to wholesalers, retailers and consumers, for consideration,  electro-medical equipment registered under the names of PRO ElecDT 2000, PRO ElecDT, ElecDT Horizon and ElecDT.  PLAINTIFFS further allege that DEFENDANT HAKO-MED ELECTROMEDICINE intentionally placed the above-mentioned products into the stream of commerce with the expectation that those products would regularly be purchased by consumers in the State of California.

9.     DEFENDANT HAKO-MED USA, INC. is a Hawaii corporation or other entity authorized to do business in the State of California.  PLAINTIFFS are informed and believe that DEFENDANT HAKO-MED USA, INC. was engaged in the business of manufacturing, designing, assembling, repairing, maintaining, renting, leasing, testing, constructing, fabricating, analyzing, recommending, distributing, merchandising, advertising, modifying, warranting, promoting, selling and marketing to wholesalers, retailers and consumers, for consideration, electro-medical equipment registered under the names of PRO ElecDT 2000, PRO ElecDT, ElecDT Horizon and ElecDT.

10.     PLAINTIFFS further allege that DEFENDANT HAKO-MED USA, INC. intentionally placed the above-mentioned products into the stream of commerce with the

3

expectation that those products would regularly be purchased by consumers in the State of California.

11.     DEFENDANT ALIVE, INC. is a Hawaii corporation or other entity authorized to do business in the State of California.  PLAINTIFFS are informed and believe that DEFENDANT ALIVE, INC. was engaged in the business of manufacturing, designing, assembling, repairing, maintaining, renting, leasing, testing, constructing, fabricating, analyzing, recommending, distributing, merchandising, advertising, modifying, warranting, promoting, selling and marketing to wholesalers, retailers and consumers, for consideration, electro-medical equipment registered under the names of PRO ElecDT 2000, PRO ElecDT, ElecDT Horizon and ElecDT.  PLAINTIFFS further allege that DEFENDANT ALIVE, INC. intentionally placed the above-mentioned products into the stream of commerce with the expectation that those products would regularly be purchased by consumers in the State of California.

12.     DEFENDANT HAKO-MED HOLDINGS, INC. is a Nevada corporation or other entity authorized to do business in the State of California.  PLAINTIFFS are informed and believe that DEFENDANT HAKO-MED HOLDINGS, INC. was engaged in the business of manufacturing, designing, assembling, repairing, maintaining, renting, leasing, testing, constructing, fabricating, analyzing, recommending, distributing, merchandising, advertising, modifying, warranting, promoting, selling and marketing to wholesalers, retailers and consumers, for consideration, electro-medical equipment registered under the names of PRO ElecDT 2000, PRO ElecDT, ElecDT Horizon and ElecDT.  PLAINTIFFS further allege that DEFENDANT HAKO-MED HOLDINGS , INC. intentionally placed the above-mentioned products into the stream of commerce with the expectation that those products would regularly be purchased by consumers in the State of California.

13.     This is an action for Damages by PLAINITFFS HARVEY STONE and DONNA STONE that exceeds Twenty-Five Thousand Dollars ($25,000.00).

14.     Plaintiff HARVEY STONE was diagnosed with cancer in or about March,

4

Second Amended Complaint

2017, and received treatment, including surgery, and thereafter, radiation for more than 6 months.  Plaintiffs therefore did not discover the negligence, wrongdoing, fraud or elder abuse of Plaintiffs HARVEY STONE and DONNA STONE until on or after July 2017.

15.    The true names and capacities of DEFENDANTS sued herein as DOES 1-50, inclusive, whether individual, corporate, or otherwise, are unknown at this time to PLAINTIFFS, who therefore sues such DEFENDANTS by such fictitious names. PLAINTIFFS will seek leave of the Court to amend this Complaint to state their true names and capacities when same have been ascertained.  PLAINTIFFS allege on information and belief that each DEFENDANT named herein as a DOE is responsible in some manner for each and every act and any and all conduct set forth in this Complaint. PLAINTIFFS are informed and believe and thereon allege that at all times mentioned herein, each of the DEFENDANTS sued herein was the agent and employee of each of the remaining DFEENDANTS and was at all times acting within the purpose and scope of such agency and employment.

16.    As used herein, the term "DEFENDANTS" shall mean and include the named DEFENDANTS and each and every DOE DEFENDANT.

### FIRST CAUSE OF ACTION

### (MEDICAL NEGLIGENCE- AGAINST DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C. AND OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC.)

17.    PLAINTIFFS incorporate paragraphs 1-16 inclusive into this cause of action as if fully set forth and re-alleged herein.

18.    On or about January 2016, PLAINTIFF HARVEY STONE was a 70 year old male who, after attending a free dinner seminar presented by PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., became a patient of DAVID ZENG, D.C. at OPTIMAL HEALTH located at 411 N. Central Avenue, #115, Glendale, California.

19.     DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., OPTIMAL
HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees,
represented that they could provide PLAINITFF HARVEY STONE with treatment for
his peripheral neuropathy.

20.     Treatment recommended by DEFENDANTS DAVID ZENG, D.C., PHILIP
STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., and
their agents and employees, included light therapy and electrical therapy with a large
electrical device referred to by DEFENDANTS as "the HAKO-MED".  PLAINTIFF is
informed and believes "the HAKO-MED" was registered under the name of HAKO-
MED ElecDT 2000.   While receiving the HAKO-MED treatment, PLAINITFF
HARVEY STONE sat in a chair and DEFENDANTS' back office assistants placed
electrode patches on Mr. Stone's legs.  The electrodes had wires attached to them that
were connected to the HAKO-MED device.  When activated, the HAKO-MED device
emitted an electrical current of varying intensity that was transferred to PLAINTIFF
HARVEY STONE'S legs.

21.     DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., OPTIMAL
HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees,
were informed by PLAINITFF HARVEY STONE directly and through examination of
Mr. Stone at his initial visit, that PLAINITFF HARVEY STONE had limited feeling in
his lower extremities due to complications from Type 2 Diabetes.

22.     On or about February 29, 2016, while PLAINTIFF HARVEY STONE was
receiving the HAKO-MED electrical therapy treatment from DEFENDANTS,
PLAINITFF DONNA STONE, who was seated in the chair next to him, began to smell
something burning. PLAINTIFF DONNA STONE immediately altered DEFENDANTS'
assistants and the electrode patches were removed.

23.     DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C. and OPTIMAL
HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC.,
NEUROPATHY SOLUTIONS, INC., and their agents and employees, had duty to use

the level of skill, knowledge and care in the diagnosis and treatment of PLAINTIFF HARVEY STONE that other reasonably careful chiropractors would use in the same or similar circumstances.

24.    PLAINTIFF reasonably relied on the claimed knowledge, skill and expertise of DEFENDANTS PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC. and became a patient under DEFENDANTS' care.

25.    DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees, breached their duty of care by providing an electrical treatment, namely, the large electrical therapy device described as "the HAKO-MED", to PLAINTIFF HARVEY STONE that was contraindicated for a patient like Mr. Stone, who was 70 year old a Type 2 Diabetic with peripheral neuropathy that had limited sensation in his lower extremities.   Said DEFENDANTS, and each of them, and their agents and employees, further failed to ensure that Mr. Stone's skin was clean and dry and failed to replace the electrode patches after a reasonable number of uses to ensure that the adhesive on the electrode patch had not sufficiently worn before applying the electrode to Mr. Stone's calf.  Furthermore, DEFENDANTS, and their agents and employees, failed properly apply the electrode patch to Mr. Stone's leg and failed to adequately monitor Mr. Stone while he received this electrical treatment, such that PLAINTIFF HARVEY STONE'S skin began to burn.  Said DEFENDANTS, and their agents and employees, through their actions described above, failed to protect PLAINITFF HARVEY STONE from health and safety standards. Said DEFENDANTS further failed to refer Mr. Stone to a medical doctor for the treatment of his electrical burn.

26.    DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees, were prohibited under their professional license from providing treatment for conditions that were not musculoskeletal related.  Neither PLAINTIFF HARVEY STONE, nor PLAINITFF DONNA STONE ever received a musculoskeletal examination or

musculoskeletal treatment during the course of their treatment at OPTIMAL HEALTH.

27.     As a result of the actions of DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees, PLAINTIFF HARVEY STONE sustained deep partial-thickness fibrotic electrical burns to his right calf that required extensive medical treatment.

28.     The negligence of DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees, was a substantial factor in causing PLAINTIFF HARVEY STONE'S harm.

29.     As a direct and proximate result of the negligence of DEFENDANTS, and each of them, and their agents and employees, as aforesaid, PLAINTIFF HARVEY STONE sustained severe injury to his person, all to PLAINTIFF HARVEY STONE'S damage in a sum within the jurisdiction of this Court and to be shown according to proof.

30.     By reason of the forgoing,  PLAINTIFF HARVEY STONE has been required to employ the services of hospitals, physicians, surgeons, nurses and other professionals, and PLAINITFF HARVEY STONE has incurred expenses for those services as well as medicines, imaging studies and other medical testing and supplies.  PLAINTFF HARVEY STONE is informed and believes, and thereon alleges, that further services of such nature will be required by PLAINITFF HARVEY STONE in an amount to be shown according to proof.

31.     As a direct and proximate result of the negligence of DEFENDANTS, and each of them, and their agents and employees, as aforesaid, PLAINTIFF HARVEY STONE suffered and continues to suffer non-economic damages, including but not limited to, physical pain, disfigurement, mental suffering, emotional distress and loss of enjoyment of life, in an amount to be shown according to proof.

///

## SECOND CAUSE OF ACTION

### (ELDER ABUSE/FINANCIAL ABUSE- Welfare and Institutions Code
### §15610.30- AS AGAINST DEFENDANTS PHILIP STRAW, D.C ,
### OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN
### CALIFORNIA, INC., NEUROPATHY SOLUTIONS, INC.)

32.     PLAINTIFFS incorporate paragraphs 1-30 inclusive into this cause of action as if fully set forth and re-alleged herein.

33.     At all times mentioned herein, PLAINTIFF HARVEY STONE was a 70 year old male residing in Los Angeles County, in the State of California.

34.     At all times herein, PLAINITFF HARVEY STONE suffered from peripheral neuropathy, secondary to Type 2 Diabetes.

35.     At all times mentioned herein, PLAINTIFF DONNA STONE was a 65 year old female living in Los Angeles County, in the State of California.

36.     At all times mentioned herein, PLAINTIFF DONNA STONE suffered from Type 2 Diabetes, without neuropathy.

37.     In January 2016, PLAINTIFFS HARVEY STONE and DONNA STONE received a card in the mail from DEFENDANTS PHILIP STRAW, D.C, OPTIMAL HEALTH and NEUROPAQTHY SOLUTIONS, INC. inviting PLAINTIFFS to attend a free dinner seminar regarding a new treatment for peripheral neuropathy.  The mailer indicated that space in the seminar was limited and requested that PLAINTIFFS call a toll-free number to RSVP.

38.     In January 2016, PLAINTIFFS attended the free dinner seminar conducted by DEFENDANTS PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC. and their agents and employees.  At that time, said DEFENDANTS and their agents and employees aggressively marketed a new treatment for the relief of peripheral neuropathy that consisted of light therapy and electrical therapy with a device called the HAKO-MED.  THE DEFENDANTS' presentation included the path of peripheral neuropathy if it was not effectively treated, including but not limited to

9

lameness, gangrene and amputation, and promised that the DEFENDANTS' treatment would increase blood flow, regenerate nerves and return the feeling in PLAINITFFS' extremities and would also end the pins and needles sensation associated with peripheral neuropathy. DEFENDANTS claimed OPTIMAL HEALTH was one of the nation's most effective neuropathy clinics and suggested that if PLAINTIFFS cared about their health and were tired of taking medications, they should come see one of their doctors.

39.   The DEFENDANTS' dinner seminar presentation further promised that the proposed treatment would prevent the onset of peripheral neuropathy.

40.   Concerned over causing further damage to their bodies, in desperation for effective treatment for and prevention of peripheral neuropathy and in reliance upon DEFENDANTS' claimed knowledge, skill and expertise, PLAINTIFFS HARVEY STONE and DONNA STONE agreed to a free initial evaluation at DEFENDANTS' Glendale office.

41.   In January 2016, PLAINITFFS HARVEY STONE and DONNA STONE received a free initial medical evaluation by DEFENDANTS' agents and employees at their office located at 411 N. Central Avenue, #115, Glendale, California. DEFENDANTS' non-clinician "case manager" represented to PLAINTIFFS HARVEY STONE and DONNA STONE that they each had a diagnosis of peripheral neuropathy and were eligible for the light therapy and electrical therapy, but the treatment was not covered by traditional health insurance. DEFENDANTS represented at this free initial visit that they could not commence the treatment until they had received payment in full for the entire amount of recommended treatment.

42.   At this visit, DEFENDANTS' "patient coordinator" brokered a usury loan agreement between PLAINTIFFS HARVEY STONE and DONNA STONE and WHITEBRIDGE FINANCIAL for the total sum of $18,655.68 to pay for PLAINITFFS' treatment as recommended by DEFENDANTS. That money was immediately paid to DEFENDANTS PHILIP STRAW, D.C., OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., while PLAINTIFFS HARVEY STONE and DONNA STONE

10

Second Amended Complaint

became obligated to make monthly payments with interest of 14.99% APR accruing on the balance.  DEFENDANTS induced PLAINITFFS to sign the loan agreement and obtain their personal property with the intent to defraud them.

43.     WHITEBRIDGE FINANCIAL is a company that operates exclusively for providers and retailers selling products and/or services.  In this case, DEFENDANTS improperly induced PLAINTIFFS into signing a loan agreement with WHITEBRIDGE FINANCIAL for the total sum of $18,655.68 to finance the bogus and illegal medical treatment offered by DEFENDANTS.

44.     PLAINITFS reasonably relied on DEFENDANTS' representations that the light therapy and the electrical HAKO-MED therapy would eliminate and/or prevent their peripheral neuropathy.

45.     PLAINITFFS are both elders 65 years of age or older, as defined by Welfare and Institutions Code §15610.27.

46.     Prior to attending DEFENDANTS' dinner seminar, PLAINTIFF HARVEY STONE had tried numerous traditional treatments for his Type 2 Diabetes and peripheral neuropathy and was disappointed with the results of these traditional treatments. PLAINTIFF DONNA STONE had recently undergone hip surgery and was advised by DEFENDANTS that their proposed light therapy and electrical HAO-MED therapy would benefit her as well. PLAINTIFF DONNA STONE also had a previous diagnosis of Type 2 Diabetes but not a diagnosis of peripheral neuropathy.

47.     PLAINITFFS are particularly vulnerable members of society, as they are elders 65 years or older, who are on a fixed income and who suffer from a chronic illness and its related complications.

48.     DEFENDANTS primarily and aggressively advertised, marketed and presented their purported treatment to elderly persons with diabetes such as PLAINTIFFS. Furthermore, DEFENDANTS failed to disclose to the intended recipients of this information that OPTIMAL HEALTH was only a chiropractic office and not a medical group of doctors or a "Neuropathy clinic".

Second Amended Complaint

49.     DEFENDANTS, with intent to defraud, used fear tactics to scare these vulnerable elderly persons with chronic illnesses, including PLAINITFFS, to induce them to "come in and see one of our doctors" and to pay for non-evidence based treatment that was not covered by traditional health insurance through a 3rd party loan service called WHITEBRIDGE FINANCIAL, with the intent to defraud PLAINTIFFS of significant personal property; namely, the total sum of $18,655.68.

50.     DEFENDANTS knew and intentionally directed their mailers, marketing presentations and patient population to persons age 65 years or older with diabetes and peripheral neuropathy.

51.     DEFENDANTS, as chiropractors and non-clinicians, knew they were not licensed to perform the recommended light and electrical therapy treatments exclusively on patient's lower extremities but did so anyway on thousands of patients, including Harvey and Donna Stone.  Defendants further knew they were not trained, nor licensed to treat peripheral neuropathy.  However, these defendants claimed an unsubstantiated expertise in the treatment of peripheral neuropathy, claimed to be doctors in one of the nation's most effective neuropathy clinics and intentionally concealed from the PLAINTIFFS that they were practicing outside the scope of their expertise and their license, with the sole purpose of causing elderly persons, including Harvey and Donna Stone, to suffer the loss of significant sums of money.

52.     DEFENDANTS knew or should have known that their conduct, as described above was likely to be harmful to the PLAINITFFS, as elders 65 years of age or older, on a fixed income, and with chronic illnesses.

53.     DEFENDANTS' actions, as described above, were despicable and in conscious disregard of PLAINITFF's rights.  As such, PLAINTIFFS are entitled to an award of punitive damages.

54.     As a direct and proximate result of DEFENDANTS' actions, as described above, PLAINITFFS HARVEY STONE and DONNA STONE each have incurred a loss of substantial personal property in the total sum of $18,655.68.

Second Amended Complaint

55.     As a result of the deceptive acts of DEFENDANTS, as described above, against PLAINTIFFS who are senior citizens as defined by Civil Code Section 1761, PLAINTIFFS further seek an award of treble damages under Civil Code Section 3345.

## THIRD CAUSE OF ACTION

## (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS- AGAINST DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., AND OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC.)

56.     PLAINTIFFS incorporate paragraphs 1-55 inclusive into this cause of action as if fully set forth and re-alleged herein.

57.     In January 2016, PLAINTIFF HARVEY STONE became a patient of DEFENDANT OPTIMAL HEALTH, the chiropractic office owned by DEFENDANT PHILIP STRAW, D.C. and operated by PHILIP STRAW, D.C. and NEUROPATHY SOLUTIONS, INC.  PLAINTIFF HARVEY STONE was assigned to the care of DEFENDANT OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC. employee, DEFENDANT DAVID ZENG, D.C.

58.     The treatment recommended by DEFENDANTS included a large electrical therapy device, which PLAINTIFFS are informed and believe was registered under the name HAKO-MED Pro ElecDT 2000.  During this treatment PLAINTIFF HARVEY STONE sat in a chair and DEFENDANTS' back office assistants placed electrode patches on Mr. Stone's legs.  The electrode patches had wires attached to them that were connected to the large electro-medical device.  The HAKO-MED device emitted an electrical current of varying intensity that was transferred to PLAINTIFF HARVEY STONE'S legs.

59.     DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., and OPTIMAL HEALTH, and their agents and employees, were informed by PLAINTIFF HARVEY STONE directly and through examination of Mr. Stone at his initial visit, that PLAINITFF HARVEY STONE had limited feeling in his lower extremities due to

complications from Type 2 Diabetes.

60.     On or about February 29, 2016, while PLAINTIFF HARVEY STONE was receiving the HAKO-MED electrical therapy device treatment from DEFENDANTS, PLAINITFF DONNA STONE, who was seated in a chair next to him, began to smell something burning.  PLAINTIFFS realized that Mr. Stone's skin was burning and alerted the DEFENDANTS' back office assistants, who turned off the HAKO-MED device and removed the electrode from Mr. Stone's right calf.   Once removed, PLAINTIFFS observed a large awareness ribbon shaped electrical burn on Mr. Stone's right calf.

61.     DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., and OPTIMAL HEALTH, had duty to use the level of skill, knowledge and care in the diagnosis and treatment of PLAINTIFF HARVEY STONE that other reasonably careful chiropractors would use in the same or similar circumstances.

62.     DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C. and OPTIMAL HEALTH, and their agents and employees, breached their duty of care by providing an electrical treatment, namely, the large electrical therapy device (the HAKO-MED) to PLAINTIFF HARVEY STONE, that was contraindicated for a patient like Mr. Stone, who was 70 year old a Type 2 Diabetic with peripheral neuropathy that had limited sensation in his lower extremities.   DEFENDANTS, and each of them, further failed to adequately monitor the use of the large electrical therapy device, such that PLAINTIFF HARVEY STONE'S skin began to burn. DEFENDANTS, and each of them, further failed to ensure the Mr. Stone's skin was clean and dry and failed to ensure that the electrode patch was in good condition had sufficient remaining adhesive before applying the electrode to Mr. Stone's skin and activating the HAKO-MED device.

63.     As a result of the actions of DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., and OPTIMAL HEALTH, and their agents and employees, PLAINITFF HARVEY STONE sustained deep partial-thickness fibrotic electrical burns to his right calf that required extensive medical treatment.

64.     As a further and proximate result of the actions of DEFENDANTS DAVID

14

Second Amended Complaint

ZENG, D.C., PHILIP STRAW, D.C., and OPTIMAL HEALTH, and their agents and employees, PLAINTIFF HARVEY STONE suffered emotional distress, including suffering, anguish, fright, nervousness, grief, anxiety, worry and shock.

65.    PLAINITFF DONNA STONE was seated directly next to PLAINITFF HARVEY STONE when she smelled burning flesh and realized her husband's leg was burning.  She immediately notified DEFENDANTS' assistants.   As a proximate result of the actions of DEFENDANTS DAVID ZENG, D.C. PHILIP STRAW, D.C., and OPTIMAL HEALTH, and their agents and employees, PLAINTIFF DONNA STONE suffered emotional distress, including suffering, anguish, fright, nervousness, grief, anxiety, worry and shock.

66.    The actions of DEFENDANTS DAVID ZENG, D.C., PHILIP STRAW, D.C., and OPTIMAL HEALTH, and their agents and employees, as described above, were a substantial factor in causing PLAINITFFS' emotional distress.

67.    As a result of DEFENDANTS' actions, as described above, PLAINTIFFS HARVEY STONE and DONNA STONE are entitled to an award of compensatory damages.

68.    As a result of the deceptive acts of DEFENDANTS against PLAINITFFS who are senior citizens as defined under Civil Code Section 1761, PLAINTIFFS further seek treble damages under Civil Code Section 3345.

## FOURTH CAUSE OF ACTION

### (FRAUD-INTENTIONAL MISREPRESENTATION- AS AGAINST DEFENDANTS PHILIP STRAW, D.C., OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA, INC. AND NEUROPATHY SOLUTIONS, INC.)

69.    PLAINTIFFS incorporate paragraphs 1-68 inclusive into this cause of action as if fully set forth and re-alleged herein.

70.    DEFENDANTS OPTIMAL HEALTH, PHILIP STRAW, D.C. and

NEUROPATHY SOLUTIONS, INC. intentionally targeted a vulnerable segment of the population; elderly persons aged 65 or older who suffered from peripheral neuropathy as a complication of diabetes, by mailing invitations to a "free gourmet dinner" "Exclusively for People with Nerve Damages Symptoms" to "Learn the Latest About Neuropathy."

71.    In December 2015, PLAINTIFFS received such an invitation from DEFENDANTS OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC. and attended a "free gourmet dinner" at a BJs restaurant in Woodland Hills, California.  The invitation added"YOU NEED TO ATTEND THIS EVENT" and "Seating is Limited!"

72.    At the dinner, DEFENDANTS OPTIMAL HEALTH, PHILIP STRAW, D.C. and NEUROPATHY SOLUTIONS, INC., and their agents and employees, presented a lengthy predatory power point presentation, during which attendees, including PLAINTIFFS, were told about new types of therapy called "neuro light therapy" and electrical therapy with a special device called "the HAKO-MED".  DEFENDANTS used scare tactics such as showing photographs of gangrene, amputation and confinement to a wheelchair as the ultimate consequences of peripheral neuropathy if not effectively treated.

73.    Said DEFENDANTS claimed to have special knowledge of new and effective treatments for peripheral neuropathy and "over 2000 research articles on the therapies we are using."

74.    Said DEFENDANTS further claimed OPTIMAL HEALTH was "one of the nation's most effective Neuropathy clinics."

75.    Said DEFENDANTS intentionally misrepresented to the attendees, including PLAINTIFFS, that this new therapy would regenerate damaged nerves and further misrepresented that the treatment was being offered by doctors.

76.    Said DEFENDANTS offered PLAINTIFFS a neurological examination to see if they qualified for the treatment and added they should make an appointment if they cared about their health and were tired of simply taking medications for their peripheral

neuropathy.

77.     Said DEFENDANTS intentionally feigned scarcity and falsely represented to the attendees, including PLAINTIFFS, that availability for this "neurological examination" was limited.

78.     PLAINTIFFS reasonably relied on the feigned scarcity of this neurologocal examination and made an appointment for an initial consultation at DEFENDANT OPTIMAL HEALTH.

79.     Said DEFENDANTS knew their representation regarding the scarcity of neurological examinations at OPTIMAL HEALTH was false.

80.     Said DEFENDANTS' representations were false because the only "doctor" at OPTIMAL HEALTH was a chiropractor.

81.     DEFENDANTS knew their representation that treatment at OPTIMAL HEALTH was being offered by doctors was false because they intentionally failed to disclose that OPTIMAL HEALTH was exclusively a chiropractic office, run by chiropractor Phillip Straw and lay persons.

82.     Said DEFENDANTS proposed treatment plan for peripheral neuropathy was outside the scope of allowable practice under a chiropractic license.

83.     Said DEFENDANTS knew that their proposed treatment plan for peripheral neuropathy was outside the scope of chiropractic practice, as it did not involvement musculoskeletal treatment.

84.     Said DEFENDANTS intended for PLAINTIFFS to rely on the representations that PLAINTIFFS were being offered neurological treatment by doctors.

85.     PLAINITFFS reasonably relied on said DEFENDANTS' representations, and as a result, on January 18, 2016 attended an examination of their lower extremities only at DEFENDANT OPTIMAL HEALTH, after which PLAINTIFFS were diagnosed with peripheral neuropathy.

86.     After receiving the alleged examination results, said DEFENDANTS told PLAINTIFFS that the proposed treatment plan was not covered by health insurance.

However, said DEFENDANTS again falsely represented that they could treat peripheral neuropathy with the new "neuro light therapy" and the HAKO-MED and brokered a usury loan agreement between PLAINTIFFS and a third party finance company called Whitebridge Financial, for the total sum of $18,655.68.

87.    PLAINTIFF HARVEY STONE had tried various forms of traditional medical treatment for his diabetes and related complications and reasonably relied on DEFENDANTS' representations that OPTIMAL HEALTH and NUEROPATHY SOLUTIONS, INC. could treat his peripheral neuropathy. PLAINITFF DONNA STONE had recently undergone hip surgery and reasonably relied on DEFENDANTS' representations that OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC. could treat her lower extremity pain following surgery.

88.    PLAINTIFFS' reliance on DEFENDANTS' representations, as described above, were a substantial factor in causing PLAINTIFFS to lose a significant sum of money.

89.    PLAINTIFFS' reliance on DEFENDANTS' representations, as described above, was a substantial factor in causing PLAINTIFF HARVEY STONE physical injury at OPTIMAL HEALTH, specifically an electrical burn to Mr. Stone's right calf. PLAINTIFF HARVEY STONE seeks damages for his injury related medical expenses according to proof.

90.    PLAINTIFFS' reliance on DEFENDANTS' representations, as described above, was a substantial factor in causing PLAINTIFFS' emotional injury. PLAINTIFFS seek damages for their pain, suffering, anguish, fright, nervousness, grief, anxiety, worry and shock.

91.    As a result of DEFENDANTS' intentional misrepresentations, PLAINTIFFS seek recovery of the entirety of the loan amount with Whitebridge Financial in the sum of $18,655.68 that was improperly induced and brokered by DEFENDANTS.

92.    As a result of the deceptive acts of DEFENDANTS against PLAINITFFS who are senior citizens as defined under Civil Code Section 1761, PLAINTIFFS further seek

18

Second Amended Complaint

treble damages under Civil Code Section 3345.

## FIFTH CAUSE OF ACTION

**(CONCEALMENT- AS AGAINST DEFENDANTS PHILIP STRAW, D.C. ,**

**OPTIMAL HEALTH STRAW CHIROPRACTIC SOUTHERN CALIFORNIA,**

**INC., AND NEUROPATHY SOLUTIONS, INC.)**

93.     PLAINTIFFS incorporate paragraphs 1-91 inclusive into this cause of action as if fully set forth and re-alleged herein.

94.     In January 2016, PLAINTIFFS attended the free gourmet dinner presentation on the treatment of peripheral neuropathy hosted by DEFENDANTS OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC.  In the presentation, DEFENDANTS OPTIMAL HEALTH and NEUROPATHY SOLUTIONS represented that it had expertise in the field of periphertal neuropathy.

95.     On January 18, 2016, PLAINTIFFS presented for an initial consulation at DEFENDANT OPTIMAL HEALTH to deteremine if they were a candidate for the proposed treatment of peripheral neuropathy.  At that time, an employee of OPTIMAL HEALTH and/or NEUROPATHY SOLUTIONS, INC. conducted an alleged examination of PLAINTIFFS' lower extremities only.

96.     Thereafter, PLAINTIFFS were given their alleged results of the neurological examination by a non-clinician case manager at DEFENDANT OPTIMAL HEALTH, who was an employee of DEFENDANT NEUROPATHY SOLUTIONS, INC. The case manager then brokered a loan agreement to finance the entirety of the proposed treatment between PLAINTIFFS and Whitebridge Financial.

97.     PLAINTIFFS then entered into a clinician-patient relationship with OPTIMAL HEALTH and/or NEUROPATHY SOLUTIONS, INC. employee DAVID ZENG, D.C.

98.     At no time prior to agreeing to the proposed treatment from OPTIMAL

19

Second Amended Complaint

HEALTH did DEFENDANTS disclose to PLAINTIFFS that OPTIMAL HEALTH was a chiropractic office and that the chiropractic license only allowed for the diagnosis and treatment of muskuloskeletal complants.

99.     DEFENDANTS enticed PLAINTIFFS to DEFENDANT OPTIMAL HEALTH under the guise that "their doctors" would perform a neurological exam and would offer "neuro light therapy" and electrical therapy as new and effective methods to treat their peripheral neuropathy.

100.    DEFENDANTS OPTIMAL HEALTH and NEUROPATHY SOLUTIONS, INC., and their agents and employees, intentionally concealed the fact they had no license to exclusively treat peripheral neuropathy of the lower extremities.  This was not a fact that PLAINITFF would have discovered.

101.    Although, PLAINTIFFS were given a form entitled "informed consent", that document related only to chiropractic treatment.  PLAINTIFFS did not know that chiropractors could not exlcusively treat conditions of the lower extremities such as peripheral neuropathy.

102.    DEFENDANTS intentionally concealed this fact to deceive PLAINTIFFS and do so solely for the purpose of financial gain.

103.    Had PLAINTIFFS been informed that chiropractors were not licensed to exclusively treat peripheral neuropathy of the lower extremities, PLAINTIFFS would not have consented to the treatment and would not have agreed to pay for the treatment through the Whitebridge loan.

104.    As a result of DEFENDANTS' concealment, as described above, PLAINTIFFS became encumbered with a loan amount of $18,655.68.

105.    DEFENDANTS' concealment, as described above, was a substantial factor is causing the loss of $18,655.68 to the PLAINTIFFS.

106.    DEFENDANTS' concealment was a subtantial factor in causing physical injury to PLAINTIFF HAREVY STONE in the form on an electrical burn to his right calf. PLAINTIFF seeks damages for his medical related expenses according to proof.

Second Amended Complaint

107.   DEFENDANTS' concealment was a subtantial factor in causing emotional injury to PLAINTIFFS HAREVY STONE and DONNA STONE in the form of pain, suffering, anguish, fright, nervousness, grief, anxiety, worry and shock. PLAINTIFFS seek damages for their emotional injuries acording to proof.

108.   As a result of the deceptive acts of DEFENDANTS against PLAINITFFS who are senior citizens as defined under Civil Code Section 1761, PLAINTIFFS further seek treble damages under Civil Code Section 3345.

**On the First Cause of Action:**

1. Special damages according to proof;

2. General damages;

3. Costs of suit; and

4. For such other and further relief as the court may deem just and proper.

**On the Second Cause of Action**

1. Special damages according to proof;

2. General damages;

3. Statutory damages

4. Treble damages

5. Punitive damages;

6. Reasonable attorney's fees;

7. Costs of suit; and

8. For such other and further relief as the court may deem just and proper.

**On the Third Cause of Action:**

1. General Damages;

2. Costs of suit; and

3. For such other and further relief as the court may deem just and proper.

**On the Fourth Cause of Action**

1. Special damages

21

2. General damages

3. Treble damages

4. Punitive damages

5. Costs of suit; and

6. For such other and further relief as the court may deem just and proper.

**On the Fifth Cause of Action**

1. Special damages

2. General damages

3. Treble damages

4. Punitive damages

5. Costs of suit; and

6. For such other and further relief as the court may deem just and proper.

DATED: March 12, 2018          LAW OFFICES OF SAVIN & BURSK

By: _____
ARNOLD W. GROSS, ESQ.
JENNIFER A. RUIZ, ESQ.
ATTORNEYS FOR PLAINTIFFS
HARVEY STONE AND DONNA
STONE

22
Second Amended Complaint

## PROOF OF SERVICE — 1013a

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California; I am over the age of 18 years and not a party to the within action; my business address is 15915 Ventura Boulevard, Suite 201, Encino, California 91436

On **MARCH 12, 2019**, I served true copies of the following document (s) described as: **PLAINTIFFS' SECOND AMENDED COMPLAINT** on the interested parties in this action to:

| COUNSEL ADDRESS | PHONE FAX | PARTY REPRESENTED |
|---|---|---|
| Jack R. Reinholtz, Esq. <br> Douglas S. de Heras, Esq. <br> **PRINDLE, GOETZ, BARNES & REINHOLTZ, LLP** <br> 310 Golden Shore, 4th Floor <br> Long Beach, California 90802 <br> jreinholtz@prindlelaw.com | (562) 436-3946 <br> (562) 495-0564 | Philip Straw, D.C. <br><br> Optimal Health Straw Chiropractic Southern California, Inc. |
| Christopher R. Clark, Esq. <br> **FINGAL, FAHRNEY & CLARK** <br> 5120 Campus Drive, Suite 200 <br> Newport Beach, California 92660 <br> cclark@ffc-law.com | (949) 723-8100 <br> (949) 723-8108 | Neuropathy Solutions, Inc. |
| Mark S. Ashworth, Esq. <br> Michael C. Ashworth, Esq. <br> **ASHWORTH & ASHWORTH, LLP** <br> 1301 Dove Street, Suite 370 <br> Newport Beach, California 92660-2448 | (949) 752-9401 <br> (949) 752-9403 | David Zeng, D.C. |

   **X**  **BY MAIL**: I enclosed the document(s) in a sealed envelope/package addressed to the addressee(s) designated and placed it for mailing, following our ordinary business practices. I am readily familiar with the mailing practice of my place of employment in respect to the collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Service on that same day in the ordinary course of business with postage fully prepaid.

       **BY HAND DELIVERY:** On the above date, I delivered such envelope(s) by hand to the addressee (s).

**PROOF OF SERVICE**

# PROOF OF SERVICE — 1013a

_____ **BY FEDERAL EXPRESS/OVERNIGHT:** I caused such envelope(s) to be delivered via Federal Express Overnight to the addressee(s) designated.

_____ **BY EMAIL:** by electronic mail transmission to the email address(es) listed.

_____ **BY FACSIMILE TRANSMISSION**: From fax number (818) 285-8474 to the fax number(s) listed and/or on the attached service list. The facsimile machine I used complied with Rule 2008 and no Error was reported when processed.

      **(STATE)** I declare under the penalty of perjury under the laws of
  **X** the State of California that the foregoing is true and correct.

Executed on **MARCH 12, 2019**, at Encino, California.

                             **Chris Jensen**

**PROOF OF SERVICE**

# EXHIBIT G

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| Arnold W. Gross; Jennifer A. Ruiz (SBN: 181085)<br>LAW OFFICES OF SAVIN & BURSK<br>17337 Ventura Blvd., Suite 200<br>Encino, CA 91316<br>Phone: (818) 368-8646; FAX: (818) 285-8474 | 571 | **FILED**<br>Superior Court Of California<br>County Of Los Angeles<br><br>MAR 29 2018<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By _____, Deputy<br>Charlie L. Coleman |
| ATTORNEY FOR (Name): Plaintiffs Harvey Stone and Donna Stone | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: |
|---|
| 111 N. Hill Street, Los Angeles, CA 90012 |

| PLAINTIFF: |
|---|
| Harvey Stone, Donna Stone |

| DEFENDANT: |
|---|
| Philip Straw, D.C. et al. |

| **AMENDMENT TO COMPLAINT**<br>**(Fictitious /Incorrect Name)** | CASE NUMBER:<br>BC677958 |
|---|---|

☑ **FICTITIOUS NAME** *(No order required)*

Upon the filing of the complaint, the plaintiff, being ignorant of the true name of the defendant and having designated the defendant in the complaint by the fictitious name of:

| FICTITIOUS NAME |
|---|
| DOE 1 |

and having discovered the true name of the defendant to be:

| TRUE NAME |
|---|
| Neuropathy Solutions, Inc. |

amends the complaint by substituting the true name for the fictitious name wherever it appears in the complaint.

| DATE | TYPE OR PRINT NAME | SIGNATURE OF ATTORNEY |
|---|---|---|
| 3/27/18 | Jennifer A. Ruiz | *[signature]* |

---

☐ **INCORRECT NAME** *(Order required)*

The plaintiff, having designated a defendant in the complaint by the incorrect name of:

| INCORRECT NAME |
|---|
|  |

and having discovered the true name of the defendant to be:

| TRUE NAME |
|---|
|  |

amends the complaint by substituting the true name for the incorrect name wherever it appears in the complaint.

| DATE | TYPE OR PRINT NAME | SIGNATURE OF ATTORNEY |
|---|---|---|
|  |  |  |

**ORDER**

THE COURT ORDERS the amendment approved and filed.

_____          _____
Dated                                          Judicial Officer

| LACIV 105 (Rev. 01/07)<br>LASC Approved 03-04 | **AMENDMENT TO COMPLAINT**<br>**(Fictitious / Incorrect Name)** | Code Civ. Proc., §§ 471.5,<br>472, 473, 474 |
|---|---|---|

## PROOF OF SERVICE — 1013a

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California; I am over the age of 18 years and not a party to the within action; my business address is 17337 Ventura Blvd., Suite 200, Encino, CA 91316

On **MARCH 29, 2018**, I served true copies of the following document (s) described as: **AMENDMENT TO COMPLAINT (FICTITIOUS NAME)** on the interested parties in this action to:

| COUNSEL ADDRESS | PHONE FAX | PARTY REPRESENTED |
|---|---|---|
| Thomas P. Quinn, Jr., Esq. **NOKES & QUINN** 410 Broadway Street, Suite 200 Laguna Beach, California 921651 tquinn@nokesquinn.com | (949) 376-3500 (949) 376-3070 | Hako-Med Holdings, Inc. |
| Jack R. Reinholtz, Esq. **PRINDLE, GOETZ, BARNES & REINHOLTZ, LLP** 310 Golden Shore, 4th Floor Long Beach, California 90802 jreinholtz@prindlelaw.com | (562) 436-3946 (562) 495-0564 | Philip Straw, D.C. Optimal Health Straw Chiropractic Southern California, Inc. |

**X    BY MAIL**: I enclosed the document(s) in a sealed envelope/package addressed to the addressee(s) designated and placed it for mailing, following our ordinary business practices. I am readily familiar with the mailing practice of my place of employment in respect to the collection and processing of correspondence and pleadings for mailing.  It is deposited with the United States Postal Service on that same day in the ordinary course of business with postage fully prepaid.

_____ **BY HAND DELIVERY:**  On the above date, I delivered such envelope(s) by hand to the addressee (s).

_____ **BY FEDERAL EXPRESS/OVERNIGHT:** I caused such envelope(s) to be delivered via Federal Express Overnight to the addressee(s) designated.

_____ **BY EMAIL:** by electronic mail transmission to the email address(es) listed.

**PROOF OF SERVICE**

## PROOF OF SERVICE — 1013a

1    _____   **BY FACSIMILE TRANSMISSION**: From fax number (818) 285-8474 to the fax number(s) listed and/or on the attached service list. The facsimile machine I used complied with Rule 2008 and no Error was reported when processed.

2

3

         **(STATE)**   **I declare under the penalty of perjury under the laws of**

4    __X__   **the State of California that the foregoing is true and correct.**

5

6   Executed on **March 29, 2018**, at Encino, California.

7

8

9                                              **Leslie Rowan**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov
RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

| Complaints | File Date | Disposition |
|---|---|---|
| Complaint of RIGOBERTO BERNAL | 09/09/2020 | |

| Plaintiff(s) | Defendant(s) |
|---|---|
| RIGOBERTO BERNAL | RALPH HIGHSHAW M.D. |
| ATT: FOX LAW APC | ATT: LEIBL, MIRETSKY & MOSEL,LLP |
| MARILENA BERNAL | ELITE MEDICAL GROUP PC |
| ATT: FOX LAW APC | ATT: LEIBL, MIRETSKY & MOSEL,LLP |
| | NEUROPATHY SOLUTIONS |
| | DBA: SUPERIOR HEALTH CENTERES |
| | ATT: Fingal Fahrney & Clark LLP |
| | ALEXA BENSON |
| | ATT: LEIBL, MIRETSKY & MOSEL,LLP |

| Date | Action |
|---|---|
| 09/09/2020 | Complaint Filed Fast Track. (Riverside) |
| 09/09/2020 | Case Assigned to Department 03. (Riverside) |
| 09/09/2020 | Complaint and Party Information Entered |
| 09/09/2020 | Civil Case Cover Sheet filed. |
| 09/09/2020 | Certificate of Counsel filed. The zip code is 92881. |
| 09/09/2020 | Summons Issued on Complaint of BERNAL and filed. |
| 09/14/2020 | Case Management Conference set for 3/15/21 at 8:30 in Dept. 03 |
| 09/14/2020 | Stat Count: Case management conference set |
| 09/14/2020 | Non-Proof of Service Hearing set for 1/12/21 at 8:30 in Dept CLER |
| 09/14/2020 | System Generated Notice re: Department Assignment For All Purposes and Notice of Case Management Conference. |

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov

RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

| Date | Action |
|------|--------|
| 09/28/2020 | Proof of Service (Sub-Served and Mailed) on Complaint of BERNAL as to ALEXA BENSON; mailing date of 09/22/20 filed. |
| 09/28/2020 | Proof of Service on the Complaint of BERNAL served on ELITE MEDICAL GROUP PC with service date of 09/23/20 filed.(Personal Service) |
| 09/28/2020 | Proof of Service on the Complaint of BERNAL served on NEUROPATHY SOLUTIONS with service date of 09/23/20 filed.(Personal Service) |
| 10/23/2020 | Answer to Complaint of BERNAL by ELITE MEDICAL GROUP PC, ALEXA BENSON represented by LEIBL, MIRETSKY & MOSEL,LLP filed. (Over $25,000.00) |
| 11/05/2020 | Answer of Defendant Ralph Highshaw, M.D. to Plaintiffs' Complaint on Complaint of RIGOBERTO BERNAL<br>Filed By: RALPH HIGHSHAW M.D. |
| 11/12/2020 | Payment: $450.00, LEIBL, MIRETSKY & MOSEL,LLP, for HIGHSHAW M.D., RALPH, Receipt: 20201112-00198 |
| 12/15/2020 | ANSWER TO COMPLAINT on Complaint of RIGOBERTO BERNAL<br>Filed By: NEUROPATHY SOLUTIONS |
| 12/21/2020 | Payment: $450.00, Fingal Fahrney & Clark LLP, for NEUROPATHY SOLUTIONS, Receipt: 20201221-00137 |
| 02/16/2021 | Motion for Preferential Trial Setting<br>Filed By: RIGOBERTO BERNAL, MARILENA BERNAL |
| 02/16/2021 | Notice of Document Return. |
| 02/18/2021 | Joinder in opposition to motion for preferential trial setting<br>Filed By: NEUROPATHY SOLUTIONS |
| 02/18/2021 | Opposition to Motion for Trial Preference; Memorandum of Points and Authorities<br>Filed By: RALPH HIGHSHAW M.D., ELITE MEDICAL GROUP PC, ALEXA BENSON |
| 02/19/2021 | Notice of Posting Jury Fees.<br>Filed By: RALPH HIGHSHAW M.D., ELITE MEDICAL GROUP PC, ALEXA BENSON |
| 02/22/2021 | Plaintiff's Reply in Support of Motion for Preference Under California Code of Civil Procedure 36(a)and/or 36(e)<br>Filed By: RIGOBERTO BERNAL, MARILENA BERNAL |
| 02/22/2021 | Declaration of Christopher Hendricks in Support of Plaintiff Rigoberto Bernal's Reply in Support of Motion for Preferential Trial Setting Under CCP 36(a) and/or CCP 36(e)<br>Filed By: RIGOBERTO BERNAL, MARILENA BERNAL |

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov

RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

---

| Date | Action |
|---|---|
| 02/22/2021 | Proof of Service Via Email |
| 02/22/2021 | Proposed Order re: Granting Plaintiff's Motion for Preferential Trial Setting under CCP 36(a) and/or 36(e) |
| 02/22/2021 | Notice of Document Quality Assurance |
| 02/22/2021 | Notice of Document Quality Assurance |
| 02/23/2021 | Case Management Statement<br>Filed By: RIGOBERTO BERNAL |
| 02/23/2021 | PROOF OF SERVICE VIA EMAIL PLAINTIFFS NOTICE OF JURY FEE DEPOSIT; SEE LIST ATTACH 2/23/2021 |
| 02/23/2021 | PLAINTIFFS NOTICE OF JURY FEE DEPOSIT<br>Filed By: RIGOBERTO BERNAL, MARILENA BERNAL |
| 02/25/2021 | Case Management Statement<br>Filed By: NEUROPATHY SOLUTIONS |
| 02/25/2021 | Notice of Document Quality Assurance |
| 02/26/2021 | Case Management Statement<br>Filed By: RALPH HIGHSHAW M.D., ELITE MEDICAL GROUP PC, ALEXA BENSON |
| 02/26/2021 | Payment: $150.00, LEIBL, MIRETSKY & MOSEL,LLP, for BENSON, ALEXA, ELITE MEDICAL GROUP PC, HIGHSHAW M.D., RALPH, Receipt: 20210226-00348 |
| 02/26/2021 | Payment: $150.00, NATIONWIDE LEGAL LLC, for BERNAL, MARILENA, BERNAL, RIGOBERTO, Receipt: 20210226-00375 |
| 03/10/2021 | Minute Order: Court on its Own Motion |

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov

RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

Date        Action

03/10/2021  Court on its Own Motion at 2:29 PM in Department 3 Honorable Chad
            Firetag, Judge
            K. Rahlwes, Courtroom Assistant
            Court Reporter: None
            APPEARANCES:
            No Appearances
            On Court's own motion:
            Continue (future hearing) 03/15/2021 08:30 AM Case Management
            Conference Hearing to 05/11/2021 at 08:30 AM in Department 3.
            All future hearings, until further notice, are to be telephonic and
            there are published instructions for public access to this hearing
            at: https://www.riverside.courts.ca.gov/PublicNotices/COVID-19-
            Court-Operations.php#court-appearances.
            Plaintiff ordered to timely file updated, detailed and complete Case
            Management Statement. Plaintiff's Case Management Statement fails to
            describe the nature and amount of any damages sought (paragraph 4.
            B. of CM-110).

            Notice to be given by Clerk to FOX LAW APC , LEIBL, MIRETSKY &
            MOSEL,LLP , Christopher Randall Clark .
            Minute entry completed.

03/10/2021  Certificate of Mailing

03/15/2021  Motion for Preferential Trial Setting on Complaint of RIGOBERTO
            BERNAL
            Filed By: RIGOBERTO BERNAL
03/15/2021  Memorandum of Points & Authorities in Support of Motion for
            Preferential Trial Setting
            Filed By: RIGOBERTO BERNAL
03/15/2021  Declaration of Amy Magnusson MD in Support of Motion for
            Preferential Trial Setting
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL
03/15/2021  Declaration of Christopher Hendricks in Support of Motion for
            Preferential Trial Setting
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov

RIC2003600: BERNAL vs HIGHSHAW M.D.

Civil

Unlimited Civil Medical Malpractice

Historic Court House Department 3

Status: Active

---

Date        Action

03/15/2021  Proof of Service by Electronic Service (non-complaint) of Motion for
            Preferential Trial Setting; Memorandum of Points and Authorities in
            Support of; Declaration of Christopher Hendricks/Amy Magnusson MD;
            Proposed Order on see attached service list with a service date of
            3/15/21

03/15/2021  Case Management Conference Hearing
            Notice sent to FOX LAW APC on 9/14/20

03/25/2021  Payment: $30.00, One Legal, for BERNAL, RIGOBERTO, Receipt:
            20210325-00659

03/25/2021  Payment: $60.00, One Legal, for BERNAL, RIGOBERTO, Receipt:
            20210325-00659

04/01/2021  Defendants Opposition to Plaintiffs Motion for Preferential trial
            setting; Memorandum of points and authorities and Declaration of
            Christopher R. Clark in support thereof on Complaint of RIGOBERTO
            BERNAL
            Untimely Pursuant: untimely per 1005CCP/3.1300(d)CRC/437c(b)CCP
            Filed By: NEUROPATHY SOLUTIONS

04/01/2021  Plaintiffs' Reply in Support of Motion for Preference
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL

04/01/2021  Proof of Service Via Mail

04/02/2021  Proposed Order
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL

04/12/2021  ORDER GRANTING PLA'S MOTION FOR PREFERENTIAL TRIAL SETTING UNDER CCP
            36
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL

04/12/2021  Trial Setting Order

04/12/2021  Amendment to Trial Setting Order

04/12/2021  Minute Order: Hearing re: Motion for Preferential Trial Setting

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov

RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

Date        Action

04/12/2021  Hearing re: Motion for Preferential Trial Setting at 8:30 AM in
            Department 3 Honorable Chad Firetag, Judge
            Kathy Rahlwes, Courtroom Assistant
            K. Baricuatro, Court Reporter
            APPEARANCES:
            Christopher Hendricks (for Plaintiff) appearing telephonically in
            court.
            Loren Leibl (for Defendant - Highshaw/Elite/Benson) appearing
            telephonically in court.
            Deborah DeBoer / Christopher Clark (for Defendant - Neuropathy)
            appearing telephonically in court.
            At 08:51 AM, the following proceedings were held:
            This matter is being live streamed for public access
            The Court notes tentative ruling was posted pursuant to California
            Rules of Court, Rule 3.1308 (a)(1) for tentative rulings (see
            Riverside Superior Court Local Rule 3316) and no request for oral
            argument was made.
            Court makes the following order(s):
            Tentative ruling shall become the ruling of the court.
            Motion for preferential trial granted.
            Court and counsel confer regarding trial date and scheduling.
            Court further orders:
            Jury Trial - Estimated 8 Days set for 07/30/2021 at 08:30 AM in
            Department 3.
            Trial Setting Order and Amendment to the Trial Setting Order to be
            prepared and served by court.
            Notice waived.

04/15/2021  Request for Judicial Notice.
            Filed By: NEUROPATHY SOLUTIONS

04/15/2021  Joinder in Notice of Posting Jury Fees on Complaint of RIGOBERTO
            BERNAL
            Filed By: NEUROPATHY SOLUTIONS

04/21/2021  Payment: $150.00, NEUROPATHY SOLUTIONS, for NEUROPATHY SOLUTIONS,
            Receipt: 20210421-00450

04/22/2021  Plaintiff's Ex Parte Application for Leave to Amend Complaint or, In
            the Alternative, to Shorten Time for a Motion on Complaint of
            RIGOBERTO BERNAL
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov
RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

Date        Action

04/22/2021  Notice of Telephonic Appearance for Hearing on Complaint of
            RIGOBERTO BERNAL

04/22/2021  Declaration of Christopher L. Hendricks in Support of Plaintiff's Ex
            Parte
            Filed By: RIGOBERTO BERNAL, MARILENA BERNAL

04/22/2021  Proof of Service Via Email on Complaint of RIGOBERTO BERNAL

04/22/2021  Proposed Order re: Plaintiff's Ex Parte Application on Complaint of
            RIGOBERTO BERNAL

04/22/2021  Declaration of Tamara L Glaser in Opposition to Ex Parte Application
            for Leave to Amend Complaint
            Filed By: NEUROPATHY SOLUTIONS

04/22/2021  Payment: $30.00, Info Track US, for FOX LAW APC, Receipt: 20210422-
            00344

04/22/2021  Payment: $60.00, Info Track US, for BERNAL, MARILENA, BERNAL,
            RIGOBERTO, Receipt: 20210422-00344

04/23/2021  Minute Order: Plaintiff's Ex Parte Application

Superior Court of California, County of Riverside
Register of Actions
www.riverside.courts.ca.gov

RIC2003600: BERNAL vs HIGHSHAW M.D.
Civil
Unlimited Civil Medical Malpractice
Historic Court House Department 3
Status: Active

Date        Action

04/23/2021  Plaintiff's Ex Parte Application at 8:30 AM in Department 3
            Honorable Chad Firetag, Judge
            Kathy Rahlwes, Courtroom Assistant
            K. Baricuatro, Court Reporter
            APPEARANCES:
            Chris Hendricks (for Plaintiff) appearing telephonically in court.
            Richard Wood (for Defendants - Highshaw/Elite/Benson) appearing
            telephonically in court.
            Tamara Glaser (for Defedant - Neuropathy & appearing for co-counsel
            Chris Clark) appearing telephonically in court.
            At 08:40 AM, the following proceedings were held:
            This matter is being live streamed for public access
            Court has Read and Considered ex parte for Amended Complaint or
            Shorten time for a motion and opposition. Court notes there is a
            trial preference in this matter.
            Mr. Wood states his clients have settled. Mrs. Glaser requests this
            matter be set for mid May.
            Issues and scheduling discussed.
            Court makes the following order(s):
            Ex parte to shorten time is granted.
            Hearing re: Motion for leave to Amend Complaint set 05/11/2021 at
            08:30 AM in Department 3
            Opposition to be filed on or before 05/03/2021.
            Reply to be filed on or before 05/06/2021.
            All future hearings, until further notice, are to be telephonic and
            there are published instructions for public access to this hearing
            at: https://www.riverside.courts.ca.gov/PublicNotices/COVID-19-
            Court-Operations.php#court-appearances.
            Courtesy copy to be sent to Department 3 at
            dept3@riverside.courts.ca.gov.
            Notice waived.

05/11/2021  Case Management Conference Hearing at 8:30 AM in Department 3

05/11/2021  Hearing re: Motion for leave to Amend Complaint at 8:30 AM in
            Department 3

07/30/2021  Jury Trial at 8:30 AM in Department 3

# EXHIBIT I

# HAYES SCOTT BONINO ELLINGSON
# GUSLANI SIMONSON & CLAUSE LLP

Ryan Z. Keller, Esq. | Direct Line: 650.486.2886 | Email: rkeller@hayesscott.com | www.hayesscott.com

February 25, 2021

**VIA E-MAIL: cclark@ffc-law.com**

Christopher R. Clark
Fingal, Fahrney & Clark, LLP
5120 Campus Drive, Suite 200
Newport Beach, California 92660

|  |  |
|---|---|
| **Matter:** | ***Rigoberto Bernal et al. v. Ralph Highshaw, M.D. et al.*, County of Riverside Case No. RIC 2003600 ("*Bernal* Action")** |
| **Insured:** | **Neuropathy Solutions, Inc.** |
| **Policy No.:** | **0D3-D903901-00 ("Policy")** |
| **Claim No.:** | **19-00753234 ("Claim")** |

Dear Mr. Clark:

We have been retained as coverage counsel by The Hanover Insurance Group, Inc., ("Hanover"), the authorized representative for Massachusetts Bay Insurance Company ("MBIC"), which issued Businessowners Insurance Policy No. 0D3-D903901-00 ("Policy") to your client, Neuropathy Solutions, Inc. ("Neuropathy").

The purpose of this letter is to respond to your communications requesting that MBIC reconsider its coverage denial. As explained below, MBIC agrees to defend Neuropathy under a full reservation of rights.

In considering Neuropathy's request for reconsideration, we have carefully reviewed the Policy and the arguments asserted in your letters and e-mails. No other policies were considered.

## I.  Complaint

On September 9, 2020, plaintiffs filed the *Bernal* Action complaint and named Neuropathy dba Superior Health Centers as one of the defendants. The complaint alleges five causes of action against Neuropathy: (1) Negligence – Medical Malpractice, (2) Negligence – Failure to Warn, (3) Loss of Consortium, (4) Financial Elder Abuse, and (5) Fraud. Plaintiffs' claim is primarily based on the following allegations:

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                      Page 2

- In September 2019, plaintiff Rigoberto Bernal attended an "informational sales pitch" with Neuropathy, at which time Neuropathy's non-medical professionals falsely advised Mr. Bernal that they had licensed doctors who could cure his knee pain through a single stem cell injection.  (Complaint, ¶¶ 14-15.)

- On October 9, 2019, Mr. Bernal underwent stem cell injections at Neuropathy's Corona location.  Mr. Bernal was required to enter an abusive financial relationship with the defendants to receive the stem cell treatment, which consisted of a financing agreement for an excessive amount.  Dr. Ralph Highshaw, through his professional corporation, Elite Medical Group, PC ("EMG") was supposed to facilitate and oversee the medical treatment.  Nurse Alexa Benson performed the injection on Mr. Bernal's knees and she also injected Mr. Bernal's shoulder.  The injections did not include live stem cells.  (Complaint, ¶¶ 17-22, 29-33.)

- The injections resulted in Mr. Bernal becoming a permanent paraplegic as of October 14, 2019 (erroneously stated as 2020).  (Complaint, ¶ 25.)

## II.  Correspondence Between Neuropathy and MBIC

On October 2, 2020, Neuropathy, through it broker, requested MBIC defend it in the *Bernal* Action.  On October 15, 2020, MBIC sent a letter denying coverage citing the "professional services" exclusion.

On November 16, 2020, you wrote a one-page letter to MBIC advising that you represented Neuropathy.  You contended that the allegation in the complaint that "Defendants did not offer Mr. Bernal a cash pay or insurance based option even though he had medical insurance" incorporated into plaintiff's Fourth Cause of Action for Financial Elder Abuse "is covered under the terms of the policy since mental anguish and emotional distress are recoverable damages."  MBIC acknowledged receipt of this letter the next day.

On January 14, 2021, you argued that "this claim should [also] be accepted under the advertising injury coverage in the policy as a result of the allegations in paragraphs 14-16 of the Complaint in this action."  Those allegations are based on the alleged "informational sales pitch".  You also provided the following information:

1. Neuropathy Solutions has management services agreements with medical providers.
2. Neuropathy Solutions assists in providing marketing and advertising services for the medical providers.
3. The medical providers supply medical information and Neuropathy Solutions may provide nonmedical information.
4. Neuropathy does not provide any medical services.

On January 21, 2021, you provided MBIC with a copy of a Management Services Agreement ("MSA") between Neuropathy and EMG, effective 4/25/2019.

1800815

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                                                    Page 3

You and MBIC have exchanged additional e-mails and letters since your initial letter of representation as part of your request for reconsideration and MBIC's investigation.

### III. Policy

MBIC issued the Policy to Neuropathy for the policy period of May 1, 2019 to May 1, 2020.  SECTION II – LIABILITY is the applicable section.  The Policy's liability limit is $2,000,000.

The Policy's Liability section includes an insuring agreement that states in relevant part:

> We will pay those sums the insured
> becomes legally obligated to pay as
> damages because of "bodily injury",
> "property damage" or "personal and
> advertising injury" to which this insurance
> applies. We will have the right and duty to
> defend the insured against any "suit"
> seeking those damages. However, we will
> have no duty to defend the insured against
> any "suit" seeking damages for "bodily
> injury", "property damage" or "personal
> and advertising injury", to which this
> insurance does not apply. We may, at our
> discretion, investigate any "occurrence" or
> any offense and settle any claim or "suit"
> that may result.
> ***
> b. This insurance applies:
>    (1) To "bodily injury" and "property
>        damage" only if:
>        (a) The "bodily injury" or "property
>            damage" is caused by an
>            "occurrence" that takes place in
>            the "coverage territory";
>          ***
>    (2) To "personal and advertising injury"
>        caused by an offense arising out of
>        your business, but only if the offense
>        was committed in the "coverage
>        territory" during the policy period.

The Liability section contains the following relevant exclusions:

> **a. Expected or Intended Injury**
>    "Bodily injury" or "property damage"

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                 Page 4

expected or intended from the
standpoint of the insured. ***

\*\*\*

### j. Professional Services

"Bodily injury", "property damage", "personal and advertising injury" caused by the rendering of or failure to render any professional service, advice or instruction:

(1) By you; or
(2) On your behalf; or
(3) From whom any of you assumed liability by reason of a contract or agreement, regardless of whether any such service, advice or instruction is ordinary to any insured's profession.

Professional services include but are not limited to:

\*\*\*

(8) Any health or therapeutic service treatment, advice or instruction;

\*\*\*

This exclusion applies even if a claim
alleges negligence or other
wrongdoing in the supervision, hiring,
employment, training or monitoring of
others by an insured, if the
"occurrence" which caused the "bodily
injury" or "property damage", or the
offense which caused the "personal
and advertising injury", involved the
rendering of or failure to render any
professional service.

The Liability section contains the following relevant definitions as amended by the Businessowners Liability Special Broadening Endorsement:

**3.** "Bodily injury" means bodily injury,
sickness or disease sustained by a
person, including death resulting from any
of these at any time. "Bodily injury"
includes mental anguish or other mental
injury resulting from "bodily injury".

\*\*\*

**13.** "Occurrence" means an accident,
including continuous or repeated

1800815

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                                          Page 5

exposure to substantially the same
general harmful conditions.

\*\*\*

**14.** "Personal and advertising injury" means
injury, including consequential "bodily
injury", arising out of one or more of the
following offenses:
    **a.** False arrest, detention or
     imprisonment;
    **b.** Malicious prosecution or abuse of process;
    **c.** The wrongful eviction from, wrongful
     entry into, or invasion of the right of
     private occupancy of a room, dwelling
     or premises that a person occupies,
     committed by or on behalf of its
     owner, landlord or lessor;
    **d.** Oral or written publication, in any
     manner, of material that slanders or
     libels a person or organization or
     disparages a person's or
     organization's goods, products or
     services;
    **e.** Oral or written publication, in any
     manner, of material that violates a
     person's right of privacy;
    **f.** The use of another's advertising idea
     in your "advertisement"; or
    **g.** Infringing upon another's copyright,
     trade dress or slogan in your "advertisement".
    **h.** "Discrimination" (unless insurance thereof is
     prohibited by law) that results in injury to the
     feelings or reputation of a natural person,
     but only if such "discrimination" is:
     **(1)** Not done intentionally by or at the
      direction of:
      **(a)** The insured;
      **(b)** Any officer of the corporation,
       director, stockholder, partner or
       member of the insured; and
     **(2)** Not directly or indirectly related to an
      "employee", not to the employment,
      prospective employment or termination
      of any person or persons by an insured.

\*\*\*

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                                            Page 6

    **17.** "Property damage" means:
- **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
- **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    "Discrimination" means the unlawful treatment of individuals based upon race, color, ethnic origin, gender, religion, age, or sexual preference. "Discrimination" does not include the unlawful treatment of individuals based upon developmental, physical, cognitive, mental, sensory or emotional impairment or any combination of these.

## IV. MBIC's Coverage Position

There does not appear to be any potential for coverage for Neuropathy for the *Bernal* Action. MBIC reserves the right to find that there is no duty to defend or indemnify Neuropathy for any of the claims in the *Bernal* Action. However, as part of your request for reconsideration of MBIC's coverage position, on January 21, 2021, you provided MBIC with a copy of a Management Services Agreement ("MSA") between Neuropathy and EMG, effective 4/25/2019. To the extent that the MSA supports your claim that Neuropathy is only providing administrative services, and not "professional services" subject to the professional services exclusion, MBIC hereby agrees to defend Neuropathy in the *Bernal* Action under a full reservation of rights. MBIC understands Neuropathy's contention to be that Mr. Bernal was not under the "care and treatment" of Neuropathy despite this express allegation. (Complaint, ¶ 36.) Still, MBIC observes that the alleged "informational sales pitch" did not include any alleged slander to fall within the "personal and advertising injury" coverage promise. In addition, the alleged pitch was health or therapeutic advice, which falls within the professional services exclusion. The extrinsic facts in question must point towards a potential theory of liability that is covered under the policy, and they do not appear to do so.

MBIC reserves the right to find the professional services exclusion excludes coverage for any and all allegations in the complaint, including that the insured committed medical malpractice, failed to warn of the dangers of the medical services, and fraudulently misrepresented the medical services.

1800815

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                              Page 7

MBIC reserves the right to find that the allegations regarding the "abusive financial relationship", wherein Neuropathy allegedly required Mr. Bernal to enter a financing agreement with excessive interest rates and did not offer a cash-pay or insurance-based option, do not satisfy the insuring agreement because no "occurrence", "property damage", or "bodily injury" is alleged.  This includes any allegation of mental anguish or other mental injury resulting from "bodily injury".  MBIC further reserves the right to find that the Expected or Intended Injury exclusion precludes coverage for these claims.

MBIC also reserves the right to find that there is no duty to defend or indemnify Neuropathy for the Financial Elder Abuse and Fraud causes of action on several grounds.  First, Insurance Code section 533 precludes coverage.  Second, there is no "occurrence" to trigger "bodily coverage" for these claims.   Third, plaintiffs do not allege "Discrimination" that resulted in injury to the feelings or reputation of Mr. Bernal to trigger "personal and advertising injury" coverage, and the alleged Discrimination was done intentionally by or at the direction of Neuropathy causing it not to apply.

Please note that the complaint seeks punitive damages, which are not insurable under California law.

MBIC reserves the right to file a declaratory relief action to determine MBIC's duty to defend and/or duty to indemnify under the Policy for the *Bernal* Action.

MBIC acknowledges Neuropathy is entitled to obtain the services of independent counsel, subject to the criteria set forth in Civil Code section 2860, because the reservation of rights under which this defense is being provided potentially creates a conflict.  The courts have held that an insurer must provide independent counsel where the insured's conduct for which liability is asserted may be classified as either negligent or intentional and the insurer reserves its rights to deny coverage for damages resulting from intentional conduct.  (*San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358; *Previews, Inc. v. California Union Ins. Co.* (9th Cir. 1981) 640 F.2d 1026, 1078; *Blanchard v. State Farm Fire & Casualty Co.*, *supra*, 2 Cal.App.4th at p. 349.)

Civil Code section 2860(d) requires that independent counsel selected by the insured keep the insurer apprised of all matters relevant to the litigation:

> When independent counsel has been selected by the insured, it shall be the duty of that counsel and the insured to disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes, and timely to inform and consult with the insurer on all matters relating to the action.  Any claim of privilege asserted is subject to in camera review in the appropriate law and motion department of the superior court.  Any information disclosed by the insured or by independent counsel is not a waiver of the privilege as to any other party.

Christopher R. Clark
Re: *Bernal v. Highshaw*
February 25, 2021                                                                                          Page 8

      Civil Code section 2860(f) further provides: "… Nothing in this section shall relieve the insured of his or her duty to cooperate with the insurer under the terms of the insurance contract."

      Please provide a copy of the defense bills to date.  MBIC will pay for reasonable defense costs beginning on the date of tender.  Please advise of the defense counsel selected by Neuropathy and their hourly rates, which will need to be agreed to by MBIC.  MBIC is only required to pay the rates which are actually paid by MBIC "to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended."  (Civil Code section 2860(c).)

      MBIC's coverage position is based on the information presently available to us.  Should you have any additional information that you feel would either cause us to review our position, or would assist us in our investigation or determination, we ask that you advise us as soon as possible.

      This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by Hanover or any of its affiliates.  MBIC expressly reserves all rights under the Policy, at law or in equity, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.  MBIC also reserves the right to amend, alter and/or supplement this letter based upon receipt of any additional information (including policy information) subsequently discovered or provided to MBIC.  Nothing in this letter is intended to (nor should be interpreted to) modify, abridge or otherwise restrict any of Hanover's rights under any Hanover policy.

      If you have any other insurance policies which may respond to this claim asserted, you should report this matter to the insuring carrier(s) immediately.

      If you believe this claim has been wrongfully disclaimed or rejected, you may have the matter reviewed by the California Department of Insurance.  Their mailing address is 300 South Spring Street, Los Angeles, California, 90013.  Their telephone number is 1-800-927-4357.

      Please contact us should you have any questions or concerns regarding the contents of this letter.

      Sincerely,

      Stephen M. Hayes
      Ryan Z. Keller

RZK

Cc: Harita Bhatt (hbhatt@hanover.com)

1800815

# EXHIBIT J

| From: | Dara Tang |
|---|---|
| To: | Chris Clark |
| Cc: | Stephen M. Hayes; Ryan Z. Keller; Charles E. Tillage |
| Subject: | RE: MBIC v. Bernal |
| Date: | Tuesday, April 20, 2021 9:11:25 AM |

Chris,

Neuropathy's agent was served on April 13, 2021.

Thanks,

Dara M. Tang, Esq.

**HAYES SCOTT BONINO ELLINGSON**
**GUSLANI SIMONSON & CLAUSE, LLP**

999 Skyway Road, Suite 310
San Carlos, CA  94070
Tel: (650) 637-9100  •  Direct Dial: (650) 486-2899  •  Fax: (650) 637-8071
dtang@hayesscott.com

** Notice**

This e-mail message constitutes an electronic communication as defined by the Electronic Communications Privacy Act, 18 U.S.C. 2510.  It is confidential and intended only for authorized recipients and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you are not a named recipient or have otherwise received this message in error, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message, all copies and attachments from your computer.

**From:** Chris Clark <cclark@ffc-law.com>
**Sent:** Tuesday, April 20, 2021 7:56 AM
**To:** Dara Tang <dtang@hayesscott.com>
**Cc:** Stephen M. Hayes <shayes@hayesscott.com>; Ryan Z. Keller <rkeller@hayesscott.com>; Charles E. Tillage <CTillage@hayesscott.com>
**Subject:** Re: MBIC v. Bernal

*[EXTERNAL SOURCE]*
Dara,

I am out of the country this week but will be available to discuss on Monday. What was the date of service of the complaint?

Thanks.

Chris

Sent from my iPhone

On Apr 19, 2021, at 6:36 PM, Dara Tang <dtang@hayesscott.com> wrote:

Chris,

This follows the message I left with your office to meet and confer in advance of filing our summary judgment motion.

As you know, MBIC has filed a declaratory relief action against Neuropathy Solutions. We intend to file a summary judgment motion next Monday, April 26th, on the grounds that there is no potential for coverage under the professional services exclusion and because the insuring agreement is not satisfied.  We are in receipt of the First Amended Complaint filed by the Bernals, which does not change our coverage opinion. Please give me a call to further discuss.

Thanks,

Dara M. Tang, Esq.
**HAYES SCOTT BONINO ELLINGSON**
**GUSLANI SIMONSON & CLAUSE, LLP** Chris,


999 Skyway Road, Suite 310
San Carlos, CA  94070
Tel: (650) 637-9100  •  Direct Dial: (650) 486-2899  •  Fax: (650) 637-8071
dtang@hayesscott.com

** Notice**

This e-mail message constitutes an electronic communication as defined by the Electronic Communications Privacy Act, 18 U.S.C. 2510.  It is confidential and intended only for authorized recipients and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you are not a named recipient or have otherwise received this message in error, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message, all copies and attachments from your computer.